UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TELADOC HEALTH, INC. SECURITIES LITIGATION | Case No.: 1:22-cv4687 (DLC) **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <u>JURY TRIAL DEMANDED</u> <u>CLASS ACTION</u> |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION.............................................................................2

II.     JURISDICTION AND VENUE.....................................................................18

III.    PARTIES ........................................................................................................19

        A.      Lead Plaintiff ......................................................................................19

        B.      Defendants...........................................................................................19

                1.      Corporate Defendant ...............................................................19

                2.      Individual Defendants..............................................................20

                3.      Relevant Third Parties .............................................................22

IV.     SUBSTANTIVE ALLEGATIONS OF FRAUD ..........................................26

        A.      Overview of Teladoc's Business ........................................................26

                1.      Teladoc's Business Model .......................................................26

                2.      The Covid 19 Pandemic Fueled Rapid Growth for Teladoc and the
                        Telehealth Market....................................................................28

        B.      In 2020, Teladoc Announced Two Major Acquisitions as It Sought to
                Fend off Growing Competition ...........................................................31

                1.      InTouch Acquisition in July 2020 ...........................................31

                2.      The Livongo Acquisition in October 2020..............................32

                        (a)     Teladoc and Livongo Announced the Merger of the Two
                                Companies in August 2020 .........................................32

                        (b)     The Livongo Acquisition Closed in October 2020.......39

        C.      Teladoc Faced Severe Livongo Integration Challenges and Competitive
                Pressures..............................................................................................39

                1.      Sources Within Teladoc Confirm that Teladoc Was Unable to
                        Fully Integrate Livongo During the Class Period ....................39

                        (a)     Teladoc Struggled to Integrate Livongo Technological
                                Systems Such as the Companies' CRM, Data, and Product
                                Platforms ....................................................................40

(i)  Problems Integrating Salesforce.com Systems ................40

(ii)  Problems Integrating Tableau Platforms .........................44

(iii)  Problems Integrating Livongo's Product Platforms ..........52

(b)  Teladoc Had No Integration Plan to Reconcile the
Companies' Different Business Models and Teams ....................66

(c)  High Attrition After the Livongo Acquisition Further
Undermined a Successful Integration ...........................................80

2.  Teladoc Former Employees Confirm that Increased Competition
Was Negatively Impacting Teladoc's Business, Particularly Due to
Teladoc's Livongo Integration Failures....................................................88

D.  Teladoc Falsely Touted the Company's Successful Integration of Livongo
and Downplayed Concerns about Increased Competition ...................................93

E.  As the Truth About Teladoc's Livongo Integration Challenges Began to
Emerge, Defendants Continued to Falsely Reassure Investors ..........................100

F.  Defendants Revealed a $6 Billion Goodwill Impairment Due to the
Livongo Integration Failures and Competition Challenges, but
Nevertheless Continued to Minimize the Problems...........................................103

G.  Investors Finally Learned the Full Truth When Defendants Revealed an
Additional $3 Billion Goodwill Impairment and Disclosed Continued
Adverse Effects of Growing Competition.........................................................109

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS................................113

A.  February 11, 2021 – Interview with WTF Health .............................................114

1.  Misstatements Concerning the Livongo Integration .............................114

B.  February 24, 2021 – Q4 FY 2020 Earnings Call ...............................................121

1.  Misstatements Concerning the Livongo Integration .............................121

2.  Misstatements Concerning Competition................................................123

C.  March 1, 2021 – 2020 Form 10-K ....................................................................126

1.  Misstatements Concerning the Livongo Integration .............................126

2.  Misstatements Concerning Competition................................................128

D.  March 15, 2021 – Interview with Former Senator Bill Frist.............................129

       1.       Misstatements Concerning the Livongo Integration ..............................129

E.     April 28, 2021 – Q1 FY 2021 Earnings Call.......................................................132

       1.       Misstatements Concerning the Livongo Integration ..............................132

       2.       Misstatements Concerning Competition.................................................135

F.     May 11, 2021 – CNBC Interview ......................................................................138

       1.       Misstatements Concerning Competition.................................................138

G.    June 1, 2021 – 41st Annual William Blair & Company Growth Stock
       Conference.........................................................................................................140

       1.       Misstatements Concerning Competition.................................................140

H.    June 8, 2021 – Credit Suisse Meeting ...............................................................140

       1.       Misstatements Concerning the Livongo Integration ..............................140

       2.       Misstatements Concerning Competition.................................................141

I.      October 27, 2021 – Q3 FY 2021 Earnings Call.................................................142

       1.       Misstatements Concerning the Livongo Integration ..............................142

       2.       Misstatements Concerning Competition.................................................144

J.      October 28, 2021 – Credit Suisse Conference Call with Teladoc
       Management .......................................................................................................147

       1.       Misstatements Concerning the Livongo Integration ..............................147

K.    November 10, 2021 – *Business Insider* Article and Partial Disclosure /
       Materialization of the Risk ................................................................................148

L.     November 18, 2021 – Investor Day; CNBC Interview......................................150

       1.       Misstatements Concerning the Livongo Integration ..............................150

       2.       Misstatements Concerning Competition.................................................153

M.   January 10, 2022 – JPMorgan 40th Annual Healthcare Conference .................154

       1.       Misstatements Concerning Competition.................................................154

N.    February 22, 2022 – Q4 FY 2021 Earnings Call................................................154

|  |  | 1. | Misstatements Concerning Competition | 154 |

| | O. | February 28, 2022 – 2021 Form 10-K | 155 |

| | | 1. | Misstatements Concerning the Livongo Integration | 155 |

| | | 2. | Misstatements Concerning Competition | 157 |

| | P. | April 27, 2022 – Q1 FY 2022 Press Release; Q1 FY 2022 Earnings Call; and Partial Disclosure / Materialization of the Risk | 159 |

VI. LOSS CAUSATION ...... 161

   A. November 10, 2021 – First Partial Disclosure / Materialization of the Risk ...... 163

   B. April 27, 2022 – Second Partial Disclosure / Materialization of the Risk ...... 166

   C. July 27, 2022 – Final Disclosure / Materialization of the Risk ...... 175

VII. ADDITIONAL INDICIA OF SCIENTER ...... 181

   A. The Livongo Acquisition Was a Critical Transaction for the Company, and Its Successful Integration Was Core to Teladoc's Operations ...... 182

   B. Defendants' Personal Involvement in the Teladoc-Livongo Integration Efforts Supports Their Scienter ...... 185

   C. Defendants' Statements Themselves Support Scienter ...... 190

   D. Defendants Enriched Themselves Through Insider Sales Throughout the Class Period ...... 191

VIII. CONTROL PERSON ALLEGATIONS ...... 195

IX. CLASS ACTION ALLEGATIONS ...... 196

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ...... 198

XI. NO SAFE HARBOR ...... 200

XII. CAUSES OF ACTION ...... 202

PRAYER FOR RELIEF ...... 205

JURY DEMAND ...... 205

Court-appointed Lead Plaintiff Leadersel Innotech ESG ("Lead Plaintiff") and additional Plaintiff Hui Ma, individually and on behalf of all persons and entities who or which, during the period from February 11, 2021 through July 27, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of Teladoc Health, Inc. ("Teladoc" or the "Company") and were damaged thereby (the "Class"),[1] brings this Second Amended Class Action Complaint for Violations of the Federal Securities Laws against Defendants Teladoc and several of Teladoc's senior executives—Chief Executive Officer ("CEO") Jason Gorevic, Chief Financial Officer ("CFO") Mala Murthy, Chief Marketing & Engagement Officer ("CMEO") Stephany Verstraete, Chief Medical Officer of Product & Analytics ("CMO") Bimal Shah, and Senior Vice President ("SVP"), Chief Accounting Officer ("CAO"), and Controller Richard Napolitano (collectively, the "Individual Defendants").

Lead Plaintiff's claims are brought upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Teladoc with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Teladoc and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Teladoc, its business, and the Individual Defendants; (4) an investigation conducted by Lead Plaintiff's attorneys, including interviews with former Teladoc employees; (5) documents provided by a former Teladoc employee; and (6) other publicly available information concerning

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Teladoc during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Teladoc's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, and/or assigns of any such excluded person.

Teladoc, its business, and the allegations contained herein. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This securities fraud action arises out of a telehealth company's failure to successfully integrate one of its key competitors after acquiring it in an increasingly competitive market during the Covid-19 pandemic, which drove unprecedented growth for such virtual healthcare services. More specifically, Defendants falsely assured investors throughout the Class Period that Teladoc was successfully integrating Livongo Health, Inc. ("Livongo"), which the Company acquired in October 2020 for approximately *$18.5 billion* (the "Livongo Acquisition")—a record-setting deal in the telehealth industry that was also critical to Teladoc's growth strategy and ability to fend off growing competition. Defendants also falsely assuaged investor concerns about such competition, repeatedly denying that it was materiality affecting Teladoc's business. In reality, however, the Livongo integration was an unmitigated disaster as Teladoc struggled to integrate the companies' technological systems, business processes, and personnel, which adversely affected its operations and sales. These Livongo integration failures also compounded Teladoc's growing competitive pressures as competitors took advantage of these issues to increasingly take the Company's business. When the truth about these problems was finally revealed, Teladoc investors suffered billions in losses.

### A.    In the Midst of Growing Competition in the Telehealth Market, Teladoc Acquired Livongo for $18.5 Billion

2.    Teladoc saw explosive revenue growth after the onset of the Covid-19 pandemic in early 2020 as demand for virtual healthcare services skyrocketed. This soaring demand, however, also fueled unprecedented growth in the telehealth market overall, resulting in fiercer competition

that increasingly jeopardized Teladoc's leading position as the pioneer in this space.

3.      Accordingly, recognizing that the boost from the Covid-19 pandemic would not last forever—particularly in the face of this growing competition—Teladoc began to explore potential acquisitions as another way to grow its business and protect its competitive position. After initially acquiring a smaller telehealth company in July 2020, just weeks later, on August 5, 2020, Teladoc announced a planned merger with another telehealth giant, Livongo, a leading provider of virtual management for chronic conditions, such as diabetes and hypertension.

4.      Teladoc rushed to complete the acquisition process, closing the transaction only a few months later, on October 30, 2020, for approximately $18.5 billion.  This acquisition not only removed a large competitor, but also greatly expanded Teladoc's small existing chronic care business.  Indeed, the transaction was critical to Teladoc's self-professed growth strategy and competitive advantage as the only telehealth provider of comprehensive "whole-person" virtual healthcare products, which it repeatedly touted as the differentiating feature from its competitors, who offered only stand-alone "point solutions" for specific conditions.  Thus, Defendants repeatedly publicly acknowledged the importance of the Livongo Acquisition to Teladoc's financial success and their close monitoring of its integration into the Company.

5.      Accordingly, during the Class Period investors were highly focused on Teladoc's ability to successfully integrate this massive acquisition, which was crucial for Teladoc to maintain its leading competitive position and deliver on its vaunted whole-person care growth strategy.

**B.      Defendants Falsely Touted the Successful Integration of the Livongo Acquisition and Downplayed Any Negative Effects of Growing Competition**

6.      Throughout the Class Period, Defendants repeatedly touted to investors that the Livongo integration was either already fully complete in certain respects or on track such that the Company was making tremendous progress towards successful completion.  For example, on

February 11, 2021, the first day of the Class Period, Defendant Shah assured investors that the Livongo integration was "***going really great***," including specifically that Livongo and Teladoc had "***a shared culture***" and "***really do fit together" from a "technology perspective" "to provide [] a continuum of care, a whole person experience***" and that Teladoc was "***well on our way of building [] that highway to quickly deliver***" such integrated whole-person products to its customers.[2]

7.      Similarly, Defendant Gorevic assured investors on February 24, 2021 that "***[o]ur commercial organization is now fully integrated***, and our teams responsible for cross-selling have been collaborating for months."  He also represented that the integration of the companies' technological platforms and products was on track, stating, for example, that the "***[t]he integration of our data platform and assets also continues to progress***."

8.       Defendants repeated similar assertions throughout the Class Period.  For example, on April 28, 2021, Defendant Murthy touted the Company's "***very, very clear road map***" to integrating the companies, particularly the product platforms, and reassured investors that "***we are well on our way to do it***"—referring to the "deep" integration of the companies' data.  On the same day, Defendant Gorevic similarly again reassured investors, *inter alia*, that "***[w]e've made considerable progress across our key work streams***" in the integration and that "***our commercial organization has been fully integrated***" with sales teams selling across the entire whole-person portfolio of products since early this year.**"**  Likewise, on October 27, 2021, Defendant Gorevic again described the companies' teams as "***fully integrat[ed]***."

9.      Further, Defendants denied any delays with the integration, even when specifically confronted with direct analysts' questions on this topic.  For example, on October 28, 2021, Credit

---

[2] All emphasis is added unless otherwise noted.

Suisse publicly reported on its discussions with Teladoc management on the previous day, conveying to investors the following response by the Company to the analysts' comment that "[s]ome people have thought Livongo might be slightly behind schedule:"  "Overall, ***management pushes back on the claim that TDOC is behind when it comes to the actual integration of Livongo***."

10.     Defendants' integration statements had their intended effect—the market was convinced that the Company was successfully integrating Livongo, a misconception that analysts incorporated into their positive investment recommendations on the stock.  For instance, William Blair issued an analyst report on February 25, 2021, writing: "We also believe ***the Livongo integration and initial sales efforts are off to a very strong start***."  Similarly, on April 29, 2021, Credit Suisse echoed Defendants' misrepresentations, reporting that Teladoc "***has made considerable progress working through the integration of Livongo,*** with the commercial organization having been ***fully integrated.***"

11.     Throughout the Class Period, Defendants also repeatedly assured investors that increased competition was nothing to worry about even in the face of direct analyst questions about such concerns.  For example, in response to an analyst's question on an April 28, 2021 earnings calls about new competitors in this space, Defendant Gorevic reassured that "for the most part, ***many of them, we almost never bump into, and some of the new entrants, we're just not seeing gain traction***."  Similarly, on a June 1, 2021 analyst call, in response to another analyst's question about competition, Defendant Gorevic again denied that Teladoc was being impacted by such competitors.  Specifically, he asserted  that "***we really never bump into***" large new competitors like Amazon and Walmart, "because they're just in the very, very, very early days of sort of deciding even what they want to be, much less compete in the marketplace;" likewise, with respect

to competitors that offer "smaller point solutions," he insisted that "*we win because of our multiproduct breadth of solutions* . . . [a]nd that's a significant competitive advantage."

12.    The market was also materially misled by Defendants' misrepresentations downplaying the impact of competition on Teladoc's business.  For example, on April 28, 2021, William Blair wrote: "We also believe that, following the acquisitions of Best Doctors, Advance Medical, InTouch Health, *and now Livongo, Teladoc has increased its competitive differentiation*—as there are no organizations that can match the company's international scale and scope of offerings across the continuum of care."  Credit Suisse similarly stated in its April 29, 2021 report that it was encouraged by Defendants' statements downplaying any competitive pressures: "TDOC has a differentiated set of capabilities that health plans will likely gravitate towards.  While management did not comment on Amazon Care directly, *the company did say that some of 'the new entrants into the market' have yet to gain any traction*."  Healthcare Dive, an industry media website, likewise wrote: "[O]n a call with investors aftermarket Wednesday, *Gorevic contended he wasn't worried about growing competition*."

**C.    Teladoc Experienced Severe Livongo Integration Problems and Competitive Pressures, Which Adversely Impacted the Company's Business**

13.    Defendants' misrepresentations were directly contradicted by the internal reality, as described by numerous former Teladoc employees ("CWs") interviewed in the course of Lead Counsel's investigation.  These CWs' accounts were also corroborated by internal Teladoc documents obtained by Lead Counsel and a *Business Insider* article published on November 11, 2021 (the "*Business Insider* Article"), the first alleged partial corrective disclosure date.  This *Business Insider* Article was based on that media outlet's independent investigation, which included interviews with twelve current and former employees.  These sources reveal that, at the same time that Defendants were publicly touting the supposedly smooth Livongo integration,

Teladoc was in reality experiencing severe integration challenges with respect to the companies' technological systems (including the product platforms), processes, and personnel, all of which adversely affected the Company's operations and sales.  Further, these integration struggles were compounded by increased competition, who took advantage of these issues to steal significant business from Teladoc.  Thus, the Company's inability to integrate Livongo during the Class Period jeopardized Teladoc's competitive position, rather than enhancing it as originally intended.

### 1.     Defendants Knew About Severe Integration Problems

14.     Specifically, throughout the Class Period, and unbeknownst to investors, Teladoc was experiencing substantial problems integrating Livongo, including: (a) an inability to integrate critical technological systems, such as the companies' customer relationship management ("CRM") systems, known as Salesforce.com, and data platforms, known as Tableau, as well as the companies' product platforms; (b) the lack of an integration plan to reconcile the companies' differing business models, marketing and other processes, and teams; and (c) personnel challenges, including a high attrition rate that led to loss of crucial talent.

15.     Indeed, contrary to the smooth public façade presented by Defendants, multiple CWs described the Livongo integration as "*a total disaster*" or a "*shit show*."  Further, Defendants subsequently admitted to integration "issues" from the outset of the acquisition.  For example, according to the *Business Insider* Article, "[a] spokesperson for Teladoc ***acknowledged the integration was an issue in the first six months***"—*i.e.*, November 2020—April 2021.

16.     In fact, multiple CWs confirm that Teladoc was experiencing significant Livongo integration problems beginning shortly after the acquisition closed in October 2020.  For example, CW 3, a Marketing Leader, stated that she first noticed problems with Teladoc's integration of Livongo about ***two to four weeks*** after the deal closed in October 2020.  Similarly, CW 4—who

was formerly employed by Livongo and Teladoc as a Senior Leader on their clinical team and directly communicated with Defendant Gorevic—stated that it became apparent to her by around **three months** after the acquisition that Teladoc did not know how to use and integrate Livongo. Indeed, as detailed below, internal Teladoc documents provided by another CW show that internal confusion as to Livongo's product technological capabilities, which resulted in Teladoc personnel misrepresenting to clients the features of the Company's combined products, were known to senior executives by November 2020. Numerous CWs also confirm that the integration failures they described persisted throughout the Class Period.

17.     For example, numerous CWs recounted significant integration challenges with respect to critical technological systems that severely hampered daily operations and sales. In particular, multiple CWs recalled that Teladoc was not able to integrate the companies' Salesforce.com CRM systems, which provided essential corporate infrastructure for tracking sales and related data. Importantly, multiple CWs confirmed that Teladoc's failure to integrate its Salesforce system with Livongo's was not resolved during the Class Period, even after Teladoc hired an outside consultant, PricewaterhouseCoopers ("PwC") to help integrate such systems.

18.     Further, Teladoc similarly failed to integrate another critical Livongo technological system during the Class Period. Specifically, CW 11 stated that the integration of the companies' data analytics platforms, called Tableau, which stored and was used to analyze de-identified patient, client, and other data for marketing, advertising, sales, and other purposes, had not **started** by the time she left the Company, (*i.e.*, June 2021). Indeed, apparently Teladoc had only recently **started** that Tableau data integration process, well after the Class Period. This therefore directly contradicts, for example, Defendant Verstraete's November 18, 2021 statement that Teladoc had already "***integrated the legacy Livongo and Teladoc marketing data and tech stacks.***"

19.     Further, Teladoc was unable to fully integrate the companies' product technological systems, and thus provide the seamless "whole person" virtual care that the Livongo Acquisition was supposed to help it achieve, as Defendants repeatedly touted to investors.  For example, CW 6 stated that Livongo sold a glucometer for diabetes patients that stored digital recordings in the cloud and was accessible via the Livongo app.  CW 6 recalled that Teladoc's vision was to allow doctors to access the glucometer data during virtual care sessions, but doctors were still not able to do so when CW 6 left in Fall 2021.

20.     CW 1 also confirmed that Teladoc was slow to create a comprehensive product that incorporated both Livongo and Teladoc services.  For example, CW 1 recalled that Teladoc had begun to sell a ***beta*** version of this comprehensive "whole person solution" to a "handful of clients" by the time she left Teladoc in ***January 2022***.  CW 1 added that this "whole person solution" that Teladoc was testing was really just a legacy Livongo service that Teladoc rebranded.

21.     Likewise, CW 2, a Vice President in the Livongo Sales Organization from before the merger until a year after the merger, explained that after the acquisition closed, Teladoc brought in new executives who did not know anything about Livongo and would make things up in client meetings.  For example, CW 2 recalled that these newly hired executives pitched clients on a "whole person platform," ***while Livongo had standalone products for diabetes and other diseases but had not yet integrated them***.  Specifically, according to CW 2, Teladoc was pushing CW 2 and her team to pitch whole patient remote monitoring to customers, but that Teladoc never had that capability during her tenure.  In fact, CW 2 recalled emailing management above her about Teladoc's inability to provide whole patient remote monitoring.

22.     Internal Teladoc documents obtained by Lead Counsel corroborate CW 2's statements regarding these product and personnel integration issues.  Specifically, such documents

9

show that in October – December 2020, CW 2 repeatedly emailed senior executives, **_including_**
**_Defendant Shah_**, to warn them that many Teladoc employees—**_including Defendant Gorevic_**
**_personally_**—were touting to clients these non-existent remote patient monitoring ("RPM")
capabilities by Livongo.

23.     For example, on November 30, 2020, CW 2 sent an email to multiple legacy
Livongo executives who stayed on at Teladoc after the acquisition, including Defendant Shah,
Teladoc's CMO, and Teladoc's Chief Product Officer Amar Kendale, wherein CW 2 expressed
her concerns that "our new Teladoc colleagues [who were] . . . pushing the RPM messaging," were
"**_not quite on the same page_**" about these RPM capabilities and that their client discussions were
not "**_anchor[ed] [] in reality_** based on our roadmap."  Importantly, CW 2 informed these senior
executives that "I am getting these kind of meeting requests regularly from the Teladoc [] team [in
CW 2's region] and [] clients [in CW 2's region] and **_am starting to feel uncomfortable on making_**
**_up 'futures'_**"—_i.e._, the capabilities of these future Livongo-Teladoc integrated products.  CW 2
also provided "four examples" of such discussions—**_including one involving Defendant Gorevic_**
**_himself_**—with key current or prospective clients. Indeed, another internal Teladoc email from
October 29, 2020 that CW 2 sent to several legacy Livongo executives, including Defendant Shah
and Kendale, indicates that Defendant Gorevic had a call that week with a senior leader at
"Montefiore Health (New York)" wherein he touted such technological capabilities to this client.
Defendant Shah responded that "there is an active workstream on integration of [Livongo and
Teladoc] services and business model" to try to provide such capabilities, and "[w]e know that
there is an imperative to have this together **_by H1 [first half] 2021, but don't have details yet nor_**
**_are ready for a client_**."  In actuality, Teladoc still did not have such capabilities even in the fall of

2021, as described by CWs above, or even at the end of the Class Period, as Defendants later admitted.

24.      Indeed, another internal Teladoc document obtained by Lead Counsel, a PowerPoint presentation that CW 2 created in late 2020, refined in January 2021 and updated on July 29, 2021 and shared with management, confirms the lack of RPM capabilities in the combined companies' product portfolio (and the continued need to remind Teladoc sales personnel of that fact) at least through July 2021.  In particular, CW 2 recalled that she created a presentation to management where one of the slides showed management that Livongo did not have the RPM capabilities that Teladoc was touting to third parties such as clients.  Indeed, one of the slides included a Venn diagram with Teladoc and Livongo on opposite sides and had the term "RPM" circled and crossed out in red in the middle portion where the two companies' circles intersected, showing the lack of such RPM capabilities in the companies' product integration—as reflected below.



25.     Moreover, CW 10, a former Teladoc employee in a customer-facing role, stated that there was no way to do customer-centric integrated marketing of Teladoc and legacy Livongo's product systems until after the first quarter of 2021 because there were "product blockers" prior to that time.  In other words, if a legacy Livongo customer wanted to add Teladoc's telehealth services after the acquisition, that prior to the first quarter of 2021, there was no way of sending that customer a link to simply add that additional benefit within their existing customer portal.  CW 10 explained that the customer would have had to re-enroll in their program entirely rather than simply adding on the telehealth benefit, calling this process "clunky."

26.     These CW accounts of product integration failures, including due to lack of technological capabilities, were further corroborated by the *Business Insider* Article, which similarly revealed that as of November 2021 Teladoc was still unable to integrate the two companies' patient portals into a single application: "One concern has been around member experience, the current employee said. Patients in the Livongo program can be passed off to Teladoc physicians, and vice versa, with a webpage.  ***But for now, they're still separate apps***."  Similarly, the *Business Insider* Article further reported: "The department in charge of client operations, for example, had to fully combine with Livongo's by January 1, a former employee said.  ***They had a hard time navigating two separate internal systems***, but were told to present a unified front to customers without each other's full product details, they said."

27.     CWs also discussed significant integration challenges with respect to the companies' business models and processes, such as how to market the combined companies' products, and an inability to fully integrate Livongo's teams into Teladoc's organizational structure.  For example, according to CW 4, another reason the integration had not gone well throughout her tenure was because Teladoc seemingly had ***no integration plan*** and that they

seemingly did not know how to create one because the two companies had two fundamentally different business models.

28.     Similarly, according to CW 11, the Company had "no clear integration plan" for integrating the two companies' data – *e.g.*, to make sure that regardless of who was selling from any Teladoc line of business, that the data was for the same patient and the same client—during her tenure at Teladoc (*i.e.*, at least until June 2021).

29.     Indeed, numerous CWs described internal confusion, dysfunction, and division with respect to personnel integration, including an inability to fit various Livongo teams into Teladoc's structure, which persisted throughout the Class Period.  Therefore, for example, CW 2 stated that ***she would not have considered Teladoc's commercial business "fully integrated" during her tenure***—which continued until a year after the merger (*i.e.,* Fall of 2021)—***because the businesses were all running separately***.  Such CW accounts thus directly contradict Defendants' repeated representations to investors during the Class Period that Livongo's teams had been "***fully integrated***" into Teladoc's "commercial organization" by early 2021.

30.     Moreover, with respect to these personnel integration issues, multiple former employees and Company insiders as reported by *Business Insider*, corroborate that Teladoc also experienced a high attrition rate after the Livongo Acquisition, which led to the loss of numerous Livongo employees, particularly executives, who were key to a successful integration.  Indeed, according to CW 8, it appeared to her to be more of "***integration through attrition***."

31.     Multiple former employees confirm that Defendants knew about these Livongo integration problems.  For example, CW 1 explained that projected timelines for integrating Livongo and Teladoc were discussed at townhall and all-hands meetings, and that C-Suite executives—including Defendant Gorevic—discussed the integration timelines, as well as Vice

Presidents and Directors such as the VP of Strategy or VP of Operations.  Critically, CW 1 recalled that the timelines were often missed and delayed by a month or quarter.  Likewise, CW 2 also specifically recalled questions coming into the townhall through the chat function about difficulties the Company faced regarding the integration or other issues that ***Gorevic fielded personally***, ***but that Gorevic either avoided the questions all together or answered them in a way that did not directly respond to the questions.***  Such statements confirm that Defendant Gorevic knew about significant Livongo integration problems and thus intentionally or recklessly misrepresented the purportedly smooth progress of the integration to investors.

32.     Further, senior Teladoc executives internally acknowledged the lack of an integration plan during the Class Period.  For instance, CW 2 described a meeting that took place on June 17–18, 2021 in Nashville, where she asked Teladoc COO David Sides about the plan to integrate Livongo.  CW 2 recalled that Sides's response was, "That's a great question," without providing a plan, which worried CW 2 and her team.

33.     In fact, this integration plan was still a work-in-progress internally seven months later—almost ***a year after the acquisition had closed***.  CW 4—who had direct communications with Defendant Gorevic at a Company leadership meeting—recalled an instance in September 2021 where Defendant Gorevic acknowledged integration difficulties—*i.e.*, Teladoc's apparent lack of an integration plan and other problems that CW 4 described—to some degree.  Specifically, the purported integration plan that Gorevic finally presented at the September 2021 leadership meeting was still woefully inadequate.  According to CW 4, Gorevic's presentation at the leadership meeting regarding the integration plan added nothing new, provided very general information and no specifics, that it seemingly to CW 4 did not resolve the integration issues she was referring to when she approached Gorevic the previous evening, and CW 4 felt that it came

across as "not sophisticated" and "underwhelming." Thus, according to CW 4, when Gorevic gave his presentation "alarm bells went off" in CW 4's mind.

34.     All of these significant integration failures directly undermined Defendants' repeated representations to investors during the Class Period that, for example, the companies' teams were "fully integrated" and the integration, including of the companies' product and data platforms, was progressing well and not "behind schedule."

> ### 2.     Defendants Knew About Competition Problems, Including Due to the Livongo Integration Challenges

35.     At the same time Defendants were publicly downplaying competition, the Company in reality was negatively affected by growing competition, particularly as a result of Teladoc's integration struggles, which competitors exploited to their advantage. For example, CW 2 recalled that CVS (which had a deal with Livongo to sell Livongo's diabetes programs), terminated the contract right before Livongo was acquired by Teladoc. CW 2 recalled that after the contract ended, CVS tried to flip its clients into using its own diabetes program, leveraging the integration issues at Teladoc as one of the reasons that the clients should leave Livongo.

36.     Similarly, CW 1 recalled that CVS dissolved the partnership slowly between 2020 and 2021, which turned CVS from a partner into a competitor. CW 1 recalled that the legacy Livongo business lost a "tremendous" amount of annual recurring revenue due to the partnership's dissolution.

37.     Defendants knew or recklessly disregarded such significant business losses due to increased competition. For example, CW 3 stated that Defendant Murthy and Defendant Verstraete discussed increased competition at quarterly and monthly all-hands meetings that CW 3 attended throughout her tenure. Further, CW 2 explained that if a client were lost to a competitor that it was logged into Salesforce. CW 2 further stated that if it was a "visible deal" that it would

be reviewed by management.  Accordingly, Defendants had real-time access to and reviewed key business losses to competitors, such as the CVS example described above.

38.     At the same time as Defendants knew about these undisclosed, material integration and competition problems, they enriched themselves at shareholders' expense through substantial insider sales of Teladoc stock during the Class Period.  Collectively, three Individual Defendants sold over ***$35 million*** in Teladoc stock during the Class Period, with Gorevic alone selling almost $30 million.  Further, three Individual Defendants collectively sold on average 31.3% of their total Teladoc stock holdings during the Class Period.  Moreover, during the Class Period, Teladoc insiders, including three Individual Defendants, collectively, sold approximately ***$168 million*** of their Teladoc stock.

**D.     The Truth Gradually Emerged, Causing Billions in Shareholder Losses**

39.     The truth regarding Teladoc's Livongo integration problems and competitive pressures emerged slowly over the course of three corrective disclosures.  First, on November 10, 2021, the *Business Insider* Article described above partially revealed, for the first time, that Teladoc was experiencing some issues integrating Livongo, including with respect to the companies' systems, processes, and personnel, which resulted in heavy attrition.  In response, Teladoc's stock price fell over 4%.  However, the *Business Insider* Article also included false denials by Defendants.  Specifically, as reported in the article, Defendants falsely minimized the integration problems, reassuring that they were mostly resolved in that it "***was less of an issue today***," and Defendant Gorevic, for example, specifically insisted that the integration efforts were still "***on track.***"

40.     On April 27, 2022, Defendants further partially revealed that Teladoc was experiencing severe integration issues and faced increased competition—both of which were

materially adversely affecting the Company's financial results.  Notably, Defendants reported reduced guidance a ***goodwill impairment charge of $6.6 billion***, which the market directly linked to the Company's poor integration of Livongo.  For example, as one media source reported: "[Teladoc] saw its stock lose about half its value after announcing a $6.6 billion impairment charge ***amid a challenging integration of Livongo.***"  Importantly, Defendants also admitted that Teladoc still had not completed integrating Livongo's products into Teladoc's platforms:  "And over the last 12-plus months, we've been working on integrating the Livongo products into our whole-person care experience.  And ***admittedly, we're not done with that yet***."  Defendants further disclosed that the Company was experiencing increased competitive pressures, including specifically sales issues in its chronic care (*i.e.*, Livongo) business, which were adversely impacting the Company's financials.  In response, Teladoc's stock price fell ***over 40%.*** Yet, the Company's stock price remained artificially inflated even after this news, as Defendants continued to downplay the integration and competition issues.

41.     Finally, on July 27, 2022, the truth was fully revealed.  Teladoc disclosed another goodwill impairment charge of $3 billion, which the market again directly connected to the Company's floundering integration of Livongo.  For example, UBS reported on July 28, 2022 that "the [C]ompany recognized ***another $3B goodwill write down related [to] (Livongo)*** as a result of TDOC's share price decline."  Defendants also reported another quarter of disappointing financial performance, which they again attributed to continuing issues with integrating the Livongo Acquisition and competitive dynamics, including the lingering sales slowdown in the Livongo chronic care business, and admitted to a continued failure to fully integrate its products to provide "whole person" solutions.

42.     Investors understood these disclosures to reveal that the problems previously disclosed were more serious and long-term than Defendants had let on.  For example, Wells Fargo reported that "[i]t appears the challenges for BetterHelp and *chronic care (Livongo) were less transitory than hoped for*," and Canaccord similarly concluded that "*the band-aid wasn't entirely ripped off following*" last quarter's disclosures. In response, Teladoc's stock price fell over *17%*. In total, Teladoc investors lost billions of dollars in shareholder value as a result of Defendants' fraud.

## II.     JURISDICTION AND VENUE

43.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5(a), (b), and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

44.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

45.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 27 of the Exchange Act, because Teladoc's headquarters are located in this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

46.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

### A.   Lead Plaintiff

47.    Lead Plaintiff Leadersel Innotech ESG ("Leadersel Innotech") is an actively managed international equity mutual fund with approximately $100 million in assets as of December 31, 2021, which was set up under the laws of Luxembourg and contained within the Leadersel umbrella of mutual funds.   Leadersel Innotech is managed by Ersel Gestion Internationale S.A., which serves as the dedicated manager to each of the various diversified Leadersel sub-funds.   On August 23, 2022, the Court appointed Leadersel Innotech as Lead Plaintiff for this litigation.   ECF No. 40.   As set forth in its previously filed certification (ECF No. 52-1), Lead Plaintiff Leadersel Innotech purchased Teladoc common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' fraud.[3]

48.    As set forth in the attached certification (Exhibit A), additional Plaintiff Hui Ma purchased Teladoc common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' fraud.

### B.   Defendants

#### 1.   Corporate Defendant

49.    Defendant Teladoc is a Delaware corporation with principal executive offices located at 2 Manhattanville Road, Suite 203, Purchase, New York 10577.   Teladoc provides virtual healthcare services in the U.S. and internationally through Business-to-Business ("B2B") and Direct-to-Consumer ("D2C" or "DTC") distribution channels, serving employers, health plans, hospitals and health systems, insurance and financial services companies, and individual members.

---

[3] Lead Plaintiff's trading in Teladoc common stock in the currently alleged Class Period (February 11, 2021 through July 27, 2022, inclusive) is the same as its trading in the class period previously alleged (February 24, 2021 through July 27, 2022, inclusive) in the first Amended Class Action Complaint (ECF No. 52).

The Company offers its customers various virtual products and services addressing, among other medical issues, mental health through its BetterHelp D2C product, and chronic conditions. Teladoc's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "TDOC."

## 2.     Individual Defendants

50.     Defendant Jason Gorevic ("Gorevic") has served as Teladoc's CEO since 2009 and at all relevant times.  Defendant Gorevic is also a member of Teladoc's Board of Directors.  In his role as CEO, during the Class Period, Defendant Gorevic participated in earnings calls and conferences with securities analysts and interviews with the news media, during which he made false and misleading statements and omissions of material fact relating to the Company's integration of Livongo and the effects of competition on the Company's business.

51.     Defendant Mala Murthy ("Murthy") has served as Teladoc's CFO since June 2019 and at all relevant times.   In her role as CFO, during the Class Period, Defendant Murthy participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact relating to the Company's integration of Livongo and the effects of competition on the Company's business.  According to Teladoc's website, Defendant Murthy leads Teladoc's global finance organization, including accounting, financial planning & analysis ("FP&A") and investor relations groups.  Also according to the Company's website, Defendant Murthy has supported substantial acquisitions and overseen the development of capital structure and liquidity strategies.

52.     Defendant Stephany Verstraete ("Verstraete") has served as Teladoc's CMEO since 2006 and at all relevant times.  In her role as CMEO, during the Class Period, Defendant Verstraete participated on a conference call with securities analysts, during which she made false

and misleading statements and omissions of material fact relating to the Company's integration of Livongo.

53.     Defendant Bimal Shah ("Shah") served as Teladoc's CMO since the Livongo Acquisition until January 2022.  In this role, Defendant Shah was responsible for Teladoc Health strategic clinical product vision, clinical content, clinical research, and analytics. Prior to the Livongo Acquisition, Defendant Shah was Livongo's Chief Medical Officer. In his role as CMO, during the Class Period, Defendant Shah participated in interviews with the news media, during which he made false and misleading statements and omissions of material fact relating to the Company's integration of Livongo.

54.     Defendant Richard J. Napolitano ("Napolitano") has served as Teladoc's SVP, CAO, and Controller since January 28, 2021 and at all relevant times.  In this role, Defendant Napolitano was responsible for overseeing the Company's financial accounting and other financial reporting and auditing functions.  In his role as SVP, CAO, and Controller, during the Class Period, Defendant Napolitano signed Teladoc's Forms 10-K publicly filed with the SEC in which he made false and misleading statements and omissions of material fact relating to the Company's integration of Livongo and the effects of competition on Teladoc's business.

55.     Defendants Gorevic, Murthy, Verstraete, Shah, and Napolitano are referred to herein as the "Individual Defendants."  Defendant Teladoc and the Individual Defendants are referred to herein, collectively, as "Defendants."

3.      **Relevant Third Parties**[4]

56.      **Confidential Witness ("CW") 1** was formerly employed by Teladoc and Livongo, which Teladoc acquired in October 2020, between September 2020 and January 2022 as a Senior Client Success Associate.  CW 1's responsibilities included client retention and sales and "client happiness." CW 1 reported to Jo Halstead.[5]  CW 1 stated that Teladoc acquired Livongo about a week after she began working at Livongo.

57.      **CW 2**[6] was formerly employed as a Vice President in the Livongo and then Teladoc Sales Organization from before the merger until a year after the merger.  CW 2's responsibilities included finding new business for Teladoc, and her clients included hospitals and health systems. CW 2 stated that Teladoc divided its sales into five regions, and she covered one of those regions. CW 2 reported to Bruce Brandes,[7] who reported to Joe DeVivo, who was former InTouch CEO and became Teladoc's President, HHS after the InTouch acquisition until April 2022, and who CW 2 believes reported to Gorevic.

58.      **CW 3**[8] was formerly employed by Teladoc as a Marketing Leader from before the Class Period until the Spring of 2022.

---

[4] All Confidential Witnesses are referred to with female pronouns, regardless of gender, to protect their identity.

[5] According to a commercially available database, Halstead has worked as Senior Director, Client Success, at Teladoc since March 2022. Halstead previously worked at Livongo starting in May 2020.

[6] At CW 2's request, Lead Plaintiff has withheld additional details of CW 2's employment at Teladoc. While Lead Plaintiff believes that the details of CW 2's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff can provide additional information, including CW 2's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

[7] According to a commercially available database, Brandes was an SVP, Health System Innovation, at Teladoc from 2020 to 2022.

[8] At CW 3's request, Lead Plaintiff has withheld additional details of CW 3's employment at Teladoc. While Lead Plaintiff believes that the details of CW 3's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff can provide additional

59.     **CW 4**[9] was formerly employed by Livongo and Teladoc as a Senior Leader on their clinical team.  CW 4 first held this position with Livongo for several years before Teladoc acquired Livongo in October 2020.  CW 4 then held the same position at Teladoc from November 2020 to early 2022.

60.     **CW 5** was formerly employed by Teladoc from November 2020 through June 2021.  CW 5 previously worked at Livongo, which was acquired by Teladoc in October 2020.  At Teladoc, CW 5 worked as a Senior Director, Client Success, and her responsibilities included retaining Teladoc's existing customers.  CW 5 explained that part of her job was to make sure existing Livongo clients didn't leave Livongo because of the merger.  CW 5 was part of a group that was responsible for integrating the two companies' sales forces starting in January 2021.

61.     **CW 6**[10] was formerly employed by Livongo and joined Teladoc after the merger and through Fall 2021.  CW 6 was a VP within Teladoc's Hospital Health Systems division, and her team was responsible for selling into health systems.

62.     **CW 7** was formerly employed by Teladoc from November 2020 through October 2021.  CW 7 previously worked at Livongo, which was acquired by Teladoc in October 2020.  At

---

information, including CW 3's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

    [9] At CW 4's request, Lead Plaintiff has withheld additional details of CW 4's employment at Teladoc. While Lead Plaintiff believes that the details of CW 4's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff can provide additional information, including CW 4's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

    [10] At CW 6's request, Lead Plaintiff has withheld additional details of CW 6's employment at Teladoc. While Lead Plaintiff believes that the details of CW 6's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff can provide additional information, including CW 6's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

Teladoc, CW 7 most recently worked as a Growth Acquisition Manager, and her responsibilities included encouraging clients' employees to sign up for Livongo through various email campaigns.

63.    **CW 8** was formerly employed by Teladoc Health and Livongo from October 2015 to December 2021.  According to CW 8, her final role at Teladoc Health was Director of Growth Marketing from October 2021 to December 2021, and her previous title was Head of Consumer Brands from November 2020 to October 2021.  Prior to the Livongo acquisition, CW 8 was employed by Livongo as Director – Brand and Corporate Marketing (May 2016 – October 2020) and Senior Marketing Manager – Brand (October 2015 – May 2016).  CW 8 stated that in her final reporting structure she reported to someone who reported to Senior Vice President – Consumer Engagement, Opeyemi Oluwole, who in turn reported to CMEO, Stephany Verstraete, who in turn reported to CEO Jason Gorevic.  CW 8 added that prior to transitioning to a role in growth marketing, she oversaw consumer experience brands.  CW 8 further explained that as Director of Growth Marketing, her focus was on marketing for Teladoc Health's chronic care line of business, adding that she held the role for two months before leaving the Company.  CW 8 was based out of the Livongo office in Mountain View, California.

64.    **CW 9** was formerly employed by Teladoc as Senior Implementation Technical Project Manager between March 2020 and July 2021.  CW 9's responsibilities included implementing both hardware and software for domestic and international clinical clients.  CW 9 reported to Senior Director, Implementation TPM Virgil Agustin.

65.    **CW 10** is a former Teladoc employee in a customer-facing role who was employed by the Company from before the Class Period until the third quarter of 2021.[11]

---

[11] At CW 10's request, Lead Plaintiff has withheld additional details of CW 10's employment at Teladoc. While Lead Plaintiff believes that the details of CW 10's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff can provide additional

66.     **CW 11** was formerly employed by Teladoc as Senior Director Analytics from November 2020 to June 2021, and she held the same title and role with Livongo before transferring over to Teladoc upon the completion of the acquisition.  According to CW 11, in her final reporting structure she reported to Anmol Madan,[12] who in turn reported to Chief Innovative Officer Yulun Wang[13] and then Wang's replacement, Claus Jensen,[14] both of whom in turn she believes may have reported to Defendant Gorevic.  CW 11 added that there may have been a layer in between the Chief Innovative Officer and the CEO.  CW 11 stated that she had been a Senior Director on Livongo's data science team.  According to CW 11, her main responsibility at Livongo and then Teladoc was the Livongo Tableau platform (a data analytics software system), and she described herself as the business application owner for Livongo's Tableau.  CW 11 explained that Teladoc, Livongo, and Teladoc's other acquisitions each had their own Tableau platforms that stored client, and patient, and other information, and that she took the lead in trying to integrate Livongo and Teladoc's Tableau instances or platforms.

---

information, including CW 10's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

[12] A commercially available database search indicates that Madan remains employed by Teladoc as Chief Data Scientist, and that he held the same title with Livongo since 03/2019.

[13] A commercially available database search indicates that Wang remains employed by Teladoc as "Fellow."

[14] A commercially available database search indicates that Jensen remains employed by Teladoc as Chief Innovation Officer, Executive Vice President of R&D Technology (May 2021 – present).

## IV.  SUBSTANTIVE ALLEGATIONS OF FRAUD[15]

### A.  Overview of Teladoc's Business

#### 1.  Teladoc's Business Model

67.    Founded in 2002 in Dallas, Texas, Teladoc is one of the first and largest telehealth companies in the United States.  It employs thousands of healthcare professionals to provide patients with diagnoses, recommend treatments, and prescribe medications for routine medical issues through telephone and videoconference consultations.  The Company primarily offers its patients various virtual products and services addressing mental health issues and chronic health conditions, such as diabetes and hypertension.

68.    Traditionally, Teladoc had focused on treating acute conditions (such as providing short-term solutions to a sudden onset of an injury or illness).  But over the last few years, in the midst of growing competition in the telehealth industry, Teladoc expanded its product portfolio through a series of acquisitions, with the goal of staying competitive by providing full-spectrum, "whole-person" virtual care.  Specifically, this whole-person approach seeks to treat the entire person—*i.e.*, both their physical and mental health, their acute episodic needs as well as their chronic and complex needs and taking care of them on a preventive basis.

69.    To help accomplish this goal, Teladoc acquired companies that would allow it to expand its business further into the treatment of mental health and chronic conditions. For example, in 2015, Teladoc acquired BetterHelp, which provides patients with mental health sessions via videoconference without prescribing antidepressants or other drugs.  Additionally, and as explained in more detail below, in July 2020 Teladoc acquired InTouch Health, Inc. ("InTouch"), the leading provider of enterprise telehealth solutions for hospitals and health

---

[15] Unless otherwise noted, all references to Teladoc's business and operations refer to events that occurred during the Class Period as defined herein.

systems.  Just a few months later, Teladoc also acquired Livongo, the leader in digital chronic condition management solutions for employers and health plans, to significantly expand its chronic care business.  Teladoc now provides telehealth services for chronic condition management, mental health solutions, primary care, and more.

70.     Teladoc's business operates through its B2B and D2C distribution channels. Within the B2B channels, Teladoc sells to employers (including approximately 50% of Fortune 500 companies), health plans, hospitals, and health systems, as well as insurance and financial services companies.  Further, Teladoc regularly engages third parties, including health plans, pharmacy benefits managers, financial institutions, brokers, agents, benefits consultants, and resellers to distribute the Company's virtual solutions to various end markets around the world.

71.     Teladoc offers a variety of services to patients, including providing patients with access to a virtual mental health service, a virtual primary care platform through which they can access Teladoc primary care physicians, and a solution to help patients improve their health outcomes while living with multiple chronic conditions.

72.     Teladoc's B2B channels' primary revenue source is recurring access fees. Specifically, Teladoc's primary care solutions generate contractually recurring revenue on a per-member-per-month ("PMPM") basis, as well as visit fees on a per-virtual healthcare visit basis for general medical or other specialty visits, or expert medical service on a per-case basis.  For its chronic care management solutions, namely MyStrength Complete and Chronic Care Complete, Teladoc receives monthly access fees under a PMPM model, based on the number of active enrolled members each month.  Additional revenue comes from health system and providers that use Teladoc's licensed technology platform, primarily in the form of recurring access fee revenue and from the sale and lease of devices such as robots, carts, and tablets.  Those client agreements

generally have a term of one to three years.  Most clients have a term of one year and renew their contracts following their first year of services.

73.     Teladoc's D2C channels and partnerships with other brands primarily revolve around BetterHelp.  BetterHelp enables individuals to access professional mental health therapy through a web-based virtual platform.  Teladoc touts that "BetterHelp is a leader in the D2C therapy market," both in terms of the number of individuals enrolled and the number of providers who provide services on the platform.  According to Teladoc, BetterHelp further differentiates itself from its competitors by leveraging its data science capabilities and diverse customer acquisition channels.  In its D2C business, Teladoc generates revenue through monthly member access fees.

> **2.     The Covid 19 Pandemic Fueled Rapid Growth for Teladoc and the Telehealth Market**

74.     While the telehealth market had been growing steadily for years before the Class Period, the Covid 19 pandemic proved to be a watershed moment for the industry.  Specifically, in early 2020, the Covid-19 virus entered the United States and began to spread rapidly.  By March 11, 2020, the World Health Organization ("WHO") declared Covid-19 a global pandemic, and infection rates in the United States began to rise at an alarming rate.  Due to the uncontrolled spread of the virus, between March 19, 2020 and April 7, 2020, nearly every state in the United States issued a public safety mandate: lockdown or shelter-in-place orders.  Consequently, patients who would have in-person office visits for their needs were isolating, quarantining, sheltering under health orders, or fearful to venture out.

75.     As doctors needed a way to communicate with patients with health issues without requiring them to visit their facilities, telehealth services provided an integral solution to this

problem.  Accordingly, demand for telehealth services soared in early 2020 as consumers and providers sought ways to safely access and deliver healthcare.

76.     To further encourage use of and access to telehealth, the U.S. made multiple alterations to the regulatory landscape surrounding the telemedicine market.  For instance, in early March 2020, Congress revised Medicare restrictions on where telemedicine must originate, what would be reimbursed, and what platforms could be used.  Around the same time, the Department of Health and Human Services declared that it would not penalize noncompliance with the regulatory requirements under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") against covered telehealth providers.  The Drug Enforcement Administration ("DEA") allowed practitioners to prescribe controlled substances to patients through telemedicine, even if the patients were not at hospitals or clinics registered with the DEA.  With barriers to telehealth upended, in the first three months of the pandemic, telemedicine encounters increased 766%.

77.     Teladoc significantly benefited from the exploding demand for telehealth services and loosening regulatory framework during the Covid-19 pandemic.  Because of a substantial increase in utilization of its telehealth services, Teladoc's revenue grew 98% in 2020, including an incremental $128.3 million from its InTouch acquisition and Livongo merger, which as discussed further below, became an integral part of Teladoc's future success and growth plan. Further, Teladoc's number of telehealth visits increased from 4.1 million in 2019 to 10.6 million in 2020, and Teladoc's U.S. paid membership increased by approximately 15.1 million members in 2019 to 51.8 million in 2020.

78.     The red-hot telehealth market not only fast-tracked Teladoc's growth, but also that of its competitors, including incumbent telehealth players—Teladoc's primary competitors—such as MDLive, Inc., American Well Corporation, and Grand Rounds, Inc.  It also drove the growth

of many newer, smaller telehealth entrants—for example, Ro, a New-York-based healthcare company that connects patients with US-licensed professionals all online, and Hims & Hers Health, Inc., which offers prescriptions, primary care, and mental health services.  Moreover, Teladoc has increasingly been fending off competition from privately held virtual mental health therapy platforms like Cerebral, Done Health, and Talkiatry, which also grew rapidly during the pandemic and began to put significant pressure on advertising rates.  Additionally, over the last few years, corporate giants like Amazon have been increasingly developing their own virtual treatment platforms.  For example, in 2019 Amazon.com launched its own telehealth service, known as Amazon Care, for employees in and around the company's Seattle headquarters, which provided virtual urgent care visits, as well as free telehealth consults and in-home visits for a fee from nurses for testing and vaccinations.  In February 2022, Amazon.com announced that it was rolling out Amazon Care nationwide.[16]  Similarly, Walmart announced in May 2021 that it would acquire MeMD, a multispecialty telehealth provider, in an effort to significantly expand its telehealth capabilities.  In May 2022, Walmart announced that it was changing its telehealth MeMD name to Walmart Health Virtual Care, which provides services nationwide, including urgent care, behavioral health, and primary care.

79.   Accordingly, given this rapid increase in competition in the telehealth market, Teladoc investors were highly focused on Teladoc's ability to maintain its leading competitive position before and during the Class Period.  For example, leading up to the Class Period, on

---

[16] As of August 2022, Amazon.com announced that it plans to end Amazon Care operations after December 31, 2022. However, around the same time, Amazon also announced that it had agreed to acquire the concierge healthcare start-up One Medical and that it was among the leading bidders for home health service provider Signify Health. Thus, according to Citi analysts, the end of Amazon Care "is far from the death knell for AMZN's healthcare ambitions"—"more like just the beginning."

August 5, 2020, William Blair included as a "[r]isk" to its valuation of Teladoc the fact of "emerging competition from other telehealth providers as well as novel entrants including Amazon.com . . . and Zoom Video Communications." Similarly, on December 16, 2020, Stephens reported that "we are becoming increasingly worried about competition in the space." As a result, and as further detailed below, during the Class Period, analysts and the media repeatedly asked Defendants about the increased competition, but Defendants repeatedly brushed off such concerns as unfounded.

**B.      In 2020, Teladoc Announced Two Major Acquisitions as It Sought to Fend off Growing Competition**

80.      Defendants knew that the success Teladoc experienced from the pandemic, which drove record highs in Teladoc's stock price, would not last forever, particularly after Covid 19 vaccines became widely available and people began returning to the office and resuming other normal activities, including in-person doctor visits. Given this reality, and especially in light of growing competitive pressures also fueled by the pandemic, Teladoc began to explore more drastic measures, including acquisitions of competitors, to protect its leading market position. Indeed, in Teladoc announced and closed two major acquisitions in rapid succession during the pandemic.

**1.      InTouch Acquisition in July 2020**

81.      First, on July 1, 2020, Teladoc acquired InTouch, a leading provider of enterprise telehealth solutions for hospitals and health systems, in a transaction valued at approximately $1.1 billion. InTouch contracted with more than 450 hospitals and health systems, including 30 of the 50 largest U.S. health systems like HCA and Kaiser Permanente. Thus, the InTouch acquisition allowed Teladoc to greatly expand the Company's provider client list. Additionally, the InTouch acquisition enabled Teladoc to bring more virtual care technology directly into the homes of

consumers given InTouch's development of a Bluetooth-enabled device with a built-in microphone that plugs into television sets, turning any screen into a virtual care platform.

### 2. The Livongo Acquisition in October 2020

82.     Second, on October 30, 2020, Teladoc acquired Livongo, another telehealth pioneer and a leading provider of virtual chronic disease management, for approximately ***$18.5 billion***— a record in the telehealth industry.  Like Teladoc, Livongo had experienced explosive growth during the Covid-19 pandemic as consumers turned to virtual care options.  Livongo helped people with chronic conditions to live better and healthier lives, beginning with diabetes and eventually including hypertension, weight management, diabetes prevention, and behavioral health.  That is, Livongo offered patients personalized insights for conditions including diabetes and hypertension (such as providing diabetes monitoring and remote monitoring), along with coaching and feedback on how to manage them.

83.     Not only did the Livongo acquisition remove a key competitor and solidify Teladoc's position as the largest telehealth company, but it allowed Teladoc to substantially expand the Company's chronic care business, which Teladoc saw as an important growing market. The latter was also crucial for Teladoc's position as the only telehealth provider of comprehensive whole-person care, which it repeatedly touted to investors as the key differentiating feature from its competitors.

### (a) Teladoc and Livongo Announced the Merger of the Two Companies in August 2020

84.     More specifically, Teladoc first began exploring the possibility of a partnership with Livongo in June 2020, when Teladoc's head of Corporate Development, Andrew Turitz, met with Livongo's CFO, Lee Shapiro.  According to Teladoc's public SEC filings, at the meeting, "Mr. Turitz discussed the evolving competitive landscape and accelerated demand for longitudinal

virtual care for Teladoc's members and how a combination between the two companies could capitalize on an unprecedented opportunity."

85.     The merger discussions quickly accelerated thereafter, with Defendant Gorevic closely involved in subsequent planning.  For example, according to Teladoc's filing, "[o]n June 18, 2020, Messrs. Tullman [Livongo's founder and then-Executive Chairman] and Shapiro [Livongo's then-CFO] called Mr. Jason Gorevic, Chief Executive Officer of Teladoc, to further discuss the strategic rationale for the potential business combination."  Furthermore, "[b]etween July 9, 2020 and July 16, 2020, Messrs. Tullman and Shapiro had discussions with Messrs. Gorevic and Turitz by telephone regarding the transaction, due diligence, and potential transaction timelines.  Mr. Shapiro and Messrs. Gorevic and Turitz tentatively agreed to work towards an announcement date in early August 2020."

86.     A few months later, on August 5, 2020, Teladoc and Livongo announced that they had entered into a definitive merger agreement, which, according to the companies, represented a transformational opportunity to improve the delivery, access, and experience of healthcare for consumers around the world.

87.     Under the terms of the merger, Teladoc would keep its name, ticker, and CEO but concede five of its board seats to the Livongo team.  Teladoc shareholders would own 58% of the new company, and Livongo shareholders would own 42%.  Livongo and Teladoc both mostly make money from subscription fees from health plans and employers, which gives their members and employees access to the applications and online doctors.  According to Teladoc's SEC filings, their overall client base overlapped by less than 25% at the time of the merger negotiations, which would ideally provide cross-selling opportunities.

88.     Before the Livongo Acquisition, Teladoc had only a small chronic care business segment.   Accordingly, the market viewed the Livongo Acquisition as a great expansion of Teladoc's position in the chronic care management market.   Indeed, according to Teladoc's SEC filing, one of the strategic considerations that the Teladoc Board considered when approving the merger was "the belief that Livongo is the largest and most comprehensive provider of personalized chronic condition management, with a differentiated data-driven health experience that enables better outcomes and is fully scalable across multiple chronic conditions."

89.     In fact, Defendants emphasized many times the importance of the Livongo Acquisition in connection with the Company's overall business.   For example, when the Company first announced the acquisition on August 5, 2020, Defendant Gorevic stated, with respect to Teladoc and Livongo merging: "Together, we will further transform the healthcare experience from preventive care to the most complex cases, bringing 'whole person' health to consumers and greater value to our clients and shareholders as a result."   In addition, during a conference call that Teladoc's management held that same day, on August 5, 2020, Defendant Gorevic doubled down on the importance of the acquisition, explaining that "[t]his is a transformative moment that will set a new standard for the delivery, access and experience of health care" and that "[t]hese newly combined capabilities will enable us to create the next generation of health care delivery models." Defendant Gorevic also stated on the same call that "[t]his combination offers many strategic and financial benefits, delivering tremendous opportunity for revenue accretion for the combined entity."

90.     Accordingly, after the acquisition, the Livongo segment, was essentially considered synonymous with Teladoc's Chronic Care business.   For example, as Credit Suisse wrote in in a December 16, 2021 report: "Livongo is almost synonymous with virtual care for chronic condition

management."  Likewise, during the Class Period, many analysts, such as Wells Fargo in a January 7, 2022 report, repeatedly referred to Teladoc's Chronic Care segment as "Livongo:" "Chronic Care 'Livongo' Revenue"; "Chronic Care (Livongo)"; "Chronic care management suite (Livongo)"; "Chronic Care 'Livongo.'"

91.    Thus, given Livongo's capabilities, and in light of the rapidly changing competitive landscape, Teladoc believed acquiring Livongo would catapult the Company's success and fend off growing competition.  Moreover, the Livongo acquisition removed one of Teladoc's largest competitors. Indeed, as Defendant Gorevic acknowledged during an August 5, 2020 CNBC interview, it was more advantageous for Teladoc to acquire Livongo than for the two companies to "duke it out in competition."  Analysts recognized as much.  For example, a February 25, 2021 analyst report echoed this point, explaining that "emerging competition from other telehealth providers as well as novel entrants" posed a "[r]isk" to Teladoc but also noting that the Company had purportedly "*increased its competitive differentiation" in part through the Livongo Acquisition*.

92.    Similarly, during another CNBC interview on May 11, 2021, when asked about the evolving competitive market, Defendant Gorevic explained the Company's thought process for acquiring Livongo:

> Last summer, at the beginning of this summer, we said**, '**Oh oh my God, the, the market has rapidly changed, people's expectations have rapidly changed and, and this pandemic has thrown the whole market into motion.' And so as we looked at the market, we said 'we need to be bold in taking a giant step forward and seeing where the puck is going.'  And that's why we put Livongo and Teladoc health together.

93.    In fact, the market understood that the reason Teladoc acquired Livongo was to maintain the Company's leading position in light of the evolving competitive landscape.  For

example, as Credit Suisse reported on June 8, 2021, "throughout 2020, [Teladoc] witnessed the market significantly accelerate and the strategic chessboard moving around, which was part of what prompted the company's merger with Livongo."  The analyst report continued, "[Teladoc] made the decision to combine the two leaders (Teladoc & Livongo) in their respective markets, *in order to define the competitive landscape*, as opposed to following it."

94.     Similarly, the public understood that for Teladoc to achieve its strategic vision for providing "whole-person care," which Defendants repeatedly touted as central to the Company's financial success, Teladoc would need Livongo.  For example, as *Business Insider* stated on November 10, 2021: "Gorevic said Teladoc's future was 'whole-person care,' or the ability to treat a patient's various needs — from mental health to diabetes — with different kinds of products that talk to each other.  *And it's using Livongo's assets to make that happen*."

95.     Teladoc's acquisition of Livongo was thus critical for Teladoc to maintain its leading competitive position and massive growth, and thus ensure Teladoc's future success. Indeed, when the Company first announced the merger on August 5, 2020, Defendant Gorevic stated as much, as quoted in the Company's press release on that day:

> "This merger firmly establishes Teladoc Health at the forefront of the next-generation of healthcare," said Jason Gorevic, CEO of Teladoc Health. "Livongo is a world-class innovator we deeply admire and has demonstrated success improving the lives of people living with chronic conditions. Together, we will further transform the healthcare experience from preventive care to the most complex cases, bringing 'whole person' health to consumers and greater value to our clients and shareholders as a result."

96.     Likewise, during a conference call that Teladoc's management held that same day, Defendant Gorevic emphasized the importance of this $18.5 billion acquisition, explaining that "[t]his is a transformative moment that will set a new standard for the delivery, access and

experience of health care" and that "[t]hese newly combined capabilities will enable us to create the next generation of health care delivery models."

97.    Defendant Murthy likewise insisted that "this is a transformative moment in health care," noting that "[i]n addition to the strategic benefit of the transaction, it offers significant financial benefits to our shareholders."   Specifically, Defendant Murthy explained, "This combination has the potential to deliver $500 million in run rate revenue synergies by 2025 from cross-selling and increased penetration into each other's respective client basis."

98.    Similarly, Teladoc's Form 10-K for the fiscal year ended December 31, 2020 highlighted the importance of the successful integration of these two large companies, explaining that "the combination of [Teladoc's] data scale, technology and clinical capabilities with Livongo's technology and data insights will underpin the combined company's ability to deliver differentiated care."  Indeed, in the Company's press release announcing the closing of the merger on October 30, 2020, the Company emphasized the importance of this transaction: "The milestone marks completion of *the most significant blending* of capabilities and talent in the history of digital health."

99.    Given the importance of the Livongo Acquisition to the Company's future, as CEO of the soon-to-be combined Company, Defendant Gorevic publicly touted his personal involvement in the Livongo acquisition and integration, emphasizing its significance to Teladoc's growth strategy.  For example, he represented in a September 15, 2020 letter to employees that was publicly filed with the SEC, that he personally spoke with employees leading up to the merger, explaining: "Personally, I have enjoyed meeting and speaking with many soon-to-be colleagues—learning about the inspiring team Livongo has assembled and sharing my reflections on what Teladoc Health has built."  In the same letter, Defendant Gorevic also announced "an Integration

Management Office (IMO) steering committee to oversee our combination, meeting weekly to lay out integration milestones and ensure steady progress."  CW 2 similarly recalled that Teladoc had a formal integration committee.

100.    Shortly before the merger closed, Defendants held a conference call on October 28, 2020 to discuss the financial results for the third quarter of 2020.  During that call, Defendants also discussed the Livongo Acquisition, particularly the Company's integration planning efforts thus far.  And in doing so, Defendant Gorevic again highlighted his hands-on management style with respect to the Livongo acquisition, explaining that "I was fortunate to spend some time with several of the Livongo commercial leaders last week."  Similarly, during that same call, Defendant Murthy acknowledged her personal involvement in the integration process.  For example, Defendant Murthy explained that "***[w]e spent all day looking at integration from every possible function and within every function, every possible subfunction***."

101.    Indeed, Defendant Gorevic attended and spoke at internal townhall meetings where the Livongo integration was discussed.  For example, with respect to internal meetings where Teladoc executives provided integration progress updates, CW 2 recalled that Teladoc held townhalls about once a month, which CW 2 attended, where CEO Gorevic attended and gave opening speeches, and such meetings included a Q&A session.  CW 2 explained that at these meetings executives, including Defendant Gorevic, would speak broadly about the Livongo integration and were sometimes asked broadly about "challenges" the Company was facing with the integration of the Livongo deal.

102.    Notably, CW 2 also specifically recalled questions coming into the townhall through the chat function about difficulties the Company faced regarding the integration or other

issues that *Gorevic fielded personally*, but that *Gorevic either avoided the questions all together or answered them in a way that did not directly respond to the questions*.

   **(b)**  **The Livongo Acquisition Closed in October 2020**

  103. On October 29, 2020, Teladoc announced that its shareholders supported the merger with Livongo by voting to approve the Teladoc charter amendment and share issuance.  On October 30, 2020, Teladoc completed the merger with Livongo, where Teladoc paid $13.9 billion in cash and stock—a record deal for the digital health industry.  The total value of the Livongo Acquisition, which was completed in just under three months, when combining the total cash and stock consideration, was estimated to be approximately *$18.5 billion*.

  104. But for Teladoc's $18.5 billion bet on Livongo to pay off, Teladoc had to complete a successful integration of these two large companies.  As discussed below, however, contrary to Defendants' repeated assurances to investors during the Class Period this integration was progressing smoothly, in reality it struggled from the start, plagued by severe technological, operational, and personnel problems that materially affected its financial performance and competitive position, particularly in the face of increased competition.

  **C.**  **Teladoc Faced Severe Livongo Integration Challenges and Competitive Pressures**

   **1.**  **Sources Within Teladoc Confirm that Teladoc Was Unable to Fully Integrate Livongo During the Class Period**

  105. Throughout the Class Period, and unbeknownst to investors, Teladoc was experiencing major problems integrating Livongo with respect to its technology, processes, and people, which included: (a) Teladoc being unable to integrate critical technological systems, such as the companies' product and customer relationship management ("CRM") platforms; (b) Teladoc lacking an integration plan to reconcile the companies' differing business models and processes; and (c) personnel challenges, which resulted in a high attrition rate that led to loss of crucial

Livongo talent.  Indeed, according to CW 4, who worked at Teladoc as a Senior Leader on the clinical team since before the Class Period, from her perspective the integration of the two companies was "*a total disaster*" throughout her tenure at Teladoc (*i.e.*, from the time of the merger until she left in early 2022).  Likewise, Marketing Leader CW 3 stated that integrating Livongo following the October 2020 acquisition went very poorly from both a systems and personnel perspective.  Notably, Teladoc subsequently admitted to integration challenges, that squarely contradicted their positive representations of the integration during the Class Period.  For example, according to the November 10, 2021 *Business Insider* Article, "[a] spokesperson for Teladoc *acknowledged the integration was an issue in the first six months*"—*i.e.*, November 2020 – April 2021.

(a)     **Teladoc Struggled to Integrate Livongo Technological Systems Such as the Companies' CRM, Data, and Product Platforms**

(i)     **Problems Integrating Salesforce.com Systems**

106.    Throughout the Class Period, according to multiple former Teladoc employees and Defendants themselves, Teladoc was unable to integrate Livongo's technology and products with Teladoc's. Notably, as detailed below, Defendants still were unable to integrate the two companies' CRM systems, critical programs to track sales and customer data, throughout the Class Period, even after hiring outside consultants to do so.

107.    According to former employees, significant problems with the Livongo integration were apparent internally soon after the acquisition closed in October 2020—*i.e.*, by December 2020.  CW 3 stated that she first noticed problems with Teladoc's integration of Livongo about *two to four weeks* after the deal closed in October 2020.  For example, CW 3 recalled that the integration problems that she first noticed about two to four weeks after the merger closed resulted in a slowdown in sales activity because the salespeople were unsure who to report to and whether

40

they were about to be laid off.  CW 3 added that there was confusion around whether to enter sales into Teladoc's or Livongo's Salesforce,[17] and immediately after the acquisition Livongo employees were using the legacy Livongo Salesforce and Teladoc employees were using Teladoc's.

108.    CW 3 further recalled that another one of the issues that she first noticed about two to four weeks after the acquisition closed was that Livongo employees were unsure how to login to Teladoc's Salesforce system.  Specifically, CW 3 explained that employees that came from Livongo did not have login credentials or access to Teladoc's Salesforce.com system, which was resulting in delays in sales.

109.    Indeed, CW 3 also explained that internal bickering amongst salespeople over whose customers belonged to whom and confusion around which Salesforce system to use created an environment at Teladoc wherein things moved more slowly.  CW 3 recalled that there were four instances (versions) of CRMs and none of them interacted with each other.  CW 3 elaborated that the four CRMs were legacy Teladoc, legacy InTouch, legacy Livongo, and international.

110.    CW 3 recalled that Teladoc ultimately decided that the Teladoc Salesforce would be the "CRM of record" probably around the second quarter of 2021, meaning that Teladoc declared Teladoc's Salesforce.com system to be the official CRM of Teladoc, which meant that everyone was required to log their sales in Teladoc's Salesforce rather than Livongo's.

111.    However, CW 3 explained that there were ongoing issues even after Teladoc declared its legacy Salesforce the CRM of record around the second quarter of 2021.  CW 3 referred to the solution as a Band-Aid and recalled that Teladoc was "cramming independent

---

[17] Salesforce.com provides companies with CRM software and applications focused on sales, customer service, marketing automation, analytics, and application development.  Salesforce is important because it helps companies store, organize, and track customer and product data.

methodologies" into one CRM system.  CW 3 explained that Livongo and Teladoc had different methodologies when using Salesforce, and the CRMs spoke different languages on the front and back ends.  CW 3 recalled that she told VP Tracy Warren about these concerns.

112.    CW 3 further recalled that Teladoc's Salesforce could not replicate certain items in their system.  CW 3 explained that Livongo was tracking metrics that she was unable to duplicate.  For example, CW 3 recalled that Amy Cosler, Senior VP of Client Success at Teladoc and a former Livongo employee, told her to calculate "sales velocity" but was unable to explain how.  CW 3 recalled that her discussions with Cosler began a month or two after Teladoc's acquisition of Livongo in October 2020.  CW 3 raised the issue to SVP Laura Whipple but recalled that Whipple did not like CW 3 pushing back.

113.    Even though Teladoc ultimately chose to use its own Salesforce system in early 2021, the integration of these platforms remained incomplete afterwards and throughout the Class Period.  Indeed, CW 3 explained that there were ongoing issues even after Teladoc declared its legacy Salesforce the CRM of record around the second quarter of 2021.  CW 3 stated that Teladoc hired PricewaterhouseCoopers ("PwC") to integrate the two companies.  Specifically, CW 3 explained that PwC was brought in to create one consolidated CRM but that the project was ongoing when she left (*i.e.*, Spring of 2022).  CW 3 recalled that the project was expected to take 18 months, with ***13 months remaining when she left in Spring of 2022***.  CW 3 added that PwC was retained to assist with integrating the Salesforce systems, though CW 3 noted that PwC might have been brought in sooner than she realized in order to help integrate other aspects of the business.  CW 3 elaborated that PwC's primary purpose was to consolidate process flows and convert everything to a "single language" with respect to the Saleforce.com systems.  Moreover, CW 3 recalled that PwC was brought in so that an objective third party could oversee the

integration.  CW 3 reiterated that the integration issues were ***ongoing when she left in Spring of 2022***.

114.    Accordingly, Teladoc was nowhere near completing the integration of the Salesforce systems even by the end of the Class Period in mid-2022.  In particular, CW 3's statements above indicate that Teladoc only retained PwC to assist with integrating the Salesforce.com systems in ***fall 2021***—given it had begun this integration project only five months before she left in Spring of 2022—*i.e.*, approximately a full year after the Livongo acquisition had closed.  Moreover, near the end of the Class Period, in Spring of 2022, Teladoc was still only five months—or less than a ***third*** of the way—in PwC's 18-month timeline for integrating the Salesforce systems, and would not complete this work until spring 2023 at the earliest.  Thus, Teladoc was not on track with its integration efforts during the Class Period given this failure to timely integrate the companies' crucial CRM sales systems after the Livongo Acquisition closed in late 2020.

115.    Other former employees corroborate that Teladoc's and Livongo's Salesforce systems were not fully integrated during the Class Period.  CW 6 explained that, since the [Livongo] merger closed, the Livongo, InTouch,[18] and Teladoc Salesforce systems worked independently of each other.  CW 6 recalled that when she logged into the Livongo Salesforce, she could only see Livongo data, and when she logged into the InTouch Salesforce, she could only see InTouch data.  CW 6 recalled that the systems had not been integrated by the time she left in ***Fall 2021.***  Critically, CW 6 recalled that the lack of Salesforce integration caused delays in processing

---

[18] As discussed above, Teladoc had acquired InTouch in July 2020, just four months before Livongo, and was thus still in the process of integrating this first smaller acquisition, when it then had to begin integrating the second, much larger company.

sales data, because it required additional time and effort to pull data from numerous different places.

116.   Likewise, CW 2 stated that Teladoc and Livongo had their own Salesforce platforms that did not interact with one another, and that Livongo, InTouch, and Teladoc effectively operated as separate entities despite being one company.  CW 2 further recalled that when her tenure ended at Teladoc, that the Company was in the process of rolling out the combined Salesforce platform, but the salesforce platforms were still operating as separate entities by the end of her tenure (*i.e.*, a year after the merger).  Indeed, as detailed further below, CW 2 also gave examples of times when Teladoc lost customers due to these issues integrating Livongo.  Accordingly, these integration failures had a significant adverse impact on Teladoc's business, which Defendants failed to disclose to investors.

### (ii)   Problems Integrating Tableau Platforms

117.   Similarly, during the Class Period, Teladoc also failed to integrate another crucial internal software system – the Tableau data analytics platform that stored the companies' patient and client information.[19]  Specifically, CW 11, a Senior Director of Analytics at Teladoc, who had previously worked as a Senior Director on Livongo's data science team, explained that Teladoc, Livongo, and Teladoc's other acquisitions each had their own Tableau platforms, and that her main responsibility, while at Teladoc, was taking the lead on integrating Livongo's Tableau "instance," or platform.  Importantly, CW 11 stated that the integration of the separate Tableau platforms storing patient and client information for Teladoc, Livongo, and Teladoc's other acquisitions ***had***

---

[19]  According to CW 11, a "client" was considered to be a company that provided health insurance, such as BlueCross BlueShield of Arkansas (as an example), a hospital, or an employer. CW 11 added that providers, or clients, were who Teladoc conducted business with.  CW 11 explained that a "patient," on the other hand, would be John Doe of BlueCross BlueShield of Arkansas; that is, the person covered by that health insurance program or employer.

*not started* by the time she left the Company, i.e., June 2021, and thus obviously was not completed by that time. CW 11 added that, based on a recent conversation she had with a colleague who is still at Teladoc, that the Company only *now* started that integration process. Thus, the integration of these crucial data systems had not even begun, let alone been completed, during the Class Period.

118.   CW 11 added that the Sales Team, Clients Services Team, and Data Science Team were all advocating for a merger of the separate Tableau platforms. CW 11 explained that this was because, internally, different teams including Data Science argued that combing through multiple platforms to create holistic data resulted in wasted time.

119.   According to CW 11, internally a single Tableau platform was desired but that a plan was "not present" for the integration of the multiple Tableau platforms. CW 11 added that another reason for wanting to integrate the Tableau platforms was that multiple Tableau platforms required a licensing fee for each platform, and that to merge the platforms was viewed internally as using the "budget effectively." CW 11 also explained that patient, client, marketing, and other data and important metrics for sales personnel, including Key Performance Indicators ("KPIs") as just one example, were stored in and could be accessed in the Tableau platforms.

120.   CW 11 elaborated that Livongo's Tableau was on a different server than Teladoc's, and that she worked closely with Teladoc counterparts in managing the Teladoc Tableau platform. CW 11 added that "they all wanted" to integrate the Tableau platforms so that the "thousands of people" who used them would log into one Tableau. CW 11 further explained that there may have been a plan, but that if there was that there were no timelines and specific tasks, from above her in the corporate chain, to achieve what in turn would have provided a clear path or plan to follow, and that the process was very slow.   Indeed, regarding the intended integration of the Tableau

platforms, CW 11 reiterated that during her tenure there was "no formal plan being tracked" and no timelines or deadlines handed down from above her in the corporate chain. CW 11 added that she and some of her Teladoc colleagues took the lead in starting to look at integrating the Tableau platforms based on feedback from both the Sales Teams and Client Services Teams who wanted a holistic visualization into the Company's clients and members. CW 11 added that there had been an effort to integrate core data bases but that it was abandoned after she left Teladoc, according to Teladoc colleagues that she stays in contact with.

121.   CW 11 explained that the Salesforce and Tableau platforms at Teladoc were separate systems, but that Tableau pulled data from Salesforce as well as other platforms and applications that were stored on Teladoc's servers. CW 11 added that all Livongo's applications operated through the Livongo servers until they were going to be integrated. CW 11 further added that "everything" was still "behind two different firewalls" when her tenure ended. CW 11 elaborated that Livongo used their Salesforce as a customer relationship tool where sales leads were entered, as well as notes on those sales leads, as they progressed into becoming clients. According to CW 11, Tableau, on the other hand, was a data visualization tool that pulled data from different sources, including Salesforce, to put into charts and other visual tools. CW 11 described Tableau as a tool for non-tech savvy employees to easily access and visualize data.

122.   Teladoc used the Tableau platform and the data stored within it in the Company's marketing, advertising, and sales efforts. Accordingly, Teladoc's failure to integrate its and Livongo's Tableau platforms during the Class Period adversely affected such efforts. For example, according to CW 11, Tableau stored client information and de-identified patient data.[20]  CW 11

---

[20] CW 11 recalled that Tableau pulled its data from data stored on Teladoc servers and not data in the cloud because the data reflected patient information, which needed to be securely stored. CW 11 added that it was her understanding that Teladoc's Salesforce data was stored on Teladoc's

went on to explain that Livongo's Tableau instance, or platform, pulled data from Livongo's primary data warehouse and other applications, and that it was her understanding that Teladoc did the same on their side.  CW 11 stated that the data that could be pulled from Tableau or other sources like Salesforce, such as membership counts or the number of clients a sales representative has, could then quickly be produced into a chart using the Tableau analytics platform. Additionally, CW 11 explained that Teladoc used the Tableau platform to analyze whether Teladoc's products and services were effective—meaning, if the de-identified patient data from the Tableau platform showed that patients were improving or getting healthier, then that showed that Teladoc's products and services were effective.  CW 11 explained that what she meant by "effective" was that Teladoc provided "improved outcomes" because patients using Teladoc's products were getting healthier.  According to CW 11, different teams were looking for different data for different purposes, so they wanted the ability to pull up the pertinent data points that they needed, including for marketing purposes.  CW 11 added that Teladoc analyzed the trends in the de-identified patient data on Tableau for marketing and advertising, among other, purposes because Teladoc could thus advertise that the Company's products and services were effective. According to CW 11, because of Teladoc's failure to integrate the Tableau platforms, it was much less efficient for Teladoc to get a holistic view of the de-identified patient data for these purposes because they had to go into multiple systems..

123.    Further, CW 11 elaborated that each of Teladoc's, Livongo's, and InTouch's own Tableau platforms used different types of data, which she explained was one reason Teladoc had

---

servers.  CW 11 recalled that new data was uploaded onto the Tableau platform on a daily, weekly, or monthly basis depending upon the type of data and how often it needed to be updated and was available.  CW 11 added that, in contrast to Teladoc, Livongo pulled its data from *Amazon Redshift*, which she described as Livongo's central warehouse.

difficulties in integrating those systems.  CW 11 added that, as an example, Livongo's Tableau data was based on Livongo's products pre-acquisition, such as chronic care, and that if Teladoc wanted Livongo data that it had to pull it from the Livongo Tableau. It was CW 11's understanding that Teladoc had not completely integrated the Tableau platforms of their other acquisitions, including InTouch's (although Teladoc may have integrated some aspects of them).  Additionally, CW 11 explained that Livongo's Tableau platform pulled data on how often patients accessed the applications that Livongo offered, and if they were accessing any of Livongo's other applications or systems.  According to CW 11, Teladoc, on the other hand, tracked and pulled doctor visits by patients since that was the "bread and butter" of its business.  CW 11 then reiterated that Livongo's Tableau platform could not identify specific patient information, but that it would access patient information as data points at a de-identified level.  According to CW 11, this could be used, as an example, to see how many people activated a Livongo account.  CW 11 added that one of the ways Livongo had used its Tableau platform was to retrieve de-identified patient data on enrollment in its chronic care program.

124.    With respect to what Teladoc wanted to achieve with the intended integration of the multiple Tableau platforms, CW 11 explained that the Teladoc Sales team wanted a "holistic picture" of clients so that they could ascertain what Teladoc, Livongo, and InTouch programs clients already participated in and what other services Teladoc could provide the clients.  CW 11 added that the Sales Teams were more focused on integrated platforms and a holistic picture to better understand the size of clients, and that the Customer Success team wanted a holistic picture to be able to upsell that patients are getting healthier due to using Teladoc's various services from under its corporate umbrella.

125.    CW 11 similarly recalled that Teladoc's Customer Success team was asking for a "holistic view" of patients and clients across Tableau platforms.  But, according to CW 11, there was a "lot of red tape" in trying to get that information from Teladoc's data engineers, whom CW 11 described as being the holders of that data, and that they did not willingly provide that information.  CW 11 added that she and colleagues tried to find patient overlap from the two datasets, but that it was difficult working with legacy Teladoc.  Thus, per CW 11, such a holistic view of patients was not available by the time CW 11 left (in June 2021) and was not available a year after she left the Company, based on her recent conversations with colleagues still employed by Teladoc.

126.    According to CW 11, because the Tableau platforms were not integrated, it was hard for the Sales teams and Customer Success teams[21] to get a holistic picture of clients.  CW 11 further explained that Customer Success teams not getting a holistic picture of clients made their efforts in selling to clients less efficient.  CW 11 elaborated that not having integrated Tableau platforms made Teladoc's sales efforts less efficient because instead of having one system to pull client information from, the Sales and Customer Success teams had to pull information from multiple databases in order to get a fulsome picture of what the customer was already using from either Teladoc, Livongo, or InTouch, and what could also be realistically sold to them.[22]

---

[21] According to CW 11, the Customer Success teams were the ones interacting with clients each day and acted as go-betweens between clients and product development on developing new programs and applications based on the client's needs.

[22] CW 11 explained that the Sales Teams were not as heavy users of Tableau as the Customer Success teams were, adding that Salesforce integration would have been more important to the Sales Teams. CW 11 further explained that with both Tableau and Salesforce "we could not move data" when the Sales Teams and Customer Success Teams requested it because the data could not be moved from behind the firewalls of one platform to another.

127.     Additionally, CW 11 further explained that the plan was to be able to provide a "holistic" view of all of Teladoc's lines of business, such as Teladoc, Livongo and BetterHelp as examples, on patient and client overlap.  This was, as CW 11 explained, to make sure that regardless of who was selling from any Teladoc line of business, that the data was for the same patient and the same client. Regarding the clients' requirements and the term "same client," CW 11 explained that a client, say Home Depot or Lowe's as examples, would want to be able to have a full "menu" of options from each of Teladoc's acquisitions/lines of business for their employees who they provided health coverage to, and that there was a need to make sure that there was no employee overlap or redundancies since they may have already existed in multiple databases as Teladoc acquired companies that they brought under their corporate umbrella.  CW 11 further described it as Teladoc internally wanting to know employee overlap on offerings, and that they wanted to know more if the value was there and that, internally, Teladoc wanted to verify if you can make more "synergy" between the offerings and clients.  CW 11 added that the client needed to make sure that the data for "Mike Smith," as an example, was the correct data for the correct Mike Smith and not a different Mike Smith.

128.     With respect to the failure to integrate the companies' Tableau platforms, CW 11 added that, unlike Livongo, Teladoc "did not have a well-defined" data science group, which she described as Teladoc having data science engineers but not so much a team.  CW 11 added that Teladoc data scientists were decentralized and were embedded within Teladoc's clinical teams.  CW 11 explained that while Teladoc had some data engineers, that they appeared to her to be "standoffish" and who she experienced "contention from" in sharing data for the purposes of integrating with Livongo.  CW 11 added that she had been involved in integrating platforms when working for other large companies in the past including AOL (America OnLine).  CW 11 recalled

that when she had been involved in previous integrations at other companies, that those data engineers were eager in getting the integrations done. CW 11 stated that this was not her experience at Teladoc, adding that the Company had "*no clear integration plan" on data* during her tenure at Teladoc. CW 11 added that there was no clear information on integrating coming down from above.

129.     In fact, with respect to how the attempted integration of the Tableau platforms even began, CW 11 explained that various teams within Teladoc wanted an integrated Tableau for various reasons, but a clear timeline on results was never presented from above. CW 11 added that she presented an integration plan of the Livongo and Teladoc Tableau platforms to her direct supervisor, Chief Data Scientist Anmol Madan, but that she never received any clear direction from him on it. CW 11 added that she was under the impression that the subject was "outside of Anmol's control."

130.     Further, from CW 11's perspective, while Livongo had always been a very data-driven company, that Teladoc was not and that Teladoc was less data driven than Livongo. CW 11 added that she had been involved with two integrations that Livongo had made, before itself being acquired by Teladoc, and she described those integrations as having moved at a much faster pace. CW 11 described the different attitudes towards data as just part of the cultural differences between Livongo and Teladoc.

131.     Accordingly, during the Class Period, Teladoc failed to integrate another of the companies' critical technological system—the Tableau platforms—which was central to the Company's ability to have a wholistic view of client and patient data across its many business lines and thus provide the seamless, integrated product offerings that it publicly touted to investors.

### (iii)     Problems Integrating Livongo's Product Platforms

132.     Numerous CWs also recounted Teladoc's failure to fully integrate Livongo's product technology.  For example, CW 2 recalled that Teladoc CEO Jason Gorevic let go of all of Livongo's management team within the first week after the acquisition—*i.e.*, they were gone "within days" of the merger closing.  CW 2 explained that Teladoc then brought in new executives who did not know anything about Livongo and would make things up in client meetings.  For example, CW 2 recalled that these newly hired executives pitched clients on a "whole person platform," *while Livongo had standalone products for diabetes and other diseases but had not yet integrated them*.

133.     CW 2 further recalled that the newly hired executives told clients that Livongo had the capability to remotely monitor patients, which was in-demand during the Covid-19 pandemic, but Livongo never had that capability.  CW 2 recalled sending emails to colleagues saying Livongo never had such capabilities.

134.     Specifically, according to CW 2, Teladoc was pushing CW 2 and her team to pitch whole patient remote monitoring to customers, but that Teladoc never had that capability.  CW 2 explained that Livongo's standalone diabetes product was popular and that Teladoc wanted to build off of that given the interest by the federal government with the onset of the Covid pandemic, but that it—*i.e.*, whole patient remote patient monitoring—was not something that the Company had been capable of doing by the time her tenure ended (in fall of 2021).  Indeed, regarding whole patient remote monitoring, CW 2 reiterated that by the time her tenure ended that "Livongo and Teladoc can't do this," meaning that they could not provide whole patient remote monitoring.  CW

2 further recalled that Primary360[23] was being "spun" as having this capability and that the Company was rolling it out as her tenure ended, and that she did not know how integrated it was at that time.  Moreover, CW 2 recalled telling hospitals that it was something that Teladoc could not do and that *she became so uncomfortable with the situation* since hospitals were showing interest based on the Company touting that it could offer whole patient remote monitoring, that CW 2 decided to miss out on meetings that Teladoc had with the hospitals.  CW 2 recalled emailing management above her about Teladoc's inability to provide whole patient remote monitoring.

135.    Importantly, internal Teladoc documents corroborate CW 2's statements that Livongo did not have such technological capabilities regarding remote patient monitoring that Teladoc, including specifically Defendant Gorevic, were touting to clients after the Livongo Acquisition closed, and that CW 2's concerns about this issue were elevated to senior executives. For example, on November 30, 2020, CW 2 sent an email, with the subject line, "Teladoc Remote Patient Monitoring and Chronic Care Management," to multiple legacy Livongo employees, including, among others, Defendant Bimal Shah, Teladoc's Chief Product Officer Amar Kendale, Teladoc's SVP of Product Marketing Philip Bernosky, and Teladoc's Senior Director of Product Marketing Calvin Chin, wherein CW 2 expressed her concern over Teladoc account executives— as well as Defendant Gorevic personally—overselling Teladoc's remote patient monitoring ("RPM") capabilities to clients.

136.    Specifically, CW 2 wrote in this email, with respect to "our new Teladoc colleagues [who were] . . . pushing the RPM messaging," "[t]he challenge is *we are not quite on the same page* on the definition of what exactly is RPM, how we deliver it, and the business model behind

---

[23] Primary360 is a virtual primary care platform through which patients can access Teladoc primary care physicians, which Teladoc piloted in 2019 and made available to commercial health plans, employers, and other organizations in the United States in October 2021.

it (*i.e.*, patients versus employees)."  CW 2 further stated: "I would value your input and guidance on how best to keep this excitement and momentum going with our Teladoc colleagues ***but anchor the discussion in reality*** based on our roadmap. I am getting these kind of meeting requests regularly from the Teladoc [] team [in CW 2's region] and [] clients [in CW 2's region] and ***am starting to feel uncomfortable on making up 'futures.'***"  CW 2 further provided "four examples" of such inquiries from Teladoc current or prospective clients regarding the Company's and Livongo's RPM and other technological capabilities to provide various integrated product solutions to address those clients' specific needs—*i.e.*, Mount Sinai, Cancer Treatment Centers of America, Montefiore, and AtlantiCare.

137.    With respect to the Mount Sinai example, CW 2's email further forwarded an email chain from earlier in November 2020 between Teladoc account executives and Mount Sinai representatives discussing their interest in Teladoc's "RPM line of products" based on Livongo technology in response to the Teladoc employee's offer to meet and discuss the Company's product offerings after "the mergers of Teladoc and Livongo [upon which] we have multiple enterprise solutions that compl[e]ment each other."  Specifically, Mount Sinai was "most interested in an enterprise system that handles patients across departments and providers" and that "[t]he end result would be a platform that feeds data to a common Provider Console that we build manifesting the data produced by those devices."  The Mount Sinai representative further stated that "we understand that the connected devices would be managed through Livongo (not InTouch it appears)."  In other words, Mount Sinai was inquiring whether Teladoc had the capabilities to provide Mount Sinai with the integrated technology, based on Teladoc's and Livongo's respective technological capabilities, to perform those tasks.  In response, the Teladoc account executive forwarded Mount Sinai's email internally to other Teladoc and legacy Livongo employees,

including CW 2, regarding that account executive outreach to the Mount Sinai representatives about such potential product offerings based on Livongo technology, noting that "***hope I did not paint to aggressive a picture with Livongo as an RPM Solution here***," referring to the prior email chain with Mount Sinai.

138.    Notably, it was not just Teladoc account executives who fielded and oversold Teladoc's and Livongo's capabilities after the acquisition in response to client inquiries. Instead, the Montefiore example provided by CW 2's email alluded to similar pushing of Livongo's non-existent RPM capabilities by ***Defendant Gorevic***, who personally engaged in similar conversations with clients, such as Montefiore hospital in New York, after the Livongo Acquisition.

139.    Specifically, on October 29, 2020, CW 2 sent another internal Teladoc email, with the subject line, "Montefiore 'subscription' request," to several others at Livongo, including Defendant Shah and Chief Product Officer Kendale. CW 2 stated in the email: "Amar and Bimal – I got a call this morning . . . [and I was informed] that ***Jason Gorevic had a call with []*** VP and Chief of Staff; Leader of the Faculty Practice Physician Group for Montefiore Health (New York) this week." On that call between Defendant Gorevic and a high-level executive at Montefiore Health, Defendant Gorevic apparently discussed the possibility of Teladoc "co-developing a patient focused 'subscription' model that would include urgent care (like Teladoc's Employee Benefit System) with chronic care (Livongo)." CW 2 then requested Defendant Shah's and Amar's assistance with such capabilities.

140.    In response, Defendant Shah emailed CW 2 on October 30, 2020, explaining that "there is an active workstream on integration of [Livongo and Teladoc] services and business model," and "[w]e know that there is an imperative to have this together ***by H1 [first half] 2021, but don't have details yet nor are ready for a client***." Therefore, after the Livongo Acquisition

closed, Defendant Gorevic and others at Teladoc were having conversations with multiple clients touting the Company's capabilities based on newly acquired technology from Livongo, when such capabilities did not exist and would not be ready for quite some time—first half of 2021 at the earliest.  In fact, as CWs' accounts demonstrate, Teladoc still did not have such capabilities by Fall of 2021, and later admitted that Livongo's products were still not "fully integrated" by the end of the Class Period.

141.    These internal documents further demonstrate the confusion internally within Teladoc about Livongo's product technology and lack of a clear product roadmap for integrated product solutions from the combined companies, which resulted in Teladoc employees marketing technological capabilities to clients that it did not have at the time and would not be able to develop for a while.

142.    Further, CW 2 sent another email to Defendant Shah, Kendal and others following up on her November 30, 2020 email, marked with "High" importance, again reiterating that "R[P]M keeps coming up as a main talking point in our joint Teladoc prospect/client meetings" and again asking for their guidance on "[w]hat is our client position and talk track on RPM?"  Such emails further support CW 2's statements that she repeatedly raised this issue to senior management, and further evidence that this was a widespread issue, affecting discussions with numerous prospective clients.

143.    With respect to whether Teladoc implemented any changes in response to CW 2's emails about RPM, CW 2 recalled that management, including Bruce Brandes, Defendant Shah, and former Chief Product Officer Amar Kendale, would say they were working on something, but CW 2 perceived this as them "kicking the can down the road."

144.    Notably, CW 2 also recalled asking Chief Operating Officer ("COO") David Sides what the plan was to integrate RPM, and Sides responded, "*I don't know*."  Specifically, CW 2 described a meeting that took place on June 17–18, 2021 in Nashville, where she asked Sides about the plan to integrate Livongo.  According to CW 2, Sides spoke to the team on the morning of Friday, June 18, and that is when CW 2 asked him the question.  CW 2 recalled that Sides's response was "That's a great question," without providing a plan, which worried CW 2 and her team.  CW 2 added that the meeting was attended by members of Teladoc's HHS Division run by Joe DeVivo.  CW 2 recalled that about 30-40 people were in attendance in person (though some could not attend due to Covid).  CW 2 also stated that Sides was the first speaker at the meeting that morning.  CW 2 recalled that everyone in attendance would have heard her question and Sides's response as she asked Sides about it in front of the entire team, explaining that she wanted to address the "elephant in the room"—*i.e.*, the apparent lack of an integration plan for Livongo.

145.    Further, CW 2 recalled that she created a presentation to management where one of the slides showed management that Livongo did not have the RPM capabilities that Teladoc was touting to third parties such as clients.  CW 2 explained that management in this instance included Bruce Brandes, Joe DeVivo, Rob Fithian,[24] and Gerry Marini.[25]  Specifically, CW 2 created a PowerPoint presentation entitled "Prevalence of Chronic Conditions" in late 2020, which was refined in January 2021 and periodically updated at least until July 29, 2021.[26]  CW 2 explained that this presentation was an internal training document that she had put together proactively to

---

[24] A commercially available database search indicates that Fithian is currently Vice President of Sales, Hospital & Health Systems (January 2018 – present).

[25] A commercially available database search indicates that Marini was previously Teladoc's VP of Sales (January 2021 – April 2022).

[26] With respect to the date of this presentation, CW 2 confirmed that she updated it last as of this July 2021 date that was in the file name, and that Teladoc personnel thus at this time still needed to be reminded not to pitch these RPM capabilities that Livongo/Teladoc did not have.

help train Teladoc sales personnel (including legacy InTouch sales staff who had joined Teladoc after the InTouch acquisition) on Livongo's products and capabilities and a story about the combined company's combined services that sales personnel could pitch to prospective clients, *i.e.*, hospitals, when they would go out into the field jointly.  CW 2 elaborated that she and some other legacy Livongo personnel had been "shoved" by Teladoc into a newly combined team after the Livongo acquisition and that Teladoc personnel seemingly had no idea who Livongo was or its product capabilities, and thus she put together this presentation to help train the Teladoc (including legacy InTouch) salespeople for joint sales pitches to clients.

146.    A slide in this presentation depicts a Venn diagram showing the differences and overlap of clientele, businesses, and capabilities of Livongo and Teladoc.  The middle of the Venn diagram, *i.e.*, the intersection between the two companies, includes the term "RPM" circled and crossed out in red—as reflected below:



147.   CW 2 stated that the reason she crossed out RPM was because Teladoc did not have RPM capabilities, despite Teladoc employees repeatedly pitching these capabilities to third parties such as current and prospective clients during sales pitches.  CW 2 explained further that her intention with crossing out RPM in Slide 17 was to warn management to stop talking about Teladoc's RPM capabilities because Teladoc did not have these RPM capabilities.  CW 2 elaborated that at the time, given the Covid-19 pandemic, remote technology services like RPM were highly in demand by potential clients and that is why Teladoc personnel wanted to be able to pitch such RPM products.  CW 2 gave the following example of the kind of RPM solution that Teladoc sales personnel were pitching to clients: for a patient with, *e.g.*, heart failure who after being released from a hospital, the RPM solution would track in real time her blood pressure, heart rate, or other such vital information and send this information in real time to a hospital control center, such that if something were to go wrong, an alert would be sent in real time and immediately notify the patient and/or her doctors.  CW 2 stressed that Livongo did not have any of that—*i.e.* such real time remote patient tracking and response (RPM) capabilities.

148.   CW 2 then added that the left side of the Venn diagram showed Livongo's strengths and the right side of the Venn diagram showed InTouch's and Teladoc's strengths.  The middle of the Venn diagram was meant to show commonalities between the companies, but CW 2 recalled that there were not really any commonalities.  CW 2 then reiterated that "there wasn't a lot of overlap" between the two companies.  CW 2 added, for example, that when going for client sales pitches at hospitals she/Livongo sales personnel would go one way while Teladoc sales personnel would go the other way (*e.g.*, pitching entirely different groups at the prospective client hospital), and they would only meet up afterwards at the end -- showing that there really was no overlap or

synergies with respect to any potential joint sales pitches to sell the combined companies' products and services.

149.    Further, CW 2 stated that in slides 13–18 of this presentation, she tried to propose the Employee Benefit Solution + ("EBS+"), but it "fell on deaf ears." CW 2 added that she showed these slides to Joe DeVivo, Rob Fithian, and Bruce Brandes to demonstrate her concept for EBS+. CW 2 explained that EBS+ was her proposal for how Teladoc and Livongo could offer a combined product solution to bring together the two companies' product technology, and thus offer the kind of services that are listed on the far right of Slide 18 (*i.e.* "Virtual urgent care, Real-time Telehealth for non-emergency virtual care," "chronic care for diabetes, hypertension, pre-diabetes and/or weight management," and "Mental Health, Stepped Care Behavioral Health"). CW 2 further stated that she did this because she was proactively trying to put together a "common story" that the now-combined legacy Livongo and Teladoc personnel could pitch together to a client because there were no synergies among the two companies, *i.e.*, there was not much in common between them, and there were no combined product solutions or other such information coming down from the top (*i.e.*, management) to instruct employees on how to sell these two companies' products and services together. CW 2 noted, however, that Teladoc did not implement her proposal, suggesting that they were not able to do it at that point. CW 2 explained that she was not given a reason by management as to why Teladoc did not implement EBS+.

150.    Thus, this document further corroborates that, from before the Class Period until at least July 29, 2021, Teladoc sales personnel still needed to be reminded that Livongo did not actually have RPM capabilities that they were promoting to Teladoc clients in trying to sell the companies' products. Such continued confusion among sales personnel about the companies'

60

combined product offerings nine months after the Livongo Acquisition had closed, therefore, underscores the poor progress of the Livongo integration during the Class Period.

151.     Other CWs echo CW 2's statements regarding the Company's problems integrating Livongo product technology into Teladoc's offerings during the Class Period.  CW 6, who was Vice President within Teladoc's Hospital Health Systems (i.e. HHS) division, explained that the integration problems during her tenure (*i.e.*, from before the Class Period until Fall 2021) fell into three categories: people, processes, and technology.  For example, with regard to technology, CW 6 stated that Livongo sold a glucometer for diabetes patients that stored digital recordings in the cloud and was accessible via the Livongo app.  CW 6 recalled that Teladoc's vision was to allow doctors to access the glucometer data during virtual care sessions, but doctors were ***still not able to do so when CW 6 left in Fall 2021***.

152.     CW 1 also confirmed that Teladoc was slow to create a comprehensive product that incorporated both Livongo and Teladoc services.  For example, CW 1 recalled that Teladoc had begun to sell a beta version of this comprehensive "whole person solution" to a "handful of clients" by the time she left Teladoc in ***January 2022***.  CW 1 added that this "whole person solution" that Teladoc was testing was really just a legacy Livongo service that Teladoc rebranded.

153.     Additionally, other CWs' accounts show that the two companies' organizational differences caused Teladoc to be less efficient at addressing patients' needs regarding the companies' products and thus contributed to Teladoc's problems integrating the companies' product technology.  For example, CW 11 recalled that organizationally Teladoc and Livongo were very different.  CW 11 explained that Livongo had a dedicated Product Development team while Teladoc did not.  CW 11 explained that the Product Development team that Livongo had, pre-acquisition, worked closely with the Clinical team on creating consumer applications because

it was the clinical team that understood what was clinically needed for patients, such as the ability to monitor their own blood glucose levels as an example.

154.    CW 11 recalled that Teladoc, on the other hand, had engineers or developers embedded in the clinical teams to produce products and/or applications that were desired by the client, but that the Company "absolutely did not have" a separate, dedicated Product Development team, unlike Livongo had pre-acquisition.  CW 11 added that she was also unsure if Teladoc had Product personnel embedded within the clinical teams because she was unsure if the Company had any product development personnel at all.  CW 11 further stated that, from her perspective, Teladoc should have had a dedicated Product Development team to have been more efficient at addressing patients' needs.  CW 11 also explained that the benefits of a Product Development team is to have dedicated people to make an efficient process for the end-user.  CW 11 explained that having a dedicated Product Development team gives a heightened focus on the end-user experience. Accordingly, Teladoc's lack of a dedicated Product Development team further hindered the Company's efforts to integrate Livongo's product technology and to develop the comprehensive, whole-person product solutions that it was publicly touting during the Class Period.

155.    Likewise, CW 10, a former Teladoc employee in a customer-facing role, recalled that Teladoc's integration of Livongo took longer than expected.  CW 10 explained that a working group was created in December 2020, through which CW 10 was paired with a Teladoc counterpart and tasked with integrating Teladoc and Livongo communications and their approaches to the health plan teams or employer customers.  CW 10 recalled that she and her Teladoc counterpart had planned to have this completed in the first quarter of 2021, but there was no way to do customer centric integrated marketing of Teladoc and legacy Livongo's product systems until after the first quarter of 2021.

156.    CW 10 explained that there were "product blockers" prior to the first quarter of 2021.  CW 10 elaborated that if a legacy Livongo customer wanted to add Teladoc's telehealth services after the acquisition, that prior to first quarter 2021, there was no way of sending that customer a link to simply add that additional benefit within their existing customer portal.  CW 10 explained that the customer would have had to re-enroll in their program entirely rather than simply adding on the telehealth benefit, calling this process "clunky."  According to CW 10, customer-centric integrated marketing was important because Teladoc could inform members they had access to Livongo and Teladoc services, but had no way to offer members an integrated way to sign up for the services.

157.    Teladoc's acquisition of InTouch just a few months before Livongo only further exacerbated these Livongo-Teladoc product integration problems.  For example, CW 9 stated that Teladoc's integration of InTouch, which Teladoc acquired in July 2020, was not completed by the time she left in July 2021 and InTouch had issues integrating with Livongo as well.  CW 9 heard from others who worked on the Livongo acquisition that Livongo's platform wasn't compatible with InTouch's technology.  CW 9 recalled that the systems required a "***major overhaul***," and InTouch's integration with Livongo was not complete by the time she left Teladoc.  With respect to the systems that CW 9 referred to, CW 9 stated that it was primarily the Solo Saas product, which she explained was an InTouch platform that was acquired by Teladoc.

158.    CW 9 further stated that legacy InTouch customers were "eagerly awaiting" new feature functionalities to be released following the Teladoc acquisition.  CW 9 added that following the Teladoc acquisition, InTouch had been working to upgrade its Software as a Service (SaaS) platform, called Solo, to a new version referred to as Solo 2.0.  CW 9 recalled that Teladoc had initially announced that Solo 2.0 would be available in January 2021 but pushed the date back until

March 2021, and the project wasn't completed by the time CW 9 left Teladoc in July 2021.  CW 9 recalled that the project wasn't completed because the timeline was too aggressive for the developers.  CW 9 went on to say that the fact that the timeline was unrealistic was escalated within her small team.  CW 9 recalled that her clients were frustrated that the timeline kept getting pushed back, since their old products were sunsetting and they didn't have the necessary functionality to tend to patients.  CW 9 recalled that a "big, white glove customer" of hers might have left Teladoc due to frustrations with the Solo 2.0 launch, though she wasn't sure.  CW 9 recalled that the customer she referred to was "very frustrated" with the situation.

159.    Accordingly, Teladoc still had not fully integrated key Livongo product technology into its offerings, long after the Livongo Acquisition had closed and during the majority of the Class Period, contrary to Defendants' repeated statements.

160.    Other sources corroborate the CWs' statements about these integration failures.  In particular, *Business Insider*, based on its own comprehensive investigation, published an article on November 10, 2021, detailing some of the integration problems that Teladoc was experiencing throughout the Class Period.  According to the article, *Business Insider* had "conversations with 12 current and former employees, many of whom came over from Livongo during the merger," who "spoke under the condition of anonymity because of fear of retribution from the company, and their identities are known to Insider."

161.    The *Business Insider* Article reported: "The department in charge of client operations, for example, had to fully combine with Livongo's by January 1, a former employee said. ***They had a hard time navigating two separate internal systems***, but were told to present a unified front to customers without each other's full product details, they said." The article further elaborated: ***"[T]he rushed union led to confusion and made it difficult for Teladoc to work with***

***customers and iron out its plan for new products***, four people said."  According to the *Business Insider* Article: "Analysts, industry experts, and employees *Insider* spoke with agreed the company needed more time to execute the rationale behind the deal, like connecting Livongo's various care programs to physicians."

162.    Indeed, *Business Insider* explained that the two companies still were not able to integrate the patient portals into a single application as of November 2021, more than a year after the acquisition had closed, which adversely affected customers' experience: "One concern has been around member experience, the current employee said. Patients in the Livongo program can be passed off to Teladoc physicians, and vice versa, with a webpage.  ***But for now, they're still separate apps***."

163.    Indeed, as further detailed below, these CW and Business Insider Article accounts are corroborated by Defendants' own subsequent admissions.   Specifically, Defendants subsequently admitted at the end of the Class Period that Teladoc still had not fully integrated Livongo's chronic care products into Teladoc's platforms by that time and thus could not provide the full comprehensive line of "whole person" virtual solutions that it repeatedly touted to investors.  First, on April 27, 2022, the second partial corrective disclosure date, in addition to revealing a $6.6 billion goodwill impairment charge, Defendants admitted that Teladoc still had not completed integrating Livongo's products into Teladoc's platforms:  "And over the last 12-plus months, we've been working on integrating the Livongo products into our whole-person care experience.  And ***admittedly, we're not done with that yet***."  Second, on July 27, 2022, the final corrective disclosure date, in addition to revealing a $3 billion goodwill impairment charge, Defendants disclosed, among other things, that the "***continued integration of our data that underpins bringing together all of our suite of products . . . still continues.***"

164.    Finally, on August 1, 2022 during a post-quarterly conference call discussion between analysts at Credit Suisse and Teladoc management, in response to Credit Suisse's question about reasons for the Company's disappointing sales performance in the chronic care segment—which is essentially the Livongo business—Defendants explained that: "***The company's products are not yet fully integrated***. ***For example, TDOC has three separate apps***. So there is a bit of a challenge of getting into a client and saying ***we'll be a one stop shop when we can't show that yet***."

**(b)     Teladoc Had No Integration Plan to Reconcile the Companies' Different Business Models and Teams**

165.    According to CW 4, who worked at Teladoc from before the Class Period until early 2022, another reason the integration had not gone well throughout her tenure was because Teladoc seemingly had ***no integration plan*** and that they seemingly did not know how to create one because the two companies had two fundamentally different business models.  According to CW 4, Teladoc's model was to get as many remote physician consultations as possible because each one incurred a charge.  CW 4 explained that, conversely, Livongo's business model was based on monthly subscriptions, which she described as recurring revenue, which focused on keeping patients away from constant physician consultations and trying to drive down utilization.  CW 4 further described it as Teladoc wanting to increase physician visits/charges, and Livongo wanting to increase subscriptions.  According to CW 4, the problem was that "If we boost one, we hurt the other."  That is, according to CW 4, Teladoc's business was based on utilization and Livongo's was based on subscriptions that would lead to utilization.  CW 4 recalled that this was an issue at Teladoc throughout her tenure, adding that it became apparent to her by around ***three months after the acquisition*** that Teladoc did not know how to use and integrate Livongo.

166.    Thus, given the differing business models between Livongo and Teladoc, Teladoc was unable to figure out how to reconcile the different models or how to properly allocate resources to each business without hurting the other.

167.    Similarly, CW 10 recalled that she found it strange that after Teladoc acquired Livongo, Teladoc put more resources toward Teladoc's telehealth solution rather than Livongo's offerings.  CW 10 explained that Teladoc's telehealth solution charged a one-time fee, whereas Livongo offered a subscription product that charged a recurring monthly fee.  CW 10 recalled that she discussed the concerns with her legacy Livongo colleagues, who were unhappy with the direction that Teladoc leadership was taking.

168.    CW accounts also confirm that Defendants knew about these Livongo integration problems.  For example, CW 1 explained that projected timelines for integrating Livongo and Teladoc were discussed at townhall and all-hands meetings.   CW 1 recalled that C-Suite executives, including Gorevic, discussed the integration timelines, as well as Vice Presidents and Directors, such as the VP of Strategy or VP of Operations.  CW 1 added that the Vice President of Strategic Sales, or a title similar to that, was also present in those meetings.  CW 1 recalled that the timelines were often missed and delayed by a month or quarter.

169.    Importantly, CW 4 recalled an instance where CEO Jason Gorevic acknowledged these integration difficulties—*i.e.*, Teladoc's apparent lack of an integration plan and other problems that CW 4 described above—to some degree.  According to CW 4, Teladoc held a leadership meeting over the course of a few days in or around September 2021 in Chicago, Illinois, that she and Gorevic attended.  CW 4 recalled having direct conversations with Gorevic about plans for the Livongo integration at the meeting, and that Gorevic responded with "Wait until tomorrow."  CW 4 explained that Gorevic was referring to the presentation that he (Gorevic) was

giving the following day regarding plans for integrating Livongo, and that Gorevic had seemingly stated it in a way that suggested that CW 4 would be satisfied, and that the integration issues would finally be resolved.

170.    According to CW 4, Gorevic's presentation the following day added nothing new, provided very general information and no specifics, that it seemingly to CW 4 did not resolve the integration issues she was referring to when she approached Gorevic the previous evening, and CW 4 felt that it came across as "not sophisticated" and "underwhelming."  Thus, according to CW 4, when Gorevic gave his presentation "alarm bells went off" in CW's mind.

171.    Other CWs' statements further illustrate the internal organizational confusion that resulted from the lack of a clear, coherent integration plan.  For example, CW 2 recalled that after the Livongo acquisition, her Hospitals and Health Systems (HSS) team was merged with InTouch's Acute Care team, which Teladoc had acquired.  CW 2 explained that the placement did not make sense because the Acute Care team sold to completely different buyers than CW 2's HSS team.  For example, CW 2's team sold the Livongo platform as an employee benefit to HR departments or finance teams, whereas InTouch sold its acute care product to emergency rooms and stroke doctors.  CW 2 recalled that other divisions "had no idea" what to do with the Livongo personnel either.

172.    Internal documents further corroborate CW 2's concerns about this lack of a clear integration plan and the resulting structural disorder and personnel confusion that ensued after the Livongo Acquisition closed.

173.    Specifically, CW 2 and another legacy Livongo employee drafted a document entitled, "HHS Team Open Issues," in November or December 2020, with a final version in mid-January 2021, as they prepared for the 2021 selling season.  According to CW 2, the purpose of

the document was to document their concerns with being moved into HHS[27] and the lack of

direction and purpose for the Livongo team that was assigned to HHS given the lack of synergy or

fit.  CW 2 explained that they were trying to be proactive given that Teladoc did not seem to know

what to do with them.  CW 2 added that these were personal notes with outlined points to have a

consistent message that she and her Livongo colleague used to try and convey a strategy to "right"

the ship when addressing their management, which included Bruce Brandes, Rob Fithian, and

Gerry Marini. The document indicates that these "open questions" were also intended for "Joe

DeVivo," who was former InTouch CEO and became Teladoc's President, HHS after the InTouch

acquisition until April 2022.  CW 2 confirmed that she and her colleague also used these notes as

"talking points" with management, such as Joe DeVivo, when discussing their concerns.

174.    For example, among many other questions of concern and confusion raised in the

HHS Team Open Issues document, the Livongo team was eager to find answers to some very basic

information about how the two companies would fit together with respect to sales and other

operations, including the following:

1. **HHS Team - Joe DeVivo / Rob Fithian**
   a. What does Joe's TDOC team sell? Breadth of TDOC services?
   b. Who is their target audience & populations? Clinicians, IT, Finance? Top use cases and service lines?
   c. JoeD Team gets paid for leads for LVGO - How does this work?

2. **Open Questions for Joe D, Bruce, Rob Fithian**
   a. What is Joe and Rob's vision for our team?
   b. Alignment goals (how do they envision Vu and David aligning to support their business goals?)
   c. How will we work with other divisions? If at all?
   d. How can they leverage our expertise? e. What are we called?
   e. Who is our support team (e.g., MKTG)

---

[27] As discussed above, HHS was the new name of Teladoc's recently acquired InTouch business.

    f. How do we work with Teladoc, SMEs etc.?

    g. TDOC SFDC - can we get access now? - Also, what other tools does the TDOC team use? i. What is the Health System structure at Teladoc?

3. **What do we sell?**

    a. What is in our bag? What can we sell? (i) Existing Livongo legacy? (ii) EBS (EBS - can we get EBS to extend the continuum of care to urgent plus chronic plus BH for employees)? (iii) myStrength? (iv) New Developmental Programs? Other? b. RPM - Patient-focused, what is it? What do we have?

    b. HS Employees only? Or Health System plus their Health Plan and ACO?

    c. Patient population - distinguishing mix between employee sales and patient use cases?

4. **Clients (who we can target?)**

    a. Define our clients - who are they? Both LVGO to TDOC and TDOC to LVGO

    b. Current TDOC MSAs in place that we can update with SOW/addendum and leverage? c. NEED TO CLARIFY: Employees of hospitals only? + Health System Health Plan? + Health System ACOs? Health System Medicare Advantage Plans? IDNs? Health System outbound Workplace Wellness programs (e.g., Health Systems that sell services to the employees of local Employers)?

5. **Our Role?**

    a. Protect the base with existing products/programs?

    b. Build/expand within existing clients (other programs)? Land and expand?

    c. New Biz? e.g., EBS?

    d. Explore pilots, new program development within prospects and clients, e.g., HF, CKD, CCCE?

6. **Comp Plan -** Base+VC+MBOs? Shared or team (Pod) goals? Double comp for employees who fall under Health Plan (since sale would go to Sturmer's team)

7. **Intercompany Relationships**

    a. With CSMs?

    b. With Product Team, i.e., how are we building a bridge to the patient population?

    c. What is RPM? How real? How defined? When? Comp? Go-to-market plan?

    d.   What is the Chronic Care Center of Excellence? How real? Go live date? How defined? When? Comp? Go-to-market plan?

175.    Therefore, the fact that several months after the Livongo Acquisition closed, legacy Livongo employees in the HHS team at Teladoc still had so many open questions, including such basic information about how their team fit into the combined Company, including "what are we called?," "how do we work with Teladoc" and "what can we sell?," confirms the lack of a clear integration plan for combining two companies' businesses and personnel and the resulting disorder and dysfunction that existed during the Class Period as Teladoc struggled to integrate the companies' teams.

176.    Furthermore, these questions presented in the HHS Team Open Issues document also corroborate other CWs' allegations.  For example, multiple CWs recalled the lack of integration between Livongo's and Teladoc's Salesforce.com systems, which adversely impacted the Company.  Indeed, CW 3 explained that employees that came from Livongo did not have login credentials or access to Teladoc's Salesforce.com system, which was resulting in delays in sales. According to the HHS Team Open Issues document, one of the issues within the HHS team was this very problem: "TDOC SFDC[28] – can we get access now? – Also, what other tools does the TDOC team use?"

177.    Indeed, senior Teladoc executives internally acknowledged the lack of an integration plan at the start of the Class Period, which was several months after the integration had begun.  Notably, as discussed above, CW 2 described a meeting that took place on June 17–18, 2021 in Nashville, where she asked Teladoc COO David Sides about the plan to integrate Livongo.

---

[28] "SFDC" is a common abbreviation for Salesforce.com (which is read as "Salesforce Dot Com").

According to CW 2, Sides spoke to the team on the morning of Friday, June 18, and that is when CW 2 asked him the question. CW 2 recalled that Sides's response was "That's a great question," without providing a plan, which worried CW 2 and her team.

178. Additionally, Teladoc was also unable to fully integrate one of the Company's main business segments—its commercial organization. For example, CW 2 explained that "commercial integration" likely referred to Teladoc's main business, or their virtual whole-care primary care product. Similarly, according to CW 2, Teladoc considered their "commercial" business to be the Company's traditional business. CW 2 then further clarified that any entity, such as an employer or union, which was responsible for or provided health benefits for their employees (self-insured employers) was considered "commercial" business by Teladoc.

179. CW 2's description of the Company's commercial organization is corroborated by its SEC filings. For example, according to an October 15, 2020 Teladoc SEC filing, the Company's "global commercial organization," all of which reported to COO David Sides, "integrates the combined company's channels and operations into one team that will deliver on [the companies'] commitments to customers and clients." As illustrated by the group heads who were within this global commercial organization and reported to COO Sides,[29] the commercial organization thus encompassed most of Teladoc's main businesses. Importantly, ***CW 2 stated that she would not have considered the commercial business "fully integrated" during her tenure—***

---

[29] According to Teladoc's SEC filings, the following individuals were part of the global commercial organization who reported to COO Sides: Kelly Bliss, President, U.S. Group Health; Rob Bressler, SVP, General Manager, Virtual Primary Care; Gary Britton, VP, Operations; Joe DeVivo, President, Hospitals & Health Systems; Steve Lalonde, Chief Sales Innovation Officer; Alon Matas, President, BetterHelp; Carlos Nueno, President, International; Dr. Alan Roga, Chief of Clinical Operations; Matt Sopcich, SVP, General Manager, Behavioral Health.

which continued until a year after the merger (*i.e.,* Fall of 2021)—***because the businesses were all***
***running separately.***

180.    CW 2 further recalled that Teladoc attempted to merge the legacy Livongo
employees with their consumer division that was run by Kelly Bliss, despite there being "no real
continuity" between the divisions.  Further, CW 2 recalled that employees questioned Bliss's
background and experience.  Indeed, according to CW 2's handwritten notes that she took about a
year after the Livongo Acquisition and prior to her exit interview (the "Exit Interview Notes"),
there was a "Battle of Kelly vs. Joe" (referring to the competing ideas between Kelly Bliss and Joe
DeVivo about how the business should be run), and "Kelly Won."  CW 2 added that the "Battle
of Kelly vs. Joe" exemplified the friction between Teladoc and InTouch employees, which was a
result of Teladoc still not being able to fully integrate InTouch.  CW 2 explained that Kelly Bliss's
team was the Consumer division, which sold Teladoc's consumer product line, to employer clients
like Delta or Boeing, for example, in contrast to Joe Devivo's HHS division, which CW 2 was part
of and which sold to hospital systems.

181.    Furthermore, CW 2's Exit Interview Notes, under the heading "InTouch," stated
that "David Sides had no answer" to "[w]hat is integration plan."  Such notes thus further
corroborate CW 2's and other CWs' accounts regarding Teladoc's problems integrating InTouch,
which exacerbated its failures in integrating Livongo.  The Exit Interview Notes also stated, that
the Company had "***[b]uilt fence – put us on an island***"—further evidencing that the companies
that Teladoc acquired operated as separate entities rather than the fully integrated company that
Teladoc publicly touted.

182.    Additionally, with respect to another item in CW 2's Exit Interview Notes, which
stated "[c]ut off communications with ex-LVGO Team," CW 2 explained that this meant that she

and the other legacy Livongo personnel, who were put in the HHS division and were still selling the full line of Livongo products, were carved out from the rest of the HHS team—*i.e.*, they were excluded from Teladoc HHS team meetings that discussed the combined company's go-to-market strategies, product updates, and other such sales-related information.

183.    Thus, far from a smooth, completed integration of groups and personnel into one successfully merged organization, as Defendants publicly portrayed the integration to investors, the Company's main business segment after the Livongo Acquisition was an amalgam of separate warring factions, riddled with confusion and infighting, which adversely impacted sales and operations during the Class Period.

184.    Additionally, CW 2 explained that internal emails—such as the email thread from November 30, 2020 with the subject line, "Teladoc Remote Patient Monitoring and Chronic Care Management," which, as described in detail above, discussed Teladoc overselling Teladoc's RPM capabilities to clients—were examples showing that Teladoc's commercial organization was not fully integrated during CW 2's tenure, which spanned from before the merger until a year after the merger.

185.    Moreover, CW 2 stated that the InTouch employees worked closely with Emergency Room personnel, whereas the Livongo employees worked closely with Human Resources personnel.  CW 2 explained that Teladoc envisioned that the Livongo and InTouch divisions could ultimately sell an end-to-end product to hospitals, but CW 2 reiterated that the two divisions sold to different buyers.  CW 2 recalled that the two divisions would walk into a hospital and the InTouch people would go to the ER and the Livongo people would go to the HR department; CW 2 said that there were no synergies between the selling approach of Livongo's employees and InTouch's employees. For example, CW 2 specifically recalled this happening at

hospitals including the Ohio State Medical Center, MetroHealth in Cleveland, and Montefiore in the Bronx.  CW 2 explained that Teladoc was attempting to take credit for the Ohio State deal, trying to spin it as an example of a successful sales deal that the Livongo and Teladoc personnel had done together after the Livongo acquisition to show that they were "one big happy company," even though the deal was almost already 99% completed by Livongo at the time of the acquisition. Indeed, CW 2 added that Livongo and Teladoc (including the acquired InTouch business) had different business models, which also contributed to the lack of synergies between the companies and their personnel.

186.    Accordingly, CW 2's account and documents showing this continued organizational confusion and division and lack of synergies among the teams and personnel during her tenure at Teladoc supports that the Company had not fully and successfully integrated Livongo's business and teams during the Class Period.

187.    Similarly, CW 7 stated that when she left Teladoc in October 2021, she was working on a team that was still focusing exclusively on the Livongo product.  CW 7 recalled that many of the business segments at Teladoc were *"siloed."* CW 7 added that Teladoc had planned to eventually phase out the "Livongo" brand name and replace it with "chronic care by Teladoc," but this had not happened by the time she left in October 2021.

188.    Likewise, CW 1 explained that her legacy Livongo team was ***still operating separately*** from their Teladoc counterparts when she left in ***January 2022***.  CW 1 recalled that the integration seemed to be happening from the top down, meaning that higher-ups were integrating before her team would have.

189.    Further, in discussing a statement by Defendant Verstraete from the November 18, 2021, Analyst Day Conference as set forth in the accompanying footnote,[30] CW 8 explained that "at that point," meaning November 18, 2021, she would have to disagree with that statement because she recalled that Teladoc "did not have much of a data science team," and that it was Livongo who provided the vast majority of the data science personnel after the merger.  CW 8 added that she was surprised that Teladoc had not invested much in data science prior to the merger.  According to CW 8, when the merger occurred, Teladoc had "only" 4 or 5 employees on their data science team.  CW 8 added that Livongo brought over 15 – 20 data science personnel, and who wound up making the vast majority of Teladoc's data science team.  CW 8 added that it was from her perspective that the capabilities of Teladoc's data science team were very limited compared to Livongo's legacy data science personnel.

190.    Likewise, as discussed above, with respect to the failure to integrate the companies' Tableau platforms, CW 11 stated that, unlike Livongo, Teladoc "did not have a well-defined" data science group, which she described as Teladoc having data science engineers but not so much a team.  CW 11 added that Teladoc data scientists were decentralized and were embedded within Teladoc's clinical teams.  CW 11 explained that while Teladoc had some data engineers, that they appeared to her to be "standoffish" and who she experienced "contention from" in the sharing of data for the purposes of integrating with Livongo.  CW 11 added that she had been involved in integrating platforms when working for other large companies in the past including AOL (America

---

[30] Specifically, CW 8 referred to the following statement by Defendant Verstraete: "Now if we were to look under the proverbial hood of the engagement engine, over the course of this year, we've significantly deepened our capabilities *as we brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks*, right? In doing so, we've created – we've equipped ourselves to be able to deliver highly relevant, scalable, but one-to-one engagement life cycle management, which drives those stickier relationships and which sort of allows us to reach any given member with any given service configuration."

OnLine).   CW 11 recalled that when she had been involved in previous integrations at other companies, that those data engineers were eager in getting the integrations done.   CW 11 recalled that this was not her experience at Teladoc, adding that the Company had "no clear integration plan" on data during her tenure at Teladoc. CW 11 added that there was no clear information on integrating coming down from above.

191.     In fact, with respect to how the attempted integration of the Tableau platforms even began, CW 11 explained that various teams within Teladoc wanted an integrated Tableau for various reasons, but a clear timeline on results was never presented from above.  CW 11 added that she presented an integration plan of the Livongo and Teladoc Tableau platforms to her direct supervisor, Chief Data Scientist Anmol Madan, but that she never received any clear direction from him on it.  CW 11 added that she was under the impression that the subject was "outside of Anmol's control."

192.     Additionally, CW 11 explained that, in the context of Defendant Verstraete's November 18, 2021 statement that Teladoc had already "integrated the legacy Livongo and Teladoc marketing data and tech stacks," CW 11 believed that the term "tech stacks" was referring to applications used for marketing purposes.  CW 11 elaborated that some examples of such applications was the use of email blasts or text messages to customers to market products.  CW 11 further explained that the *marketing team mined data from Tableau to use for its marketing data and tech stacks*, which includes email blasts and text messages.  In general, CW 11 explained that the term "tech stacks" refers to one or more applications in a specific area to optimize operations.

193.     Thus, CW 11's account makes clear that the Company did not even *begin* the process of integrating Livongo's and Teladoc's data systems, Tableau, let alone *complete* it, during the Class Period.  Her account also indicates that Teladoc relied on the Tableau system and the

patient and client data it stored for important ***marketing***, among other, purposes. *Id.* Thus, CW 11's account of Teladoc's failure to integrate the companies' data platforms that were critical for marketing functions during the Class Period further illustrates that Defendant Verstraete's November 18, 2021 statement representing that they had "***integrated the legacy Livongo and Teladoc marketing data and tech stacks***" was false and misleading when made. Indeed, Teladoc could not have integrated the companies' "marketing data" or their marketing "tech stacks," i.e., applications that relied on such data, at this time given it had not even ***begun*** the process of integrating the platforms that stored such data until after the Class Period.

194.    CWs also described similar confusion and lack of a coherent plan with respect to integrating the companies' marketing strategies, which also adversely affected sales. For example, according to CW 8, Teladoc had not done anything to improve marketing, and she felt that Defendant Verstraete did not understand enough about Livongo or the product. CW 8 added that Verstraete never seemed to be familiar with the Livongo products when she discussed them. CW 8 recalled that internally Teladoc was unsure if they wanted to even keep the "Livongo" name or rebrand it as something similar to "Livongo by Teladoc." CW 8 recalled that this was a long-running debate that continued up through the end of her tenure (*i.e.*, December 2021) because there were Livongo clinical customers, such as HCSC as one example, who did not want to use or be associated with Teladoc. CW 8 also recalled that it was around October 2021 when Teladoc was no longer on Express Scripts' primary formulary, which meant that Teladoc was no longer a preferred customer as Livongo had been.

195.    These problems in integrating Livongo's teams into Teladoc's organizational structure were also compounded by Teladoc's acquisition of InTouch, which it had also acquired shortly before the Livongo Acquisition, and was still struggling to integrate. CW 6, who worked

as a Vice President within Teladoc's Hospital Health Systems division, and her team was responsible for selling into health systems, said that Teladoc had acquired InTouch Health in July 2020 and InTouch was dedicated to health systems as well. CW 6 recalled that, given this overlap, nobody knew where to put her Livongo health systems team. CW 6 compared the situation to horse trading, saying that one executive would want the team whereas another executive would not. CW 6 recalled that confusion about where to place her Hospital Health Systems (HHS) team started on day one of the integration of Livongo and Teladoc, meaning since the companies merged.

196.    CW 6 recalled that her team eventually landed as part of InTouch's health and hospital systems team around November 2020. But CW 6 recalled that the confusion on her team persisted even after November 2020 and that the integration of the two teams was a "Band-Aid," noting that the entire team was dissolved within a year of the Livongo merger closing. CW 6 explained that the "solution failed within a year." One example of confusion that persisted throughout her tenure that CW 6 recalled was that the legacy InTouch leadership did not understand the Livongo business, which CW 6 explained was frustrating.

197.    CW 6 added that the challenge then became how to integrate the organizations— meaning primarily Livongo and Teladoc—rather than just act as a holding company. CW 6 also explained that there was "misalignment" throughout the organization. CW 6 explained that in her HHS division, the finance leaders were not measured on Livongo sales despite having dedicated Livongo resources. CW 6 further explained that Teladoc was slow to integrate Livongo's platform and is slower to market than Livongo was. Indeed, CW 6 explained that the Livongo integration was not complete when she left Teladoc in Fall 2021.

(c)     **High Attrition After the Livongo Acquisition Further Undermined a Successful Integration**

198.     Teladoc also experienced a high attrition rate after the Livongo Acquisition, which led to the loss of numerous Livongo employees, particularly executives, who were key to a successful integration.  In the midst of increasing competition, such a loss of key personnel prevented Teladoc from successfully integrating Livongo and thus hurt Teladoc's ability to successfully leverage Livongo's business.  For example, CW 4 explained that Teladoc bought Livongo as a commodity but that apart from the services that Livongo offered, that its accumulated people-knowledge was extremely important to the success of Livongo.  According to CW 4, prior to the acquisition Livongo enjoyed a great trajectory because of the leadership of its founder Glen Tullman as well as the institutional knowledge of key Livongo employees who were not retained by Teladoc but were the key to Livongo's success.  CW 4 identified some of these key people as President Jenny Schneider and the top two executive heads of sales (names not recalled), with all three (including Schneider) leaving upon the merger being finalized.  CW 4 further explained that Livongo had experienced much success prior to being acquired by Teladoc due to its people-knowledge, meaning how well those Livongo employees understood Livongo's product and capabilities.  CW 4 added that Teladoc treated the Livongo acquisition like a commodity or a "widget," explaining that she meant that a lot of human know-how was required to make that commodity successful, and that it was not just a product that could be sold off the shelf.

199.     According to CW 4, many legacy Livongo employees were either terminated or left Teladoc during her tenure, adding that there were hardly any legacy Livongo employees left by the time her own tenure ended in early 2022 and very little effort was made to retain them.  CW 4 recalled that most terminations of Livongo employees occurred at the time of the merger, and that then many others voluntarily left Teladoc between the merger and when CW 4 departed in early

2022.  CW 4 also explained that Teladoc did not retain many key Livongo employees who held knowledge of that company at the merger, and that many other Livongo employees wound up seeking employment elsewhere, adding that Teladoc "undervalued the historical knowledge" of the legacy Livongo employees.  CW 4 recalled that this also included Chief Product Officer Amar Kendale, who she recalled left around 6 months after the merger.  CW 4 added that Kendale had been "instrumental" at Livongo.

200.    Moreover, CW 4 added that she understood that a certain number of employees are usually terminated after an acquisition because a company does not want to duplicate responsibilities, but that she had been through three or four other mergers in the past and had never witnessed the hemorrhaging of employees from an acquired company that she witnessed with Livongo with the Teladoc merger.  CW 4 reiterated that Teladoc was seemingly making no effort to keep Livongo employees.

201.    Similarly, CW 2 recalled that Teladoc CEO Jason Gorevic let go of all Livongo's management team within the first week after the acquisition.  Specifically, CW 2 explained that Livongo executives had a farewell zoom call around a week before the merger became official and were then gone "within days" of the merger closing.

202.    Furthermore, as discussed above, CW 2 explained that Teladoc brought in new executives who did not know anything about Livongo and would make things up in client meetings.  Indeed, CW 2's Exit Interview Notes specifically indicated that sales management had "[n]o depth of knowledge of LVGO (e.g., Need ROI [return on investment] tool)."  CW 2 added that Marini did not realize that Livongo had an existing ROI tool; Marini told CW 2 that Livongo needed to start building a new ROI tool after the Livongo acquisition, which CW 2 considered unnecessary and repetitive, given Livongo's existing capabilities.  CW 2 recalled that a lot of her

job was educating Teladoc personnel about what products Livongo had and what they could do, and thus telling them that certain capabilities that they wanted to create (*e.g.*, the ROI tool) already existed within the Livongo portfolio or that Livongo was incapable of doing other things.

203.    And with respect to Bruce Brandes, Teladoc's SVP of Health System Innovation and who (according to LinkedIn) helped lead the strategic integration of Teladoc, Livongo, and InTouch Health in 2020, the notes further indicated that Bruce had "[n]o Livongo history" and had "[n]o Livongo contracts – especially Product Team."   Additionally, the notes indicated that Brandes would "[s]ell futures" and "go down rabbit Holes," which "frustrates clients."   CW 2 explained that "sell futures" referred to selling products that Livongo did not have, *i.e.*, making up product capabilities that Livongo did not have, like the RPM example discussed earlier.

204.    Similarly, as explained above, CW 2 recalled that these newly hired executives pitched clients on a "whole person platform," while Livongo had standalone products for diabetes and other diseases but had not yet integrated them.   Accordingly, such heavy attrition of key Livongo personnel who were knowledgeable about Livongo's products and technological capabilities resulted in significant problems for the Company's ability to develop, market, and sell "whole person" integrated products to clients.   Indeed, the internal Teladoc documents described above amply demonstrate these problems after the Livongo Acquisition closed, as well as the fact that these problems were elevated to senior executives, including Defendant Shah and Kendale.

205.    CWs also discussed significant personnel integration issues, particularly in the companies' sales forces, which also negatively impacted operations.   CW 2 further recalled that Teladoc and InTouch were claiming credit for Livongo deals they had no part in. For example, CW 2 explained that she brought in a deal with Ohio State University while working for Livongo. CW 2 recalled that Teladoc then attributed that deal and its corresponding synergies and revenue

to Teladoc, as well as Livongo.  CW 2 recalled an InTouch employee was also paid commission for one of CW 2's Livongo deals.  Because of this, CW 2 suggested that Teladoc was double counting deals, but she said she was not sure.  CW 2 recalled that Josh Akers, who reported to Rob Fithian, was the person crediting InTouch and Teladoc with CW 2's Livongo deals.  CW 2 added that she told Akers that no one from InTouch or Teladoc worked on her deals.  Regarding the double counting of deals, CW 2 suggested this was the case because scorecards presented in an InTouch synergy meeting indicated to her that her Ohio State deal appeared to be recorded as both an InTouch sale and a Teladoc sale.

206.     CW 2's Exit Interview Notes confirm these issues, including the lack of synergy and cultural clash, between Teladoc and Livongo employees.  For instance, under the heading "Sales Mgmt [Management]," CW 2 had written, among other things, "[n]o synergy – 'double count' & claim credit"—which CW 2 similarly recalled above.  The notes further identified several differences between Teladoc and Livongo customers including that there were "[d]ifferent [b]uyers and [e]nd [u]sers," and noted that the Teladoc sales management was "[i]ndifferent to LVGO people," and the message to "stay out of our swim lane," further illustrating the division and siloed approach—rather than unified integration—of personnel fostered by sales management.

207.     Other internal Teladoc emails from December 2020 corroborate the discord and confusion created by the Company's policies for whether Livongo or Teladoc sales personnel would be paid commission for certain deals.  For example, a Teladoc email dated December 23, 2020, with the subject line, "Update on recent sales via Cleerly and important point of clarification re: 2021 deals to be closed," provided updates to the Company's policy for who would receive sales credit and commissions for deals closed in 2020 versus 2021.  As CW 2 confirmed, Teladoc was crediting Teladoc employees with deals regardless of whether Teladoc employees or legacy

Livongo employees were the ones responsible for such deals—further contributing to the annoyance between Teladoc and Livongo employees.

208.    A few days later, CW 2 emailed Bruce Brandes and Vu Van,[31] expressing her concern over the updates and proposing some structure to minimize the internal competition between Kelly Bliss's USGH business unit and HHS.  For example, according to a Teladoc email dated December 2020, CW 2 wrote, "Bruce – thanks for the call today to get my input on 'what we own' for 2021.  I wanted to document my suggestions and re-cap what we discussed earlier today. I am *deeply concerned about the added complexity, confusion and turmoil* this USGH directive will cause internally.  And the *mixed messages and confusion it will cause with the customers and prospects of Teladoc*."  CW 2 explained that USGH stood for United States Group Health, which was Kelly Bliss's division.  CW 2 added that "the USGH directive" referred to the way in which, after the Livongo acquisition, people were moved from key accounts, personnel were moved to different groups without any input from them, the "turf war" between Joe DeVivo and Kelly Bliss, and the way in which some people were put in positions of importance despite having no real grasp of what they were doing (like Teladoc personnel taking over Livongo-related business that they did not understand).

209.    Such emails, therefore, further demonstrate the lack of integration among the Livongo and Teladoc sales personnel and groups after the Livongo Acquisition, which adversely affected the Company's sales efforts with existing and prospective clients. Accordingly, the Company's failure to integrate the Livongo and Teladoc personnel fostered conflicts and division among the employees that adversely affected the day-to-day operations and sales of the Company.

---

[31] According to LinkedIn, Vu Van was VP of Health Systems at Livongo and then Teladoc from 2018 to May 2021.

210.    Similarly, CW 3 recalled that Teladoc saw a very high attrition rate after the Livongo deal.  CW 3 estimated that 50% of her team had left within a year of the deal closing. CW 3 added that many people, including herself, waited to leave until Spring of 2022, when they received their annual bonuses and RSUs.[32]  CW 3 explained that there was an "us vs. them" mentality between Teladoc and Livongo and a lot of finger pointing.  For example, CW 3 further recalled that the Livongo salespeople would steal clients from Teladoc salespeople.

211.    Likewise, CW 5 recalled that the "highest level of leadership" from Livongo left shortly after Teladoc acquired Livongo.  CW 5 added that an "outrageous" number of people have left Teladoc since the merger, especially legacy Livongo people.

212.    Similarly, CW 5 recalled that she was part of a group that was responsible for integrating the two companies' sales forces starting in January 2021.  CW 5 stated that the group was tasked with identifying duplicate clients and ensuring that the teams were working in concert and not stepping on each other's toes.  CW 5 further noted that the integration wasn't complete by the time she left in June 2021.

213.    Furthermore, CW 6 stated that at least 80% of legacy Livongo employees are no longer with the Company and all five members of her team left between May 2021 and January 2022.  CW 6 explained that she personally left because the integration was a "shit show," explaining that the vision for Livongo left with its leadership.  CW 6 further said that Livongo had been "innovating quickly" before the merger but that innovation and portfolio expansion stopped under Teladoc.

214.    Similarly, according to CW 8, many Livongo employees left before and after the merger so that it appeared to her to be more of "***integration through attrition***," through a shedding

---

[32] The term "RSU" refers to restricted stock units.

of as many Livongo employees as possible.  CW 8 added that a lot of the Livongo institutional knowledge and experience was depleted with those departures as well.  CW 8 also recalled that many legacy Livongo personnel continued to leave Teladoc after the merger, including large groups that departed in August and December 2021, as well as in March 2022 after RSUs and bonuses were paid out.

215.    CW 1 also recalled that after Teladoc acquired Livongo, Teladoc experienced operational issues such as a loss of Livongo leadership and culture clash between the two companies.

216.    The *Business Insider* Article further corroborates these CWs' accounts of major failures in integrating Livongo personnel and related attrition problems post-acquisition, which substantially affected Teladoc's performance.  Specifically, according to the *Business Insider* Article, as of November 10, 2021, "[m]ore than 110 Livongo employees have left since the deal closed, with only a few of Livongo's senior leadership sticking around for the long haul," and "[w]ithout those senior leaders, the employees Insider spoke with said there's been confusion in the sales process as Teladoc grapples with an increasingly competitive market, and its clients, such as health plans, stand up their own virtual-care tools."

217.    *Business Insider* further explained that "[i]n reality, Teladoc quickly dismantled the roughly 800-person Livongo unit."  Indeed, according to the article, "[a] year in, only two members of Livongo's C-suite remain: Arnnon Geshuri, who's now Teladoc's chief people officer, and Dr. Bimal Shah, who's now its chief medical officer."  The article continued: "Tullman and Hemant Taneja, a managing partner at General Catalyst and longtime healthcare entrepreneur, departed Teladoc's board of directors earlier this year so that Tullman could start a General Catalyst-backed startup, Transcarent, that used other telehealth companies through partnerships."  Furthermore, the

article reported that "Dr. Jennifer Schneider, who served as president and chief medical officer, left the companies before the merger finished, working as an independent advisor to a blank-check company backed by General Catalyst that's meant to take more startups like Livongo public." Moreover, "[i]n the next-highest category of executives*, only a handful remain*, according to LinkedIn profiles: Anmol Madan, Teladoc's chief data scientist, as well as Senior Vice Presidents Karl Greiter, Matthew Sopcich, Steve Lalonde, and Whitney Mirro."

218.    The hemorrhaging of employees after the Livongo Acquisition could not be ignored inside the Company.  For example, as the *Business Insider* Article reported: "As recently as in the past few months, Teladoc has had to address the departures, discussing them in townhalls and via companywide emails, an employee said.  'How could you get a successful merger if all your intellectual capital leaves?' a current employee said."  In fact, "Tullman [Livongo's founder and chairman, who left after the acquisition] told Stat's Erin Brodwin last month that *the jury was still out on Teladoc's ability to provide a 'comprehensive offering*,' in part because of how many employees had left."  The article continued, "'I think given a lot of loss of talent, *that's an indicator that things aren't going as well as we would have hoped,' Tullman said*."

219.    The article also corroborated the CWs' accounts of related culture clash issues between Livongo and Teladoc personnel, which contributed to this attrition.  In particular, *Business Insider* wrote that a "culture clash dominated the better part of the last year, according to Insider's conversations with 12 current and former employees, many of whom came over from Livongo during the merger."  Similarly, the article explained that "[t]here have also been cultural challenges. The two companies come from very different backgrounds. Teladoc, a 19-year-old services company with more than 5,000 employees who generally keep standard work hours, says it doesn't want to disrupt healthcare."  The article provided the following example: "'Teladoc is

different. No one wanted to get close to the business issues. They wanted to manage via the numbers,' a former Teladoc employee said. 'Glen would have fought you all day, but at least he would have been there.'"   Accordingly, these personnel integration challenges, and resulting massive attrition, further illustrated that the integration of the companies' teams was not progressing smoothly or complete during the Class Period, as Defendants repeatedly represented to investors.

> **2.    Teladoc Former Employees Confirm that Increased Competition Was Negatively Impacting Teladoc's Business, Particularly Due to Teladoc's Livongo Integration Failures**

220.    Investors knew that there was increased competition in the telemedicine market, particularly as a result of the pandemic, and thus were highly focused on whether Teladoc would be able to successfully fend off such competition during the Class Period.  As discussed further below, Defendants repeatedly assuaged such investor concerns by denying or downplaying any adverse effects from increased competition on the Company's business, concealing internal red flags to the contrary. In particular, investors did not know that Teladoc was in fact increasingly losing business to competitors during the Class Period in part because of its failures in integrating Livongo, which competitors exploited to their benefit.

221.    In particular, CW 2 gave examples of times when Teladoc lost customers due to issues integrating Livongo.  As one example, CW 2 explained that prior to the Teladoc acquisition, Livongo had reached a deal with CVS in which CVS would sell Livongo's diabetes programs as a rebranded CVS "Transform Diabetes Care" Program.  CW 2 recalled that CVS's own sales team sold the program to their clients, and Livongo subsequently got a "huge percentage" of their business through this CVS program.  CW 2 stated that CVS then decided to terminate the contract right before Livongo was acquired by Teladoc.   CW 2 added that the termination process concluded after the acquisition closed.   According to CW 2, CVS gave clients the option to

terminate their own contracts with Livongo immediately or to defer for one year.  CW 2 recalled that some clients chose to defer for one year then move on.

222.    CW 2 recalled that after the contract ended, CVS tried to flip its clients into using its own diabetes program, citing and leveraging the integration issues at Teladoc as one of the reasons that the clients should leave Livongo.  CW 2 recalled that she personally oversaw at least four CVS-sold deals, two of which were terminated after CVS ended its contract.  CW 2 recalled that Temple University Health System and another client left Teladoc in September 2021 as a result of CVS leveraging the integration issues.

223.    Second, CW 2 explained that Teladoc competitors were able to steal clients from Teladoc by citing the integration problems.  With respect to the names of competitors who were able to steal clients from Teladoc by citing the integration problems, CW 2 identified some of the Livongo competitors as Omada, Virta, and CVS, and identified American Well as an InTouch competitor.  CW 2 recalled that the competitors were able to take advantage of the lack of direction amongst Teladoc leadership and the atmosphere of uncertainty at the Company.  With respect to specific examples of integration problems, CW 2 stated that competitors told clients there was no synergy between Teladoc and Livongo, Teladoc was not leveraging assets, all Livongo management had left and others were following suit, and Teladoc management did not know the Livongo business.  CW 2 recalled that it was taking management time to put the Companies together, and that many clients put their business on hold beginning about six to seven months after the Livongo acquisition closed—*i.e.*, May or June 2021.  CW 2 further recalled that 5 or 6 of her clients terminated their relationship with Teladoc the final month of her tenure, including Northwell and Temple University.  CW 2 was unable to quantify the amount of lost business but recalled that "it was impactful."

224.     Other sources corroborate that CVS turned into a Teladoc competitor during the Class Period.   Specifically, CW 1 stated that during her tenure with Livongo and Teladoc, the legacy Livongo business experienced increased competition with CVS.   CW 1 explained that Livongo had a partnership with CVS wherein CVS accounted for roughly 45% to 50% of Livongo's partnership business and potentially up to 60% of Livongo's partnership business.   CW 1 added that as part of that partnership, CVS sold the Livongo product and Livongo would handle the day-to-day services for the client. Livongo and CVS would then split the revenue in various amounts depending on the client account (ex. 50-50 revenue split or 70-30 revenue split, etc.).   CW 1 explained that CVS decided to take the program in a different direction and dissolved the partnership slowly between 2020 and 2021, which turned CVS from a partner into a competitor. CW 1 recalled that the legacy Livongo business lost a "tremendous" amount of annual recurring revenue due to the partnership's dissolution.   CW 1 suggested that between 20% and 30% of the clients decided to "go a different route," partly due to the Teladoc deal but largely because CVS was less expensive than Livongo.   In fact, CW 1 explained that CVS was "way cheaper."   CW 1 noted that Livongo's partnership with CVS had three-year term periods.

225.     Additionally, with regard to competition, CW 10 recalled that some health plans were in the process of "standing up" their own telehealth solutions while she was at Teladoc.   CW 10 recalled that Teladoc had two health plans that were very important to the company, one of which was Aetna.   CW 10 explained that these two health plans were not happy with Teladoc's service and were not meeting Teladoc's own internal financial projections.   CW 10 explained that every month, the health plans' "actuals" would be below Teladoc's forecasts for them.   CW 10 recalled that this was occurring around April or May of 2021.

226.    Defendants discussed internally the increased competition and were also aware of the negative impact of such competition.  For example, CW 3 stated that Teladoc CFO Mala Murthy and CMEO Stephany Verstraete discussed increased competition at quarterly and monthly all-hands meetings that CW 3 attended throughout her tenure.  CW 3 explained that the discussions generally asserted that Teladoc's success had attracted increased competition in the telehealth space.  CW 3 explained that Teladoc's competitors included Amazon and other telehealth companies.  CW 3 added that health plans, which were traditionally Teladoc customers, had begun to build out their own telehealth platforms that were beginning to replace Teladoc during her tenure.

227.    This is corroborated by CW 2, who recalled that CVS (which had a deal with Livongo to sell Livongo's diabetes programs), terminated the contract right before Livongo was acquired by Teladoc. Indeed, as explained above, CW 2 recalled that after the contract ended, CVS tried to flip its clients into using its own diabetes program, citing and leveraging the integration issues at Teladoc as one of the reasons that the clients should leave Livongo.

228.    Additionally, with regard to competition, CW 2 recalled that Livongo and Teladoc had competitive profiles that salespeople reviewed regularly, so she was surprised when Gorevic cited competition as a reason for the April stock drop.  CW 2 stated that "no one popped onto the scene out of nowhere."  Indeed, according to CW 2, Teladoc executives had access to data in competitive profiles that were regularly updated on Salesforce.  Importantly, CW 2 explained that *if a client were lost to a competitor that it was logged into Salesforce*.  *CW 2 further explained that if it was a "visible deal" that it would be reviewed by management.*  Accordingly, Defendants had access to and thus knew about any lost business to competitors, including due to integration issues, via the Salesforce.com system.

229.     Furthermore, the *Business Insider* Article corroborated these CWs' accounts about Teladoc clients turning into its competitors during the Class Period.  For example, the article explained that "[i]nsurers themselves are scooping up telehealth startups and building their own virtual-care units," and that "[l]ast month, UnitedHealth announced a health plan that would tap doctors in its care-delivery business for both virtual and in-person visits. Teladoc still serves UnitedHealthcare members, but the option online to use 'Optum Virtual Care' is now more prominent."  In addition, *Business Insider* reported that "some insurers bristled when Teladoc started pushing Livongo because they typically have their own programs for chronic conditions, four current and former Teladoc employees said."  The article continued: "For instance, CVS's Aetna will offer Teladoc's new primary-care product to all of its self-insured employers next year, but the company has been expanding its homemade service for diabetes."

230.     Moreover, as *Business Insider* reported, these issues contributed to disappointing sales growth by Livongo after the acquisition.  For example, the article reported that "Livongo's growth projections during the acquisition also started to take a toll on staff, three current and former employees said."  The article added that "[s]ome segments of the business were expected to double or triple their sales compared to 2020, even though new products are just starting to roll out now, a former employee said," and that "[a]s a result, **less than 20% of the employer and health-plan-facing group is on track to hit its quotas for 2021**, a sign that the company overestimated demand, a current employee said."

231.     Accordingly, increased competition and the severe Livongo integration issues significantly affected Teladoc's performance during the Class Period.

D.     **Teladoc Falsely Touted the Company's Successful Integration of Livongo and Downplayed Concerns about Increased Competition**

232.    As described above, Teladoc experienced major challenges integrating Livongo and an adverse impact from growing competition, including due to these integration failures, during the Class Period.  Nonetheless, Defendants concealed these problems from investors and falsely touted that integration was either fully complete or on track such that the Company was making substantial progress towards successful completion.  Defendants also repeatedly falsely assured investors that increased competition was nothing to worry about.

233.    On February 11, 2021, the first day of the Class Period and approximately four months after the Livongo Acquisition had closed, Defendant Shah participated in an interview with WTF (What's The Future) Health, an online news publication focusing on the telehealth services industry.  During that interview, Defendant Shah publicly touted that the Livongo integration was "***going really great***," including specifically that Livongo and Teladoc had "***a shared mission" and "a shared culture" and "really do fit together" from a "technology perspective"  "to provide [] a continuum of care, a whole person experience***" and that Teladoc was "***well on our way of building [] that highway to quickly deliver***" such integrated whole-person products to its customers.

234.    A few weeks later, on February 24, 2021, Defendants held an earnings call to discuss the Company's fourth quarter 2020 financial results ("Q4 FY 2020 Earnings Call").  During that call, Defendants touted the Company's purportedly successful integration of Livongo.  For example, Defendant Gorevic assured that "***[o]ur commercial organization is now fully integrated***, and our teams responsible for cross-selling have been collaborating for months."

235.    As mentioned above, according to an October 15, 2020 Teladoc SEC filing, the Company's "global commercial organization," all of which reported to COO David Sides,

"integrates the combined company's channels and operations into one team that will deliver on [the companies'] commitments to customers and clients."  As illustrated by the group heads who were within this global commercial organization and reported to COO Sides,[33] the commercial organization thus encompassed most of Teladoc's main businesses.  Accordingly, Defendants' statements at this time were false and misleading given the accounts of numerous CWs, corroborated by internal documents, showing that the commercial organization, which included the acquired Livongo and InTouch businesses, were not "fully integrated" at this point given the widespread organizational confusion, dysfunction, and division among the teams and personnel, which were "siloed" and still operating separately as their own "islands."

236.    Furthermore, Defendants at the same time deliberately assuaged growing investor concerns about new competitors entering the market, by downplaying any impact that these new entrants were having on the Company's business.  For example, during that same Q4 FY 2020 Earnings Call, in response to a JPMorgan analyst's question about "retention rates," and "competition in the marketplace," and "want[ing] to understand how you're thinking about the competitive market right now around what you saw on the retention side," Defendant Gorevic assured, *inter alia*, that Teladoc's integrated "whole person" care products would enable it to trounce its competitors:

> I've had a number of large client discussions over the last several weeks as we start to move into this selling season and we start to talk about the opportunity of the full credit answer, ***sort of that full solution across all of our product portfolio, and it is truly differentiated. So I was just talking to a regional Blue plan, who,***

---

[33] According to Teladoc's SEC filings, the following individuals were part of the global commercial organization who reported to COO Sides: Kelly Bliss, President, U.S. Group Health; Rob Bressler, SVP, General Manager, Virtual Primary Care; Gary Britton, VP, Operations; Joe DeVivo, President, Hospitals & Health Systems; Steve Lalonde, Chief Sales Innovation Officer; Alon Matas, President, BetterHelp; Carlos Nueno, President, International; Dr. Alan Roga, Chief of Clinical Operations; Matt Sopcich, SVP, General Manager, Behavioral Health.

*I believe, we will take away from a competitor who has a much narrower set of products and can't compete in the evolving landscape and sort of the new paradigm that we've created*.

237.    The above statements were false and misleading because, as discussed above, internally Teladoc was struggling to integrate Livongo's product systems and teams, and thus did not have these integrated "whole person" care solutions that it trumpeted as giving it a key competitive advantage.

238.    Similarly, Defendant Gorevic stated—in response to a Credit Suisse analyst's inquiries about BetterHelp's margins and growth prospects in light of the fact that "several employers [] expanding telebehavioral and mental health services"—"*we continue to see that market be very, very sort of underpenetrated;* the opportunity, very significant. *And so we don't see any slowing down of that in sight*." These statements were false and misleading because, as discussed above, competitors were making significant inroads and taking away Teladoc business, including due to its Livongo integration failures.

239.    The market believed Defendants' false assurances about the Livongo integration. For example, William Blair issued an analyst report on February 25, 2021, reporting: "*We also believe the Livongo integration and initial sales efforts are off to a very strong start*."  That same analyst also bought into the Company's misstatements minimizing the effects of growing competition, reporting, for example, that following the Livongo Acquisition, among others: "Teladoc has increased its competitive differentiation—as there are no organizations that can match the company's international scale and scope of offerings across the continuum of care, or the number of distribution channels that Teladoc targets."

240.    Moreover, despite the fact that the Company rushed the integration and in reality was experiencing major integration problems as outlined above, Defendants touted that the

Company was on track with its purported integration plan.  For example, on April 28, 2021, during the Q1 FY 2021 Earnings call, in response to a SVB Leerink analyst's question about the Livongo integration and more specifically wanting to get an "update on **the platform integration side**," Defendant Murthy touted the Company's "very, very clear road map" to integrating the companies, particularly, their product platforms, and that they were "well on our way" with respect to the companies "data integration":

> I'd also add, Stephanie. **The good thing is we have a very, very clear road map**.  And we have spent a fair amount of time as a leadership team, prioritizing that road map, so that the investments we've put against that, as we have talked about, I expect 2021 to be an investment year, it is stacked and aligned against those very clear priorities in the R&D road map. **Whether it be in terms of data integration**, as you asked, recognizing a unique member from an eligibility and an identity perspective, that requires **deep integration**.  **And I would say we are well on our way to do it**.

Such statements were directly contradicted by multiple CWs' accounts above detailing how Teladoc was nowhere near on track with its integration of the companies' product or data platforms (i.e. Tableau) at this time or throughout the Class Period.

241.    During that same earnings call, Defendant Gorevic similarly reassured investors that "**[w]e've made considerable progress across our key work streams**," and "**our commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products since early this year.**"

242.    Furthermore, Defendants continued to deny any negative effects of increased competition.  For instance, in response to JPMogan analyst's question about new competitors in this space during the Q1 FY 2021 Earnings Call, Defendant Gorevic reassured investors that "**for the most part, many of them, we almost never bump into, and some of the new entrants, we're just not seeing gain traction**."

243.    The market was encouraged by Defendants positive statements about integration. Indeed, as the previous quarter, William Blair reported on April 28, 2021 that it "believe[s] the Livongo integration and sales efforts are off to a strong start." Similarly, on April 29, 2021, Credit Suisse reported that Teladoc "*has made considerable progress working through the integration of Livongo, with the commercial organization having been fully integrated* with the sales teams selling the combined company's portfolio of products since early in 2021." And that same day, Healthcare Dive published an article, stating, "on a call with investors aftermarket Wednesday, *Gorevic contended he wasn't worried about growing competition*."

244.    Defendants continued their false narrative about the Company's purportedly successful integration of Livongo throughout the Class Period, making similar misrepresentations on numerous conference calls (such as on earnings calls and at analyst conferences) and news media and analyst interviews (such as with CNBC and Credit Suisse). For example, on June 1, 2021, during the 41st Annual William Blair & Company Growth Stock Conference, and in response to an analyst's question about Teladoc's position in the competitive environment, Defendant Gorevic rejected any notion that Teladoc was being impacted by smaller competitors: "*we win because of our multiproduct breadth of solutions, and that's evident in our data about the sales that we booked as well as the revenue per member and things like that. And that's a significant competitive advantage*."

245.    However, these misrepresentations were in direct contrast to reality as described in by numerous CWs and the *Business Insider* Article above. Specifically, while Defendants publicly touted the successful Livongo integration, Teladoc was in fact experiencing multiple integration problems that was preventing the Company from realizing the full benefit of the Livongo Acquisition and thereby depreciated the value of this expensive new asset. Moreover, these

integration struggles were happening in the face of growing competition, who took advantage of such integration issues to make inroads with Teladoc's customers. Thus, the bungled Livongo integration only further jeopardized Teladoc's competitive position, rather than enhancing it as Defendants repeatedly represented.

246.   Defendants nevertheless continued to assure investors that the Livongo integration was an unmitigated success and any concerns about increased competition were overblown. For example, during the Q3 FY 2021 Earnings Call on October 27, 2021, in explaining that Teladoc received a certain certification from an organization called a Great Place to Work, Defendant Gorevic touted that the Company received this certification "in the wake of ***fully integrating our teams***."

247.   Similarly, the next day on October 28, 2021 during an interview that Teladoc's management had with Credit Suisse (which Credit Suisse reported publicly in its October 28, 2021 analyst report), in response to Credit Suisse's questions about synergies between Teladoc and Livongo, Credit Suisse reported Teladoc management's response as follows: "***With the Livongo and Teladoc commercial teams now integrated***, Teladoc has been very disciplined in how it manages and measures its pipeline, and creates the forecasts to ensure the company meets or exceeds the guidance put forth." These and other similar misstatements during the Class Period were false and misleading because, as described by multiple CWs and the *Business Insider* Article above, Livongo's teams were not yet fully and successfully integrated into Teladoc's organization at this time given they continued to operate as "siloes" and suffered from extensive division and attrition, which materially affected operations and sales performance.

248.   Notably, during that same interview with Credit Suisse analysts on October 28, 2021, Defendants also assuaged investor concerns about any potential delays in the Livongo

integration.  Specifically, Teladoc management stated the following in response to Credit Suisse's comment that "[s]ome people have thought Livongo might be slightly behind schedule":

> The success that the company is having with multi-product sales is a good proof point behind that integration.  Overall, ***management pushes back on the claim that TDOC is behind when it comes to the actual integration of Livongo***.  TDOC launched myStrength Complete[34] just eight months after the closing of the transaction and in the middle of a pandemic.

249.   This statement was false and misleading because, as described above, the integration was still far behind schedule and struggling due to a host of issues, including not being able to able to integrate critical technology systems, such as the companies' products and CRM systems and Tableau data analytics platforms; not having an integration plan to reconcile the companies' differing business models; and experiencing severe personnel issues such as a high attrition rate that negatively impacted the Company's business operations and financial position.  Notably, Teladoc was nowhere near completing the integration of the Salesforce systems even by the end of the Class Period in mid-2022.  In particular, CW 3's statements indicate that Teladoc only retained PwC to assist with integrating the Salesforce.com systems in ***fall 2021***—given it had begun this integration project only five months before she left in Spring of 2022—*i.e.*, approximately a full year after the Livongo acquisition had closed.

250.   In addition, despite Defendants' reassurances that the Company was successfully integrating the companies' teams, such a representation is contradicted by CWs.  For example, CW 5 explained that the group was tasked with identifying duplicate clients and ensuring that the teams were working in concert and not stepping on each other's toes.  CW 5 further recalled that the integration wasn't complete by the time she left in June 2021. Likewise, CW 6 noted that

---

[34] As explained above, MyStrength Complete is Teladoc's virtual mental health service.

Teladoc was still in the process of integrating InTouch's resources and sales teams as well during her tenure, which spanned from before the Class Period until Fall 2021.

      E.     **As the Truth About Teladoc's Livongo Integration Challenges Began to Emerge, Defendants Continued to Falsely Reassure Investors**

251.    Indeed, investors began to learn of the true state of the Company's integration process on November 10, 2021, during market hours, when *Business Insider* published an article, based upon private conversations with 12 current and former Teladoc employees, revealing credibly for the first time that the Livongo integration was not completed or proceeding smoothly as Defendants had repeatedly represented.  As detailed above, the *Business Insider* Article outlined multiple integration challenges that Teladoc was facing, such as problems relating to Teladoc rushing the integration process, issues with merging the companies' internal systems, and high attrition.  Indeed, according to the November 10, 2021 *Business Insider* Article, "[a] spokesperson for Teladoc ***acknowledged the integration was an issue in the first six months***."

252.    In particular, *Business Insider* reported that the Company "rushed" the integration of Teladoc and Livongo, which "led to confusion and made it difficult for Teladoc to work with customers and iron out its plan for new products, four people said."  In fact, the *Business Insider* elaborated as follows:  "The department in charge of client operations, for example, had to fully combine with Livongo's by January 1, a former employee said. They had a hard time navigating two separate internal systems, but were told to present a unified front to customers without each other's full product details, they said."

253.    *Business Insider* further reported, "Analysts, industry experts, and employees Insider spoke with agreed the company needed more time to execute the rationale behind the deal, like connecting Livongo's various care programs to physicians."

254.     Additionally, *Business Insider* revealed that the two companies still were not able to integrate the patient portals into a single app: "One concern has been around member experience, the current employee said. Patients in the Livongo program can be passed off to Teladoc physicians, and vice versa, with a webpage.  But for now, they're still separate apps."

255.     With respect to attrition, *Business Insider* also disclosed that  "[m]ore than 110 Livongo employees have left since the deal closed, with only a few of Livongo's senior leadership sticking around for the long haul," and "[w]ithout those senior leaders, the employees Insider spoke with said there's been confusion in the sales process as Teladoc grapples with an increasingly competitive market, and its clients, such as health plans, stand up their own virtual-care tools."

256.     Indeed, *Business Insider* quoted Livongo's founder and chairman, Glen Tullman, as saying "I think given a lot of loss of talent, ***that's an indicator that things aren't going as well as we would have hoped***."

257.     The article also revealed certain competitive pressures that Teladoc was facing.  For example, the article explained that "[i]nsurers themselves are scooping up telehealth startups and building their own virtual-care units," and that "the option online to use 'Optum Virtual Care' is now more prominent."

258.     In response, Teladoc's stock price fell $6.02 per share, or 4.21%, to close at $137.04 per share on November 10, 2021.

259.     Defendants, however, at the same time downplayed the integration challenges that were only partially revealed in the *Business Insider* Article, and continued to falsely reassure investors that the integration efforts were now back on track with any initial issues now fully resolved.

260.    For example, in the *Business Insider* Article, Defendant Gorevic reassured investors, that "he was proud of the [C]ompany's progress," and that Teladoc had "launched two connected services in 2021, ***one of which fully blends Livongo's assets with Teladoc's***."  Indeed, Defendant Gorevic reassured investors that the integration efforts were "on track": "The vision that we laid out then — about whole-person care and bringing together the unique capabilities of two complementary companies to deliver something that really hasn't been done before — ***is on track***."  Moreover, the Company minimized the integration issues as initial growing pains that were now largely behind it.  Specifically, as *Business Insider* reported: "A spokesperson for Teladoc acknowledged the integration was an issue in the first six months but said ***it was less of an issue today***."

261.    Defendants continued these false and misleading denials in the ensuing weeks.  For example, during the Company's 2021 Investor Day conference held on November 18, 2021, Defendant Verstraete touted that "over the course of this year, we've significantly deepened our capabilities as we brought together and ***integrated the legacy Livongo and Teladoc marketing data and tech stacks***."

262.    These statements were false and misleading because, as described above, the CWs' accounts confirm that the Livongo integration problems were still not resolved at this time, including because key technological systems such as the Salesforce and various product platforms were still not fully integrated, contrary to Defendants' reassurances.

263.    Defendants also continued reassuring investors that competition was nothing to worry about.  For instance, Defendant Gorevic touted during that same Investor Day the Company's competitive position:

> And I've said, look, there are low barriers to entry and high barriers
> to scale and success.  And it is a complex system of leading

capabilities that creates a true moat in what we do.  And so every one of these points has to be a leading capability in order to really take advantage of the opportunity in front of us.  And I believe very strongly that our capabilities on every one of these dimensions leads the market.

> *And that results in what I would argue is an unmatched competitive advantage, and a moat that is virtually impossible for an upstart to cross, right, and sets us up for the future of virtual care, not the past of virtual care.*  And for a broad set of whole-person care solutions, not a point solution.

264.    However, these statements minimizing competition were also false and misleading because, as detailed above, increased competition was in fact already taking business away from Teladoc by this time, including due to continued Livongo integration challenges, such as the lack of fully integrated product platforms, which these competitors exploited to their advantage.

### F.    Defendants Revealed a $6 Billion Goodwill Impairment Due to the Livongo Integration Failures and Competition Challenges, but Nevertheless Continued to Minimize the Problems

265.    However, Defendants could only reassure investors for so long as the truth continued to leak out as the impact of the Livongo integration failures and growing competition began to materialize in the Company's publicly reported financial performance.  On April 27, 2022, after the market closed, the market continued to learn the true extent of the challenges that Teladoc faced in trying to integrate Livongo when Teladoc issued a press release announcing the Company's first quarter 2022 financial results ("Q1 FY 2022 Press Release").  Notably, Teladoc reported a "[n]et loss per share of $41.58, primarily driven by [a] non-cash goodwill impairment charge of *$6.6 billion* or $41.11 per share."[35]

---

[35] If a company purchases assets at more than fair market value, it can record the difference as goodwill on its balance sheet. But if the value of the assets subsequently declines, the company may be required to record a goodwill impairment.  In other words, goodwill impairment is an accounting charge that is incurred when the fair value of goodwill drops below the previously

266.     Later that day after market hours, Defendants held an earnings call to discuss the Company's first quarter 2022 financial results ("Q1 FY 2022 Earnings Call").  During this call, Defendants revealed that they were facing challenges integrating Livongo's products with Teladoc's business.   Indeed, after explaining differences between Livongo's business and Teladoc's (*e.g.*, Livongo was traditionally focused on offering individual point solutions vs. Teladoc's focus on offering full whole-person care solutions), and the need to integrate those businesses, Defendant Gorevic admitted that Teladoc has not yet completed that integration.

267.     Specifically, Defendant Gorevic stated, in pertinent part:

> And over the last 12-plus months, we've been working on integrating the Livongo products into our whole-person care experience.  And ***admittedly, we're not done with that yet.*** We are deep into that process, and we have line of sight to the finish line, but we don't have proof points behind it because ***we're not finished with it.***

268.     Defendant Gorevic further explained that—with respect to the Company's investment in and "commit[ment] to completing the integration"—"we're disappointed with our performance."

269.     The market understood that Teladoc's $6.6 billion goodwill impairment charge reflected the failed integration of Livongo.  Indeed, as explained in more detail below, analysts directly connected the goodwill impairment to the Livongo integration problems, noting, for example, that the stock lost "about half its value after announcing a $6.6 billion impairment charge ***amid a challenging integration of Livongo and its health management app***."

270.     Additionally, Defendants disclosed that the Company was experiencing increased competition that was adversely impacting the Company's financials, such as increasing marketing

_____

recorded value from the time of an acquisition. Impairment may occur if the assets acquired no longer generate the financial results that were previously expected of them at the time of purchase.

and advertising expenses that were cutting into BetterHelp's margins.   Specifically, Defendant

Gorevic explained:

> [L]et me spend some time walking through what led us to reassess our outlook for the balance of 2022, starting with our direct-to-consumer mental health service, BetterHelp. Over the past several weeks, we've seen lower-than-expected yield on marketing spend for BetterHelp, which is a reversal of the trends we experienced exiting 2021 and in the early part of 2022.
>
> One example of this is paid search advertising, where we've seen a notable increase in rates for keywords associated with online therapy. ***We believe the biggest driver of this dynamic is smaller private competitors pursuing what we think are low- or no-return customer acquisition strategies in an attempt to establish market share.*** Some of those same providers are also exploiting the temporary suspension of certain regulations associated with the national health emergency concerning the prescription of controlled substances.
>
> We believe these strategies are unsustainable in the long term. ***This dynamic is likely to persist at least throughout the remainder of this year***, however, resulting in growth and margin contribution from BetterHelp that is below our expectation in February.

271.   Likewise, Defendant Gorevic disclosed that increased competition was also

negatively impacting the Company's sales results in its chronic care segment, i.e., the Livongo

business:

> ***[W]e're also seeing our chronic care sales pipeline developed more slowly than anticipated***.  Last October, we discussed two trends in the marketplace that we saw leading to an elongated selling cycle. The first was in the employer market, where we saw benefit managers focused on COVID and return to work, which we felt was contributing to a longer decision-making process.  The second was a large pipeline of health plan deals that were simply harder to predict when it comes to timing given the size and complexity of those clients.
>
> At the beginning of this year, we were encouraged by very strong fourth quarter bookings and a robust late-stage pipeline.  ***However, as we progressed through the first part of the year, we're seeing clear signs of the slower bookings pace continuing.***

> In addition to the factors we discussed last fall, *we're seeing clients inundated with a number of new smaller point solutions, which has created noise in the marketplace* . . . . [W]e are in the process of taking a closer look at some of these forces that are impacting the near-term conversion of pipeline to revenue, and we'll continue to make adjustments as necessary to address them.
>
> [W]e're not seeing deals progress at the pace that we expected.

272.    Moreover, the Q1 FY 2022 Press Release reported revenue of $565.4 million, which missed consensus estimates by $3.23 million, revised its FY 2022 revenue guidance to $2.4–$2.5 billion, down from previous guidance of $2.55–$2.65 billion, and revised its FY 2022 adjusted EBITDA guidance to $240–$265 million, down from previous guidance of $330–$355 million, "*to reflect dynamics we are currently experiencing in the [D2C] mental health and chronic condition markets*."   Relating to these competitive and other market dynamics that Teladoc was experiencing, the Q1 FY 2022 Press Release quoted Defendant Gorevic:

> In the D2C mental health market, higher advertising costs in some channels are generating a lower-than-expected yield on our marketing spend. *In the chronic condition market, we are seeing an elongated sales cycle* as employers and health plans evaluate their long-term strategies to deliver the benefits and care that their populations need.

273.    In response, Teladoc's stock price fell $22.48 per share, or *over 40%*, to close at $33.51 per share on April 28, 2022.

274.    Upon learning of this news, the market was both shocked and disappointed.[36] Indeed, Evercore ISI Research reported that the Company's disclosures were "particularly alarming." Similarly, Goldman Sachs wrote in a research note that "[w]e are disappointed and

---

[36] While the Company mentioned in its February 28, 2022 Form 10-K that there was a possibility of taking a goodwill impairment charge, Teladoc indicated that the charge could potentially range from $800 million to $4 billion—nowhere near the substantial $6.6 billion amount of the impairment charge that the Company had actually faced.

surprised" by the revised financial outlook.  Further, the market was shocked by Defendants'
disclosure of the massive goodwill impairment charge, which the market linked directly to the
failures in integrating the Livongo Acquisition, as noted above.  Further, media outlet Healthcare
Dive, similarly connected the large stock price decline directly to such revelations:

> Teladoc, the largest virtual care company in the U.S., bought
> Livongo for $18.5 billion in cash and stock late 2020 in the biggest
> digital health deal to date.  ***However, the merger has struggled,
> resulting in the large goodwill impairment charge*** for the Purchase,
> New York-based vendor.  Teladoc's stock had plummeted 45% by
> early trade Thursday following the news.

275.    Furthermore, while the Healthcare Dive article acknowledged that Teladoc
mentioned the possibility of writing a goodwill charge previously, the article correctly pointed out:
"The filing estimated the goodwill impairment charge could range from $800 million to $4 billion,
***though Wednesday's total is notably bigger, at $6.6 billion***."

276.    Another news article on April 28, 2022 by MassDevice similarly reported that same
day: "Teladoc (NYSE: TDOC) saw its stock lose about half its value after announcing a $6.6
billion impairment charge ***amid a challenging integration of Livongo and its health management
app***."

277.    Likewise, Seeking Alpha wrote on May 4, 2022 that "**the *Livongo acquisition has
turned into a disaster***," "Teladoc's BetterHelp (mental health) business is also facing headwinds
due to ***heightened competition*** and wage inflation," and "management's 2022 guidance cut and
the goodwill impairment expense of $6.6B were simply horrific developments at the [C]ompany."
Notably, the Seeking Alpha analyst report explained that the massive goodwill impairment charge
revealed Teladoc's failure to successfully integrate Livongo:

> In Q1 2022, Teladoc's chronic care enrollment numbers rose by just
> ~2K, which indicates further dissipation of Livongo's growth
> momentum.  Basically, Teladoc took a fantastic asset and has

managed to slow its growth down to essentially zero within a few quarters.   While Teladoc's management is expecting new populations on its chronic care products to go live toward the end of this year (resulting in mid-teens growth in the chronic care business), *the $6.6B goodwill impairment charge is an admission of the destruction of Livongo's value.  Even after several months since the merger closed, Teladoc's management has failed to complete the integration of Livongo into its platform.*  And now, the decision to remove all of Livongo's senior leadership seems to have backfired horribly.

278.   Defendants, however, still continued to falsely reassure investors that the integration of Livongo was successful and downplay competition-related challenges.  For example, in speaking directly about how the Company had not yet finished integrating the Livongo products into Teladoc's whole-person care experience, Defendant Gorevic immediately followed that up by reassuring investors on the Q1 FY 2022 Earnings Call that "[w]e're getting great feedback.  And what we're seeing, and I think is evidenced by the fact that in the first quarter, 78% of our sales were multiproduct sales. *The market is responding really well to it.*  And I think the other evidence of that is the strength of our Primary360 product and the reception we're getting to that." Defendant Gorevic further reassured investors on the Q1 FY 2022 Earnings Call that, based on how the market was purportedly responding to the integration thus far, that "we're convinced that that's the right strategy.  And *we're committed to completing the integration*, *really delivering a unified multidimensional, multi-condition solution to the market*."

279.   However, Defendants' denials minimizing these integration issues were false and misleading because, as discussed above, CWs confirm that these integration problems— particularly the failure to fully integrate Livongo's products—persisted throughout the Class Period.  Indeed, as discussed below, on August 1, 2022, Defendants themselves acknowledged to Credit Suisse during a post-quarterly conference call discussion with Teladoc management about

the Company's chronic care (*i.e.*, Livongo) business that the Company's products were still "***not yet fully integrated***."

280.    Analysts were reassured by Defendants' positive statements.  For example, on April 28, 2022, Cowen reported that while it was "surprised by the relatively quick reversal in the outlook since 4Q results were reported at the end of February," Cowen "continue[s] to believe that virtual care will be a critical part of care delivery (based on KOL checks), and that TDOC is very well-positioned going forward."

### G.    Investors Finally Learned the Full Truth When Defendants Revealed an Additional $3 Billion Goodwill Impairment and Disclosed Continued Adverse Effects of Growing Competition

281.    However, notwithstanding Defendants' positive reassurances throughout the Class Period, the integration problems that depreciated Livongo's value—at a time where Teladoc needed it most in light of growing competition—continued to negatively impact the Company. Indeed, on July 27, 2022, the full truth was finally revealed when Teladoc issued a press release announcing the Company's second quarter 2022 financial results ("Q2 FY 2022 Press Release"). Notably, Teladoc reported a "[n]et loss per share of $19.22, primarily driven by [a] non-cash goodwill impairment charge of ***$3.0 billion***, or $18.78 per share."

282.    Later that day after market hours, Defendants held an earnings call to discuss the Company's second quarter 2022 financial results ("Q2 FY 2022 Earnings Call").  During that call, Defendant Murthy admitted that all of the Company's products (thus including Livongo's chronic care products) were still not fully integrated:

> We've talked about investing in our integrated platform in new capabilities in new products, such as my strength of fleet Primary360, Chronic Care Complete, continued integration of our data that underpins bringing together all of our suite of products. ***That still continues.***

283.     Similarly, Defendant Murthy further stated that the Chronic Care, i.e., Livongo, business continued to underperform, providing disappointing guidance: "I would expect Chronic Care revenue growth to be towards the low end of the low to mid-teens."

284.     In addition, Defendant Gorevic further revealed that the Company was experiencing deals progressing at a slower rate in Teladoc's Chronic Care business (*i.e.*, the Livongo business), which the Company directly attributed to increased competitive pressures:

> While we were pleased to exceed our member enrollment targets during the quarter, *we are continuing to see our pipeline of Chronic Care deals developed more slowly than we anticipated at the start of the year*, as we discussed in our first quarter call. It remains early in the selling season, but deals continue to progress at a slower pace. *We believe at least in part due to competitive noise* as the market transitions from stand-alone point solutions to integrated whole-person virtual care.

285.     In response, Teladoc's stock price fell $7.64 per share, or 17.67%, to close at $35.60 per share on July 28, 2022.

286.     The market was disappointed by these revelations and acknowledged that—contrary to Defendants' reassurances the previous quarter—the failed integration of the Livongo Acquisition was still adversely impacting the Company's financials.  For example, Oppenheimer reported on July 27, 2022 that "[Teladoc's] near-term outlook *remains challenged* by the (previously discussed) lower acquisition yields with BetterHelp and *longer sales conversions in chronic care."*

287.     In fact, like in the prior quarter, the market again directly linked the goodwill impairment charge to the struggles in integrating the Livongo Acquisition, and to the Company's stock price drop on the disclosures.  For example, on July 28, 2022, UBS reported that "the [C]ompany recognized another *$3B goodwill write down related [to] (Livongo)* as a result of TDOC's share price decline."  The Motley Fool also published an article on July 28, 2022, stating:

"Teladoc was forced to take a non-cash goodwill impairment charge of $3 billion.  Teladoc acquired digital health company Livongo for $18.5 billion in late 2020.  The plan was to combine Teladoc's virtual care platform with Livongo's chronic condition management tools.  However, Teladoc has written down the value by nearly $10 billion since the deal was completed, suggesting that it drastically overpaid for Livongo."

288.    Additionally, the market was surprised that competitive pressures were still adversely impacting the Company's Chronic Care (Livongo) business.  For example, on July 27, 2022, in discussing the Company's disclosures about a slowdown in sales due to "competitive noise," the Canaccord concluded that "*the band-aid wasn't entirely ripped off following 1Q guide down*," and explained, in pertinent part, as follows:

> *What puzzles us is that Teladoc also cited slower chronic deal conversion.* Specifically, management highlighted that while 2Q chronic enrollment outperformed, *new deals are still closing but more slowly, possibly from competitive noise* and economic uncertainty. Thus, the company needed to remove any in-period contribution from guidance. The problem we have is that the company supposedly removed a majority of this revenue from guidance with the previous update following 1Q

289.    Accordingly, the market understood that these revelations to indicate that the previously disclosed issues were not temporary blimps.  For instance, on July 28, 2022, Wells Fargo explained, that "*management lowered full-year Livongo revenue growth guidance* to the low end of 'low- to mid-teen growth' given *challenges with adding new clients* in the current environment."

290.    Wells Fargo similarly concluded that "*[i]t appears the challenges for BetterHelp and chronic care (Livongo) were less transitory than hoped for*, with full year revenue now guided to the bottom end of previous guidance ranges (35%-40% for BetterHelp, and low- to mid-teens for Livongo)."   Likewise, on July 27, 2022, William Blair reported that increased

competition and higher overall ad rates" "were again present in the second quarter, and are still anticipated to impact organic growth in 2022."

291.    On July 28, 2022, Craig-Hallum similarly reported: "Paid search costs (for BetterHelp) were said to have remained elevated during the quarter (which has been attributed to competition), ***while on the Chronic Care side of Teladoc's business, competitive noise was said to be one reasons that deals are progressing at a slower pace***."

292.    Also on July 28, 2022, Wells Fargo wrote that "we believe that ***increased competition*** has introduced significant uncertainty for the trajectory of revenue and margins over both the near and intermediate term."

293.    Notably, on August 1, 2022, Credit Suisse issued a report providing highlights from a post-quarterly conference call discussion with Teladoc management about the Company's chronic care (*i.e.*, Livongo) business, where Defendants acknowledged that the Company's products were still "not yet fully integrated."  Specifically, Credit Suisse explained:

> We had a post-quarterly conference call discussion with TDOC management to review 2Q22 results, individual business trends, and the 2022 outlook. In the text below, we list our questions and the company's responses. The answers are not verbatim, but we put the company's answers in their proper context in a give-and-take format.

294.    According to the analyst report, Teladoc's management discussed with Credit Suisse the competitive pressures in the Company's chronic care business—which the market understood to be essentially synonymous with the Livongo business— that it continued seeing, and notably, admitted that "***[t]he company's products are not yet fully integrated yet***."  For example, Credit Suisse commented:  "For the second conference call in a row, management called out that chronic care deals are developing more slowly than historically than the company anticipated at the beginning of the year. This is attributed to ***more competitive noise*** being in the

market."  Credit Suisse followed that up with the following question: "What do you think is necessary to break this logjam and get deal activity going again?"  Credit Suisse then reported the Company's response as follows:

> There are two things.  One is the competition factor and the point solutions in the marketplace which is causing people to sit and evaluate.  Management talked about this last quarter a bit where TDOC's competitive advantage is really around integrated care, but the market hasn't fully transitioned to that yet.  The market is moving from point solutions to whole person care. So, the company is competing against various point solutions.  ***The company's products are not yet fully integrated yet***.  ***For example, TDOC has three separate apps.  So there is a bit of a challenge of getting into a client and saying we'll be a one stop shop when we can't show that yet***.  The market is still evolving.

Accordingly, Defendants' admissions of these continued challenges immediately after the Class Period further evidence that Teladoc's integration of Livongo, particularly with respect to merging its product platforms into Teladoc's, was not successfully completed or on track during the Class Period.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

295.    Lead Plaintiff alleges that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of Teladoc's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

296.    Throughout the Class Period, Defendants made a series of misrepresentations concerning two related topics.  Specifically, Defendants made numerous material misstatements and omissions concerning: (i) the purportedly successful progress of Teladoc's integration of the Livongo Acquisition, which were false and misleading given the integration was riddled with

multiple, substantial problems that Defendants concealed; and (ii) the purported lack of any adverse impact of increased competition on Teladoc's business, which were false and misleading because growing competition was eroding Teladoc's sales, including because of the Livongo integration problems, which competitors exploited to their advantage.

### A.      February 11, 2021 – Interview with WTF Health

#### 1.      Misstatements Concerning the Livongo Integration

297.    On February 11, 2021, Defendant Shah and Joe DeVivo, who was Teladoc's President, HHS and former InTouch CEO, participated in an interview with WTF (i.e. "What's The Future?") Health, an online news publication focusing on the telehealth services industry, which published the interview on its website and Youtube.com on the same day, entitled "Teladoc Health Integration Update: Former Livongo & InTouch Health Execs Weigh-In."[37] The purpose of the interview was to discuss updates with respect to Teladoc's integration of Livongo (which Defendant Shah spoke to) and InTouch (which DeVivo spoke to).   During that interview, Defendant Shah misled investors to believe that Teladoc was successfully integrating Livongo.

298.    Specifically, during that interview, the interviewer asked Defendant Shah to "give us an update on how the integration has been going so far."  In response, Defendant Shah stated:

> *It's it's going really great,* you know the deal was announced you know late summer, late August, we closed it right at the end of October so to your point had a lot of time to to start learning about each other, cross-selling, and *really what became evident really early on was once again exactly what Joe said about his experience was a shared mission and a shared culture* of of how do we make it more convenient and improve the experience for people who are seeking out health care, and that was one of the things that I think brings has brought these three entities together is that common thread, that common fabric that that all of the employees across three organizations have been committed to from day one and and then you accelerate that forward, what's been been really exciting is now understanding how these three chassis *from a*

---

[37] *See* https://www.wtf.health/; https://www.youtube.com/watch?v=UQf-xfz38YE.

*technology perspective, a consumer engagement perspective really do fit together to provide you know a continuum of care, a whole person experience you know that really is going to deliver on that promise* that you know once again COVID accelerated but now we've got the assets in in place and it's really the onus on the internal teams to execute to deliver that vision, and *we're already well on our way of building you know that highway to quickly deliver that to the consumers and to our clients.*

299.    Defendant Shah's statements in the WTF Health interview assuring that the Livongo integration was "going really great," including specifically that Livongo and Teladoc had "a shared mission" and "a shared culture" and "really do fit together" from a "technology" perspective  "to provide [] a continuum of care, a whole person experience" and that Teladoc was "well on our way of building [] that highway to quickly deliver" such integrated whole-person products to its customers, were materially false and misleading because in reality, as reported by numerous CWs and other sources familiar with Teladoc's integration problems (such as the employees cited by the *Business Insider* Article), by the start of the Class Period, Teladoc experienced multiple, severe integration problems that substantially, adversely impacted the Company's business—material facts that Defendants concealed from investors.

300.    Specifically, Defendant Shah's statements were false and misleading because, as outlined in detail above in Section IV.C, by the start of and throughout the Class Period, and unbeknownst to investors, Teladoc was experiencing substantial problems integrating Livongo, including: (a) an inability to integrate critical technological systems, such as the companies' CRM systems (known as Salesforce.com) and Tableau data analytics platforms, and the companies' product platforms; (b) the lack of an integration plan to reconcile the companies' differing business models, marketing, and teams; and (c) personnel challenges, including a high attrition rate that led to loss of crucial talent and confusion as to roles and culture clash among the two companies'

remaining personnel—all of which were adversely impacting the Company's business operations and financial position.

301.    Indeed, numerous CWs confirmed that since the beginning of the Class Period, Teladoc was experiencing material Livongo integration problems with respect to technological systems, business models and processes, and personnel.  For example, such sources corroborate, *inter alia*¸ that these integration problems had become apparent internally soon after the Livongo Acquisition had closed—*i.e.*, by no later than late 2020 and thus before the Class Period began in February 2021:

(a)     According to the *Business Insider* Article, "[a] spokesperson for Teladoc acknowledged the integration was an issue in the first six months"—*i.e.*, November 2020 – April 2021;

(b)     CW 3, a Marketing Leader, stated that she first noticed problems with Teladoc's integration of Livongo about **two to four weeks** after the deal closed in October 2020;

(c)     CW 4—directly communicated with Defendant Gorevic—stated that it became apparent to her by around **three months** after the acquisition that Teladoc did not know how to use and integrate Livongo; and

(d)     Internal Teladoc documents provided by a CW, which were dated October – December 2020 show internal confusion by Teladoc executives—including Defendant Gorevic personally—as to Livongo's product technological capabilities, which resulted in them misrepresenting to clients the features of the Company's combined products; these documents further show that these issues were elevated to senior executives by **no later than November 2020**.

302.    Multiple CWs, others familiar with the Company's Livongo integration, and internal Teladoc documents confirm that there were significant integration challenges with respect to critical technological systems that severely hampered daily operations and sales.  For example, such sources corroborate, *inter alia*¸ the following problems integrating the companies' Salesforce systems and Tableau data analytics platforms:

(a)     CW 3 recalled that one of the issues that she first noticed about two to four weeks after the acquisition closed was that Livongo employees were unsure how to login to Teladoc's Salesforce system.  CW 3 explained that employees that came from Livongo did not have login credentials or access to Teladoc's Salesforce.com system, which was resulting in delays in sales.  CW 3 explained that there were ongoing issues even after Teladoc declared its legacy Salesforce the CRM of record around the second quarter of 2021.  CW 3 referred to the solution as a Band-Aid and recalled that Teladoc was "cramming independent methodologies" into one CRM system.   CW 3 explained that Livongo and Teladoc had different methodologies when using Salesforce, and the CRMs spoke different languages on the front and back ends;

(b)     CW 6 explained that, since the Livongo merger closed, the Livongo, InTouch, and Teladoc Salesforce systems worked independently of each other.  CW 6 recalled that when she logged into the Livongo Salesforce, she could only see Livongo data, and when she logged into the InTouch Salesforce, she could only see InTouch data.  CW 6 recalled that the systems had not been integrated by the time she left in *Fall 2021.*  Critically, CW 6 recalled that the lack of Salesforce integration caused delays in processing sales data, because it required additional time and effort to pull data from numerous different places;

(c)     CW 2 stated that Teladoc and Livongo had their own Salesforce platforms that did not interact with one another, and that Livongo, InTouch, and Teladoc effectively operated as separate entities despite being one company.  CW 2 further recalled that when her tenure ended at Teladoc, that the Company was in the process of rolling out the combined Salesforce platform, but the salesforce platforms were still operating as separate entities by the end of her tenure (*i.e.*, a year after the merger); and

(d)     CW 11 recalled that the integration of the separate Tableau platforms storing patient and client information for Teladoc, Livongo, and Teladoc's other acquisitions *had not started* by the time she left the Company, *i.e.*, June 2021, and thus obviously was not completed by that time. CW 11 added that, based on a recent conversation she had with a colleague who is still at Teladoc, that the Company only *now* started that integration process.  Thus, the integration of these crucial data systems had not even begun, let alone been completed, during the Class Period.

303.    Similarly, such sources confirm, *inter alia¸* the following problems integrating the companies' product technological platforms:

(a)     CW 6 stated, with regard to technology, that Livongo sold a glucometer for diabetes patients that stored digital recordings in the cloud and was accessible via the Livongo app.  CW 6 recalled that Teladoc's vision was to allow doctors to access

the glucometer data during virtual care sessions, but doctors were still not able to do so when CW 6 left in Fall 2021;

(b)    The *Business Insider* Article revealed that Teladoc was still unable to integrate the two companies' patient portals into a single application: "One concern has been around member experience, the current employee said. Patients in the Livongo program can be passed off to Teladoc physicians, and vice versa, with a webpage. But for now, they're still separate apps";

(c)    CW 2 explained that after the acquisition closed, Teladoc brought in new executives who did not know anything about Livongo and would make things up in client meetings.  For example, CW 2 recalled that these newly hired executives pitched clients on a "whole person platform," ***while Livongo had standalone products for diabetes and other diseases but had not yet integrated them***.  Further, CW 2 recalled that the newly hired executives told clients that Livongo had the capability to remotely monitor patients, which was in-demand during the Covid-19 pandemic, but Livongo never had that capability; and

(d)    Internal Teladoc documents from October – December 2020 confirm CW 2's statements that Livongo in fact did not have these remote patient monitoring technological capabilities that Defendants, including Defendant Gorevic, were touting to clients, that they would not be ready for clients until the first half of 2021 at the earliest, and that these concerns were elevated directly to senior executives by November and December 2020.

304.    CWs and others familiar with the Company's Livongo integration further recalled signification integration challenges with respect to the companies' business models and processes, such as how to market the combined companies' products, and an inability to fully integrate Livongo's teams into Teladoc's organizational structure.  For example, such sources corroborate, *inter alia*, the following:

(a)    According to CW 4, another reason the integration had not gone well throughout her tenure was because Teladoc seemingly had ***no integration plan*** and that they seemingly did not know how to create one because the two companies had two fundamentally different business models;

(b)    CW 11 recalled that the Company had "no clear integration plan" for integrating the two companies' data—*e.g.*, to make sure that regardless of who was selling from any Teladoc line of business, that the data was for the same patient and the same client—during her tenure at Teladoc (*i.e.*, at least until June 2021);

(c)     CW 2 described a meeting that took place on ***June 17–18, 2021*** in Nashville, where she asked Teladoc COO David Sides about the plan to integrate Livongo.  CW 2 recalled that Sides's response was, "That's a great question," without providing a plan, which worried CW 2 and her team.  CW 2 also recalled asking Sides what the plan was to integrate RPM, and Sides responded, "***I don't know***";

(d)     CW 2 stated that she would not have considered the commercial business "fully integrated" during her tenure—which continued until a year after the merger—because the businesses were all running separately;

(e)     CW 6 recalled that the challenge became how to integrate the organizations—meaning primarily Livongo and Teladoc—rather than just act as a holding company.  CW 6 also explained that there was "misalignment" throughout the organization.  CW 6 explained that in her HHS division, the finance leaders were not measured on Livongo sales despite having dedicated Livongo resources.  CW 6 further explained that Teladoc was slow to integrate Livongo's platform and is slower to market than Livongo was. Indeed, CW 6 explained that the Livongo integration was not complete when she left Teladoc in Fall 2021;

(f)     CW 7 added that Teladoc had planned to eventually phase out the "Livongo" brand name and replace it with "chronic care by Teladoc," but this had not happened by the time she left in October 2021;

(g)     CW 10 recalled that Teladoc's integration of Livongo took longer than expected and that there was no way to do customer centric integrated marketing of Teladoc and legacy Livongo's product systems until after the first quarter of 2021 .  CW 10 explained that there were "product blockers" prior to the first quarter of 2021.  CW 10 elaborated that if a legacy Livongo customer wanted to add any of Teledoc's telehealth services after the acquisition, that prior to the first quarter of 2021, there was no way of sending that customer a link to simply add that additional benefit within their existing customer portal; and

(h)     CW 1 explained that her legacy Livongo team was still operating separately from their Teladoc counterparts when she left in January 2022.

305.     CWs and others familiar with the Company's Livongo integration also recounted significant integration challenges with respect to personnel challenges, including a high attrition rate that led to loss of crucial talent.  For example, such sources corroborate, *inter alia¸* the following:

(a)     According to CW 8, it appeared to her to be more of "***integration through attrition***," through a shedding of as many Livongo employees as possible.  CW 8

119

added that a lot of the Livongo institutional knowledge and experience was depleted with those departures as well.

(b)     CW 4 explained that Teladoc did not retain many key Livongo employees who held knowledge of that company at the merger, and that many other Livongo employees wound up seeking employment elsewhere, adding that Teladoc "undervalued the historical knowledge" of the legacy Livongo employees;

(c)     CW 2 recalled that Teladoc CEO Jason Gorevic let go of all Livongo's management team within the first week after the acquisition.  CW 2 explained that Teladoc brought in new executives who did not know anything about Livongo and would make things up in client meetings;

(d)     CW 6 stated that at least 80% of legacy Livongo employees are no longer with the Company and all five members of her team left between May 2021 and January 2022.  CW 6 explained that she personally left because the integration was a "shit show," explaining that the vision for Livongo left with its leadership.  CW 6 further said that Livongo had been "innovating quickly" before the merger but that innovation and portfolio expansion stopped under Teladoc;

(e)     CW 3 recalled that Teladoc saw a very high attrition rate after the Livongo deal.  CW 3 estimated that 50% of her team had left within a year of the deal closing;

(f)     CW 5 recalled that the "highest level of leadership" from Livongo left shortly after Teladoc acquired Livongo.  CW 5 added that an "outrageous" number of people have left Teladoc since the merger, especially legacy Livongo people; and

(g)     *Business Insider* corroborates that Teladoc experienced a high attrition rate after the Livongo Acquisition, which led to the loss of numerous Livongo employees, particularly executives, who were key to a successful integration.  Indeed, the *Business Insider* Article reported: "Tullman [Livongo's founder and chairman, who left after the acquisition] told Stat's Erin Brodwin last month that the jury was still out on Teladoc's ability to provide a 'comprehensive offering,' in part because of how many employees had left."  The article continued, "'I think given a lot of loss of talent, that's an indicator that things aren't going as well as we would have hoped,' Tullman said."

306.    Defendant Shah's false reassurances about the smooth progress of the Livongo integration had their intended effect.  The interviewer was encouraged by these misrepresentations, commenting at the end, for example:  "So so far this all sounds really great, like it sounds like you know things are firing on all cylinders." She later further stated: "so the integration sounds like it's going okay and that's always a question especially when there's any type of acquisition, not just

120

this one but then two big ones you know you wonder." These reactions confirm that the investing public was highly focused on the progress of the Livongo integration, not only because of the transaction's size but also because it came on the heels of another large acquisition (InTouch), which heightened investors' concerns about the Company's ability to successfully integrate Livongo.

**B.      February 24, 2021 – Q4 FY 2020 Earnings Call**

**1.      Misstatements Concerning the Livongo Integration**

307.    On February 24, 2021, after the market closed (4:30 PM EST), Defendants held an earnings call to discuss the Company's fourth quarter 2020 financial results ("Q4 FY 2020 Earnings Call"). During that call, Defendants touted the Company's integration of Livongo.

308.    For example, on the Q4 FY 2020 Earnings Call, Defendant Gorevic stated as follows in providing an update on the progress of the Livongo integration:

> ***Our commercial organization is now fully integrated***, and our teams responsible for cross-selling have been collaborating for months. A few weeks ago, we virtually hosted our Annual Global Growth Summit, bringing together over 700 teammates across our commercial organization, including our new teammates from InTouch Health and Livongo. This annual summit is a great opportunity to not only equip our commercial teams with the tools they need to effectively communicate our leading value proposition in the marketplace, but to share best practices and learn from one another. ***The integration of our data platform and assets also continues to progress*** as we work to unlock the power of our combined data sets. We are now capturing 2 million blood glucose data points per week, and our clinicians are responding to over 100,000 patient messages via text and chat and providing over 30,000 visits on average every day. We are also making significant investments to integrate our products and services. For example, we see a tremendous opportunity for a new integrated behavioral health product that combines the capabilities of both Livongo and Teladoc.

309.    Defendant Gorevic further touted:

> Our expanded capabilities in the management of chronic disease have uniquely positioned us to deliver on the promise of whole

person care. The combination with Livongo extends our leadership position and enhances our opportunity to redefine the future of virtual care, leveraging technology and data at unmatched scale to drive better outcomes and lower costs while delivering a better consumer experience. ***We have the capabilities to deliver and manage care virtually across the spectrum for consumers***, ranging from wellness and prevention to coordination of care for people living with chronic conditions, to high acuity for those dealing with critical illness. ***The combination is resonating in the marketplace, and we have signed multiple cross-sales since closing the Livongo transaction***. We highlighted the GuideWell and Tyson Foods deal on our last earnings call as well as a regional health plan cross-sale last month. We have now signed over a dozen new cross-sales since the close of the transaction. ***And the pipeline of new opportunities has more than doubled in just the past 3 months***. The early indicators give me tremendous confidence that we will deliver on the revenue synergies that we highlighted when we announced the transaction.

310. Defendant Gorevic's statements in the Q4 FY 2020 Earnings Call were materially false and misleading same reasons set forth in paragraphs 299–305 because they created the misimpression that the Livongo integration was either completed successfully in certain respects (e.g., with regard to the "***commercial organization***," which Gorevic claimed was "***now fully integrated***") or progressing smoothly and on track towards successful completion, including specifically with respect to the product platforms and other technological systems (e.g., "***the integration of our data platform and assets also continues to progress***").

311. In particular, Defendant Gorevic's statement that "[o]ur commercial organization ***is now fully integrated***" was materially false and misleading because Teladoc was also not able to integrate the Company's main business segment—its commercial organization. For example, CW 2 explained that "commercial integration" likely referred to Teladoc's main business, or their virtual whole-care primary care product. Similarly, according to CW 2, Teladoc considered their "commercial" business to be the Company's traditional business. CW 2 then further clarified that any entity, such as an employer or union, which was responsible for or provided health benefits

for their employees (self-insured employers) was considered "commercial" business by Teladoc. *CW 2 stated that she would not have considered the commercial business "fully integrated" during her tenure*—which continued until a year after the merger *(i.e.,* Fall of 2021)—*because the businesses were all running separately.*

312.    Additionally, CW 2 explained that internal emails, such as the email thread from November 30, 2020 with the subject line, "Teladoc Remote Patient Monitoring and Chronic Care Management," which, as described in detail above, discussed Teladoc overselling Teladoc's RPM capabilities to clients, were examples showing that Teladoc's commercial organization was not fully integrated during CW 2's tenure, which spanned from before the merger until a year after the merger.

313.    Analysts were encouraged by Defendants' positive statements about the Livongo integration.  For example, on February 24, 2021, Credit Suisse reported that "[Teladoc] has seen the combination with Livongo continue to resonate with the marketplace where the company has now signed over a dozen cross-sells since the close of the transaction."  Similarly, on February 25, 2021, William Blair reported: "*We also believe the Livongo integration and initial sales efforts are off to a very strong start*."  Additionally, William Blair reported that "emerging competition from other telehealth providers as well as novel entrants" posed a "[r]isk" to Teladoc but also reassured that the Company had *"increased its competitive differentiation" in part through the Livongo Acquisition*.  Likewise, on February 25, 2021, analyst Davidson reported: "the outlook remains bright as Teladoc is transforming well beyond telehealth with the addition of Livongo."

### 2.    Misstatements Concerning Competition

314.    On the same earnings call, Defendant Gorevic further touted the Company's competitive position.  For example, in response to a JPMorgan analyst's question about retention rates, competition in the marketplace," and "want[ing] to understand how you're thinking about

the competitive market right now around what you saw on the retention side," Defendant Gorevic

responded:

> With respect to retention rates, they continue to be at high levels, consistent with historic levels, which have always been in sort of the low to mid-90s. We continue to see that. And in fact, what we' re seeing is the pipeline is growing actually faster than we've seen in previous years.
>
> \*\*\*
>
> I've had a number of large client discussions over the last several weeks as we start to move into this selling season and we start to talk about the opportunity of the full credit answer, ***sort of that full solution across all of our product portfolio, and it is truly differentiated. So I was just talking to a regional Blue plan, who, I believe, we will take away from a competitor who has a much narrower set of products and can't compete in the evolving landscape and sort of the new paradigm that we've created***.

315.   Similarly, Defendant Gorevic also touted the Company's competitive position in

the BetterHelp segment in response to a Credit Suisse analyst's inquiries about BetterHelp's

margins and growth prospects in light of the fact that "several employers [] expanding

telebehavioral and mental health services":

> So let me answer about the market dynamics around BetterHelp and then Mala can talk to margins and performance. Yes, we really don't. I think a couple of things, Jailendra. One, we've actually started taking BetterHelp into some B2B arrangements, in particular with respect to EAP plans. And that's turned out to be a very fruitful market for us.
>
> The second thing I would say is, most people who are turning to BetterHelp either don't have adequate coverage or decide that they don't want to use that coverage, especially for reasons of expenses, honestly. One of the value propositions to BetterHelp is that for a month's worth of therapy, you can get – you can get therapy for a month, that would otherwise cost you in person about the same for a single visit or maybe a visit and a half, if you're fortunate. And so the value proposition is very, very strong. And it has always been the case and continues to be the case that many of the people who turn to BetterHelp wouldn't have otherwise gotten therapy, right?

> And so *we continue to see that market be very, very sort of underpenetrated the opportunity, very significant.   And so we don't see any slowing down of that in sight.*

316.     Defendant Gorevic's and Defendant Murthy's statements in the Q4 FY 2020 Earnings Call were materially false and misleading because, as outlined in detail above in Section IV.C, the Company in reality was negatively affected by growing competition, particularly as a result of Teladoc's integration struggles, which competitors exploited to their advantage.   For example, such sources corroborate, *inter alia¸* the following:

(a)     For example, CW 2 explained that Teladoc competitors were able to steal clients from Teladoc by citing the integration problems. In particular, CW 2 recalled that CVS (which had a deal with Livongo to sell Livongo's diabetes programs), terminated the contract right before Livongo was acquired by Teladoc.   CW 2 recalled that after the contract ended, CVS tried to flip its clients into using its own diabetes program, leveraging the integration issues at Teladoc as one of the reasons that the clients should leave Livongo;

(b)     CW 1 recalled that CVS dissolved the partnership slowly between 2020 and 2021, which turned CVS from a partner into a competitor.   CW 1 recalled that the legacy Livongo business lost a "tremendous" amount of annual recurring revenue due to the partnership's dissolution;

(c)     CW 3 stated that Teladoc CFO Mala Murthy and CMEO Stephany Verstraete discussed increased competition at quarterly and monthly all-hands meetings that CW 3 attended throughout her tenure.   CW 3 explained that the discussions generally asserted that Teladoc's success had attracted increased competition in the telehealth space.   CW 3 added that health plans, which were traditionally Teladoc customers, had begun to build out their own telehealth platforms that were beginning to replace Teladoc during her tenure;

(d)     CW 10 recalled that some health plans were in the process of "standing up" their own telehealth solutions while she was at Teladoc.   CW 10 recalled that Teladoc had two health plans that were very important to the company, one of which was Aetna.  CW 10 explained that these two health plans were not happy with Teladoc's service and were not meeting Teladoc's own internal financial projections.  CW 10 explained that every month, the health plans' "actuals" would be below Teladoc's forecasts for them.  CW 10 recalled that this was occurring around April or May of 2021; and

(e)     *Business Insider* reported that "some insurers bristled when Teladoc started pushing Livongo because they typically have their own programs for chronic conditions,

four current and former Teladoc employees said." The article continued, "For instance, CVS's Aetna will offer Teladoc's new primary-care product to all of its self-insured employers next year, but the company has been expanding its homemade service for diabetes."

317.    To the extent any of Defendant Gorevic's statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendant Gorevic's positive statements regarding the lack of adverse impact from competition on the Company.

318.    Analysts were also encouraged by Defendants' positive statements about competition. For example, according to the February 25, 2021 William Blair report, the analyst was further encouraged by the Livongo Acquisition purported positive impact on Teladoc's competitive position: "*We also believe that following the acquisitions of* Best Doctors, Advance Medical, InTouch Health, and now *Livongo, Teladoc has increased its competitive differentiation*—as there are no organizations that can match the company's international scale and scope of offerings across the continuum of care, or the number of distribution channels that Teladoc targets."

**C.    March 1, 2021 – 2020 Form 10-K**

**1.    Misstatements Concerning the Livongo Integration**

319.    On March 1, 2021, Defendants filed their Annual Report on Form 10-K for the year ended December 31, 2020 ("2020 Form 10-K"), which was signed by Defendants Gorevic, Murthy, and Napolitano. In discussing the Livongo Acquisition, Defendants stated that "*[w]e may have difficulty integrating the Livongo business, and the anticipated synergies and other benefits of the combined company may not be realized*."

320.    Defendants similarly stated in Teladoc's 2020 Form 10-K, as follows:

On October 30, 2020 we completed the merger with Livongo. The ultimate success of our merger with Livongo will depend in large

part on the success of the management of the newly combined company in integrating the operations, strategies, technologies and personnel of the two companies. ***We may fail to realize some or all of the anticipated benefits of the merger if the integration process takes longer than expected or is more costly than expected. Our failure to meet the challenges involved in successfully integrating the operations of the two companies or to otherwise realize any of the anticipated benefits of the merger, including additional cost savings and synergies, could impair our operations***. In addition, ***the overall integration of Livongo post-merger will continue to be a time-consuming and expensive process that, without proper planning and effective and timely implementation, could significantly disrupt our business***.

321.    Likewise, in Teladoc's 2020 Form 10-K, Defendants characterized the following integration difficulties as only "***potential difficulties [that Teladoc] may encounter in the integration process***":

- the integration of management teams, strategies, technologies and operations, products and services;
- the disruption of ongoing businesses and distraction of management from ongoing business concerns;
- the retention of and possible decrease in business from the existing customers of both companies;
- the creation of uniform standards, controls, procedures, policies and information systems;
- the reduction of the costs associated with each company's operations;
- the integration of corporate cultures and maintenance of employee morale;
- the retention of key employees; and
- potential unknown liabilities associated with the merger.

322.    Defendants' statements in Teladoc's 2020 Form 10-K were materially false and misleading for the same reasons set forth in paragraphs 299–305. In particular, Defendants' purported general warnings regarding future "***potential***" risks or difficulties that Teladoc "***may***" experience with the Livongo integration that "***could***" disrupt the Company's operations were materially false and misleading because Defendants knew, or were reckless in not knowing, that Teladoc was ***already*** experiencing such difficulties in integrating Livongo, which were ***already***

adversely impacting the Company's business, as described in the cited paragraphs. Indeed, among a litany of integration challenges that negatively affected Teladoc, multiple CWs confirm and corroborate that difficulties involving, among others, (i) integrating the companies' teams, technology, products, and strategies; (ii) retaining key employees; (iii) resolving cultural clashes between the companies; and (iv) losing business and customers, were not just mere possibilities by this time. To the contrary, the accounts of numerous CWs, as corroborated by internal Teladoc documents and the *Business Insider* Article, show that these very problems had already materialized by the time Defendants' statements were made.

### 2.   Misstatements Concerning Competition

323.   Teladoc's 2020 Form 10-K also contained misstatements about the adverse impact of increased competition on the Company's business. For example, Defendants stated that "[w]e operate in a competitive industry, ***and <u>if</u> we are not able to compete effectively, our business, financial condition and results of operations will be harmed***."

324.   Further, Defendants similarly stated in Teladoc's 2020 Form 10-K that, "[w]hile the virtual care market is in an early stage of development, it is competitive and we expect it to attract increased competition, ***which <u>could</u> make it difficult for us to succeed***."

325.   Similarly, Defendants additionally stated in Teladoc's 2020 Form 10-K: "Competition from specialized software and solution providers, health plans and other parties will result in continued pricing pressures, which is likely to lead to price declines in certain product segments, ***which <u>could</u> negatively impact our sales, profitability and market share***."

326.   Likewise, in Teladoc's 2020 Form 10-K, Defendants further stated:

> ***Our competitors <u>could</u> also be better positioned to serve certain segments of our markets, which <u>could</u> create additional price pressure.*** In light of these factors, even if our solutions are more effective than those of our competitors, ***current or potential Clients <u>may</u> accept competitive solutions in lieu of purchasing our***

> *solutions. __If we are unable to successfully compete, our business,__*
> *__financial condition and results of operations could be materially__*
> *__adversely affected.__*

327.     Defendants' statements in Teladoc's 2020 Form 10-K were materially false and misleading for the same reasons set forth in paragraph 316.  In particular, Defendants' general warnings of ***potential*** future risks regarding competition, e.g., that competitors "***could***" make it more difficult for Teladoc to succeed or "***could***" negatively impact Teladoc's business, sales, or financial condition "***if***" Teladoc were unable to successfully compete were materially false and misleading because Defendants knew, or were reckless in not knowing, that Teladoc was ***already*** experiencing such negative consequences from growing competition and thus ***already*** adversely impacted by such competitors.  Indeed, as detailed above, multiple CWs and the *Business Insider* Article confirm that throughout the Class Period, including by this time, Teladoc was already losing significant business to either existing competitors or to Teladoc's own customers who had begun building their own telehealth platforms, which rendered Teladoc's services unnecessary.

### D.     March 15, 2021 – Interview with Former Senator Bill Frist

#### 1.     Misstatements Concerning the Livongo Integration

328.     On March 15, 2021, *A Second Opinion with Senator Bill Frist, M.D.* podcast released publicly on Apple Podcast and Spotify[38] episode 116, which was entitled: "116 - Jason Gorevic, CEO of Teladoc Health on the Virtual Care Revolution and Doing the Largest Digital Health Deal in a Pandemic."  During the episode, Former Senator Frist interviewed Defendant Gorevic about Teladoc, including how the Livongo integration was progressing.

329.     Specifically, Former Senator Frist asked: "[O]verall has the assimilation gone well?"—referring to the assimilation, or integration, of Livongo into Teladoc.  In response,

---

[38] This episode was also released on YouTube.com on August 16, 2021.

Defendant Gorevic touted that the Livongo integration was going "***very well***" and "***as well as I could possibly have hoped for***," including that the two companies' "***cultural alignment is very strong***" as follows:

> ***Yeah very well [] in fact I would say [] as well as I could possibly have hoped for.*** Um you know there are certainly challenges.  As I said we've never been in the same room together right?  I mean it is it is amazing to me.  I have whole teams of people all around the world now who I've never met so I am anxious quite frankly to go on the tour and start to uh to be face to face with those teams.  But what what makes it successful I think is a common mission right?  We are but we're both mission-driven organizations uh and and that alignment there is really critical.  [][T]he the vision for what the future should look like and the role that we can play [] is really critical [] because those things are unifying right?  The strategy then falls out of that and [] we're working as a joint team to continue to refine that strategy.  It'll be a refining not a re-architecting [] of the strategy [] and it's warranted given the acceleration in the market [] and [] the opportunity and the possibilities that are now open to us.  And then lastly it's culture.  You know I [] think for me the sun sort of rises and sets on strategy and culture and one without the other is insufficient.  ***And the the cultural alignment is very strong***.  Both companies have incredibly collaborative collegial cultures that are really oriented to doing the right thing [] and [] our values are very very strong and similar.  So [] you know from my perspective those are the ingredients for successful integration and everybody's really aligned on [] wanting to make a big difference.  ***So [] so far, so good [] [and] that has manifested itself in some good commercial wins and*** you know there's nothing unifying like ***winning together.*** [][S]o that's been really positive [] and I'm confident that we're going to see more of that.

330.    Defendant Gorevic's statements during the interview with Senator Frist were materially false and misleading for the same reasons set forth in paragraphs 299–305.

331.    Indeed, Defendant Gorevic's statement about the companies' cultural alignment was also materially false and misleading because in direct contradiction to his representation, numerous sources in fact described substantial personnel integration problems as outlined above, including confusion about where teams belonged, heavy attrition, and other company culture clash

issues.  For example, CW 1 also recalled that after Teladoc acquired Livongo, Teladoc experienced operational issues such as a loss of Livongo leadership and culture clash between the two companies.  Similarly, The *Business Insider* Article also corroborated the CWs' accounts of related culture clash issues between Livongo and Teladoc personnel, which contributed to this attrition.  In particular, November 2021 *Business Insider* Article wrote that a "culture clash dominated the better part of the last year, according to Insider's conversations with 12 current and former employees, many of whom came over from Livongo during the merger."  Similarly, the *Business Insider* Article explained that "[t]here have also been cultural challenges."

332.    Additionally, Defendant Gorevic's statement that the integration was proceeding "*[s]o [] so far, so good [] [and] that has manifested itself in some good commercial wins*" was also materially false and misleading because Teladoc was also not able to integrate the Company's main business segments—its commercial organization.  For example, CW 2 explained that "commercial integration" likely referred to Teladoc's main business, or their virtual whole-care primary care product. Similarly, according to CW 2, Teladoc considered their "commercial" business to be the Company's traditional business.  CW 2 then further clarified that any entity, such as an employer or union, which was responsible for or provided health benefits for their employees (self-insured employers) was considered "commercial" business by Teladoc.  *CW 2 stated that she would not have considered the commercial business "fully integrated" during her tenure*—which continued until a year after the merger *(i.e.,* Fall of 2021)—*because the businesses were all running separately.*

333.    Similarly, CW 2 explained that internal emails, such as the email thread from November 30, 2020 with the subject line, "Teladoc Remote Patient Monitoring and Chronic Care Management," which, as described in detail above, discussed Teladoc overselling Teladoc's RPM

capabilities to clients, were examples showing that Teladoc's commercial organization was not fully integrated during CW 2's tenure, which spanned from before the merger until a year after the merger.

334.    To the extent any of Defendant Gorevic's statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendant Gorevic's positive statements regarding the Company's supposedly successful integration and the companies' strong cultural alignment.

**E.**    **April 28, 2021 – Q1 FY 2021 Earnings Call**

**1.**    **Misstatements Concerning the Livongo Integration**

335.    On April 28, 2021, after the market closed (4:30 PM EST), Defendants held an earnings call to discuss the Company's first quarter 2021 financial results ("Q1 FY 2021 Earnings Call").  During that call, Defendants repeatedly touted the Company's integration of Livongo.

336.    For example, Defendant Gorevic reiterated to investors that Teladoc had "made considerable progress" with the Livongo integration and that the commercial organization was "fully integrated":

> Turning to an update on integration. ***We've made considerable progress across our key work streams.***  As we previously noted, ***our commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products since early this year.***  We've now closed several deals for our new integrated mental health product that combines the Teladoc therapists and psychiatrists with the Livongo digital mental health capabilities to deliver a market-leading solution.

337.    Similarly, in response to a SVB Leerink analyst's question about the Livongo integration progress, Defendant Gorevic continued to tout the "rapid progress" that the Company had made with the integration of the commercial organization:

> We're very excited about the progress of integration. We mentioned ***the rapid progress on the commercial side***, and I think the team has

just done incredible work to bring that together. Breaking up territories and reallocating and bringing to market a comprehensive and unified suite is hard work, and the team has done just a tremendous job.

338.    Defendant Murthy also responded to that SVB Leerink analyst's question about integration, further touting the Company's "very, very clear road map" to integrating the companies, particularly their products given she specifically referred to Teladoc's "R&D," i.e., research and development efforts on that front, and claiming that they were "well on our way" to completing "deep" "data integration":

> I'd also add, Stephanie. The good thing is *we have a very, very clear road map*. And we have spent a fair amount of time as a leadership team, prioritizing that road map, so that the investments we've put against that, as we have talked about, I expect 2021 to be an investment year, it is stacked and aligned against those very clear priorities *in the R&D road map*. *Whether it be in terms of data integration*, as you asked, recognizing a unique member from an eligibility and an identity perspective, that requires *deep integration*. *And I would say we are well on our way to do it*.

339.    Defendant Gorevic's and Defendant Murthy's statements during the Q1 FY 2021 Earnings Call, including Gorevic's statement touting the "considerable progress" of the integration when in fact it was riddled with multiple, severe problems at this time, were materially false and misleading for the same reasons set forth in paragraphs 299–305.

340.    Indeed, Defendant Gorevic's statement about the commercial organization being "fully integrated" was also materially false and misleading because Teladoc was also not able to integrate the Company's main business segment—its commercial organization. For example, CW 2 explained that "commercial integration" likely referred to Teladoc's main business, or their virtual whole-care primary care product. Similarly, according to CW 2, Teladoc considered their "commercial" business to be the Company's traditional business. CW 2 then further clarified that any entity, such as an employer or union, which was responsible for or provided health benefits

for their employees (self-insured employers) was considered "commercial" business by Teladoc. ***CW 2 stated that she would not have considered the commercial business "fully integrated" during her tenure***—which continued until a year after the merger *(i.e.,* Fall of 2021)—***because the businesses were all running separately.***

341.    Similarly, CW 2 explained that internal emails, such as the email thread from November 30, 2020 with the subject line, "Teladoc Remote Patient Monitoring and Chronic Care Management," which, as described in detail above, discussed Teladoc overselling Teladoc's RPM capabilities to clients, were examples showing that Teladoc's commercial organization was not fully integrated during CW 2's tenure, which spanned from before the merger until a year after the merger.

342.    Additionally, Defendant Murthy's statement touting the Company's "very, very clear road map" to integrating the companies, and particularly their products, was materially false and misleading because Defendants in fact did not have such a clear road map, that is, an adequate integration plan, during the Class Period.  For example, CW 2 described a meeting that took place on June 17–18, 2021 in Nashville, where she asked Teladoc COO David Sides about the plan to integrate Livongo.  CW 2 recalled that Sides's response was, "That's a great question," without providing a plan, which worried CW 2 and her team.  Similarly, according to CW 4, another reason the integration had not gone well throughout her tenure was because Teladoc seemingly had ***no integration plan*** and that they seemingly did not know how to create one because the two companies had two fundamentally different business models.  CW 11 also recalled that the Company had "no clear integration plan" for integrating the two companies' data during her tenure at Teladoc (*i.e.*, at least until June 2021), and added that there was no clear information on integrating coming down from above.  Likewise, the Company lacked an adequate product road

map for successfully integrating Livongo's product platforms into Teladoc's, as demonstrated by numerous CW accounts, the *Business Insider* Article, and internal Teladoc documents, which demonstrate internal confusion about Livongo's technological capabilities and resultant overselling clients on such capabilities, and continued inability to deliver these integrated products throughout the Class Period, as in fact Defendants later admitted at the end of the Class Period.

343.    Analysts and the media were encouraged by Defendants' positive statements about the Livongo integration.  For example, on April 28, 2021, analyst William Blair reported, as it reported the previous quarter: "***We also believe the Livongo integration and sales efforts are off to a strong start***."  Similarly, on April 29, 2021, Credit Suisse reported that Teladoc "***has made considerable progress working through the integration of Livongo***, with the commercial organization having been fully integrated with the sales teams selling the combined company's portfolio of products since early in 2021."

### 2.    Misstatements Concerning Competition

344.    Defendants also downplayed any increased competition.  For example, in response to a JPMorgan analyst's questions about the Company's "most recent thoughts on competition" and how the "competitive landscape has really shifted and changed over the last couple of years," such as the entry of Amazon Care and other competitors into this telehealth space, Defendant Gorevic responded:

> There's really nobody in the market who comes close to the comprehensive solution for both acute episodic and chronic care as well as the range of both digital and professional services in terms of our clinicians that we can bring to bear.  And we see that in our pipeline based on the fact that it's characterized by larger deals than we've ever seen before.  Multi product deals are sort of the preponderance of the pipeline.  And we see it in the competitive takeaways that we have booked, as we mentioned on the call, a Large East Coast Blues plan as well as other very large opportunities in the pipeline.  And we see it in the competitive takeaways that we

have booked, as we mentioned on the call, a Large East Coast Blues plan as well as other very large opportunities in the pipeline.

In some cases, we've seen success and increased interest as some of those smaller competitors have gone to health plans.  And for the most part, one health plan doesn't want to buy from another competing health plan.  And then in other cases, the moves in the market have been somewhat antagonistic toward the health plans in an effort to disintermediate them.  So, it's been our view to work with the health care system, not against it.  And that's proven to be beneficial for us as we align with our partners and bring them greater value.

So all of those moves are sort of **within the realm of what we expected**.  And I'm not going to call out individual solutions that you mentioned or competitors that you mentioned.  But for the most part, **many of them we almost never bump into, and some of the new entrants we're just not seeing gain traction**.

345.    Defendant Gorevic's statements during the Q1 FY 2021 Earnings Call were materially false and misleading for the same reasons set forth in paragraph 316.

346.    Indeed, Defendant Gorevic's statement that "**many of [the competitors], we almost never bump into, and some of the new entrants, we're just not seeing gain traction**" and that these new competitive dynamics were "within the realm of what we expected"—i.e., nothing to worry about—were also materially false and misleading because the growing competition was in fact harming Teladoc's business during the Class Period.  For example, as detailed above, CW 2 explained that Teladoc competitors were able to steal clients from Teladoc by citing the integration problems.  Similarly, CW 1 stated that during her tenure with Livongo and Teladoc, the legacy Livongo business experienced increased competition with CVS.

347.    Analysts were also reassured by Defendants' statements minimizing growing competition as not a credible threat.  For example, with respect to competition, William Blair again explained: "We also believe that, following the acquisitions of Best Doctors, Advance Medical, InTouch Health, and **now Livongo, Teladoc has increased its competitive differentiation**—as

there are no organizations that can match the company's international scale and scope of offerings across the continuum of care, or the number of distribution channels that Teladoc targets." William Blair further stated that "[o]verall, it was a very positive start [to the] year for the clear leader in the emerging digital care delivery space, and we expect 2021 to be another strong year for the organization."

348.    Credit Suisse also stated in its April 29, 2021 report that it was encouraged by Defendants' statements downplaying any competitive pressures: "With TDOC being the most scaled digital health company, with leading brands in both chronic care (Livongo) and mental health (legacy TDOC & BetterHelp), TDOC has a differentiated set of capabilities that health plans will likely gravitate towards. While management did not comment on Amazon Care directly, *the company did say that some of 'the new entrants into the market' have yet to gain any traction*."

349.    Further, on April 29, 2021, Healthcare Dive published a news article, similarly stating that "*on a call with investors aftermarket Wednesday, Gorevic contended he wasn't worried about growing competition.*"

350.    Moreover, on April 30, 2021, Credit Suisse issued another report in light of a post-quarterly conference call discussion it had with Teladoc management discussing key investor concerns.  The analysts were again reassured by Defendants' response to Credit Suisse's follow-up question for further clarification on the Company's  statement during the Q1 FY 2021 Earnings Call that "some of the new entrants not gaining traction," writing:  "the comment was more reflective that *TDOC is essentially not running into new competitors/entrants and simply not seeing them in the marketplace. In essence, it does not seem like they are gaining any traction at all*."

F.     **May 11, 2021 – CNBC Interview**

1.     **Misstatements Concerning Competition**

351.     On May 11, 2021, after the market closed (5:40 PM EST), CNBC interviewed Defendant Gorevic.  As the CNBC video description stated, "CNBC's Bertha Coombs talks with Teledoc CEO Jason Gorevic on 'Closing Bell.'"  During that interview, Defendant Gorevic again downplayed competitive pressures and highlighted the features that purportedly differentiate Teladoc from its competitors.

352.     Specifically, CNBC reporter Bertha Coombs reported on an interview that she had with Defendant Gorevic on "Closing Bell" and stated: "But investors are worried about so much competition now in the telehealth employer market.  Amazon's launch of Amazon Care; CVS' offering that includes its minute clinics and Walmart buying telehealth service ME MD to augment its clinics."  CNBC reporter Coombs then played a clip of Defendant Gorevic's discussion on competition; specifically, in response to the reporter's questions about growing competition in the telehealth employer market, Defendant Gorevic again downplayed such concerns, citing the Company's purportedly "unified, integrated" whole-person products: "If you look at our 2020 selling season, about 2/3 of our bookings were multi-product bookings and I think *that really speaks to the market demand and consumer demand for unified integrated solutions*."

353.     Defendant Gorevic's statement during the CNBC interview was materially false and misleading for the same reasons set forth in paragraph 316.

354.     Indeed, Defendant Gorvevic's statement about how "that really speaks to the market demand and consumer demand for unified integrated solutions" was also materially false and misleading because Teladoc faced increasing competitive pressures that were in fact adversely affecting the market's demand for Teladoc's products, particularly given Teladoc's struggles integrating Livongo and continued failure to provide the "unified integrated solutions" that he

touted during the Class Period.  For example, CW 2 explained that Teladoc competitors were able to steal clients from Teladoc by citing the integration problems.  In particular, CW 2 recalled that CVS (which had a deal with Livongo to sell Livongo's diabetes programs), terminated the contract right before Livongo was acquired by Teladoc.  CW 2 recalled that after the contract ended, CVS tried to flip its clients into using its own diabetes program, leveraging the integration issues at Teladoc as one of the reasons that the clients should leave Livongo.  Additionally, CW 1 recalled that CVS dissolved the partnership slowly between 2020 and 2021, which turned CVS from a partner into a competitor.  CW 1 recalled that the legacy Livongo business lost a "tremendous" amount of annual recurring revenue due to the partnership's dissolution.  CW 3 added that health plans, which were traditionally Teladoc customers, had begun to build out their own telehealth platforms that were beginning to replace Teladoc during her tenure.

355.    The media was encouraged by Defendant Gorevic's positive remarks on competition.  For example, the next day, on May 12, 2021, Fierce Healthcare, an industry media site,  quoted Defendant Gorevic's statements about competition as mentioned in the May 11, 2021 CNBC Interview—*i.e.*, "If you look at our 2020 selling season, about two-thirds of our bookings were for multi-product bookings and I think that speaks to the market demand and consumer demand for unified, integrated solutions"—and reported that "***Teladoc CEO Jason Gorevic doesn't appear to be sweating the competition***."

356.    To the extent Defendant Gorevic's statement above was an opinion, it was false and misleading because it lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendant Gorevic's positive statement regarding the lack of adverse impact from competition on the Company.

**G.      June 1, 2021 – 41st Annual William Blair & Company Growth Stock Conference**

**1.      Misstatements Concerning Competition**

357.    On June 1, 2021, Teladoc attended a the 41st Annual William Blair & Company Growth Stock Conference ("William Blair Conference").   During that conference, Defendants touted the Company's leading competitive position in the market.

358.    For example, in response to an analyst's question about Teladoc's position in the competitive environment, Defendant Gorevic rejected any notion that Teladoc was being impacted by smaller competitors:

> The truth is that although large and sort of headline making, the ones that you mentioned [*i.e.*, Amazon; Walmart], ***we really never bump into and mostly, it's because they're just in the very, very, very early days of sort of deciding even what they want to be, much less compete in the marketplace***. And then you have a lot of smaller point solutions, and this really gets to -- and you and I have discussed before, ***we win because of our multiproduct breadth of solutions***, and that's evident in our data about the sales that we booked as well as the revenue per member and things like that. And that's a significant competitive advantage. So we don't actually see much in the way of single product sales anymore because that's not what buyers are looking for.

359.    Defendant Gorevic's statement during the William Blair Conference was materially false and misleading for the same reasons set forth in paragraph 316 and paragraph 346.

**H.      June 8, 2021 – Credit Suisse Meeting**

**1.      Misstatements Concerning the Livongo Integration**

360.    As reported in a Credit Suisse analyst report issued on June 8, 2021, that same day Credit Suisse hosted the Teladoc management team for a virtual meeting, which included Defendant Gorevic, Defendant Murthy, Patrick Feeley, Vice President, Head of Investor Relations, and Jason Plagman, VP, Investor Relations.   During that meeting, Defendants touted the Company's purported successful integration of Livongo.  Specifically, Credit Suisse reported

Teladoc's management's (as described above) positive remarks with respect to the Company's integration of Livongo, as follows:

> For Livongo, ***management highlighted that the company is*** busy and ***making great progress on integrating Livongo into the broader Teladoc businesses.*** The management team has been encouraged with the integration and pleased with the momentum from the commercial sales teams out selling the company's full suite of products and services. ***To-date, the Livongo results have been entirely in-line with the company's outlook*** and management remains confident in the business growth.

361. Defendants' statements during the Credit Suisse meeting were materially false and misleading for the same reasons set forth in paragraphs 299–305 and paragraphs 340–342.

362. Indeed, Defendants' statement that they were "***making great progress on integrating Livongo into the broader Teladoc businesses***" was also materially false and misleading because Teladoc in fact was not making great progress with the integration given the numerous continued challenges in integrating the companies' technological systems (including Salesforce and Tableau data systems and the product platforms), processes, and personnel, which according to numerous CWs and other sources, persisted throughout the Class Period.  Likewise, Defendants' statements assuring that the Livongo sales results "***have been entirely in-line with the company's outlook,***" are directly contradicted by the *Business Insider* Article, which reported, *inter alia*, that Livongo sales personnel were missing their sales quotas by wide margins, as well as CW accounts describing sales losses due to increased competition and integration issues.

### 2.   Misstatements Concerning Competition

363. Furthermore, as reported in the same June 8, 2021 Credit Suisse report, Defendants at their meeting with Credit Suisse also touted the Company's purportedly undiminished leading competitive position despite increased competition in the market. Specifically, with respect to the

Company's competitive position, Credit Suisse reported Teladoc's management's (as described above) response as follows:

> TDOC has not been surprised by the evolving digital health competitive landscape, with more companies entering the market, companies coming public (via IPO/SPAC), and the M&A activity. Management believes TDOC is in a fortunate position as the company gets to see everything that comes to market, given the fact that the company is the clear leader in the space. . . . Overall, *in spite of the market noise, management believes that TDOC's competitive positioning is as strong as it has ever been.* TDOC has been building the capabilities and underlying infrastructure to scale the business for many years now. Management believes the aforementioned is a big differentiator relative to some of the new market participants who don't have a comprehensive solution or the required scale (in healthcare) to succeed, and are not necessarily well-versed in what it takes to drive meaningful clinical outcomes.

364.    Defendant Gorevic's and Defendant Murthy's statements during the Credit Suisse meeting were materially false and misleading for the same reasons set forth in paragraph 316 and paragraph 346.

365.    To the extent Defendants' statement above was an opinion, it was false and misleading because it lacked a reasonable basis and omitted the above material facts, which did not fairly align with Defendants' positive statement regarding the lack of adverse impact from competition on the Company.

**I.      October 27, 2021 – Q3 FY 2021 Earnings Call**

      **1.      Misstatements Concerning the Livongo Integration**

366.    On October 27, 2021, after the market closed (4:30 PM EST), Defendants held an earnings call to discuss the Company's first quarter 2021 financial results ("Q3 FY 2021 Earnings Call").  During that call, Defendants touted the Company's integration of Livongo.

367.    Defendant Gorevic further touted that Teladoc's teams in the combined company were "fully integrated":

Teladoc Health as a combined company earned certification as a Great Place to Work. As some of you may know, this premier organization evaluates a company's cultural health through both objective measures and employee surveys before conferring its designation, and we are excited to get this positive report card *in the wake of fully integrating our teams*.

368.    Defendant Gorevic's statement during the Q3 FY 2021 Earnings Call was materially false and misleading for the same reasons set forth in paragraphs 299–305.

369.    Indeed, Defendant Gorevic's statement the "teams" were "fully integrat[ed]" was also materially false and misleading because Teladoc was in fact still unable to successfully integrate many of the companies' teams by this time.  For example, CW 2 recalled that after the Livongo acquisition, her Hospitals and Health Systems (HSS) team was merged with InTouch's Acute Care team, which Teladoc had acquired.  CW 2 explained that the placement did not make sense because the Acute Care team sold to completely different buyers than CW 2's HSS team.  For example, CW 2's team sold the Livongo platform as an employee benefit to HR departments or finance teams, whereas InTouch sold its acute care product to emergency rooms and stroke doctors.  CW 2 recalled that other divisions "had no idea" what to do with the Livongo personnel either.

370.    Similarly, CW 6, who worked as a Vice President within Teladoc's Hospital Health Systems division, and her team was responsible for selling into health systems, said that Teladoc had acquired InTouch Health in July 2020 and InTouch was dedicated to health systems as well.  CW 6 recalled that, given this overlap, nobody knew where to put her Livongo health systems team.  CW 6 compared the situation to horse trading, saying that one executive would want the team whereas another executive would not.  CW 6 recalled that confusion about where to place her Hospital Health Systems (HHS) team started on day one of the integration of Livongo and

Teladoc, meaning since the companies merged.  CW 6 explained that the Livongo integration was not complete when she left Teladoc in Fall 2021.

371.     Additionally, Similarly, CW 7 stated that when she left Teladoc in October 2021, she was working on a team that was still focusing exclusively on the Livongo product.  CW 7 recalled that many of the business segments at Teladoc were "siloed."  CW 7 added that Teladoc had planned to eventually phase out the "Livongo" brand name and replace it with "chronic care by Teladoc," but this had not happened by the time she left in October 2021.

372.     Indeed, Defendants were still struggling to come up with an adequate integration plan at this time, almost a year after the Livongo Acquisition had closed.  For example, according to CW 4, Teladoc held a leadership meeting over the course of a few days in or around September 2021 in Chicago, Illinois, that she and Gorevic attended.  CW 4 recalled having direct conversations with Gorevic about plans for the Livongo integration at the meeting, and that Gorevic responded with "Wait until tomorrow."  CW 4 explained that Gorevic was referring to the presentation that he (Gorevic) was giving the following day regarding plans for integrating Livongo, and that Gorevic had seemingly stated it in a way that suggested that CW 4 would be satisfied, and that the integration issues would finally be resolved.  According to CW 4, Gorevic's presentation the following day added nothing new, provided very general information and no specifics, that it seemingly to CW 4 did not resolve the integration issues she was referring to when she approached Gorevic the previous evening, and CW 4 felt that it came across as "not sophisticated" and "underwhelming."  Thus, according to CW 4, when Gorevic gave his presentation "alarm bells went off" in CW's mind.

## 2.     Misstatements Concerning Competition

373.     Furthermore, Defendant Gorevic omitted that growing competition was negatively affecting Teladoc's business.  For example, in response to a William Blair analyst's question about

what Teladoc is seeing in the competitive environment, Defendant Gorevic again denied any concerns about growing competition and assured that the Company was still "winning" due to its integrated "whole person" line of products, which implicitly included Livongo's products:

> Our win rates are staying very similar to prior years. So as we look at sort of doing the pipeline review now and where our win rates are, we're staying very similar to where we were in prior years in spite of the fact that everyone knows there's been a lot of investment in the space.
>
> Second, our retention rates are extremely strong. And third, we're seeing really good multiproduct sales. So 70% of our bookings this year were multiproduct sales as compared to about 50% last year, which I think really gets to the reason that we're winning, right? ***We're winning because of the full suite of our products and services.*** And the truth is that the point  solutions, I would say, are really struggling at this point.

374.    Defendant Gorevic's statements during the Q3 FY 2021 Earnings Call were materially false and misleading for the same reasons set forth in paragraph 316.

375.    Indeed, Defendant Gorevic's statement that "[w]e're winning because of the full suite of our products and services" was also materially false and misleading because the Company in fact was unable to fully integrate Livongo's and the Company's products during the Class Period.  For example, CW 6 stated that Livongo sold a glucometer for diabetes patients that stored digital recordings in the cloud and was accessible via the Livongo app.  CW 6 recalled that Teladoc's vision was to allow doctors to access the glucometer data during virtual care sessions, but doctors were still not able to do so when CW 6 left in Fall 2021.

376.    CW 1 also confirmed that Teladoc was slow to create a comprehensive product that incorporated both Livongo and Teladoc services.  For example, CW 1 recalled that Teladoc had begun to sell a ***beta*** version of this comprehensive "whole person solution" to a "handful of clients" by the time she left Teladoc in ***January 2022***.  CW 1 added that this "whole person solution" that

Teladoc was testing was really just a legacy Livongo service that Teladoc rebranded.  Likewise, CW 2 explained that after the acquisition closed, Teladoc brought in new executives who did not know anything about Livongo and would make things up in client meetings.  For example, CW 2 recalled that these newly hired executives pitched clients on a "whole person platform," *while Livongo had standalone products for diabetes and other diseases but had not yet integrated them*.

377.    Additionally, Defendant Gorevic's statements were also materially false and misleading because competitors in reality were increasingly taking key clients from Teladoc at this time, including due to the Livongo integration problems.  For example, CW 2 stated that CVS then decided to terminate the contract right before Livongo was acquired by Teladoc.  CW 2 added that the termination process concluded after the acquisition closed.  According to CW 2, CVS gave clients the option to terminate their own contracts with Livongo immediately or to defer for one year.  CW 2 recalled that some clients chose to defer for one year then move on.  CW 2 recalled that after the contract ended, CVS tried to flip its clients into using its own diabetes program, citing and leveraging the integration issues at Teladoc as one of the reasons that the clients should leave Livongo.  CW 2 recalled that she personally oversaw at least four CVS-sold deals, two of which were terminated after CVS ended its contract.  CW 2 recalled that Temple University Health System and another client left Teladoc *in September 2021* as a result of CVS leveraging the integration issues.

378.    Analysts were encouraged by Defendants' positive statements.  For example, on October 27, 2021, William Blair again reported that "[w]e also believe that, following the acquisitions of Best Doctors, Advance Medical, InTouch Health, and now Livongo, Teladoc has increased its competitive differentiation—as there are no organizations that can match the

company's international scale and scope of offerings across the continuum of care, or the number of distribution channels that Teladoc targets."

**J.      October 28, 2021 – Credit Suisse Conference Call with Teladoc Management**

      **1.      Misstatements Concerning the Livongo Integration**

379.    On October 28, 2021, Credit Suisse issued a report that contained a post-quarterly conference call discussion with Teladoc management.  Specifically, Credit Suisse explained:

> We had a post-quarterly conference call discussion with TDOC management to review 3Q21 results, individual business trends, the preliminary look at 2022 guidance, and other important topics. In the text below, we list our questions and the company's responses. The answers are not verbatim, but we put the company's answers in their proper context in a give-and-take format.

380.    In response to Credit Suisse's questions about synergies between Teladoc and Livongo, Credit Suisse reported Teladoc' management's answer as follows:): "***With the Livongo and Teladoc commercial teams now integrated***, Teladoc has been very disciplined in how it manages and measures its pipeline, and creates the forecasts to ensure the company meets or exceeds the guidance put forth."

381.    Notably, in this discussion with analysts when pressed about investor concerns that the Livongo integration "might be slightly behind schedule," Defendants flatly denied such delays, instead falsely reassuring investors that the integration overall, including the product platforms, were on track:

> The success that the company is having with multi-product sales is a good proof point behind that integration. Overall, ***management pushes back on the claim that TDOC is behind when it comes to the actual integration of Livongo***. TDOC launched myStrength Complete just eight months after the closing of the transaction and in the middle of a pandemic.

382.    Teladoc's management's statements during the Credit Suisse conference call were materially false and misleading for the same reasons set forth in paragraphs 299–305 and

paragraphs 340–342, 362, and 369–372.  In particular, as demonstrated above by numerous CW accounts and the *Business Insider* Article, which was released just two weeks after this misstatement, the Livongo integration continued to be riddled by substantial problems and was thus substantially behind schedule, particularly with regard to integrating the companies' product platforms, which CWs report it had not completed by this time in the Fall of 2021, and Teladoc later admitted it still had not completed by the end of the Class Period.

K.     **November 10, 2021 – *Business Insider* Article and Partial Disclosure / Materialization of the Risk**

383.     On November 10, 2021, for the first time, it was partially revealed that Teladoc was experiencing major problems with integrating the Livongo Acquisition.  Specifically, on November 10, 2021, during market hours, *Business Insider* published an article, based upon private conversations with 12 current and former Teladoc employees, revealing credibly for the first time that the Livongo integration was still not completed or proceeding smoothly, as Defendants had repeatedly represented.  The *Business Insider* Article outlined several integration challenges that Teladoc was facing as further detailed above, such as problems relating to Teladoc rushing the process, issues with merging the companies' sales processes and technological systems, and high attrition.  Indeed, the *Business Insider* Article reported that "[a] spokesperson for Teladoc ***acknowledged the integration was an issue in the first six months***."

384.     In response, Teladoc's stock price fell $6.02 per share, or 4.21%, to close at $137.04 per share on November 10, 2021.

385.     However, the Company's stock price remained artificially inflated after this revelation as Defendants knew and failed to disclose or deliberately disregarded the unsuccessful integration of the Livongo Acquisition.  Instead, Defendant Gorevic and the Company continued to lead investors to believe that the integration process was a success.

386.    For example, Defendant Gorevic reassured investors, as reported by *Business Insider*, that "he was proud of the [C]ompany's progress," and that the Company "launched two connected services in 2021, ***one of which fully blends Livongo's assets with Teladoc's***."  Indeed, Defendant Gorevic reassured investors that the integration efforts were "on track": "The vision that we laid out then — about whole-person care and bringing together the unique capabilities of two complementary companies to deliver something that really hasn't been done before — ***is on track***."

387.    Similarly, as *Business Insider* reported: "A spokesperson for Teladoc acknowledged the integration was an issue in the first six months but said ***it was less of an issue today***."

388.    Defendant Gorevic's and the Company's statements as reported in the *Business Insider* Article were materially false and misleading for the same reasons set forth in paragraphs 299–305.

389.    Indeed, Defendant Gorevic's reassurances were also materially false and misleading because the Livongo integration was in fact ***not "on track"*** at that time.  For example, Teladoc was nowhere near completing the integration of the Salesforce systems even by the end of the Class Period in mid-2022.  In particular, CW 3's statements above indicate that Teladoc only retained PwC to assist with integrating the Salesforce.com systems in ***fall 2021***—given it had begun this integration project only five months before she left in Spring of 2022—*i.e.*, approximately a full year after the Livongo acquisition had closed.  Moreover, near the end of the Class Period, in Spring of 2022, Teladoc was still only five months—or less than a ***third*** of the way—in PwC's 18-month timeline for integrating the Salesforce systems, and would not complete this work until spring 2023 at the earliest.  Thus, Teladoc was not on track with its integration

efforts during the Class Period given this failure to timely integrate the companies' crucial CRM sales systems after the Livongo Acquisition closed in late 2020.

390.     Likewise, Gorevic's statement touting that Teladoc had launched new products, "one of which *fully blends Livongo's assets with Teladoc's*," was false and misleading because it created the misimpression that Teladoc had fully integrated Livongo's product platforms with Teladoc's, when that was not true, as described above, and as Defendants later admitted at the end of the Class Period.

391.     To the extent any of Defendant Gorevic's or the Company's statements above were opinions, they were false and misleading because they lacked a reasonable basis and omitted the above material facts, which did not fairly align with their positive statements regarding the Company's supposedly successful integration and downplaying of any integration challenges.

**L.     November 18, 2021 – Investor Day; CNBC Interview**

**1.     Misstatements Concerning the Livongo Integration**

392.     On November 18, 2021, Defendants hosted Teladoc Health's 2021 Investor Day to provide certain updates to investors on the Company.   In particular, Defendants touted the successful integration of Livongo.   For example, Defendant Verstraete touted the Company's integration efforts:

> Now if we were to look under the proverbial hood of the engagement engine, over the course of this year, we've significantly deepened our capabilities as we brought together and ***integrated the legacy Livongo and Teladoc marketing data and tech stacks***, right? In doing so, we've created – we've equipped ourselves to be able to deliver highly relevant, scalable, but one-to-one engagement life cycle management, which drives those stickier relationships and which sort of allows us to reach any given member with any given service configuration.

393.     Defendant Verstraete's statement during the November 18, 2021 Investor Day was materially false and misleading for the same reasons set forth in paragraphs 299–305.

394.    Indeed, Defendant Verstraete's statement about Teladoc having "integrated" the companies' "marketing data and tech stacks" was also materially false and misleading because CWs described confusion and lack of a coherent plan with respect to integrating the companies' marketing strategies.  For example, according to CW 8, Teladoc had not done anything to improve marketing, and she felt that Chief Marketing & Engagement Officer Stephany Verstraete did not understand enough about Livongo or the product.  CW 8 added that Verstraete never seemed to be familiar with the Livongo products when she discussed them.

395.    Notably, with respect to the statement from Chief Marketing & Engagement Officer Stephany Verstraete (meaning the alleged misrepresentation above) from the November 18, 2021, Analyst Day Conference, CW 8 explained that "at that point," meaning November 18, 2021, she would have to disagree with that statement because she recalled that Teladoc "did not have much of a data science team," and that it was Livongo who provided the vast majority of the data science personnel after the merger.  CW 8 added that she was surprised that Teladoc had not invested much in data science prior to the merger. According to CW 8, when the merger occurred, Teladoc had "only" 4 or 5 employees on their data science team.  CW 8 added that Livongo brought over 15 – 20 data science personnel, and who wound up making the vast majority of Teladoc's data science team.  CW 8 added that it was from her perspective that the capabilities of Teladoc's data science team were very limited compared to Livongo's legacy data science personnel.

396.    Likewise, according to CW 11, unlike Livongo, Teladoc "did not have a well-defined" data science group, which she described as Teladoc having data science engineers but not so much a team.  CW 11 added that Teladoc data scientists were decentralized and were embedded within Teladoc's clinical teams.  CW 11 explained that while Teladoc had some data engineers, that they appeared to her to be "standoffish" and who she experienced "contention from" in sharing

of data for the purposes of integrating with Livongo.  CW 11 added that she had been involved in integrating platforms when working for other large companies in the past including AOL (America OnLine).  CW 11 recalled that when she had been involved in previous integrations at other companies, that those data engineers were eager in getting the integrations done.  CW 11 recalled that this was not her experience at Teladoc, adding that the Company had "no clear integration plan" on data during her tenure at Teladoc.  CW 11 added that there was no clear information on integrating coming down from above.

397.    Additionally, CW 11 explained that, in the context of Defendant Verstraete's November 18, 2021 statement that Teladoc had already "integrated the legacy Livongo and Teladoc marketing data and tech stacks," CW 11 believed that the term "tech stacks" was referring to applications used for marketing purposes.  CW 11 elaborated that some examples of such applications was the use of email blasts or text messages to customers to market products.  CW 11 further explained that the ***marketing team mined data from Tableau to use for its marketing data and tech stacks***, which includes email blasts and text messages.  In general, CW 11 explained that the term "tech stacks" refers to one or more applications in a specific area to optimize operations.

398.    Thus, CW 11's account makes clear that the Company did not even ***begin*** the process of integrating Livongo's and Teladoc's data systems, Tableau, let alone ***complete*** it, during the Class Period.  Her account also indicates that Teladoc relied on the Tableau system and the patient and client data it stored for important ***marketing***, among other, purposes. *Id.* Thus, CW 11's account of Teladoc's failure to integrate the companies' data platforms that were critical for marketing functions during the Class Period further illustrates that Defendant Verstraete's November 18, 2021 statement representing that they had "***integrated the legacy Livongo and Teladoc marketing data and tech stacks***" was false and misleading when made.  Indeed, Teladoc

could not have integrated the companies' "marketing data" or their marketing "tech stacks," *i.e.*, applications that relied on such data, at this time given it had not even begun the process of integrating the platforms that stored such data until after the Class Period.

### 2.   Misstatements Concerning Competition

399.   Defendants also continued reassuring investors that competition was nothing to worry about.  For instance, Defendant Gorevic touted during the November 18, 2021 Investor Day the Company's competitive position:

> And I've said, look, there are low barriers to entry and high barriers to scale and success. And it is a complex system of leading capabilities that creates a true moat in what we do. And so every one of these points has to be a leading capability in order to really take advantage of the opportunity in front of us. And I believe very strongly that our capabilities on every one of these dimensions leads the market.
>
> ***And that results in what I would argue is an unmatched competitive advantage, and a moat that is virtually impossible for an upstart to cross, right,*** and sets us up for the future of virtual care, not the past of virtual care. And for a broad set of whole-person care solutions, not a point solution.

400.   Also on November 18, 2021, CNBC interviewed Defendant Gorevic, whereby Defendant Gorevic downplayed the news reporter's question about competition.  For example, the reporter asked: "[T]he world continues to move away from what you're doing which is being at home and the home services at the same time, where you do face seemingly limitless competition. So how do you answer to those challenges?" In response, Defendant Gorevic stated: "You know we're probably 10 times larger than the next closest competitor and ***what we have is a unique set of capabilities that positions us as the only one who can deliver on true whole person care***."

401.   Defendant Gorevic's statements during the November 18, 2021 Investor Day and during the CNBC interview were materially false and misleading for the same reasons set forth in paragraph 316 and paragraphs 346 and 375.

M.     **January 10, 2022 – JPMorgan 40th Annual Healthcare Conference**

1.     **Misstatements Concerning Competition**

402.    On January 10, 2022, JPMorgan hosted Teladoc at the JPMorgan 40th Annual Healthcare Conference.   During the conference, not only did Defendant Gorevic conceal the negative impact that new entrants were having on Teladoc's business, but he in fact went further and explained that the Company "welcome[s] more entrants":

> If I think about the market at large, certainly, virtual care is here to stay. I think the number of new entrants and some of the larger players leaning into it is validation of the opportunity in front of us. And we've been at this a long time. So we think that we're uniquely positioned to take advantage of that opportunity. And quite frankly, *we welcome more entrants because it really highlights our differentiation.* And we saw that play out in the fourth quarter selling season, which is the biggest selling quarter we've ever had in the history of the company.

403.    Defendant Gorevic's statement during the JPMorgan 40th Annual Healthcare Conference was materially false and misleading for the same reasons set forth in paragraph 316 and paragraphs 346 and 375.

N.     **February 22, 2022 – Q4 FY 2021 Earnings Call**

1.     **Misstatements Concerning Competition**

404.    On February 22, 2022, after the market closed (4:30 PM EST), Defendants held an earnings call to discuss the Company's fourth quarter 2021 financial results ("Q4 FY 2021 Earnings Call").   During that call, Defendants misrepresented the extent of which competition was affecting the Company's business.   For example, in response to a Citigroup analyst's question about competitors in the BetterHelp business, Defendant Gorevic spoke only about the Company's "tremendous track record" and "outperform[ance] in that market," but concealed any negative impact that competition was having at that time:

I'm aware of some of the other players in the market. I would say our team has a tremendous track record of continuing to improve LTV. That's a combination of optimizing pricing and driving product enhancements that increase the longevity of those members. I feel like sometimes having others out there who aren't performing at the same level, casts a negative shadow. ***And to be honest, we just outperformed in that market and in that regard***.

405.     Defendant Gorevic's and Defendant Murthy's statements during the Q4 FY 2021 Earnings Call were materially false and misleading for the same reasons set forth in paragraph 316 and paragraphs 346 and 375.  In particular, this statement created the impression that Teladoc remained unaffected by growing competition, when that was not true given the significant business losses to competitors, including due to integration issues, as described above.

406.     Analysts were encouraged by Defendants' statements downplaying the competitive pressures.  For example, on February 22, 2022, Credit Suisse's report stated that "TDOC expects higher marketing & engagement spending earlier in the year to take advantage of lower media pricing in the earlier part of the year."  Similarly, William Blair again reported on February 22, 2022 that "following the acquisitions of Best Doctors, Advance Medical, InTouch Health, and now Livongo, Teladoc has increased its competitive differentiation—as there are no organizations that can match the company's international scale and scope of offerings across the continuum of care, or the number of distribution channels that Teladoc targets."

**O.     February 28, 2022 – 2021 Form 10-K**

**1.     Misstatements Concerning the Livongo Integration**

407.     On February 28, 2022, Defendants filed their Annual Report on Form 10-K for the year ended December 31, 2021 ("2021 Form 10-K"), which was signed by Defendants Gorevic, Murthy, and Napolitano.  In discussing the Livongo Acquisition, Defendants stated that "***[w]e may not realize all of the anticipated synergies and other benefits of the Livongo merger.***"

408.     Defendants similarly stated in Teladoc's 2020 Form 10-K:

On October 30, 2020 we completed the merger with Livongo. The ultimate success of our merger with Livongo will depend in large part on the success of the management of the newly combined company in integrating the operations, strategies, technologies and personnel of the two companies. ***We may fail to realize some or all of the anticipated benefits of the merger if the integration process takes longer than expected or is more costly than expected. Our failure to meet the challenges involved in successfully integrating the operations of the two companies or to otherwise realize any of the anticipated benefits of the merger, including additional cost savings and synergies, could impair our operations***. In addition, ***the overall integration of Livongo post-merger will continue to be a time-consuming and expensive process that, without proper planning and effective and timely implementation, could significantly disrupt our business***.

409.    Likewise, in Teladoc's 2021 Form 10-K, Defendants characterized the following integration difficulties as only "***potential difficulties [that Teladoc] may encounter in the integration process***":

- the integration of management teams, strategies, technologies and operations, products and services;
- the disruption of ongoing businesses and distraction of management from ongoing business concerns;
- the retention of and possible decrease in business from the existing customers of both companies;
- the creation of uniform standards, controls, procedures, policies and information systems;
- the reduction of the costs associated with each company's operations;
- the integration of corporate cultures and maintenance of employee morale;
- the retention of key employees; and
- potential unknown liabilities associated with the merger.

410.    Defendants' statements in Teladoc's 2021 Form 10-K were materially false and misleading for the same reasons set forth in paragraphs 299–305.

411.    In particular, Defendants' purported general warnings regarding future "***potential***" risks or difficulties that Teladoc "***may***" experience with the Livongo integration that "***could***"

disrupt the Company's operations were materially false and misleading because Defendants knew, or were reckless in not knowing, that Teladoc was ***already*** experiencing such difficulties in integrating Livongo, which were ***already*** adversely impacting the Company's operations and business, as described in the cited paragraphs.

412.    Indeed, among a litany of integration challenges that negatively affected Teladoc, multiple CWs confirm and corroborate that difficulties involving, among others, (i) integrating the companies' teams, technology, products, and strategies; (ii) retaining key employees; (iii) resolving cultural clashes between the companies; and (iv) losing business and customers were not just mere possibilities by this time.   To the contrary, the accounts of numerous CWs, as corroborated by internal Teladoc documents and the *Business Insider* Article, show that these very problems had already materialized by the time Defendants' statements were made.

## 2.    Misstatements Concerning Competition

413.    In Teladoc's 2021 Form 10-K also contained misstatements about the adverse impact of increased competition on the Company's business.  For example, Defendants stated that "[w]e operate in a competitive industry, and ***if we are not able to compete effectively, our business, financial condition, and results of operations will be harmed***."

414.    Further, Defendants similarly stated in Teladoc's 2021 Form 10-K that, "[t]he virtual care market is competitive, and we expect it to continue to attract increased competition, ***which could make it difficult for us to succeed***."

415.    Similarly, Defendants additionally stated in Teladoc's 2021 Form 10-K:

> We currently face competition in the virtual care industry for our solutions from a range of companies, including specialized software and solution providers that offer competitive solutions, often at substantially lower prices, and that are continuing to develop additional products and becoming more sophisticated and effective. Aside from other competing virtual care companies and smaller industry participants, we also face competition from companies that

offer solutions for management of chronic conditions and enterprise companies who are focused on or may enter the healthcare industry, including initiatives and partnerships launched by these large companies. In addition, large, well-financed health plans, technology companies and retailers have in some cases developed or acquired their own virtual care, expert medical service, or chronic condition management tools and may provide these solutions to their customers at discounted prices. Competition from these parties will result in continued pricing pressures, which is likely to lead to price declines in certain product segments, ***which <u>could</u> negatively impact our sales, profitability, and market share***.

416.    Likewise, in Teladoc's 2021 Form 10-K, Defendants further stated:

> ***Our competitors <u>could</u> also be better positioned to serve certain segments of our markets, which <u>could</u> create additional price pressure***. In light of these factors, even if our solutions are more effective than those of our competitors, ***current or potential Clients <u>may</u> accept competitive solutions in lieu of purchasing our solutions. <u>If we are unable to successfully compete, our business, financial condition, and results of operations would be materially adversely affected.</u>***

417.    Defendants' statements in Teladoc's 2021 Form 10-K were materially false and misleading for the same reasons set forth in paragraph 316.

418.    In particular, Defendants' general warnings of ***potential*** future risks regarding competition, e.g., that competitors "***could***" make it more difficult for Teladoc to succeed or "***could***" negatively impact Teladoc's business, sales, or financial condition "***if***" Teladoc were unable to successfully compete were materially false and misleading because Defendants knew, or were reckless in not knowing, that Teladoc was ***already*** experiencing such negative consequences from growing competition and thus, ***already*** adversely impacted by such competitors.

419.    Indeed, as detailed above, multiple CWs and the *Business Insider* Article confirm that throughout the Class Period, including by this time, Teladoc was already losing significant

business to either existing competitors or to Teladoc's own customers who had begun building their own telehealth platforms, which rendered Teladoc's services unnecessary.

**P.      April 27, 2022 – Q1 FY 2022 Press Release; Q1 FY 2022 Earnings Call; and Partial Disclosure / Materialization of the Risk**

420.    On April 27, 2022, it was further partially revealed that Teladoc was experiencing major integration issues and faced increased competition—both of which were materially adversely affecting the Company's financials.  For example, after the market closed, Defendants issued a press release (Q1 FY 2022 Press Release) and held an earnings call to discuss the Company's first quarter 2022 financial results ("Q1 FY 2022 Earnings Call").  Teladoc reported a "[n]et loss per share of $41.58, primarily driven by [a] non-cash goodwill impairment charge of $6.6 billion or $41.11 per share."  Indeed, as explained further below, the market understood that the goodwill impairment charge resulted from Defendants' failure to integrate the Livongo Acquisition.  Defendants also revealed that they were facing challenges integrating Livongo's products with Teladoc's business and disclosed that the Company was experiencing increased competition that was adversely impacting the Company's financials, such as increasing marketing and advertising expenses that were cutting margins.

421.    In response, Teladoc's stock price fell $22.48 per share, or ***over 40%***, to close at $33.51 per share on April 28, 2022.

422.    However, the Company's stock price remained artificially inflated even after this news, as Defendants downplayed the integration issues with the Livongo Acquisition and any adverse impact from competition.  For example, in speaking directly about how the Company had not yet finished integrating the Livongo products into Teladoc's whole-person care suite of products, Defendant Gorevic immediately followed that up by reassuring investors on the Q1 FY 2022 Earnings Call that "***[w]e're getting great feedback***. And what we're seeing, and I think is

evidenced by the fact that in the first quarter, 78% of our sales were multiproduct sales. ***The market is responding really well to it.*** And I think the other evidence of that is the strength of our Primary360 product and the reception we're getting to that."

423.     Defendant Gorevic further reassured investors on the Q1 FY 2022 Earnings Call that, based on how the market was purportedly responding to the integration thus far, that "we're convinced that that's the right strategy. And ***we're committed to completing the integration***, ***really delivering a unified multidimensional, multi-condition solution to the market***."

424.     Defendant Gorevic's statements during the Q1 FY 2022 Earnings Call were materially false and misleading for the same reasons set forth in paragraphs 299–305.

425.     Indeed, Defendant Gorevic's statements were also materially false and misleading for the following reason. Teladoc was nowhere near completing the integration of the Salesforce systems even by the end of the Class Period at this time in the spring of 2022.  In particular, CW 3's statements, as explained above, indicate that Teladoc only retained PwC to assist with integrating the Salesforce.com systems in ***fall 2021***—given it had begun this integration project only five months before she left in Spring of 2022—*i.e.*, approximately a full year after the Livongo acquisition had closed.  Moreover, near the end of the Class Period, in Spring of 2022, Teladoc was still only five months—or less than a ***third*** of the way—in PwC's 18-month timeline for integrating the Salesforce systems, and would not complete this work until spring 2023 at the earliest.  Thus, Teladoc was not on track with its integration efforts during the Class Period given this failure to timely integrate the companies' crucial CRM sales systems after the Livongo Acquisition closed in late 2020.

426.     Analysts were reassured by Defendants' positive statements.  For example, on April 28, 2022, Cowen reported that while it was "surprised by the relatively quick reversal in the

outlook since 4Q results were reported at the end of February," Cowen "continue[s] to believe that virtual care will be a critical part of care delivery (based on KOL checks), and that TDOC is very well-positioned going forward."

## VI.   LOSS CAUSATION

427.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Teladoc common stock and operated as a fraud or deceit on Class Period purchasers of Teladoc common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

428.   Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Teladoc common stock at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Teladoc stock at the artificially inflated prices at which it traded during the Class Period.

429.   The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between November 10, 2021 and July 27, 2022.  During this period, Teladoc's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Teladoc's stock price.  It was not until the final partial corrective disclosure and/or materialization of concealed risk on July 27, 2022, that the full truth was known to the market, such that there was no longer any artificial inflation in Teladoc's stock price attributable to the fraud.

430.   The declines in Teladoc's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

431.    As a result of their purchases of Teladoc common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Teladoc common stock to trade at artificially inflated levels throughout the Class Period.

432.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Teladoc's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Teladoc common stock fell significantly.  These declines removed the inflation from the price of Teladoc common stock, causing real economic loss to investors who had purchased Teladoc common stock during the Class Period.

433.    Each decline in the price of Teladoc common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

434.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Teladoc common stock and the subsequent significant decline in the value of Teladoc common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

435.    The market for Teladoc common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 4,380,409 shares during the Class Period.  As a result of Defendants' misstatements and material omissions, as alleged herein, Teladoc's common stock traded at artificially inflated prices.  Lead Plaintiff and other Class

members purchased Teladoc common stock relying upon the integrity of the market relating to Teladoc common stock and suffered economic losses as a result thereof.

436.    The declines in Teladoc's common stock price on November 10, 2021, April 28, 2022 and July 28, 2022, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors during market hours on November 10, 2021, and after the market closed on April 27, 2022 and July 27, 2022.  The timing and magnitude of Teladoc's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

### A.    November 10, 2021 – First Partial Disclosure / Materialization of the Risk

437.    On November 10, 2021, during market hours, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized when *Business Insider* published an article, based upon private conversations with 12 current and former Teladoc employees, revealing credibly for the first time that the Livongo integration was not completed or proceeding smoothly as Defendants had repeatedly represented.  The *Business Insider* Article outlined several integration challenges that Teladoc was facing, such as problems relating to Teladoc rushing the process, issues with merging the companies' internal systems, and high attrition.  Indeed, *Business Insider* even reported that "[a] spokesperson for Teladoc *acknowledged the integration was an issue in the first six months*."

438.    Specifically, *Business Insider* reported that the Company "rushed" the integration of Teladoc and Livongo, which "led to confusion and made it difficult for Teladoc to work with

customers and iron out its plan for new products, four people said."  In fact, the *Business Insider*
elaborated as follows: "The department in charge of client operations, for example, had to fully
combine with Livongo's by January 1, a former employee said. They had a hard time navigating
two separate internal systems, but were told to present a unified front to customers without each
other's full product details, they said."

439.    *Business Insider* further reported, "Analysts, industry experts, and employees
Insider spoke with agreed the company needed more time to execute the rationale behind the deal,
like connecting Livongo's various care programs to physicians."

440.    Additionally, *Business Insider* revealed that the two companies still were not able
to integrate the patient portals into a single app: "One concern has been around member experience,
the current employee said. Patients in the Livongo program can be passed off to Teladoc
physicians, and vice versa, with a webpage.  But for now, they're still separate apps."

441.    In addition, with respect to attrition, the *Business Insider* Article also disclosed that
"[m]ore than 110 Livongo employees have left since the deal closed, with only a few of Livongo's
senior leadership sticking around for the long haul," and "[w]ithout those senior leaders, the
employees Insider spoke with said there's been confusion in the sales process as Teladoc grapples
with an increasingly competitive market, and its clients, such as health plans, stand up their own
virtual-care tools."

442.    Indeed, *Business Insider* quoted Livongo's founder and chairman, Glen Tullman,
as saying "I think given a lot of loss of talent, that's an indicator that things aren't going as well as
we would have hoped."

443.    The article also revealed certain competitive pressures that Teladoc was facing.  For
example, the article explained that "[i]nsurers themselves are scooping up telehealth startups and

building their own virtual-care units," and that "the option online to use 'Optum Virtual Care' is now more prominent."

444.    The November 10, 2021 disclosures about Teladoc's integration problems were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Teladoc's then-current state of its integration process.

445.    Moreover, the November 10, 2021 *Business Insider* Article revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The November 10, 2021 *Business Insider* Article partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Teladoc's then-current state of its integration abilities.

446.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Teladoc common stock fell $6.02 per share, or 4.21%, to close at $137.04 per share on November 10, 2021.

447.    Still, the Company's stock price remained artificially inflated even after this news, as Defendants downplayed the integration issues with the Livongo Acquisition.  For example, Defendant Gorevic reassured investors, as reported by Business Insider, that "he was proud of the [C]ompany's progress," and that the Company "launched two connected services in 2021, ***one of which fully blends Livongo's assets with Teladoc's***."  Indeed, Defendant Gorevic reassured investors that the integration efforts were "on track": "The vision that we laid out then — about whole-person care and bringing together the unique capabilities of two complementary companies to deliver something that really hasn't been done before — ***is on track***."  Moreover, the Company

minimized the integration issues as initial growing pains that were now largely behind it. Specifically, as *Business Insider* reported: "A spokesperson for Teladoc acknowledged the integration was an issue in the first six months but said ***it was less of an issue today***."

### B.   April 27, 2022 – Second Partial Disclosure / Materialization of the Risk

448.    On April 27, 2022, after the market closed, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were revealed and/or partially materialized when Teladoc issued a press release attached to SEC Form 8-K, announcing the Company's first quarter 2022 financial results ("Q1 FY 2022 Press Release").  Notably, Teladoc reported a "[n]et loss per share of $41.58, primarily driven by [a] non-cash goodwill impairment charge of ***$6.6 billion*** or $41.11 per share," which, as explained below, the market understood reflected the failed integration of Livongo and that it thus related to Defendants' fraudulent conduct.

449.    Additionally, the Q1 FY 2022 Press Release reported revenue of $565.4 million, which missed consensus estimates by $3.23 million, revised its FY 2022 revenue guidance to $2.4–$2.5 billion, down from previous guidance of $2.55–$2.65 billion, and revised its FY 2022 adjusted EBITDA guidance to $240–$265 million, down from previous guidance of $330–$355 million, "to reflect dynamics we are currently experiencing in the [D2C] mental health and chronic condition markets."  Relating to these dynamics that Teladoc was experiencing, the Q1 FY 2022 Press Release quoted Defendant Gorevic:

> In the D2C mental health market, higher advertising costs in some channels are generating a lower-than-expected yield on our marketing spend. In the chronic condition market, we are seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care that their populations need.

450.     Later that day after market hours (4:30 PM EST), Defendants held an earnings call to discuss the Company's first quarter 2022 financial results ("Q1 FY 2022 Earnings Call"). During this call, Defendants revealed that they were facing challenges integrating Livongo's products with Teladoc's business.   Indeed, after explaining differences between Livongo's business and Teladoc's (*e.g.*, Livongo was traditionally focused on offering individual point solutions vs. Teladoc's focus on offering full whole-person care solutions), and the need to integrate those businesses, Defendant Gorevic admitted that Teladoc has not yet completed that product integration.

451.     Specifically, Defendant Gorevic stated, in pertinent part:

> And over the last 12-plus months, we've been working on integrating the Livongo products into our whole-person care experience. And ***admittedly, we're not done with that yet.*** We are deep into that process, and we have line of sight to the finish line, but we don't have proof points behind it because ***we're not finished with it.***

452.     Defendant Gorevic further explained that—with respect to the Company's investment in and "commit[ment] to completing the integration"—"***we're disappointed with our performance.***"

453.     Additionally, Defendants disclosed that the Company was experiencing increased competition that was adversely impacting the Company's financials, such as increasing marketing and advertising expenses that were cutting into BetterHelp's margins.   Specifically, Defendant Gorevic explained:

> [L]et me spend some time walking through what led us to reassess our outlook for the balance of 2022, starting with our direct-to-consumer mental health service, BetterHelp. Over the past several weeks, we've seen lower-than-expected yield on marketing spend for BetterHelp, which is a reversal of the trends we experienced exiting 2021 and in the early part of 2022.

One example of this is paid search advertising, where we've seen a notable increase in rates for keywords associated with online therapy. We believe the biggest driver of this dynamic is *smaller private competitors pursuing what we think are low- or no-return customer acquisition strategies in an attempt to establish market share.* Some of those same providers are also exploiting the temporary suspension of certain regulations associated with the national health emergency concerning the prescription of controlled substances.

We believe these strategies are unsustainable in the long term. This dynamic is likely to persist at least throughout the remainder of this year, however, resulting in growth and margin contribution from BetterHelp that is below our expectation in February.

454.   Likewise, Defendant Gorevic stated the following regarding how increased competition was negatively impacting the Company's chronic care business's sales:

> *[W]e're also seeing our chronic care sales pipeline developed more slowly than anticipated.* Last October, we discussed two trends in the marketplace that we saw leading to an elongated selling cycle. The first was in the employer market, where we saw benefit managers focused on COVID and return to work, which we felt was contributing to a longer decision-making process. The second was a large pipeline of health plan deals that were simply harder to predict when it comes to timing given the size and complexity of those clients.
>
> At the beginning of this year, we were encouraged by very strong fourth quarter bookings and a robust late-stage pipeline. *However, as we progressed through the first part of the year, we're seeing clear signs of the slower bookings pace continuing.*
>
> In addition to the factors we discussed last fall, *we're seeing clients inundated with a number of new smaller point solutions, which has created noise in the marketplace* . . . . [W]e are in the process of taking a closer look at some of these forces that are impacting the near-term conversion of pipeline to revenue, and we'll continue to make adjustments as necessary to address them.
>
> *[W]e're not seeing deals progress at the pace that we expected.*

455.   Defendant Gorevic further explained that "given the persistency of these trends over the past several weeks . . . , we've incorporated this updated view into our forward outlook,

including an assumed 10% lower revenue yield per dollar of ad spend for the full year." Defendant Gorevic likewise acknowledged that the "growth and margin contribution from BetterHelp" was "***below our prior expectations***."

456. Likewise, Defendant Gorevic explained that, with respect to seeing lower-than-expected yield on marketing spend, "in March, and we began to see increases in cost per acquisition and a corresponding decline in revenue yield on our advertising dollar," and "[t]here were 2 primary channels that drove that: number one is paid search, and number two is paid social media." He continued, "I would say that we strongly attribute that to ***smaller private competitors*** who have been recently well funded with a rash of venture capital money flowing into that space and making what we would consider to be economically irrational decisions."

457. The April 27, 2022 disclosures about Teladoc's inability to integrate Teladoc and Livongo and the adverse impact of increased competition, both of which were adversely impacting Teladoc's financial results and value, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Teladoc's then-current state of its integration process and market position.

458. Moreover, the Q1 FY 2022 Press Release and Q1 FY 2022 Earnings Call revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market. The Q1 FY 2022 Press Release and Q1 FY 2022 Earnings Call partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Teladoc's then-current state of its integration abilities and market position.

459. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Teladoc common stock fell $22.48 per share, or ***over 40%***, to close at $33.51 per share on April 28, 2022.

460. Upon learning of this news, analysts and the media were shocked from Defendants' news. For example, Evercore ISI Research reported on April 28, 2022 that the deterioration in the outlook since November investor day is "particularly alarming." Similarly, Goldman Sachs wrote in a research note that "[w]e are disappointed and surprised" by the revised financial outlook.

461. Further, analysts and the media were disappointed about the revelations with respect to the goodwill impairment charge and linked it to the Livongo Acquisition. For example, om April 27, 2022, Barrons reported on Teladoc's large stock drop and linked the Company's substantial goodwill impairment charge with the Livongo Acquisition's poor performance, stating:

> The loss in the first quarter was mainly driven by a noncash goodwill impairment charge of $6.6 billion, which is often recorded on the income statement after a company acknowledges that an asset has lost value or become completely worthless. In Wednesday's news release, Teladoc didn't disclose much details about the goodwill impairment charge, but a large part of goodwill on Teladoc's books came from its $18.5 billion acquisition of Livongo in 2020, according to the [C]ompany's filings with the Securities and Exchange Commission.

462. Furthermore, on April 27, 2022, Healthcare Dive understood that the goodwill impairment charge was a result of struggles related to Teladoc and Livongo's merger, and further linked the stock drop to the impairment charge:

> Teladoc, the largest virtual care company in the U.S., bought Livongo for $18.5 billion in cash and stock late 2020 in the biggest digital health deal to date. ***However, the merger has struggled, resulting in the large goodwill impairment charge*** for the Purchase, New York-based vendor. Teladoc's stock had plummeted 45% by early trade Thursday following the news.

463.     Indeed, the Healthcare Dive article explained the importance that Livongo's merger was for Teladoc and referenced integration issues:

> Acquiring Livongo was key in Teladoc's strategy to evolve into a virtual multi-specialty clinic. However, the marriage — despite spurring consolidation in health tech and pushing payers to adopt more digital health benefits — has faced difficulty in the past two years.
>
> All but one member of Livongo's senior management team had departed the combined company by November, and employees had difficultly achieving performance metrics, Insider reported at the time.  Analysts have also pointed to weak enrollment numbers for Livongo's chronic care programs, which have missed expectations in the last few quarters, and that expansion has been limited by technical challenges of scaling to different regions.

464.     While the Healthcare Dive article acknowledged that Teladoc mentioned the possibility of writing a goodwill charge previously, the article stated: "The filing estimated the goodwill impairment charge could range from $800 million to $4 billion, ***though Wednesday's total is notably bigger, at $6.6 billion***."

465.     Similarly, on April 27, 2022, Fierce Healthcare published an article that explained that "Teladoc said Wednesday it will take a charge of $6.6 billion to write down the value of its Livongo acquisition."  Then on April 28, 2022, Mobile Health News published an article that stated, the "$6.6 billion non-cash goodwill impairment charge[] related to Teladoc's $18.5 billion acquisition of chronic care management firm Livongo in 2020."  Also on April 28, 2022, Seeking Alpha reported that Teladoc's massive loss for the first quarter "included a non-cash goodwill impairment charge of $6.6B -- a move it was forced to make to write down the value of its purchase of Livongo, a digital disease management firm [Teladoc] purchased in 2020 for $18.5B."

466.    Another news article on April 28, 2022 by MassDevice[39] reported that same day: "Teladoc (NYSE: TDOC) saw its stock lose about half its value after announcing a $6.6 billion impairment charge *amid a challenging integration of Livongo and its health management app*."

467.    Likewise, on April 28, 2022, MarketWatch linked the goodwill impairment charge to the Livongo Acquisition and explained how that announcement was the cause of Teladoc's large stock drop:

> Shares head toward lowest levels in more than four years as online-medicine company wipes away more than $6.5 billion in goodwill[.] Shares of Teladoc Health Inc. were slammed in after-hours trading Wednesday, after the telemedicine company took an impairment charge of more than $6.5 billion and slashed its full-year outlook. . . . For the first quarter, Teladoc generated a net loss of $6.67 billion, or $41.58 a share, whereas it recorded a loss of $200 million, or $1.31 a share, in the year-prior period. Teladoc's loss in the most recent quarter largely reflected a $6[.]6 billion impairment charge related to goodwill. Teladoc executives did not disclose much about the goodwill impairment charge in Wednesday's news release, but roughly $12.8 billion of the $14.5 billion in goodwill on Teladoc's books stemmed from the $18.5 billion acquisition of Livongo in 2020, according to the [C]ompany's filings with the Securities and Exchange Commission.

468.    Moreover, on April 28, 2022, Bloomberg reported the following, linking the impairment charge to the Livongo Acquisition:

> Teladoc also took a $6.6 billion charge for impairment of goodwill, a non-cash charge the company excluded from its adjusted results. Most of the goodwill on Teladoc's balance sheet followed its $12.9 billion acquisition of diabetes management company Livongo Health in 2020. The deal, which followed a run-up in Livongo's stock price, valued the company at about 56 times revenue, according to data compiled by Bloomberg News.

---

[39] According to MassDevice's website: "MassDevice provides day-to-day coverage of the medtech and medical device industry, with stories about devices that save lives, the people behind them and the trends driving businesses forward. Our reach extends across the industry, with up-to-date news on clinical trials, regulatory processes research and development, financial updates and legal news for spaces including orthopedic devices, surgical robotics, replacement heart valves and plenty more."

469.     A few days later on May 3, 2022, the Hustle published an article discussing Teladoc's goodwill impairment and linking it to the Company's poor integration of Livongo.  For example, after describing the initial $18.5 billion deal where Teladoc bought Livongo, the article noted that the deal "didn't go well"—explaining in part that "Teladoc struggled to integrate and several Livongo leaders left"; and "[m]ore competitors flooded the virtual care space."  The article explained that the "result" of these issues was that "Teladoc took a $6.6B impairment charge, rattling investors while its shares dropped."

470.     As Seeking Alpha explained the next day on May 4, 2022, "***the Livongo acquisition has turned into a disaster***," "Teladoc's BetterHelp (mental health) business is also facing headwinds due to ***heightened competition*** and wage inflation," and "management's 2022 guidance cut and the goodwill impairment expense of $6.6B were simply horrific developments at the [C]ompany." Notably, the Seeking Alpha report explained:

> In Q1 2022, Teladoc's chronic care enrollment numbers rose by just ~2K, which indicates further dissipation of Livongo's growth momentum.  Basically, Teladoc took a fantastic asset and has managed to slow its growth down to essentially zero within a few quarters.  While Teladoc's management is expecting new populations on its chronic care products to go live toward the end of this year (resulting in mid-teens growth in the chronic care business), ***the $6.6B goodwill impairment charge is an admission of the destruction of Livongo's value.  Even after several months since the merger closed, Teladoc's management has failed to complete the integration of Livongo into its platform.***  And now, the decision to remove all of Livongo's senior leadership seems to have backfired horribly.

471.     Indeed, as Fierce Healthcare later reported on June 30, 2022, "***[T]he [C]ompany's massive merger with Livongo has struggled.  Teladoc's inability to execute on the $18.5 billion acquisition of Livongo led to a $6.6 billion write-down in the first quarter of this year***."

472.    Analysts and the media were also disappointed about the revelations with respect to competition.  On April 27, 2022, William Blair lowered its rating to Market Perform and linked the guidance shortfall to higher advertising costs—which the analyst report indicated was "***due to both increased competition*** and higher overall ad rates in many channels."  The report also linked the poor guidance announcement to the Company seeing an elongated sales cycle in the chronic care management market—which the report also linked to "***more competition in this space,*** ***which is "creating more noise in the marketplace.***"

473.    On April 28, 2022, Cowen was surprised by the adverse effects that increased competition had on Teladoc's business.  Specifically, Cowen reported that "we are surprised by the relatively quick reversal in the outlook since 4Q results were reported at the end of February."  In particular, Cowen explaind that "the resulting increase in competition, against both BetterHelp and chronic care, was expected. ***What's unexpected is the impact***, as we believed, particularly with BetterHelp, that its scaled ops could offset a higher pricing environment."

474.    Also on April 28, 2022, Credit Suisse downgraded its rating to neutral, and stated: "In the D2C mental health market, higher advertising costs in some channels are generating a lower-than-expected yield on marketing spend. In the chronic condition market, TDOC is seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care that their populations need."

475.    Similarly, on April 28, 2022, Bloomberg reported that "[r]esults for the Purchase, N.Y.-based Teladoc were hurt by higher advertising expenses in the mental health market, as well as an 'elongated sales cycle' in chronic conditions as employers and providers of healthcare plans evaluate strategies."  Bloomberg, citing a Citigroup analyst who "slashed his price target for the stock to $43 from $115," stated: "While the company has 'the most robust virtual health platform,

*it is clear that competitive intensity has increased significantly and, in our view, is unlikely to abate any time soon.*"

476.     Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to downplay the integration issues with the Livongo Acquisition and any adverse impact from competition as explained above.  For example, in speaking directly about how the Company had not yet finished integrating the Livongo products into Teladoc's whole-person care experience, Defendant Gorevic immediately followed that up by reassuring investors on the Q1 FY 2022 Earnings Call that "*[w]e're getting great feedback*. And what we're seeing, and I think is evidenced by the fact that in the first quarter, 78% of our sales were multiproduct sales. *The market is responding really well to it.* And I think the other evidence of that is the strength of our Primary360 product and the reception we're getting to that."

477.     Analysts were reassured by Defendants' positive statements.  For example, on April 28, 2022, Cowen reported that while it was "surprised by the relatively quick reversal in the outlook since 4Q results were reported at the end of February," Cowen "continue[s] to believe that virtual care will be a critical part of care delivery (based on KOL checks), and that TDOC is very well-positioned going forward."

**C.     July 27, 2022 – Final Disclosure / Materialization of the Risk**

478.     On July 27, 2022, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized.  On that date, after the market closed, Teladoc issued a press release announcing the Company's second quarter 2022 financial results ("Q2 FY 2022 Press Release").  Notably, Teladoc reported a "[n]et loss per share of $19.22, primarily driven by [a] non-cash goodwill impairment charge of *$3.0 billion*, or $18.78 per share," which, as explained below, the

market again understood related to the Livongo Acquisition and that it thus related to Defendants' fraudulent conduct.

479.    The Q2 FY 2022 Press Release also reported a net loss of $3.1 billion or $19.22 per share for the second quarter of 2022, compared to $133.8 million, or ($0.86) per share, for the second quarter of 2021.  Similarly, the Company reported that its adjusted EBITDA "decreased 30% to $46.7 million."

480.    Later that day after market hours (4:30 PM EST), Defendants held an earnings call to discuss the Company's second quarter 2022 financial results ("Q2 FY 2022 Earnings Call"). During that call, Defendant Murthy admitted that the Company's product platforms (thus including Livongo's) were still not yet fully integrated:

> We've talked about investing in our integrated platform in new capabilities in new products, such as my strength of fleet Primary360, Chronic Care Complete, continued integration of our data that underpins bringing together all of our suite of products. ***That still continues.***

481.    Similarly, Defendant Murthy further stated that "I would expect Chronic Care revenue growth to be towards the low end of the low to mid-teens."

482.    In addition, Defendant Gorevic further revealed that the Company was experiencing deals progressing at a slower rate in Teladoc's Chronic Care business (*i.e.*, the Livongo business), which the Company contributed to competitive pressures:

> While we were pleased to exceed our member enrollment targets during the quarter, ***we are continuing to see our pipeline of Chronic Care deals developed more slowly than we anticipated at the start of the year***, as we discussed in our first quarter call. It remains early in the selling season, but ***deals continue to progress at a slower pace. We believe at least in part due to competitive noise*** as the market transitions from stand-alone point solutions to integrated whole-person virtual care.

483.     During this call, Defendant Gorevic disclosed, in relation to the Company's direct-to-consumer business, and more specifically, BetterHelp, that "[w]e still see smaller private competitors pursuing what we believe are low or no return customer acquisition strategies to establish market share," and "[a]lthough we do not see this as sustainable, it's difficult to predict how long this dynamic may continue."

484.     The July 27, 2022 disclosures about the additional $3 billion goodwill impairment charge and the continued adverse impact of competition were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Teladoc's then-current state of its integration process and market position.

485.     Moreover, the July 27, 2022 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding purportedly successful integration of the Livongo Acquisition and the Company not being adversely impacted by growing competition.

486.     On this shocking news, the price of Teladco's stock price fell $7.64 per share, or **17.67%**, to close at $35.60 per share on July 28, 2022.

487.     Analysts were disappointed by these revelations and acknowledged that—contrary to Defendants' reassurances the previous quarter—the Livongo Acquisition was still adversely impacting the Company's financials.  For example, Oppenheimer reported on July 27, 2022 that "[Teladoc's] near-term outlook **remains challenged** by the (previously discussed) lower acquisition yields with BetterHelp and **longer sales conversions in chronic care**."

488.     Additionally, the market was surprised that competitive pressures were still adversely impacting the Company's Chronic Care (Livongo) business.  Indeed, on July 27, 2022,

Canaccord concluded that "***the band-aid wasn't entirely ripped off following 1Q guide down***"—meaning that Defendants did not fully explain and adjust the Company's financials for certain underlying factors during the 1Q FY 2022 earnings announcement, but only did so at the 2Q FY 2022 earnings announcement.  Specifically, the report discussed the Company's reasoning for poor performance and how it related to Teladoc's Chronic Care business (*i.e.*, Livongo), include due to increased "competitive noise," explaining:

> The company also maintained 2022 revenue and adj- EBITDA guidance with comments toward the lower end of previous ranges. While this was not entirely surprising, the reasoning did leave us scratching our head (and others it appears based on Q&A). We understand that BetterHelp yield has not improved since the spike in ad prices in late 1Q and some further deterioration was likely due to inflation and lower consumer confidence in the D2C channel. ***What puzzles us is that Teladoc also cited slower chronic deal conversion. Specifically, management highlighted that while 2Q chronic enrollment outperformed, new deals are still closing but more slowly, possibly from competitive noise and economic uncertainty.*** Thus, the company needed to remove any in-period contribution from guidance. The problem we have is that the company supposedly removed a majority of this revenue from guidance with the previous update following 1Q.
>
> The 3Q adj-EBITDA guide is disappointing and somewhat perplexing. As stated above, we understand the impact from BetterHelp headwinds. ***We are confused, however, that if 2Q enrollment outperformed and pricing remained stable, why chronic would be cited as a factor in 3Q guidance being meaningfully below our and consensus estimates***.

489.    Moreover, Dow Jones issued a report on July 27, 2022 linking the $3 billion impairment charge to the stock drop: "Teladoc Health Inc. shares fell 17% to $35.80 in after-hours trading Wednesday after the company widened its second-quarter loss to over $3 billion and said it expects its fiscal year results to be on the lower end of its previous outlook."

490.    Additionally, on July 28, 2022, Craig-Hallum reported that "GAAP EPS was impacted by an $18.78/share goodwill impairment charge."  The report explained that "Chronic

Care deals continue to develop more slowly than anticipated and Chronic Care revenue growth is now expected to be towards the low end of the low to mid-teens range discussed on the last call," and that "[w]e believe the return to work, increasing size/complexity of deals, macroeconomic pressures, *and lack of data for the fully integrated offering are all factors playing into this*."

491.    Likewise, analysts understood these disclosures about continuing underperformance to signify that the previously reported problems were not mere temporary blips. on July 28, 2022, Wells Fargo explained, in connection with Defendants' disclosure above the Company's Chronic Care business expecting to be in the lower end of its revenue guidance range, that "management lowered full-year Livongo revenue growth guidance to the low end of 'low- to mid-teen growth' given challenges with adding new clients in the current environment."  Wells Fargo thus found that "*[i]t appears the challenges for BetterHelp and chronic care (Livongo) were less transitory than hoped for*, with full year revenue now guided to the bottom end of previous guidance ranges (35%-40% for BetterHelp, and low- to mid- teens for Livongo)."

492.    Furthermore, the market again directly linked the goodwill impairment charge to the Livongo Acquisition.  For example, on July 28, 2022 UBS reported that "the [C]ompany recognized another *$3B goodwill write down related [to] (Livongo)* as a result of TDOC's share price decline."  The Motley Fool also published an article on July 28, 2022, stating: "Teladoc was forced to take a non-cash goodwill impairment charge of $3 billion. Teladoc acquired digital health company Livongo for $18.5 billion in late 2020.  The plan was to combine Teladoc's virtual care platform with Livongo's chronic condition management tools.  However, Teladoc has written down the value by nearly $10 billion since the deal was completed, suggesting that it drastically overpaid for Livongo."

493.    The market also linked the Company's disclosures to the reason the Company's share price fell.  For example, a July 28, 2020 news article by TipRanks explained, in connection with the stock drop, that the "downside was triggered after the company took a significant non-cash goodwill impairment charge again."

494.    Analysts and the media were also disappointed by the revelations in connection with increased competition's continued negative impact on both the Company's BetterHelp and Chronic Care businesses.  For example, on July 27, 2022, William Blair reported that increased competition and higher overall ad rates" "were again present in the second quarter, and are still anticipated to impact organic growth in 2022."

495.    On July 28, 2022, Craig-Hallum reported: "Paid search costs (for BetterHelp) were said to have remained elevated during the quarter (which has been attributed to competition), *while on the Chronic Care side of Teladoc's business, competitive noise was said to be one reasons that deals are progressing at a slower pace*."

496.    Also on July 28, 2022, Wells Fargo similarly reported, "we believe that *increased competition has introduced significant uncertainty for the trajectory of revenue and margins over both the near and intermediate term*."

497.    Wells Fargo likewise reported on August 1, 2022 the following: "Several factors contributed to the reduced outlook, including higher customer acquisition costs for BetterHelp (persistence of competitive forces plus consumer belt tightening) and *enterprise customers delaying buying decisions (an impact to Livongo sales and likely other service areas as well)*."

498.    Further, on August 1, 2022, Credit Suisse issued a report providing highlights from a post-quarterly conference call discussion with Teladoc management.  Specifically, Credit Suisse explained:

> We had a post-quarterly conference call discussion with TDOC management to review 2Q22 results, individual business trends, and the 2022 outlook. In the text below, we list our questions and the company's responses. The answers are not verbatim, but we put the company's answers in their proper context in a give-and-take format.

499.    As reported in the August 1, 2022 Credit Suisse report, during this conference call, Teladoc's management further discussed with Credit Suisse the competitive pressures in the Company's chronic care (*i.e.*, Livongo) business that Teladoc continued seeing, and notably, admitted that "*[t]he company's products are not yet fully integrated yet*.  Specifically, Credit Suisse commented:  "For the second conference call in a row, management called out that chronic care deals are developing more slowly than historically than the company anticipated at the beginning of the year. ***This is attributed to more competitive noise being in the market***."  Credit Suisse followed up this response from Defendants with the following question: "What do you think is necessary to break this logjam and get deal activity going again?"  Credit Suisse reported the Company's response as follows:

> There are two things.  ***One is the competition factor*** and the point solutions in the marketplace which is causing people to sit and evaluate.  Management talked about this last quarter a bit where TDOC's competitive advantage is really around integrated care, but the market hasn't fully transitioned to that yet.  The market is moving from point solutions to whole person care.  So, the company is competing against various point solutions.  ***The company's products are not yet fully integrated yet.  For example, TDOC has three separate apps.  So there is a bit of a challenge of getting into a client and saying we'll be a one stop shop when we can't show that yet.***  The market is still evolving.

## VII.    ADDITIONAL INDICIA OF SCIENTER

500.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Teladoc's and their materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that

they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. The Livongo Acquisition Was a Critical Transaction for the Company, and Its Successful Integration Was Core to Teladoc's Operations

501.    The Individual Defendants' knowledge of the problems with the Livongo Acquisition and subsequent integration failures can be inferred because these facts were critical to Teladoc's core operations.  Notably, the Company had to tie up a significant portion of its assets to complete the Livongo Acquisition, where Teladoc paid $13.9 billion in cash and stock—a record deal for digital health.  The Livongo Acquisition, which was completed in just under three months, was ultimately valued at approximately ***$18.5 billion***.

502.    Furthermore, because of the serious competition in the telehealth market the Livongo Acquisition was crucial to the Company's continued viability as it represented both the elimination of a significant competitor and the addition of a new suite of products to offer the Company's customers as part of its comprehensive "whole person" product line.  As a result thereof, the integration of Livongo was also critical to Teladoc's success because in order to take advantage of the synergies existing between the two companies, Teladoc needed to efficiently integrate Livongo or risk losing the benefit of the merger.

503.    The Company admitted as much at multiple points prior to and throughout the Class Period.  For example, when the Company first announced the acquisition on August 5, 2020, Defendant Gorevic touted that "[t]his merger firmly establishes Teladoc Health at the forefront of the next-generation of healthcare," explaining that "Livongo is a world-class innovator we deeply

admire and has demonstrated success improving the lives of people living with chronic conditions."  Defendant Gorevic continued, "Together, we will further transform the healthcare experience from preventive care to the most complex cases, ***bringing 'whole person' health*** to consumers and greater value to our clients and shareholders as a result."

504.    In addition, during a conference call that Teladoc's management held that same day, on August 5, 2020, Defendant Gorevic doubled down on the importance of the acquisition, explaining that "[t]his is a ***transformative*** moment that will set a new standard for the delivery, access and experience of health care" and that "[t]hese newly combined capabilities will enable us to create the next generation of health care delivery models." Defendant Gorevic also stated on the same call that "[t]his combination offers many strategic and financial benefits, delivering tremendous opportunity for revenue accretion for the combined entity."

505.    Defendants again reiterated this sentiment when the Livongo Acquisition closed on October 30, 2020, proclaiming in a press release that "[t]he milestone marks completion of ***the most significant blending of capabilities and talent*** in the history of digital health.  By joining the market leaders in virtual care and applied health signals, the combined company becomes the only consumer and healthcare provider partner to span a person's entire health journey."

506.    Similarly, on a conference call held on August 5, 2020, Defendant Murthy further explained that "[i]n addition to the strategic benefit of the transaction, it offers significant financial benefits to our shareholders."  Specifically, Defendant Murthy explained, "[t]his combination has the potential to deliver $500 million in run rate revenue synergies by 2025 from cross-selling and increased penetration into each other's respective client basis."  Similarly, on March 1, 2021 in Teladoc's Form 10-K, the first to be released after the Livongo Acquisition, the Company assured investors that "the combination of [Teladoc's] data scale, technology and clinical capabilities with

Livongo's technology and data insights will underpin the combined company's ability to deliver differentiated care." Defendant Gorevic went so far as to tie Teladoc's future success to its ability to take advantage of Livongo's assets. Indeed, on November 10, 2021 *Business Insider* reported that "Gorevic said Teladoc's future was 'whole-person care,' or the ability to treat a patient's various needs — from mental health to diabetes — with different kinds of products that talk to each other. And it's using Livongo's assets to make that happen."

507.    Analysts following Teladoc also understood that the Livongo Acquisition, and thus its successful integration, were critical to the Company's success. For example, throughout the Class Period, as explained above, analysts repeatedly questioned Defendants about the Company's ability to integrate Livongo into Teladoc's operations. As a s result of these questions and Defendants' responses, analysts fully understood that the Livongo Acquisition was critical to Teladoc's continued success. For example, on November 19, 2021, Credit Suisse stated: "[W]ith virtual primary care being the next big thing in virtual care, having an integrated & internal asset with Livongo significantly differentiates Primary360 with other virtual primary care products on the market."

508.    Similarly, throughout the Class Period, analysts commented on how important Livongo was to Teladoc's overall business. For example, on December 16, 2021, Credit Suisse reported that "Livongo is almost synonymous with virtual care for chronic condition management." Likewise, when reporting on Teladoc's Chronic Care business, Wells Fargo repeatedly referred to Teladoc's chronic care business as Livongo.

509.    Given the importance of the Livongo Acquisition to Teladoc's business, knowledge of the integration problems can therefore be imputed to the Individual Defendants.

**B. Defendants' Personal Involvement in the Teladoc-Livongo Integration Efforts Supports Their Scienter**

510.     The Individual Defendants were responsible for Teladoc's efforts to integrate the Livongo into Teladoc, supporting a strong inference of scienter.  Indeed, there is no question that the Individual Defendants were directly and personally involved in the Livongo Acquisition and its integration efforts.

511.     For example, under the terms of the merger agreement, Defendant Gorevic was allowed to stay on as the Company's CEO.  As CEO of the combined Company, Defendant Gorevic personally spoke with employees leading up to the merger, explaining in a September 15, 2020 letter to employees that "[p]ersonally, I have enjoyed meeting and speaking with many soon-to-be colleagues—learning about the inspiring team Livongo has assembled and sharing my reflections on what Teladoc Health has built."  In the same letter, Defendant Gorevic himself announced "an Integration Management Office (IMO) steering committee to oversee our combination, meeting weekly to lay out integration milestones and ensure steady progress."  CW 2 similarly recalled that Teladoc had a formal integration committee.  CW 10 also confirmed that the Integration Management Office (IMO) steering committee did in fact exist, and she explained that the committee was responsible for coordinating the integration with many different departments.

512.     Additionally, as part of the new management arrangement post-merger, and as CEO of the combined companies, Defendant Gorevic had a number of groups and businesses reporting directly to him, which supports the inference that Defendant Gorevic was kept apprised of the Company's key day-to-day operations, including the progress of the critical Livongo Integration. For instance, according to Teladoc's SEC filings, the "team reporting to [Defendant Gorevic] will represent both business and corporate responsibilities ranging from a new research and

development group to our global commercial organization to enterprise functions." Moreover, that same SEC filing stated that Defendants Murthy and Verstrate, as well as COO David Sides, also reported directly to Defendant Gorevic.[40]

513.   In fact, on October 28, 2020 during the Q3 FY 2020 Earnings Call, Defendant Gorevic touted his hands-on management approach when he explained that "I was fortunate to spend some time with several of the Livongo commercial leaders last week." Similarly, during that same earnings call, Defendant Murthy acknowledged her personal involvement in the integration process. For example, Defendant Murthy explained that ***"[w]e spent all day looking at integration from every possible function and within every function, every possible subfunction*.**"

514.   Defendant Gorevic continued to stay personally involved in the integration throughout the Class Period and engage in internal discussions about the integration process. Indeed, CW 2 recalled that Teladoc held townhalls about once a month, which CEO Gorevic attended and gave opening speeches, and such meetings included a Q&A session. CW 2 recalled that at these meetings executives would speak broadly about the integration and were sometimes asked broadly about "challenges" the Company was facing with the integration of the Livongo deal.

515.   CW 2 also specifically recalled questions coming into the townhall through the chat function about difficulties the Company faced regarding the integration or other issues that ***Gorevic fielded personally*, *but that Gorevic either avoided the questions all together or answered them in a way that did not directly respond to the questions*.**

---

[40] In addition, Defendant Gorevic's other direct reports included: Arnnon Geshuri, Chief Human Resources Officer; Dan Trencher, SVP, Corporate Strategy; Drew Turitz, SVP, Corporate Development; Adam Vandervoort, Chief Legal Officer; and Yulun Wang, Head of Research & Development (interim).

516.    CW 2 further recalled that more specific discussions about integration difficulties were given in department team meetings that were led by President, U.S. Group Health, Kelly Bliss, and President, Hospitals and Health Systems, Joe DeVivo.  According to CW 2, Bliss and DeVivo provided more details about the difficulties the Company faced regarding integration. Accordingly, such CW statements indicate that senior executives, whose scienter is imputable to the Company, knew about significant Livongo integration problems.

517.    In fact, as explained above, Defendant Gorevic himself personally spoke with clients, pushing the Company's RPM capabilities despite a lack thereof.  Indeed, one of CW 2's examples from the November 30, 2020 email was inquiries made by Montefiore, whereby Defendant Gorevic was personally involved.  Specifically, on October 29, 2020, CW 2 sent an internal Teladoc email, with the subject line, "Montefiore 'subscription' request," to several others at Livongo, including CMO Defendant Shah and Chief Product Officer Kendale.  CW 2 stated in the email: "Amar and Bimal – I got a call this morning [and I was informed] that *Jason Gorevic had a call with* [] VP and Chief of Staff; Leader of the Faculty Practice Physician Group for Montefiore Health (New York) this week."  On that call between Defendant Gorevic and a high-level executive at Montefiore Health, Defendant Gorevic apparently discussed the possibility of Teladoc "co-developing a patient focused 'subscription' model that would include urgent care (like Teladoc's Employee Benefit System) with chronic care (Livongo)."  CW 2 then requested Defendant Shah's and Amar's assistance with such capabilities.

518.    In response, Defendant Shah emailed CW 2 on October 30, 2020 explaining that "there is an active workstream on integration of [Livongo and Teladoc] services and business model," and "[w]e know that there is an imperative to have this together *by H1 [first half] 2021, but don't have details yet nor are ready for a client*."

519.    Therefore, after the Livongo Acquisition closed, Defendant Gorevic and others at Teladoc were having conversations with multiple clients touting the Company's capabilities based on newly acquired technology from Livongo, when such capabilities did not exist and would not be ready for quite some time—first half of 2021 at the earliest.  These internal documents further demonstrate the confusion internally within Teladoc about Livongo's product technology and lack of a clear product roadmap for integrated product solutions from the combined companies to clients, which resulted in Teladoc employees marketing technological capabilities to clients that it did not have at the time and would not be able to develop for a while.

520.    Further, CW 2 sent another email to Defendant Shah, Kendal, and others following up on her November 30, 2020 email, marked with "High" importance, again reiterating that "R[P]M keeps coming up as a main talking point in our joint Teladoc prospect/client meetings" and again asking for their guidance on "[w]hat is our client position and talk track on RPM?"  Such emails further support CW 2's statements that she repeatedly raised this issue to senior management—including Defendant Shah—and further evidence that this was a widespread issue, affecting discussions with numerous prospective and future clients.

521.    Defendant Shah was therefore directly informed of the issues with Teladoc sales personnel overselling customers on the combined companies' RPM product capabilities when Livongo did not have such capabilities, and that the Company was, therefore, struggling with personnel and product integration. Accordingly, he knew or recklessly disregarded the falsity of representations that the Livongo integration was "going really great," including that "from the technology perspective" the two companies "really do fit together to provide [] a continuum of care, a whole person experience" and that they were "already well on our way of building [] that highway to quickly deliver that to the consumers and to our clients."

522.    Additionally, Teladoc management, including senior executives like Joe Devivo, President of its HHS division, were apprised of concerns expressed by legacy Livongo employees with respect to being moved into HHS and the lack of direction, purpose, synergy, and fit for this Livongo team after their transition to HHS.  For example, CW 2 and another legacy Livongo employee drafted a document entitled, "HHS Team Open Issues," in November or December 2020, with a final version in mid-January 2021, as they prepared for the 2021 selling season. According to CW 2, the purpose of the document was to document their concerns with being moved into HHS and the lack of direction and purpose for the Livongo team that was assigned to HHS given the lack of synergy or fit.  CW 2 explained that they were trying to be proactive given that Teladoc did not seem to know what to do with them.  CW 2 added that these were personal notes with outlined points to have a consistent message that she and her Livongo colleague used to try and convey a strategy to "right" the ship when addressing their management, which included Bruce Brandes, Rob Fithian, and Gerry Marini.  The document also indicates that these "open questions" were also intended for "Joe DeVivo," who was former InTouch CEO and became Teladoc's President, HHS after the InTouch acquisition until April 2022.

523.    Similarly, according to CW 4, Teladoc held a leadership meeting over the course of a few days in or around September 2021 in Chicago, Illinois, that she and Gorevic attended. CW 4 recalled having direct conversations with Gorevic about plans for the Livongo integration at the meeting, and that Gorevic responded with "Wait until tomorrow."  CW 4 explained that Gorevic was referring to the presentation that he (Gorevic) was giving the following day regarding plans for integrating Livongo, and that Gorevic had seemingly stated it in a way that suggested that CW 4 would be satisfied, and that the integration issues would finally be resolved. According to CW 4, Gorevic's presentation the following day added nothing new, provided very general

information and no specifics, that it seemingly to CW 4 did not resolve the integration issues she was referring to when she approached Gorevic the previous evening, and CW 4 felt that it came across as "not sophisticated" and "underwhelming." Thus, according to CW 4, when Gorevic gave his presentation "alarm bells went off" in CW 4's mind.

524.    Defendants' direct involvement in the integration process thus supports a strong inference of scienter.

525.    Additionally, CW accounts confirm that Defendants' similarly had access to and closely monitored sales losses to competition via the Salesforce system, further supporting their knowing or reckless disregard that increased competition was in fact adversely affecting Teladoc's business. For example, CW 2 explained that *if a client were lost to a competitor that it was logged into Salesforce. CW 2 further explained that if it was a "visible deal" that it would be reviewed by management.*

### C. Defendants' Statements Themselves Support Scienter

526.    Throughout the Class Period, Defendants spoke repeatedly on Teladoc's integration ability and about competition. These false and misleading statements themselves provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing that Teladoc was unable to integrate Livongo and that there was growing competition adversely affecting the Company's business. Accordingly, Defendants breached their duty under the federal securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so.

527.    For instance, during the Company's Q4 FY 2020 Earnings Call, Defendant Gorevic touted that "*[o]ur commercial organization is now fully integrated*, and our teams responsible for cross-selling have been collaborating for months[,]" and "*[t]he integration of our data platform and assets also continues to progress as we work to unlock the power of our combined data sets*."

528.    Defendants made similar assurances throughout the Class Period.  For example, on April 28, 2021, on the Q1 FY 2021 Earnings Call, Defendant Gorevic reiterated to investors that the Company's integration efforts "made considerable progress" and that the commercial organization was "fully integrated." Similarly, in response to a SVB Leerink analyst's question about the Livongo integration progress, Defendant Gorevic continued to tout the "rapid progress" and "incredible work" that the Company had made with integration.  Defendant Murthy also responded to that SVB Leerink analyst's question about integration, explaining that the Company had a "very, very clear road map" to integrating Livongo into Teladoc's operations.  On October 27, 2021, Defendant Gorevic similarly reported to investors that Teladoc's and Livongo's teams in the combined company were ***"fully integrat[ed]."***

529.    Defendants' repeated assurances to investors that Teladoc had integrated Livongo's business into Teladoc's—when they had been apprised of the integration problems as previously described—demonstrate that they ***either*** knew that the Company was experiencing substantial integration problems ***or*** were reckless in not knowing or investigating that this was the case.  In either scenario, there is a strong inference that Defendants made these statements with scienter.

## D.    Defendants Enriched Themselves Through Insider Sales Throughout the Class Period

530.    At the same time as Defendants were publicly touting the purportedly successful integration of Livongo and downplaying the negative impact of growing competition on the Company's business, they engaged in a series of stock sales during the Class Period—reaping millions in proceeds.  Collectively, three of the Individual Defendants (Defendants Gorevic, Murthy, and Verstraete) sold over 190,000 shares, for a total of over ***$35 million*** in proceeds, during the Class Period.

531.    Indeed, during the Class Period, Defendant Gorevic alone sold over 150,000 shares

of Teladoc stock, reaping almost *$30 million* in proceeds.  These sales represented a disposition of 21.6% of Defendant Gorevic's Teladoc stock.

532.   Defendants Murthy and Verstraete also reaped millions of dollars in stock sale proceeds during the Class Period.  Specifically, during the Class Period, Defendant Murthy sold 17,695 shares, reaping almost $2 million in proceeds, and Defendant Verstraete sold 24,115 shares, reaping over $4 million in proceeds.  These sales represented a disposition of 29% and *43.1%* of Defendants Murthy's and Verstraete's Teladoc stock, respectively.

533.   Collectively, these three Individual Defendants sold on average *31.3%* of their total Teladoc stock holdings during the Class Period.

534.   Notably, Defendant Murthy—Teladoc's CFO who was closely involved in monitoring the integration process as explained above—sold over *four times*, or *355%*, more shares of Teladoc stock during the Class Period than during a period of equal-length immediately preceding the Class Period (August 29, 2019 to February 10, 2021, the "Control Period"). Specifically, compared to the 17,695 shares she sold during the Class Period, Defendant Murthy sold only 3,885 shares during the Control Period.  In doing so, Defendant Murthy *more than doubled* her stock sale proceeds during the Class Period, from approximately $769,000 to roughly $2 million.

535.   In addition, many of these three Individual Defendants' stock sales were not pursuant to any 10b5-1 plans.  Indeed, none of Defendant Murthy's Class Period sales was pursuant to any 10b5-1 plans, and most (five out of eight) of Defendant Verstraete's sales were not pursuant to any such plan.  Moreover, of Defendant Verstraete's three sales that were made pursuant to a 10b5-1 plan, one was pursuant to a plan adopted by her on August 16, 2021—*i.e.*, during the Class Period).  Furthermore, some of Defendant Gorevic's sales were similarly not

pursuant to any plan. In any event, whether these three Individual Defendants sold shares pursuant to a 10b5-1 plan or purportedly to cover tax withholding obligations, Defendants were incentivized to mislead investors to artificially inflate Teladoc's stock price to ensure the greatest amount of return on any shares sold during the Class Period—whether pursuant to a plan or not. And Defendants did exactly that.

536. These three Individual Defendants substantially benefited financially from their Class Period sales because had Defendants not made a series of misrepresentations during the Class Period, the value of Teladoc's stock would have been lower. Indeed, Defendants' misrepresentations artificially inflated Teladoc's stock price throughout the Class Period, which allowed these three Individual Defendants to benefit from a higher stock value that would have otherwise been much lower—as exemplified by the drop in value at each of the corrective disclosures and/or materialization of the risk events.

537. In addition, during the Class Period, Teladoc insiders (including these three Individual Defendants)—senior Company executives or directors who were all privy to material non-public information concerning the Livongo integration failures and adverse impact of increased competition—collectively, sold over 900,000 shares of Teladoc stock, reaping approximately ***$168 million*** in proceeds.[41] That is, while Defendants were touting to the market during the Class Period that the integration of the Livongo Acquisition was on track and that growing competition was not a threat—when they knew the opposite—Teladoc insiders profited immensely.

---

[41] Specifically, based on the available data from Bloomberg, the following Teladoc insiders collectively sold a total of 903,677 shares for $167,999,745: Defendants Gorevic, Murthy, and Verstraete; Chief People Officer Gershuri; SVP, Corporate Development Turitz; SVP, Product & Corporate Strategy Trencher; CLO / Secretary Vandervoort; Director Fenwick; Former Director Taneja; Former Director Glen Tullman; Former COO David Sides; and General Catalyst Group.

538.    In particular, Livongo founder Tullman, who served as a Teladoc director for several months after the Livongo Acquisition (between November 19, 2020 and May 2021), sold massive amounts of his Teladoc shares during the Class Period. Specifically, on March 1, 2021 and April 1, 2021, he sold almost 500,000 shares of Teladoc stock for over ***$97 million*** in proceeds. These sales represented a disposition of ***64.2%*** of Tullman's Teladoc stock.  Notably, Tullman exercised and sold every Teladoc stock option he received during the Class Period. Moreover, Tullman made these sales only months before the first partial corrective disclosure, the November 10, 2021 *Business Insider* Article, which, among other things, quoted him as saying that the Livongo integration "***[was not] going as well as we would have hoped***," contrary to Defendants' representations.

539.    Additionally, COO David Sides, who reported directly to Defendant Gorevic and is one of the other non-Defendant insiders who sold substantial amounts of his Teladoc stock during the Class Period, internally acknowledged during the Class Period that the Company lacked an adequate plan for the Livongo integration.  Specifically, CW 2 described a meeting that took place on June 17–18, 2021 in Nashville, where she asked Teladoc COO David Sides about the plan to integrate Livongo.  CW 2 recalled that Sides's response was, "That's a great question," without providing a plan, which worried CW 2 and her team.  Yet, the very next month, at the beginning of March 2021, COO Sides sold 2,866 shares for proceeds of almost $600,000.  Sides then made a second and final stock sale of almost equal value in July 2021.  Both of his sales occurred prior to any corrective disclosures.

540.    Accordingly, Teladoc insiders' massive stock sales during the Class Period— particularly those by these three Individual Defendants—raise a strong inference that these Individual Defendants were financially motivated to artificially inflate Teladoc's share price by

repeatedly making misrepresentations to investors throughout the Class Period.[42]

## VIII.   CONTROL PERSON ALLEGATIONS

541.    The Individual Defendants, by virtue of their high-level and controlling positions at Teladoc, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

542.    Defendants Gorevic, Murthy, Verstraete, Shah, and Napolitano as senior executive officers of Teladoc—a publicly-held company whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Teladoc's

---

[42] Gorevic's and Verstreate's larger sales in the Control Period—which substantially overlapped with the beginning of the Covid-19 pandemic—can be attributed to the large spike in Teladoc's stock price at that time driven by its explosive growth as demand for telehealth services skyrocketed during the pandemic. Defendants Gorevic and Verstreate knew such unprecedented demand was short-lived and would end once vaccines were widely rolled out and people returned to in-person routines, and thus sold their stock to capitalize upon this temporary boost in Teladoc's stock price during the Control Period.   Specifically, Defendants Gorevic and Verstreate began selling their Teladoc's stock significantly more after the Covid-19 pandemic began and fueled the surge in Teladoc's business and stock price, which reached an all-time high of $308.00 on February 16, 2021 (as opposed to only $124.50 in early March 2020, when pandemic stay-at-home orders and similar measures began). For instance, in 2019, Defendant Gorevic reaped only approximately $8.7 million in stock sale proceeds, which was a fraction of his sales proceeds of approximately $50 million in 2020, after the pandemic began.    Similarly, Defendant Verstreate reaped approximately $1.3 million in stock sale proceeds in 2018 and 2019 combined, which was dwarfed by her over $24.6 million in stock sale proceeds in 2020.

publicly traded common stock would be based on accurate information.  Each of the Individual Defendants violated these requirements and obligations during the Class Period.

543.    Defendants Gorevic, Murthy, Verstraete, Shah, and Napolitano because of their positions of control and authority as senior executive officers of Teladoc, were able to and did control the content of Teladoc's SEC filings, press releases, and other public statements issued by or on behalf of Teladoc during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

544.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Teladoc common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts.  The scheme deceived the investing public regarding Teladoc's business, operations, and management, and the intrinsic value of Teladoc's common stock, and caused Lead Plaintiff and members of the Class to purchase Teladoc common stock at artificially inflated prices.

## IX.    CLASS ACTION ALLEGATIONS

545.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Teladoc during the Class Period and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Teladoc during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Teladoc's employee retirement and benefit plan(s) and their

participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

546.    The members of the Class are so numerous that joinder of all members is impracticable.  According to public reports filed with the SEC, during the Class Period, Teladoc had over 150 million outstanding shares of common stock and was actively traded on the NYSE under the ticker symbol "TDOC."  While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically.  Record owners and other members of the Class may be identified from records maintained by Teladoc and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

547.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

548.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

549.    Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

> a.    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

b.  Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c.  Whether, and to what extent, the market price of Teladoc common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d.  Whether Defendants acted with the requisite level of scienter;

e.  Whether the Individual Defendants were controlling persons of Teladoc; and

f.  Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

550.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

551.   To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.  the omissions and misrepresentations were material;

c.  the Company's securities traded in an efficient market;

d.  the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

e.  Lead Plaintiff and other members of the Class purchased Teladoc's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

f.  Teladoc's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

g.  as a regulated issuer, Teladoc filed periodic public reports with the SEC and the NYSE;

h.  Teladoc regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

i.  Teladoc was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Bank of America, William Blair Equity Research, Credit Suisse, RBC Capital Markets, Cowen and Company, Oppenheimer & Co. Inc., Wells Fargo Securities, LLC, Evercore ISI Institutional Equities, Deutsche Bank AG, and J.P. Morgan Chase & Co., all of which wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firm(s) and that were publicly available and entered the public marketplace.

552.   As a result of the foregoing, the market for Teladoc's securities promptly digested current information regarding Teladoc from publicly available sources and reflected such information in Teladoc's securities price(s).  Under these circumstances, all persons and entities who or which purchased or otherwise acquired Teladoc common stock during the Class Period suffered similar injuries through their purchase of Teladoc common stock at artificially inflated prices and thus, the presumption of reliance applies.

553.   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Teladoc common stock.

554.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Teladoc common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

555.   To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Teladoc's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.   NO SAFE HARBOR

556.   The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.  First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions.  Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking

statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

557.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

558.    In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii).  Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

559.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Teladoc was significant problems integrating Livongo into the Company, leading to an over $6 billion goodwill impairment.

560.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, or the forward-looking statement was authorized or approved by an executive officer of Teladoc who knew that the statement was false when made.

## XII.   CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act**
**and SEC Rule 10b-5(b) Promulgated Thereunder**
**Against Teladoc and the Individual Defendants**

561.   Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

562.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against Teladoc and the Individual Defendants.

563.   As alleged herein, throughout the Class Period, Teladoc and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Teladoc and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the price of Teladoc common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Teladoc common stock at artificially inflated prices.

564.   The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated

documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

565.    As set forth above, Teladoc and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Teladoc common stock during the Class Period.

566.    In ignorance of the false and misleading nature of Teladoc's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Teladoc common stock, Lead Plaintiff and other members of the Class purchased Teladoc common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Teladoc common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Teladoc common stock declined precipitously, and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Teladoc common stock at artificially inflated prices and the subsequent decline in the price of that security when the truth was disclosed.

567.    By virtue of the foregoing, Teladoc and the Individual Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

568.    Lead Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

569.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

570.    The Individual Defendants had control over Teladoc and made the materially false and misleading statements and omissions on behalf of Teladoc within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive leadership positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

571.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

572.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of the Individual

Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.  Determining that this action is a proper class action, certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as Lead Counsel for the Class;

B.  Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.  Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: December 6, 2022                    Respectfully Submitted,

                                           **LABATON SUCHAROW LLP**

                                           */s/ James W. Johnson*
                                           James W. Johnson
                                           Irina Vasilchenko
                                           David J. Schwartz
                                           Philip J. Leggio

140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email: jjohnson@labaton.com
       ivasilchenko@labaton.com
       dschwartz@labaton.com
       pleggio@labaton.com

*Counsel for Lead Plaintiff*
*Leadersel Innotech ESG and*
*Lead Counsel for the Proposed Class*


**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
Facsimile: (877) 590-0482
brian@schallfirm.com

*Counsel for Additional Plaintiff Hui Ma and*
*Additional Counsel for the Proposed Class*