**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TELADOC HEALTH, INC.
SECURITIES LITIGATION

Case No. 1:22-cv-04687 (DLC)

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS THE**
**SECOND AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000

*Attorneys for Defendants Teladoc Health,*
*Inc., Jason Gorevic, Mala Murthy, Stephany*
*Verstraete, Bimal Shah, and Richard*
*Napolitano*

Dated: January 20, 2023

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 3

    A.    The Parties ............................................................................................................. 3

    B.    Teladoc Merges with Livongo .......................................................................... 4

    C.    Livongo Integration ............................................................................................. 4

    D.    Chronic Care Market Competition ..................................................................... 7

    E.    The Present Action and Challenged Statements ............................................. 9

LEGAL STANDARD ........................................................................................................... 10

ARGUMENT ........................................................................................................................ 11

I.     The Complaint Fails to Allege Any Actionable Material Misstatements ....................... 11

    A.    The Complaint Fails to Plead Falsity ................................................................. 11

    B.    The Alleged Misstatements are Non-Actionable Puffery, Opinions, and
            Forward-Looking Statements ............................................................................. 20

          1.    Puffery ....................................................................................................... 20

          2.    Opinions .................................................................................................... 22

          3.    Forward-Looking Statements .................................................................. 24

II.    The Complaint Fails to Allege a Strong Inference of Scienter ...................................... 25

    A.    Plaintiffs Fail to Allege Motive and Opportunity ............................................ 25

    B.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness ..................... 28

    C.    The "Core Operations" Theory Does Not Rescue the Complaint ...................... 31

III.   The Complaint Fails to Allege Loss Causation ............................................................. 32

IV.   The Complaint Fails to Allege a Control Person Claim against the Individual
       Defendants ........................................................................................................................ 36

CONCLUSION ..................................................................................................................... 36

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005).......................................................................................36

*Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)....................................................................................................................11

*In re Austl. and N.Z. Banking Grp. Ltd. Sec. Litig.*,
    No. 08 Civ. 11278, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009).............................................36

*Avon Pension Fund* v. *GlaxoSmithKline PLC*,
    343 F. App'x 671 (2d Cir. 2009) ..............................................................................................26

*Barilli* v. *Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019)...............................................................................20, 21

*In re Barrick Gold Corp. Sec. Litig.*,
    341 F. Supp. 3d 358 (S.D.N.Y. 2018)......................................................................................24

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ...............................................................................................11

*Boguslavsky* v. *Kaplan*,
    159 F.3d 715 (2d Cir. 1998).....................................................................................................36

*Campo* v. *Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009)......................................................................................30

*Chapman* v. *Mueller Water Prods., Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020)...............................................................................20, 27

*In re Chi Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17-cv-01580, 2019 WL 5287980 (S.D.N.Y. Oct. 16, 2019)..............................................36

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*,
    No. 19-cv-10825, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) .........................................28, 31

*City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)......................................................................................31

*City of Taylor Gen. Emps. Ret. Sys.* v. *Magna Int'l Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. 2013).......................................................................................26

*City of Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) ...................................................................21

*Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020).................................................................19

*In re Diebold Nixdorf Inc. Sec. Litig.*,
    No. 19-cv-6180, 2021 WL 1226627 (S.D.N.Y. 2021) ................................... *passim*

*In re DraftKings Inc. Sec. Litig.*,
    No. 21 Civ 5739, 2023 WL 145591 (S.D.N.Y. Jan. 10, 2023).............................17

*Dura Pharms., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)...........................................................................................10

*In re EDAP TMS S.A. Sec. Litig.*,
    No. 14 Civ. 6069, 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)........................22

*Elliott Assocs., L.P.* v. *Covance, Inc.*,
    No. 00 Civ. 4115, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) .........................22

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008).................................................................19

*Feasby* v. *Industri-Matematik Int'l Corp.*,
    No. 99-cv-8761, 2000 WL 977673 (S.D.N.Y. 2000) ............................................26

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
    No. 16 Civ. 7840, 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F.
    App'x 127 (2d Cir. 2019)....................................................................................20

*Fila* v. *Pingtan Marine Enter. Ltd.*,
    195 F. Supp. 3d 489 (S.D.N.Y. 2016).................................................................32

*Fishbaum* v. *Liz Claiborne, Inc.*,
    No. 98-9396, 1999 WL 568023 (2d Cir. 1999) ...................................................27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005).................................................................18

*Frederick* v. *Mechel OAO*,
    475 F. App'x 353 (2d Cir. 2012) ........................................................................31

*In re Garrett Motion Sec. Litig.*,
    No. 20 Civ. 7992, 2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) ..........................29

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................30

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009) ..................................................................26

*Glaser* v. *The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..................................................................26

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scot. Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015) ...............................................................................10

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
   564 U.S. 135 (2011) ............................................................................................29

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
   No. 17-cv-1944, 2019 WL 4918649 (S.D.N.Y. 2019) .........................................32

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
   No. 13-cv-755, 2014 WL 585658 (S.D.N.Y. 2014) .............................................28

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...............................................................19

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ...................................................................26

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
   No. 08 Civ. 9203, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) .........................19

*In re Nokia Corp. Sec. Litig.*,
   No. 19-cv-3982, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ................15, 21, 23

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ..................................................................24

*In re NovaGold Res. Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009) ..................................................................31

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...............................................................................25

*Oklahoma Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys.* v. *Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) .............................................21

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ......................................................................................22, 23

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).............................................................................32

*Paulsen* v. *Stifel, Nicolaus & Co.*,
    No. 18 Civ. 09440 (CM), 2019 WL 2415213 (S.D.N.Y. June 4, 2019)...................................3

*In re Plug Power, Inc. Sec. Litig.*,
    No. 21-cv-2004, 2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022) ............................................31

*Plumbers & Pipefitters Loc. Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*,
    679 F.3d 952 (7th Cir. 2012) .............................................................................28

*In re Razorfish Sec. Litig.*,
    No. 00 CIV. 9474, 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001) ............................12, 14, 20

*Ret. Sys.* v. *YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014).....................................................................33

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000)..............................................................................3

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996)............................................................................11

*Shemian* v. *Res. In Motion Ltd.*,
    570 F. App'x 32 (2d Cir. 2014) ......................................................................28

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................25

*In re Tellium, Inc. Sec. Litig.*,
    No. 02-cv-5878, 2005 WL 2090254 (D.N.J. Aug. 26, 2005) ...............................................35

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016)............................................................................23

*Town of Davie Police Officers Ret. Sys.* v. *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*,
    No. 21-909, 2021 WL 5142702 (2d Cir. Nov. 5, 2021) ....................................................28

*In re Veon Ltd. Sec. Litig.*,
    No. 15-cv-08672, 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018)............................................36

*Villare* v. *Abiomed, Inc.*,
   No. 19-cv-7319, 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ............................................30

**Statutes**

15 U.S.C. § 78u-4(b)(1) .......................................................................................................11

15 U.S.C. § 78u-5(c) ............................................................................................................24

**Other Authorities**

Federal Rule of Civil Procedure 9(b) ...............................................................................1, 10

Federal Rule of Civil Procedure 12(b)(6) ...............................................................................1

Defendants Teladoc Health, Inc. ("Teladoc" or the "Company"), Jason Gorevic, Mala Murthy, Stephany Verstraete, Bimal Shah, and Richard Napolitano respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint (the "Complaint" or "SAC") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4, 78u-5.

## PRELIMINARY STATEMENT

In this case, shareholders of Teladoc, a virtual healthcare provider, assert securities fraud claims with respect to two disconnected sets of allegedly false statements.  First, Plaintiffs claim that Teladoc overstated the degree to which it had integrated Livongo Health, Inc. ("Livongo") after the companies' October 2020 merger.  Second, Plaintiffs claim that Defendants made misstatements concerning competition within the virtual health care market.  Neither of these theories pleads securities fraud.  And while Plaintiffs responded to Defendants' prior motion to dismiss by amending, their new allegations fail to cure any pleading deficiencies.

*First*, the SAC fails to plead any material false statements by Defendants.  The premise of Plaintiffs' integration theory is that Teladoc falsely represented that the integration of the Teladoc and Livongo businesses had been accomplished without difficulties.  But Teladoc did not make any such "mission accomplished" declaration.  Rather, Defendants were transparent about the various risks and challenges of integrating Teladoc and Livongo's operations, and made clear that the integration was continuing.  None of the specific statements that Plaintiffs challenge is *actually* false because none is actually contradicted by Plaintiffs' confidential witnesses ("CWs") or the news report that Plaintiffs allege as the first corrective disclosure.  While the SAC adds new allegations by CWs, most are legacy Livongo employees critical of the way Teladoc operated, and their allegations are nothing more than subjective critiques about the perceived success of the

integration.  Further, many of the statements about integration efforts—including statements that the integration was "going really great" and "[w]e've made considerable progress across our key work streams"—are quintessential corporate puffery and subjective statements of opinion, and others are forward-looking statements protected by the PSLRA safe harbor.

As to their second theory, Plaintiffs also fail to identify any false statements about the competitive pressures affecting Teladoc's chronic care business, which led in part to Teladoc's revisions to its fiscal year 2022 revenue and adjusted EBITDA projections announced in April 2022.  From the moment that Teladoc issued the projections in October 2021, it expressly warned about two of the very trends that later caused it to revise guidance for the chronic care business in April 2022.  None of the competition-related statements Plaintiffs identify are alleged to be false when made, and many are inactionable puffery, opinions, and forward-looking statements.

*Second*, the SAC does not plead the requisite inference of fraudulent intent—indeed the competing non-fraudulent inferences are far stronger.  If Defendants were trying to artificially inflate the stock price by touting the integration's success, they would not have warned the market from the start of the various risks associated with that integration.  And similarly, if Defendants were lying about the market dynamics facing the chronic care business in the midst of the COVID-19 pandemic, they would not have sought to temper expectations with a "conservative outlook" for that business when Teladoc first announced its revenue projections.  Further, the fact that Defendants Gorevic, Murthy, and Verstraete increased their Teladoc stock holdings over the purported class period conclusively refutes any suggestion of fraudulent intent.  Indeed, while Plaintiffs point to stock sales in support of scienter, Plaintiffs do not identify any specific sales that are unusual in timing or amount, and ignore that *all* of these executives' sales were either subject to Rule 10b5-1 plans or used to satisfy tax withholding obligations.

Finally, Plaintiffs' loss causation theory fails.  None of the three alleged corrective disclosures actually revealed any previously undisclosed "truth" about the integration or competitive challenges.  The first, a November 2021 *Business Insider* article, merely discusses some of the challenges, such as employee attrition, that the Company was experiencing post-merger.  The second, the April 2022 revision of FY 2022 revenue and adjusted EBITDA projections, revealed no new information about the integration, and to the extent it related to competitive challenges facing the chronic care business, those challenges had either previously been disclosed or had only recently occurred.  The third alleged corrective disclosure, a July 2022 earnings announcement, revealed nothing new at all relating to the alleged fraud.

For all of these reasons, and because Plaintiffs have already had multiple opportunities to amend the Complaint, Plaintiffs have failed to plead a claim under section 10(b) or 20(a) of the Securities Exchange Act and the Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[1]

### A.    The Parties

Teladoc is headquartered in Purchase, New York, incorporated in Delaware, and its common stock trades on the New York Stock Exchange.   (¶ 49.)[2]  Jason Gorevic, Mala Murthy, Bimal Shah, Richard Napolitano, and Stephany Verstraete (the "Individual Defendants") are, respectively, Teladoc's Chief Executive Officer;  Chief Financial Officer; former Chief Medical Officer; Senior Vice President, Chief Accounting Officer and Controller;

---

[1]    The facts outlined herein are accepted as true solely for purposes of Defendants' motion to dismiss.  To the extent that the Complaint quotes, cites, or references a document, that document is considered part of the Complaint.  *See Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *In re Diebold Nixdorf Inc. Sec. Litig.*, 19-CV-6180 (LAP), 2021 WL 1226627, at *10 n.14 (S.D.N.Y. Mar. 30, 2021).  Similarly, a court can take judicial notice of SEC filings on a motion to dismiss.  *See Paulsen* v. *Stifel, Nicolaus & Co.*, No. 18 Civ. 09440 (CM), 2019 WL 2415213, at *3 (S.D.N.Y. June 4, 2019).

[2]    References to "Ex. _-_" refer to the exhibits to the attached Declaration of Audra J. Soloway and the corresponding page citation.  References to "¶" refer to paragraphs in the Complaint.

and Chief Marketing & Engagement Officer.    (¶¶ 50–55.)  Teladoc provides virtual healthcare services to consumers through a network of qualified providers.  (¶ 67.)  Teladoc's chronic care business provides solutions for diabetes and other chronic conditions under the brand name Livongo (¶ 3), and BetterHelp is a direct-to-consumer online mental health platform. (¶ 73.)

Lead Plaintiff Leadersel Innotech ESG and additional Plaintiff Hui Ma are Teladoc investors suing on behalf of a putative class of persons and entities who acquired Teladoc securities between February 11, 2021 and July 27, 2022 (the "Putative Class Period").  (¶ 47 n.3.)

### B.    Teladoc Merges with Livongo

On August 5, 2020, Teladoc announced its decision to merge with Livongo, a provider of healthcare monitoring products and services.  (¶¶ 82–86.)  The $18.5 billion deal, "a record in the telehealth industry," would combine Teladoc and Livongo to become "the largest telehealth company." (¶¶ 82–84.)  The merger closed on October 30, 2020.  (¶ 103.)

### C.    Livongo Integration

***Teladoc Begins to Integrate the Livongo Legacy Business.***    Teladoc quickly began integrating the Livongo business once the merger closed.  (¶ 308.)  In a February 11, 2021 interview with WTF Health, Shah explained that the Livongo integration was "going really great," noting that Livongo and Teladoc had "a shared mission," "shared culture," and "really do fit together" from a "technology perspective." (¶ 298.)  He stated that Teladoc was "well on our way of building [] that highway to quickly deliver" integrated whole-person products.  (*Id.*)  On a February 24, 2021 earnings call, Teladoc discussed the progress of the integration.  (¶ 307.)  Gorevic reported that the Company's "commercial organization"—responsible for sales to commercial clients such as health plans and employers—was "now fully integrated." (¶ 308.)  Gorevic also reported that the companies had successfully begun to cross-sell to each other's

clients.  (*Id.*; Ex. 16 at 6–7.)  However, Gorevic emphasized that full integration was ongoing, noting that "[t]he integration of our data platform and assets also *continues to progress*" and "mak[e] *significant investments to integrate* our products and services."  (¶ 308 (emphasis added).)

Gorevic provided updates on the challenges of merging Livongo and Teladoc on a March 15, 2021 episode of Former Senator Bill Frist's podcast.  (¶ 328.)  When asked if "the assimilation" of Livongo and Teladoc was going well, Gorevic acknowledged that there were challenges:

> *[T]here are certainly challenges* . . . we've never been in the same room together right? . . . . I have whole teams of people all around the world now who I've never met so I am anxious, quite frankly, to go on the tour and start to, uh, be face to face with those teams.

(¶ 329 (emphasis added).)  Gorevic opined, however, that "the cultural alignment [between Livongo and Teladoc] is very strong. . . . So, so far so good."  (*Id.*)  Gorevic also explained that the integration was at very early stages, noting that the two companies had "the ingredients for successful integration."  (*Id.*)

On an April 28, 2021 earnings call, Gorevic provided another "update on integration," reporting that "[w]e've made considerable progress across our key work streams," as the Company had "closed several deals for our new integrated mental health product" combining Teladoc and Livongo resources and "enabled the first wave of members to access and register for Livongo programs from within the Teladoc app."  (¶ 336; Ex. 17 at 4.)  Gorevic explained that "*[t]his is an important first step* toward creating a seamless member experience."  (*Id.* at 4 (emphasis added).)  Gorevic continued that Teladoc had "now executed on the *first wave* of that integration.  That will *continue* to develop over the course of this year . . . ."  (*Id.* at 8 (emphasis added).)[3]

---

[3]  On June 8, 2021, an analyst report summarizing a call with Teladoc's management reported that "the company is busy and making great progress" on integration and "[t]o-date, the Livongo results have been entirely in-line with the company's outlook."  (¶ 360.)  As such, the Company was still "encouraged with the integration and pleased with the momentum from the commercial sales teams."  (*Id.*)

On an October 27, 2021 earnings call, Murthy noted that the Company was investing resources into the "*continued* integration of Livongo, enhancements to our integrated data platform and expansions into new markets." (Ex. 19 at 5 (emphasis added).)  Similarly, as recounted in an October 28, 2021 Credit Suisse report (¶ 379), management said "*it is still early* on . . . with this being the first year post-merger" and noted that at Teladoc's Investor Day, "people will see the progress TDOC has made on the integration of the Livongo products and services." (Ex. 14 at 7.)

*Teladoc Cautions Investors About the Risks of Integrating Livongo.*  Before and during the Putative Class Period, Teladoc clearly disclosed the risks associated with the integration following the $18.5 billion merger, warning investors that it was a significant endeavor posing significant challenges.  For example, in the registration statement filed in connection with the merger, months before the first alleged misstatement, Teladoc disclosed potential risks associated with the integration of these two large companies.  The Company explained that "[c]ombining the businesses of Teladoc and Livongo may be ***more difficult, costly or time-consuming than expected*** and the combined company ***may fail to realize the anticipated benefits of the merger***, which may adversely affect the combined company's business results" and that "***any delays encountered in the integration process***[] could have an adverse effect" on the combined company's financial results.  (Ex. 5 at 54 (emphasis added).)  Further, Teladoc warned that "[t]here can be ***no assurances that [Teladoc's and Livongo's] businesses can be integrated successfully***" or that the integration would be completed "in the expected time frame." (*Id*. at 55 (emphasis added).)  Teladoc listed various "issues" that would need to be "addressed" in order to successfully integrate, including "combining the companies' operations and corporate functions," "integrating personnel from the two companies," "integrating the companies' technologies," and "integrating and unifying the offerings and services." (*Id*.; *see also id.* at 49–50 (warning that "[i]f key

6

employees of Teladoc or Livongo depart, the integration of the companies may be more difficult" and the combined company "may lose significant expertise and talent," and disclaiming any assurance "that the combined company will be able to attract or retain key employees").

Teladoc continued to make these types of disclosures well into the Putative Class Period. In its Form 10-K for 2020, filed March 1, 2021, Teladoc disclosed that it "may have difficulty integrating the Livongo business, and the anticipated synergies and other benefits of the combined company may not be realized." (Ex. 6 at 48.) It explained that the success of the merger "will depend in large part on the success of the management of the newly combined company in integrating the operations, strategies, technologies, and personnel of the two companies." (*Id*.) It warned that possible difficulties could arise with regard to "the retention of and possible decrease in business from the existing customers," "the integration of corporate cultures and maintenance of employee morale," and "the retention of key employees," among others. (*Id*.) Moreover, the Company concluded that "[e]ven if integration is successful, anticipated cost savings, synergies and other benefits may not be achieved." (*Id*. at 49.) Teladoc repeated these risk disclosures on February 28, 2022 in the Company's Form 10-K for 2021. (Ex. 9 at 51.)

D.    **Chronic Care Market Competition**

Plaintiffs also allege purportedly inadequate disclosures regarding the competitive landscape for the chronic care business that Teladoc acquired from Livongo. (¶ 296.) Throughout the Putative Class Period, Teladoc discussed the market factors affecting its chronic care business as well as the competitive landscape of the virtual healthcare market, which was rapidly changing in light of the COVID-19 pandemic. (*See, e.g.*, ¶ 402, Ex. 21 at 4) (addressing "tremendous impact" of pandemic "on the entire health care industry").

Early in the Putative Class Period, Teladoc expressed optimism on the then-current competitive landscape.  On an April 28, 2021 earnings call, Gorevic noted that, at that point in time, "for the most part, many of [the potential competitors], we *almost* never bump into, and *some* of the new entrants, we're just not seeing gain traction."  (Ex. 17 at 7 (emphasis added).)  On a June 1, 2021 earnings call, noting the market growth due to the pandemic, Gorevic explained that, in prior months, "we weren't surprised by any of the moves that have been made" by competitors and confirmed that the Company's "win rate," a common sales metric that measures the percentage of closed sales deals, had improved in past years.  (Ex. 18 at 4.)  Gorevic explained that, at the time, Teladoc had a "competitive advantage" over "retail giants" like Amazon and Walmart because these companies were in the "very early days of sort of deciding even what they want to be."  (*Id.*; ¶ 358.)  On June 8, 2021, an analyst report reported Teladoc management's "belie[f]" at the time that, "in spite of the market noise," the Company's "competitive positioning is as strong as it has ever been" due to the fact that Teladoc had "been building the capabilities and infrastructure to scale the business for many years now."  (¶ 363.)

Beginning in October 2021, however, Teladoc warned shareholders that the chronic care business was experiencing a slowdown that could affect its future performance.  On an October 27, 2021 earnings call concerning Teladoc's financial results for the third quarter of 2021, Teladoc provided its preliminary full-year revenue guidance for FY 2022.  (¶ 366.)  On that call, Gorevic cautioned that the Company expected "*to be more conservative about growth expectations for standalone chronic care.*"  (Ex. 19 at 4 (emphasis added).)  Gorevic explained that the Company's "conservative" view was motivated in part by two trends in the chronic care business—first, the Company was "trying to be very realistic" about the pace of onboarding large health plan clients, as this process often "takes a couple of years," and second, the "employer market" had slowed as

the result of "benefits managers . . . paus[ing] over the course of this year . . . due to COVID and them being focused on the pandemic and return to work." (*Id*. at 7–8.)  Moreover, Gorevic noted that two additional chronic care channels—the international and broker markets—were "moving a little more slowly than we had originally anticipated," and repeated that the Company "*want[s] to be conservative in our outlook*" for chronic care.  (*Id*. at 8 (emphasis added).)  On that same call, Gorevic noted that "everyone knows there's been a lot of investment in the [telehealth] space," referring to competitors "starting to offer more telehealth solutions."  (¶ 373; Ex. 19 at 10.)

Teladoc continuously disclosed the risks associated with such competition throughout the Putative Class Period.  In its Form 10-K filed on March 1, 2021, the Company explained that, "[w]hile the virtual care market is in an early stage of development, it is competitive and [the Company] expect[s] it to attract increased competition, which could make it difficult for [the Company] to succeed."  (Ex. 6 at 26.)  Teladoc elaborated that it "currently face[s] competition . . . from a range of companies," named specific competitors, and noted that "potential Clients may accept competitive solutions in lieu of purchasing [Teladoc's] solutions."  (*Id*. at 27.)  The Company warned that its inability to successfully compete could have a material adverse effect on its "business, financial condition and results of operations."  (*Id.*)  Teladoc repeated these risk disclosures on February 28, 2022 in the Company's Form 10-K for 2021.  (Ex. 9 at 21–22.)

### E.    The Present Action and Challenged Statements

The initial complaint was filed on June 6, 2022, and focused on the Company's April 27, 2022 revisions to its FY 2022 revenue and adjusted EBITDA projections, alleging that Teladoc failed to disclose that increased competition was negatively impacting its BetterHelp and chronic care businesses.  (ECF No. 1, ¶ 5.)  The newly appointed Lead Plaintiff then filed an amended

class action complaint on September 30, 2022 (ECF No. 52) and a second amended class action complaint on December 6, 2022 (ECF No. 63), which added two defendants and a new Plaintiff.

The SAC asserts two categories of misstatements: *First*, Plaintiffs challenge Defendants' statements regarding the progress of Teladoc's integration of the overall Livongo business as well as its teams, capabilities, and assets. (*See, e.g.*, ¶¶ 307–13.) Plaintiffs' theory is that these statements were false and misleading due to the alleged nondisclosure of various internal challenges associated with the integration, including difficulties with integrating technological systems, platforms, and business models, as well as post-merger employee attrition. (*See, e.g.*, ¶ 240.) *Second*, Plaintiffs challenge Defendants' statements regarding the competitive landscape in the virtual healthcare market due to the alleged nondisclosure of negative effects that growing competition was having on Teladoc's business, which Plaintiffs incongruously connect to difficulties the Company was experiencing with the Livongo integration, even though the Company made no such announcement. (*See, e.g.*, ¶¶ 314–18.) The alleged misstatements are listed by category in Exhibit 1 for the Court's convenience. Plaintiffs seek damages for stock drops following three purported corrective disclosures on November 10, 2021, April 27, 2022, and July 27, 2022. (¶ 39–41.)

## LEGAL STANDARD

Securities fraud claims are subject to the heightened pleading standards imposed by the PSLRA and Federal Rule of Civil Procedure 9(b), which require plaintiffs to state "with particularity the circumstances constituting fraud." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). The PSLRA also requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference" of scienter. *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005). Failure to satisfy

these stringent pleading standards requires dismissal. *See, e.g.*, *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012).

## ARGUMENT

Because Plaintiffs have not adequately alleged (a) any material misstatements or omissions, (b) scienter, or (c) loss causation, their claims should be dismissed.[4]

## I.     The Complaint Fails to Allege Any Actionable Material Misstatements

To sufficiently plead a material misstatement, a plaintiff must "specify each statement alleged to have been misleading," 15 U.S.C. § 78u-4(b)(1), and must also specify facts or evidence that show why each statement was "false at the time" it was made. *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos., Inc*., 75 F.3d 801, 812–13 (2d Cir. 1996).

### A.     The Complaint Fails to Plead Falsity

***Integration.***  Plaintiffs challenge general statements regarding the progress and anticipated pace of the Livongo integration, asserting that they "created the misimpression" that it was "progressing smoothly and on track."  (¶ 310.)  For example, Plaintiffs challenge statements that (i) "[w]e've made considerable progress across our key [integration] work streams" (¶ 336); (ii) "[w]e are also making significant investments to integrate our products and services" (¶ 308); (iii) "the company is busy and making great progress" on the integration (¶ 360); and (iv) "we brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks." (¶ 392.) Yet, Plaintiffs do not allege that any of these highly generalized statements about the progress of integration was actually false.  Specifically, Plaintiffs have not identified ***any*** statements in which

---

[4]     To state a claim for violation of section 10(b) and Rule 10b-5, a plaintiff must allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013) (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 37–38 (2011)).

the Company represented that certain milestones had been reached, when in fact they had not.  Nor can Plaintiffs plead falsity from general statements that merely mention integration efforts, absent allegations that the statements contain misstatements of fact.  *In re Razorfish Sec. Litig.*, No. 00 CIV. 9474, 2001 WL 1111502, at *2 (S.D.N.Y. Sept. 21, 2001) (stating that "'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud," and concluding that complaint nowhere alleged that stated status of integration was untrue).

For example, Plaintiffs point to the statement that "[o]ur commercial organization is now fully integrated, and our teams responsible for cross-selling have been collaborating for months." (¶ 308.)  But Plaintiffs do not plead that the commercial teams were not integrated, collaborating, and cross-selling Teladoc and Livongo products.[5]  Rather, Plaintiffs point to a former Livongo employee's vague opinion that "she would not have considered the commercial business 'fully integrated.'" (¶ 311.)  This allegation is conclusory at best, and fails to demonstrate that any fact provided by Defendants regarding the commercial organization, which consists of the Company's sales infrastructure (as distinct from product teams or other functions), was wrong.

Similarly, Plaintiffs have not identified any statements in which the Company made any representations about the integration of any specific technological systems or the availability of remote patient monitoring ("RPM") capabilities.  Plaintiffs allege that Teladoc and Livongo each used Salesforce and Tableau platforms,[6] but that these platforms had not been integrated by Fall 2021 and June 2021, respectively.  (¶¶ 117–31.)  Rather, CW 11 alleges that "the Company had

---

[5]    The same is true with respect to similar statements identified by Plaintiffs.  (¶ 336 ("[O]ur commercial organization has been fully integrated with sales teams selling across the entire whole person portfolio of products . . . ."); ¶ 337 ("We mentioned the rapid progress on the commercial side . . . ."); ¶ 380 (explaining that "[w]ith the Livongo and Teladoc commercial teams now integrated, Teladoc has been very disciplined in how it manages and measures its pipeline").)

[6]    Tableau is a data visualization platform that analyzes patient and client information and is used "as a tool for non tech-savvy employees to easily access and visualize data."  (¶ 121.)

'no clear integration plan' on data during her tenure at Teladoc."  (¶ 128.)  However, Plaintiffs fail to establish any reason why these facts, assuming true, render any of the Company's statements misleading, much less materially so.  (¶¶ 117–31, 302.)  Based on the allegations of former Livongo employee CW 11,[7] the SAC claims that the sales teams advocated for the merger of the Tableau platforms to make it more efficient to generate "a holistic picture" of client data, but admits that the teams were able to pull the same information from other databases.  (¶¶ 117–27.) This purported lack of efficiency (*see, e.g.*, ¶¶ 122, 126) hardly demonstrates that the sales teams were not integrated, and certainly does not contradict any of Teladoc's public statements.  The same goes for CW 6's allegation that the "Salesforce integration caused delays . . . because it required additional time and effort to pull data from numerous different places."  (¶ 302(b).)

Similarly, Plaintiffs allege that during the Putative Class Period there was "confusion among sales personnel" about Teladoc's RPM capabilities, with salespeople allegedly marketing RPM to customers without clarity on what that term meant.  (¶¶ 135–36, 150.)  The Complaint does not identify what RPM capabilities were being discussed or developed; indeed, CW 2's own allegations make clear that there was confusion about what the term "RPM" even meant.  (¶ 136 (claiming that "we are not quite on the same page on the definition of what exactly is RPM").)  At most, the Complaint alleges that certain Teladoc clients were interested in RPM capabilities, while those capabilities either were not available or were being misdescribed by salespeople.  But the Complaint does not allege that this rendered any of the Company's public statements misleading and merely relies on an email from CW 2, which purports to summarize statements Gorevic allegedly made about RPM to a prospective client.  Even taking CW 2's statement as true, Gorevic

---

[7]   Ultimately, CW 11's allegations appear rooted in frustration with alleged "cultural differences" between the companies and a complaint that Teladoc's data engineers were "standoffish"—such interpersonal friction hardly suggests securities fraud.  (¶¶ 128–30.)

merely "discussed the *possibility* of Teladoc 'co-developing a patient focused "subscription" model"—a far cry from "touting," as Plaintiffs describe.  (¶ 139–40 (emphasis added).)  None of these allegations contradict any public statements about the integration, which is fatal.  *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *2 (statement that defendant "successfully converged service offerings and pricing, completing the [] integration" was not false or misleading because Plaintiffs did not allege that convergence "had not in fact occurred").

Moreover, Defendants' statements about the progress of integration must be read in context with Teladoc's warnings about the risks of integration, as well as its statements qualifying its progress.  Before the Livongo merger closed, Teladoc cautioned investors that the successful integration of Livongo was not a foregone conclusion and "could result in the loss of key Teladoc or key Livongo employees, the loss of customers, . . . [and] inconsistencies in standards, controls, procedures and policies."  (Ex. 5 at 55.)  Teladoc warned that "[c]ombining the businesses of Teladoc and Livongo may be more difficult, costly or time-consuming than expected" and "any delays encountered in the integration process[] could have an adverse effect" on the combined company's financial results, and expressly disclaimed any assurances "that [Teladoc's and Livongo's] businesses can be integrated successfully."  (*Id*. at 54–55.)  The Company also listed various "issues" that would need to be "addressed" in order to successfully integrate the two companies, including integrating "the companies' operations and corporate functions," "personnel from the two companies," "the companies' technologies," and "the offerings and services."  (*Id*. at 55; *see also id.* at 49 (disclosing risks regarding employee retention).)

Teladoc continued to warn investors throughout the Putative Class Period that "the overall integration of Livongo post-merger *will continue* to be a time-consuming and expensive process that . . . could significantly disrupt our business."  (Ex. 6 at 48 (emphasis added); Ex. 9 at 51

14

(emphasis added).)   Teladoc warned that "the anticipated synergies and other benefits of the [merger] may not be realized."  (Ex. 6 at 48.)  The Company emphasized that "[t]he ultimate success of our merger with Livongo will depend in large part on the success of . . . integrating the operations, strategies, technologies and personnel of the two companies."  (*Id*.)   Again, the Company highlighted the specific challenges that Plaintiffs' claims were left unsaid regarding employee retention, technology integration, and others.  (*Id*.)  These risk disclosures were repeated in the Company's 2021 Form 10-K.  (Ex. 9 at 51.)  These warnings made clear to any reasonable investor that—as would be self-evident in a merger of this size—the integration process was complex and that different components might progress at different rates.

And beyond these risk disclosures, Teladoc regularly acknowledged certain setbacks that it encountered as they occurred, such as the challenges posed by the inability to convene in person due to the pandemic, and the activation of the broker and international channels for Livongo.  *See supra* at 8–9.  "Plaintiff's suggestion that the Company's Merger-related reporting was all roses is divorced from its own pleadings and Defendants' other public statements."  *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19-cv-6180, 2021 WL 1226627, at *10 (S.D.N.Y. Mar. 30, 2021).  Teladoc was clear that it could not guarantee success, much less a seamless process, and expressly disclosed the very risks that Plaintiffs allege materialized.  Particularly in the context of a complicated corporate merger, courts recognize that even optimistic or "rosy" statements about integration are not misleading when tempered by these sorts of cautionary statements.  *See id.*; *In re Nokia Corp. Sec. Litig.*, No. 19-cv-3982, 2021 WL 1199030, at *16 (S.D.N.Y. Mar. 29, 2021) (statements about progress of company's integration were not misleading where defendant emphasized that "there can be no assurance that the overall integration . . . will be successful").

Plaintiffs also wrongly suggest that Teladoc had an obligation to disclose each time that it encountered an issue during the Livongo integration, even in the first few weeks following the merger's closing on October 30, 2020.  For example, the SAC cites CW allegations that (i) "two to four weeks after the acquisition closed . . . Livongo employees were unsure how to log [into] Teladoc's Salesforce system" (¶¶ 108, 302(a)), (ii) prior to 1Q21, legacy Livongo customers could not add Teladoc benefits "within their existing [Livongo] customer portal" (¶¶ 156, 304(g)); and (iii) "in November or December 2020" legacy Livongo employees had "very basic" questions "about how the two companies would fit together with respect to sales." (¶ 174.)  These are routine challenges faced in every significant merger, and the securities laws do not require disclosure of such details.  *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *10 (rejecting theory that generalized statements about integration were misleading for failure to "disclose the full extent of the [c]ompany's struggles to integrate").

And even assuming that it did possess such a duty, Teladoc *did* disclose the risks associated with the integration both before and throughout the Putative Class Period, including the precise challenges on which Plaintiffs focus.  *Supra* at 14–15.

**Competition.**  Plaintiffs also allege that the Company failed to disclose the effects of growing competition in the virtual healthcare market on Teladoc's business, which Plaintiffs attempt to connect with the Livongo integration.  (*See, e.g.*, ¶ 316.)  These include statements to the effect that "we're probably 10 times larger than the next closest competitor and what we have is a unique set of capabilities that positions us as the only one who can deliver on true whole person care" (¶ 400); "about 2/3 of our bookings [in the 2020 selling season] were multi-product bookings and I think that really speaks to the market demand and consumer demand for unified integrated solutions" (¶ 352); and we have "an unmatched competitive advantage" that is "virtually

impossible for an upstart to cross . . . and sets us up for the future of virtual care." (¶¶ 263, 399.) Like the integration statements, these statements—to the extent they even contain information that is capable of verification—are not alleged to be false.  Plaintiffs do not dispute that Teladoc was indeed ten times larger than its closest competitor, or that two-thirds of Teladoc's 2020 sales were multi-product bookings, or that the breadth of Teladoc products offered a competitive advantage.

Instead, Plaintiffs cite ordinary competitive challenges that all companies face.  For example, CW 2 claims that, shortly after the merger, Livongo's former client CVS terminated a contract with the Company and sought to "flip its clients into using its own diabetes program." (¶¶ 222, 227, 316(a), 354, 377.)  Yet, Defendants never promised that Teladoc would never lose customers, and the Complaint ignores that Teladoc *explicitly disclosed* the CVS contract termination while simultaneously observing that it had "retained the vast majority of [CVS's] book of business."  (Ex. 14 at 4.)  Similarly, CW 3 and CW 10's allegations that unidentified health plans "had begun to build out their own telehealth platforms" that could theoretically replace Teladoc (¶¶ 225–26, 316(c), 354) cannot render Teladoc's statements misleading, as the Company publicly discussed "the potential for managed care organizations to utilize their own provider networks" on its October 27, 2021 earnings call.  (Ex. 19 at 11–12.)[8]

Again, the Company made robust risk disclosures that provided context to Defendants' statements and explicit warnings about competitive risks.  In its 2020 Form 10-K, Teladoc explained that the virtual care market "is competitive and [the Company] expect[s] it to attract

---

[8]   Plaintiffs also attempt to impose liability on Defendants for several statements regarding the Livongo integration that were made by unnamed individuals in press reports, such as Credit Suisse's analyst reports and the *Business Insider* article.  (*See, e.g.*, ¶¶ 363, 381, 387.)  However, reliance on such anonymous sources is improper.  *See In re DraftKings Inc. Sec. Litig.*, No. 21 Civ. 5739, 2023 WL 145591, at *18–20 (S.D.N.Y. Jan. 10, 2023) (dismissing report as "unreliab[le]" and "problematic" because it relied on statements by "unidentified former employees" of defendant).  Even if these statements were attributable to a speaker, they are clearly non-actionable opinions, as explained *infra*.

increased competition, which could make it difficult for [the Company] to succeed." (Ex. 6 at 26.) Teladoc elaborated that it "currently face[s] competition . . . from a range of companies" and warned that its inability to successfully compete could have a material adverse effect on its "business, financial condition and results of operations." (*Id.*) These risk disclosures were also repeated in its Form 10-K for 2021. (Ex. 9 at 21.) Teladoc was clear that the virtual care market was becoming increasingly competitive, and this increased competition could negatively affect its business. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 449 (S.D.N.Y. 2005) (no actionable misstatement where prospectus "informed investors that [defendant] faced stiff competition" and "contained sufficient cautionary language to warn investors of relevant risks").[9]

*Risk Disclosures.* Defendants' prior motion showed that certain risk disclosures in Teladoc's Forms 10-K for 2020 (filed just a few months after the merger closed) and 2021 explicitly warned about the risks posed by the integration and increasing competition. In an effort to neutralize those risk disclosures, the SAC now alleges they were misleading. (¶¶ 322, 410.) Plaintiffs' theory—that these risk disclosures warned of "future potential risks or difficulties" related to the integration and competition that "could" negatively impact its business, but Teladoc "was already experiencing such negative consequences" (¶¶ 407–19)—falls flat.

*First*, Plaintiffs do not allege that the disclosed risks actually came to pass during the Putative Class Period. The disclosures at issue warned that the Company "may not realize all of the anticipated synergies and other benefits of the Livongo merger," a risk that by definition cannot be assessed until completion of the integration. (¶ 407.) As explained *supra*, the Complaint fails to plead that any of the challenges associated with the Livongo integration or increasing

---

[9]   As noted above, Exhibit 1 lists all of the alleged misstatements by category, including identifying which statements constitute puffery, opinions, and/or forward-looking statements.

competition were so significant and widespread as to call the entire success of the merger into question, and the integration was clearly ongoing at the time these disclosures were made.

*Second*, to the extent Plaintiffs argue that the disclosed risks—including the risk that Teladoc's "business, financial condition, and results of operations will be harmed" if it is "not able to compete effectively" (¶ 413)—were somehow increasing in likelihood over time, and therefore the disclosures should not have stated that they "could" occur, this theory also fails. A duty to disclose does not arise in the context of a risk disclosure unless the risk itself has "transpired" or "become a 'near certainty.'" *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (quoting *Rombach* v. *Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). Nor does a duty to disclose arise when a risk has simply increased. *Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020) ("An increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading."). Teladoc had no duty to provide granular interim disclosures concerning routine challenges such as employee attrition after a merger or the loss of clients to new competitors. *See id.* (explaining that "[i]t cannot be that every time a risk increases or decreases, a company must precisely quantify the increase or decrease in its disclosures identifying that risk").

Plaintiffs seek to transform disclosures that certain risks *might* affect a business into a promise that such events will *never* happen. That is not the law. *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (risk disclosures inactionable "to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results"); *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ 9203, 2010 WL 1372709, at *7–8 (S.D.N.Y. Mar. 31, 2010) (similar). No reasonable shareholder would interpret these risk disclosures as representing that the Livongo

integration was proceeding without any difficulty or that Teladoc was unaffected by an increasingly crowded telehealth market, and thus Plaintiffs' claim must fail.  *See Chapman* v. *Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405–06 (S.D.N.Y. 2020) (risk disclosure that "new products *may* have quality or other defects" was not false or misleading because it was evident to any ordinary investor that defendant was not "warranting that every one of its . . . technologies was defect-free").

### B. The Alleged Misstatements Are Non-Actionable Puffery, Opinions, and Forward-Looking Statements

Plaintiffs' challenged statements also fail to support a claim because they constitute non-actionable expressions of corporate optimism, opinions, and/or forward-looking statements.

#### 1. Puffery

*Integration.*   Most of the challenged statements discussing the overall progress of the Livongo integration are classic examples of the exact sort of vague corporate optimism that courts routinely hold to be immaterial as a matter of law.  For example, statements like "there's nothing unifying like winning together" (¶ 329); "[w]e've made considerable progress across our key work streams" (¶ 336); "in terms of data integration . . . we are well on our way to do it" (¶ 338); and the integration is "going really great" (¶ 298) are "so vague, broad, and non-specific that a reasonable investor would not rely on [them]."  *Barilli* v. *Sky Solar Holdings, Ltd*., 389 F. Supp. 3d 232, 250 (S.D.N.Y. 2019).  Indeed, several courts have held that similar statements regarding post-merger integration were non-actionable puffery.  *See In re Razorfish Sec. Litig*., 2001 WL 1111502, at *1–2 (dismissing claims based on statements that "integration efforts" were "complete" and "successful"); *In re Ferrellgas Partners, L.P., Sec. Litig*., No. 16 Civ. 7840, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018) (statement that "integration 'was smooth and seamless'" is "far too vague to be actionable"), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).

*In re Diebold Nixdorf, Inc., Securities Litigation* is instructive.  There, the court rejected the argument that a company's optimistic statements regarding the progress of a post-merger integration—including an executive's statements that the company "continued to make progress" on the integration and "the sales team is fully aligned"—were false and misleading because they "did not disclose the full extent of the Company's struggles."  *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627,  at *2, *10.  The court held that statements about "the progress of the integration" or the "then-present status of the Company's integration efforts" were "precisely the type of puffery that the Second Circuit and other circuits have consistently held to be nonactionable."  *Id.* at *9 (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021)).  Similarly, in *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17, the court held that "statements touting the progress of [its] integration" of another company were "so vague, broad, and non-specific that a reasonable investor would not rely on them."  Just as these courts found that statements regarding the overall progress of a company's integration were so vague as to be inactionable, the same result should follow here.

**Competition.**  Similarly, Teladoc's statements regarding its competitive positioning—including Gorevic's statements that "[w]e're winning because of the full suite of our products and services" (¶ 373) and "[Teladoc's] competitive positioning is as strong as it has ever been" (¶ 363) —are puffery and thus "immaterial as a matter of law."  *See Barilli*, 389 F. Supp. 3d at 250; *see also Oklahoma Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (statement that "I think we win [contracts] because we have great technology" was inactionable puffery), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys.* v. *Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019); *City of Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*, 412 F. Supp. 3d

206, 221 (E.D.N.Y. 2019) (statement that defendant had a "strong leadership position" was "plainly puffery").

###### 2.   Opinions

Under *Omnicare*, statements of opinion are not actionable merely because they allegedly "turned out to be wrong." *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  Rather, a plaintiff must plead facts sufficient to show not only that the statements are objectively false, but also that the speaker (i) did not actually "hold the belief she professed," or (ii) omitted information about the basis for their opinion, rendering it misleading to a reasonable investor.  *Id.* at 182, 185–86, 194.  This is "no small task for an investor."  *Id.* at 194. The opinion statements challenged here fail to satisfy these pleading standards.

***Integration.***   For example, Plaintiffs challenge Gorevic's statements that (i) "[w]e mentioned the rapid progress on the commercial side, and *I think* the team has just done incredible work to bring that together." (¶ 337) (emphasis added); (ii) the assimilation has gone "very well . . . in fact *I would say* [] *as well as I could possibly have hoped for*" (¶ 329); and (iii) "[t]he vision that we laid out . . . *is on track*." (¶¶ 260, 386, 447.)  Statements containing the phrase "I think" or indicating that a particular process is "on track" have consistently been found to constitute non-actionable opinion.  *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *11 ("[P]hrases such as 'I think' or 'from my vantage point' or 'to me,' . . . signal an expression of opinion, not fact.") (emphasis in original); *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069, 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015) (statements indicating that the FDA approval "process was 'on track' and making continued 'progress'" were inactionable puffery); *Elliott Assocs., L.P.* v. *Covance, Inc.*, No. 00 Civ. 4115, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) ("If something is 'on track' it is reasonable to assume that it could go 'off track'.  Thus,

the challenged statements are vague expressions of opinion which are not sufficiently concrete or specific to impose a duty to update.")

As explained *supra*, Plaintiffs do not allege that Defendants' statements were objectively false.  But the SAC also does not plead any facts supporting the inference that the Individual Defendants did not hold the subjective views that they expressed.  None of the CWs nor the *Business Insider* article support the notion that the Individual Defendants did not contemporaneously hold an optimistic view about the progression of the integration.  Nor, even if they were aware of challenges during the Putative Class Period, were they required to disclose every challenge that Teladoc encountered during the integration that might undercut their opinion. *See Tongue* v. *Sanofi*, 816 F.3d 199, 210–14 (2d Cir. 2016) ("[R]easonable investors understand that opinions sometimes rest on a weighing of competing facts."); *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17.  An opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Omnicare*, 575 U.S. at 189.

***Competition.***  Several of Defendants' statements about competitive forces are similarly inactionable, including Gorevic's statements that "I was just talking to a regional Blue plan, who, *I believe*, we will take away from a competitor" (¶¶ 236, 314 (emphasis added)) and "[i]f you look at our 2020 selling season, about 2/3 of our bookings were multi-product bookings and *I think* that really speaks to the market demand and consumer demand for unified integrated solutions." (¶ 352 (emphasis added).)  These statements contain classic aspirational language such as "I believe" and "I think" on which no reasonable investor would rely.  *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021

WL 1226627, at *11.  The SAC does not plead either that these statements are objectively false, or that the Individual Defendants did not honestly hold the expressed opinions.[10]

### 3.   Forward-Looking Statements

Many of the statements Plaintiffs challenge regarding integration and competitive issues are inactionable forward-looking statements.  Under the PSLRA's safe-harbor provision, 15 U.S.C. § 78u-5(c), such statements are inactionable when "identified and accompanied by meaningful cautionary language . . . or . . . the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading.'"  *In re Barrick Gold Corp. Sec. Litig*., 341 F. Supp. 3d 358, 374–75 (S.D.N.Y. 2018) (quotation omitted).  Statements like "we have a very, very clear…R&D road map" (¶ 338), and "we continue to see that market be very, very sort of underpenetrated…[a]nd so we don't see any slowing down of that in sight" (¶ 315), are quintessential forward-looking statements protected by the PSLRA safe harbor.  *See, e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 398 (S.D.N.Y. 2006) (statements that "we expect to see continued momentum in CDMA" and "the product road map is a very exciting one" were forward-looking).  Each of these statements followed an explicit "forward-looking statements" disclosure (Ex. 16 at 2; Ex. 17 at 2) and touched on issues that were specifically addressed by risk disclosures in the Company's registration statement, Forms 10-K, and other SEC filings.  *Supra* at 6–7, 14–15.  Plaintiffs do not adequately allege that these statements were made with actual knowledge of falsity.  *Supra* at 12–18.  As such, the forward-looking statements are not actionable under the safe harbor.

---

[10]   As explained *infra* at 28, CW 2's allegation that Salesforce data reflected losses of clients to competitors is insufficient to plead that any Individual Defendant did not honestly believe their opinions about competition.  Teladoc did not represent that there were no client losses, and there are no allegations that the Salesforce data contradicted any statement or that any Individual Defendant actually saw such data. *Infra* at 28.

## II.      The Complaint Fails to Allege a Strong Inference of Scienter

Plaintiffs fail to allege any plausible theory, much less a logical one, that would explain why Defendants—who are not alleged to have obtained any personal benefit—would lie about the progress of the integration or the market challenges affecting its chronic care business.  Teladoc warned that it "may have difficulty integrating the Livongo business" (Ex. 6 at 48) and that it expected "to be more conservative about growth expectations for stand-alone chronic care."  (Ex. 19 at 4.)  Yet Plaintiffs ask the Court to infer that, while offering these specific risk disclosures, Defendants intentionally misled shareholders by misrepresenting integration and competitive challenges.  The far more plausible inference is that Defendants were transparent with investors about the difficulties posed by a record-breaking merger and the constantly evolving competitive landscape in the virtual care market in the wake of the COVID-19 pandemic.  Plaintiffs cannot plead scienter in the face of such transparency.  *See Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

### A.      Plaintiffs Fail to Allege Motive and Opportunity

In order to allege motive to commit fraud, Plaintiffs must allege that Defendants "benefitted in a concrete and personal way from the purported fraud."  *Novak* v. *Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  Generic motives that are common to most corporate officers, "such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," are insufficient to allege motive as a matter of law.  *ECA,* 553 F.3d at 198.  In this case, the Complaint identifies no motive to defraud.

While Plaintiffs attempt to plead scienter though stock sales, the Individual Defendants' trading actually undercuts scienter.  The three Individual Defendants who Plaintiffs allege traded during the Putative Class Period—Gorevic, Murthy, and Verstraete—all *increased* their overall

holdings of Teladoc common stock by between 7.5% and 200% during the same period.[11]  These

facts undercut any motive to engage in securities fraud.  *See, e.g.*, *Avon Pension Fund* v.

*GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (where three of four defendants

increased net holdings during relevant period and fourth had no trading activity, plaintiffs failed

to plead a "cogent and compelling" inference of fraudulent intent; rather, purchases signaled "only

confidence in the future of their company") (citation omitted); *Glaser* v. *The9, Ltd.*, 772 F. Supp.

2d 573, 593 (S.D.N.Y. 2011) (individual defendant's increase in holdings "raise[d] precisely the

contrary inference from the one suggested by plaintiffs").

The Individual Defendants' increasing exposure to the Company is so fundamentally

inconsistent with an intent to commit a fraud that the analysis should end there.  But even looking

at stock sales alone, as Plaintiffs incorrectly urge the Court to do, ¶¶ 530–36, those sales do not

support an inference of scienter, much less a strong inference.[12]  *In re Lululemon Sec. Litig.*, 14 F.

Supp. 3d 553, 584–85 (S.D.N.Y. 2014); *accord In re Gildan Activewear, Inc. Sec. Litig.*, 636 F.

Supp. 2d 261, 270 (S.D.N.Y. 2009).  To allege scienter, Plaintiffs must establish sales that are

"unusual" or "suspicious," *In re Gildan*, 636 F. Supp. 2d at 270, which requires sales "dramatically

---

[11]  From the start of the Putative Class Period to the end, Murthy increased her shares of Teladoc common stock by 200%, from 9,084 to 27,295 (Exs. 3, 12), Verstraete increased her shares by 140%, from 13,276 to 31,828 (Exs. 4, 13), and Gorevic increased his shares by 7.5%, from 527,188 to 566,464 (including 50,000 shares held indirectly through a trust) (Exs. 2, 11).  Plaintiffs make no allegations about Shah or Napolitano's trading.

[12]  The Complaint also identifies two sales by Livongo founder Glen Tullman after Livongo was acquired and shortly before he departed the Company's Board of Directors in May 2021.  (¶ 538; Ex. 10 at 30.)  Tullman is not alleged to have made any false statements, and he left the company only a few months after the Putative Class Period began and before the majority of the alleged misstatements were made.  This trading is not suspicious in timing or amount, given these circumstances.  *Feasby* v. *Industri-Matematik Int'l Corp.*, No. 99-cv-8761, 2000 WL 977673, at *4 n.5 (S.D.N.Y. 2000) (no inference of scienter when defendant "sold his shares at the time he resigned from [the company], a frequent occurrence when a former executive no longer has a say in the management of the company"); *City of Taylor Gen. Emps. Ret. Sys.* v. *Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (similar).  For these same reasons, former-Teladoc COO David Sides's March and July 2021 sales (¶ 539) do not give rise to an inference of scienter, as he resigned from the Company on September 21, 2021.  (Ex. 7 at 2.)

out of line with prior trading practices and at times calculated to maximize the personal benefit from undisclosed inside information." *Id*. (citing *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96-cv-8252, 1998 WL 915907, at *4 (S.D.N.Y. 1998), *aff'd sub nom.*, *Kwalbrun* v. *Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999)).

Plaintiffs have not shown—and cannot show—that any sales were unusual or suspicious. While Plaintiffs focus on the unsurprising fact that three executives sold millions of dollars in Teladoc stock in aggregate over the course of the 17-month Putative Class Period, they fail to identify *any* specific transactions, much less attempt to allege that any are unusual or suspicious. (¶ 530.) "[P]roceeds alone say nothing about a seller's motive." *Chapman*, 466 F. Supp. 3d at 411 (quoting *Glaser*, 772 F. Supp. 2d at 592). Moreover, the Individual Defendants' sales over the Putative Class Period follow a similar pattern to their sales prior to that period, and indeed the Individual Defendants sold more total shares in the several months prior to the Putative Class Period than during it.[13]  (*See* Exs. 11–13.)

In addition, 22 of Gorevic's 26 total Putative Class Period sales (excluding gifts)—comprising nearly $19 million in proceeds—were made pursuant to a 10b5-1 plan. (Ex. 2.) Two of Verstraete's Putative Class Period sales were as well. (Ex. 4.) Trades made under such a plan do not support an inference of scienter. *See, e.g.*, *Fishbaum* v. *Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. 1999). All remaining sales by Gorevic, Murthy, and Verstraete during the Putative Class Period (to the extent not pursuant to 10b5-1 plans) were to cover tax withholding obligations. (Exs. 2–4.) "[S]ales for tax reasons," such as these, "are not indicative

---

[13]   In the 17-month period preceding the Putative Class Period, Gorevic sold a net total of 126,736 shares, whereas during the 17-month long Putative Class Period, he gained a net total of 39,276 shares.  (Ex. 11.)  In the 17-month period preceding the Putative Class Period, Verstraete gained a net total of 7,924 shares, whereas during the Putative Class Period, she gained a net total of 18,552 shares. (Ex. 13.)  In the four-month period preceding the Putative Class Period, Murthy gained a net total of 9,084 shares, whereas during the Putative Class Period, she gained a net total of 18,211 shares.  (Ex. 12.)

of fraud." *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13-cv-755, 2014 WL 585658, at *13 (S.D.N.Y. 2014).  The SAC acknowledges these points but provides no response.  (¶ 535.)

### B.      Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness

Scienter also may be pleaded under a theory of conscious misbehavior or recklessness, but when there is no motive, the strength of the allegations must be "correspondingly greater."  *ECA*, 553 F.3d at 198–99.  In other words, the "uphill battle to plead a strong inference of scienter becomes that much steeper."  *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*, No. 19-cv-10825, 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021).  Plaintiffs must plead conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *Shemian* v. *Res. In Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014).  The Complaint fails to satisfy this standard.

*Integration.*  With regard to the Livongo integration, Plaintiffs rely on a series of CW allegations that various, often unspecified, combinations of executives attended meetings where various, often unspecified, issues were discussed.  (¶¶ 510–25.)  While Plaintiffs claim that monthly town halls, group department team meetings, and other discussions "broadly" discussed "integration difficulties," "challenges," and "plans" (¶¶ 514–16, 523) such generic allegations are insufficient to establish scienter.  *See, e.g.*, *Plumbers & Pipefitters Loc. Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012) (describing "meetings at which quality issues were discussed" does not establish scienter); *Town of Davie Police Officers Ret. Sys.* v. *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, No. 21-909, 2021 WL 5142702, at *2 (2d Cir. Nov. 5, 2021) (no scienter where confidential witnesses "fail[ed] to specifically identify the reports or statements made in connection with those meetings that contained incriminating information").

Plaintiffs are required to plead scienter as to *each* Individual Defendant separately.  *In re Garrett Motion Sec. Litig.*, No. 20 Civ. 7992, 2022 WL 976269, at *15 n.11 (S.D.N.Y. Mar. 31, 2022) ("[G]uilt by association is impermissible"); *see also Janus Capital Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 141–42 (2011) (Section 10(b) liability is limited to the person with "ultimate authority over its statement," "its content," and "whether and how to communicate it").  The Complaint fails to satisfy this requirement, as Plaintiffs' allegations regarding the Individual Defendants' scienter are remarkably thin, or in Defendant Napolitano's case, nonexistent.[14]

Plaintiffs point to only two alleged direct interactions between a CW and any Individual Defendant.  First, CW 2 alleges that she perceived in some unspecified context that Gorevic "avoided" questions regarding "the integration or other issues."  (¶ 515.)  Such vague allegations do not plead that Gorevic knowingly made misstatements about the integration.  Second, CW 2 alleges that she communicated with Shah and various non-party employees concerning RPM capabilities.  (¶¶ 517–20.)  But those communications, both within a month of the merger closing, concerned client interest in RPM capabilities and how to discuss such capabilities in those early days.  Plaintiffs fail to connect these communications with any misstatement, and certainly they fail to support an inference of scienter, much less render false Shah's optimistic, generalized statement in February 2021 that the integration was "going really great" or any other statements.  (¶¶ 298–99.)[15]

---

[14]   Even if the Court finds that Plaintiffs have adequately pled scienter as to Teladoc and its CEO and CFO (Defendants Gorevic and Murthy, respectively), its allegations as to Defendants Verstraete, Shah, and Napolitano are particularly deficient, and accordingly must fail.  Other than the few statements Plaintiffs purport to attribute to them directly, the SAC pleads no basis to infer that any one of these individuals, as Chief Marketing and Engagement Officer, Chief Medical Officer, and Chief Accounting Officer, respectively, had any authority over the Company's statements at issue.

[15]   Defendant Shah's optimism about the Livongo integration was particularly reasonable in light of the fact that these statements were made only *three months* after the merger closed.  (¶ 298.)

Moreover, the SAC's new allegations regarding CW 2's summary of supposed "concerns" about being moved to Teladoc's HHS division post-merger (¶ 522) fail to establish that any Individual Defendant was aware of any information contradicting the Company's public statements.  CW 2 alleges that the document included "open questions . . . intended for [non-party] . . . Teladoc's President, HHS," but does not actually allege that he, much less any Individual Defendant, ever reviewed it.  (¶ 522.)  CWs who did not have personal contact with Individual Defendants cannot establish that those defendants were privately aware of any fact inconsistent with their public statements.  *See Campo* v. *Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013).  And in any event, two Livongo employees' questions about merging "sales and other operations" mere months after the merger do not contradict Teladoc's public statements about the integration.  (¶ 174.)

***Competition.***  With regard to competition, Plaintiffs rely on a single allegation that the Individual Defendants "had access to and closely monitored sales losses to competition via the Salesforce system."[16]  (¶ 525.)  The mere allegation that the Individual Defendants had *access to* raw data in the Salesforce system, without more, does not rise to the level necessary to establish scienter.  *See Villare* v. *Abiomed, Inc.*, No. 19-cv-7319, 2021 WL 4311749, at \*23 (S.D.N.Y. Sept. 21, 2021); *In re Diebold Nixdorf Inc., Sec. Litig.*, 2021 WL 1226627, at \*13 (no scienter where plaintiffs failed to specify information contained in tool that tracked merger-related synergies contradicting defendant's statements).  Plaintiffs do not even cite facts showing that the Salesforce system contained data during the Putative Class Period that contradicted Defendants' public statements, much less that the Individual Defendants knew that.

---

[16]  In making this argument, Plaintiffs ignore their separate allegation that "Teladoc was not able to integrate the companies' Salesforce.com CRM systems, which provided essential corporate infrastructure for tracking sales and related data."  (¶ 17.)

Plaintiffs also argue that scienter may be inferred by virtue of the Individual Defendants' positions in the Company and involvement in integration efforts.  (¶¶ 510–14.)  But "Plaintiffs must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions."  *In re Diebold Nixdorf*, 2021 WL 1226627, at *13; *City of N. Miami Beach*, 2021 WL 212337, at *10.

### C.  The "Core Operations" Theory Does Not Rescue the Complaint

Plaintiffs fall back on the so-called "core operations" theory, alleging that scienter can be inferred because any problems faced by the Livongo integration were "critical to Teladoc's core operations."  (¶ 501.)  This theory that a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business may no longer be viable following the passage of the PSLRA.  *In re Plug Power, Inc. Sec. Litig.*, No. 21-cv-2004, 2022 WL 4631892, at *18 (S.D.N.Y. Sept. 29, 2022).  As this court noted in *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 304 (S.D.N.Y. 2009) (Cote, J.), the Second Circuit "has not endorsed [the 'core operations'] theory."  And even if viable, it can only provide *additional* support for an inference of scienter, but cannot establish scienter on its own.  *See Frederick* v. *Mechel OAO*, 475 F. App'x 353, 356 n.5 (2d Cir. 2012) (summary order).

Here, Plaintiffs fail to allege that the challenges of the integration were so core to the Company's business that the Individual Defendants would have known about the various issues raised by the CWs and *Business Insider* article.  *See City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020) (rejecting argument that acquisition of another company provided evidence of scienter under core operations theory).  Similarly, regarding competition, the SAC does not plead that the challenges discussed in April 2022 relating to chronic care affected "nearly all of [Teladoc's] business"; to the contrary, they

were faced by one business line comprising 25% of its overall business (Ex. 20 at 37).  *See In re Kandi Techs. Grp., Inc. Sec. Litig.*, No. 17-cv-1944, 2019 WL 4918649, at *7 (S.D.N.Y. 2019).

## III.  The Complaint Fails to Allege Loss Causation

Plaintiffs also fail to allege loss causation as to all of the three purported corrective disclosure dates.  Loss causation can be established by allegations "that the market reacted negatively to a corrective disclosure of the fraud" or "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  *In re Omnicom Grp.*, *Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010) (quoting *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007)).  To be "corrective," a disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint."  *In re Omnicom Grp.*, *Inc. Sec. Litig.*, 597 F.3d at 511 (emphasis added).  Failure to allege loss causation is an independent ground for dismissal.  *See Fila* v. *Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016).

**November 10, 2021 *Business Insider* Article.**  On November 10, 2021, *Business Insider* published an article discussing the progress of the integration, purportedly relying on interviews with anonymous current and former employees of the two companies.  (¶ 437.)  Far from the bombshell exposé that Plaintiffs claim it to be, the article highlights challenges such as the purported "culture clash" due to the companies' "very different backgrounds."  (Ex. 15 at 2, 4.)  The article also discussed post-merger employee attrition and quoted Gorevic acknowledging the turnover, which he suggested resulted from Livongo employees deciding to work for other startups, as he encouraged those who wanted to "pursue something else . . . if that's the path that they want to take."  (*Id.* at 5–6.)  The article quoted an unnamed source as stating that the Livongo integration "was an issue in the first six months but . . . was less of an issue today."  (*Id.* at 4.)  On the day the article was published, Teladoc's stock price fell $6.02 per share, or 4.21%.  (¶ 446.)

Loss causation cannot be pleaded from the materialization of a known and disclosed risk. *Monroe Cnty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014).  Teladoc had previously warned shareholders about the risk that it may "have difficulty integrating the Livongo business," and that these difficulties might include "the integration of . . . products and services," "the integration of corporate cultures," and "the retention of key employees." (Ex. 6 at 48.)  Even the *Business Insider* article acknowledged that such difficulties were to be expected with a merger that would create "the largest virtual-care company," noting that "it's normal for mergers . . . to cause a lot of employee turnover." (Ex. 15 at 2, 5.)  Further, these anecdotal accounts in this article did not reveal anything new about the integration or any information that was inconsistent with Defendants' statements.

**April 27, 2022 Guidance Revision.**  On April 27, 2022, Teladoc revised its FY 2022 revenue and adjusted EBITDA projections "to reflect dynamics" the Company was "currently experiencing in the [D2C] mental health and chronic condition markets."[17]  (¶ 449.) Approximately three quarters of the reduction to projected revenue and two thirds of the reduction in projected adjusted EBITDA was driven by BetterHelp—a business that is not the subject of this lawsuit.  The remainder of the reduction was attributed to the lower chronic care revenue outlook.[18] (Ex. 22 at 5.)  Gorevic explained that, separate from BetterHelp, the chronic care sales pipeline

---

[17]  On April 27 and July 27, 2022, Teladoc announced non-cash goodwill impairments of $6.6 billion and $3 billion, respectively. (¶¶ 420, 478.)  These goodwill impairments were "triggered by the sustained decline in Teladoc Health share price." (Ex. 22 at 7; *see also* Ex. 23 at 7.)  Teladoc warned investors throughout the Putative Class Period that it would likely have to incur these charges. (Ex. 6 at 33; Ex. 9 at 20, 64.)  Plaintiffs fail to plead with particularity how these impairment charges relate to the alleged fraud.  The analyst reports cited in the SAC as "link[ing] the goodwill impairment charge to the struggles in integrating the Livongo Acquisition" (¶ 287) do no such thing—they merely discuss the integration and impairment charges without explaining how they are purportedly connected. (*See, e.g.*, ¶ 276.)

[18]  Teladoc's financial results for the first quarter of 2022, including its quarterly revenue of $565.4 million, all fell within previously issued guidance ranges. (¶ 272; Ex. 8 at 3.)

was developing "more slowly than anticipated," and noted that two of the trends causing this slowdown had been previously discussed during the October 2021 earnings call when the guidance was first issued.   (¶ 271.)   First, benefit managers' focus on COVID-related return-to-work initiatives continued to "contribut[e] to a longer decision-making process."   (*Id*.)   Second, the timing for onboarding large health plan deals was difficult to predict "given the size and complexity of those clients."   (*Id*.)  In addition, Gorevic reported that Teladoc's chronic care clients were increasingly "inundated with a number of smaller point solutions" from competitors, creating "noise" in the market that was affecting "the near-term conversion of pipeline to revenue."   (*Id*.) Gorevic noted that "[a]t the beginning of this year, we were encouraged by very strong fourth quarter bookings and a robust late-stage pipeline.   However, as we progressed through the first part of the year, we're seeing clear signs of the slower bookings pace continuing."   (*Id*.)  Because the Company was "not seeing deals progress at the pace that we expected," it concluded that a revision to FY 2022 revenue and adjusted EBITDA guidance was necessary.   (*Id*.)   Importantly, the Company did not attribute any of the lowered projections to the integration—to the contrary, it identified external market dynamics.  On April 28, 2022, the stock price fell $22.48 per share, or 40.15%.  (¶ 459.)

Plaintiffs do not offer any well-pleaded facts that connect the revision of chronic care guidance to the integration-related statements.  At no point did the Company attribute its revised guidance to the integration.  Moreover, Teladoc attributed its downgrade in guidance to unrelated *external* factors, including the increasingly long sales cycle with benefits managers due to COVID, the size and complexity of large health care clients, and "noise" from new entrants to the market. Moreover, the guidance revision was based on *recent* trends, whereas Plaintiffs allege misstatements concerning integration going back 14 months.  While the Complaint attempts to

34

sidestep the disconnect between the guidance revision and integration issues by citing Gorevic's April 27, 2022 statement that the integration of "Livongo products into our whole-person care experience" was not yet complete (¶ 451), Teladoc never claimed that such integration was complete, so this statement does not contradict any previous one, and thus cannot be corrective. *In re Tellium, Inc. Sec. Litig.*, No. 02-cv-5878, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005).

Nor is the April 27 guidance revision corrective of the statements during the Putative Class Period about competition. Teladoc revised guidance that was issued five months earlier, in October 2021, when it transparently disclosed the competition issues that had led to its "conservative" outlook on chronic care. The lowering of guidance in April 2022 does not—and cannot possibly—"correct" statements from four to 14 months earlier, before the guidance was even issued. (*See* ¶¶ 314–15, 344, 352, 358, 363 (identifying alleged misstatements between February and June 2021 regarding competition).)

**July 2022 Earnings Announcement.** On July 27, 2022, Teladoc reported a second goodwill impairment charge. (¶ 478.) On an earnings call that day, Gorevic explained that the Company "continue[d] to see our pipeline of Chronic Care deals develop[] more slowly than we anticipated at the start of the year, as we discussed in our first quarter call." (Ex. 23 at 5.) Gorevic attributed the slowdown in part "to competitive noise as the market transitions from stand-alone point solutions to integrated whole-person virtual care," as he had previously explained in April. (¶ 482.) On the same call, Murthy repeated that integration, like before, was ongoing as Teladoc and Livongo "continued integration of our data that underpins bringing together all of our suite of products." (¶ 480.) Again, the Company did not attribute its financial performance to the Livongo integration or otherwise reveal any previously undisclosed information. The stock price fell $7.64 per share, or 17.67%, on July 28, 2022. (¶ 486.)

The SAC does not plead any new nonpublic information that was revealed by this alleged corrective disclosure, either about the continuing integration efforts or slowed development of chronic care deals.  This disclosure thus cannot qualify as corrective.  *In re Chi Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-01580, 2019 WL 5287980, at *39 (S.D.N.Y. Oct. 16, 2019) (holding that "news that has already been publicly disclosed . . . cannot serve as a corrective disclosure").

## IV.   The Complaint Fails to Allege a Control Person Claim against the Individual Defendants

Plaintiffs fail to state a section 20(a) claim.  *First*, the Complaint fails to allege a primary violation for the reasons herein, which alone is sufficient.  *In re Austl. and N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278, 2009 WL 4823923, at *15 (S.D.N.Y. Dec. 14, 2009) (Cote, J.).  *Second*, no facts support an "individualized determination" that the Individual Defendants were "culpable participant[s]" in any alleged fraud.[19]  *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).  *Third*, Plaintiffs have not pled the required state of mind for any Defendant, thus fails to allege any control person's knowledge.  *In re Veon Ltd. Sec. Litig.*, No. 15-cv-08672, 2018 WL 4168958, at *21 (S.D.N.Y. Aug. 30, 2018) (citation omitted).

## CONCLUSION

For these reasons, Defendants respectfully submit that the Complaint should be dismissed with prejudice in its entirety.

---

[19]  Plaintiffs particularly miss the mark with Defendants Shah, Napolitano, and Verstraete, as the Complaint makes no allegation that "support[s] a logical inference that those [D]efendants were responsible for drafting, production, reviewing or dissemination of the information communicated by [the Company]."  *In re Alstom SA*, 406 F. Supp. 2d 433, 467 & n.31 (S.D.N.Y. 2005) (holding positions such as "Senior Vice President and Vice President of Finance . . . do not, without additional facts, support a logical inference that those defendants were responsible" for making alleged misstatement); *see also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 267 (S.D.N.Y. 2008) (defendant's position as Vice President of Publishing was insufficient evidence that he had "actual authority to influence the Company's public disclosures").

Dated: January 20, 2023
New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: /s/ Audra J. Soloway
Daniel J. Kramer
Audra J. Soloway
Caitlin E. Grusauskas
Marisa A. Papenfuss
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
dkramer@paulweiss.com
asoloway@paulweiss.com
cgrusauskas@paulweiss.com
mpapenfuss@paulweiss.com

*Attorneys for Teladoc Health, Inc., Jason
Gorevic, Mala Murthy, Stephany Verstraete,
Bimal Shah, and Richard Napolitano*