# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

IN RE TELADOC HEALTH, INC.
SECURITIES LITIGATION

Civil Action No. 1:22-cv-4687 (DLC)

CLASS ACTION

ORAL ARGUMENT REQUESTED

### PLAINTIFFS' MEMORANDUM OF LAW IN
### OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
### THE SECOND AMENDED CLASS ACTION COMPLAINT

**LABATON SUCHAROW LLP**
Carol C. Villegas
Irina Vasilchenko
David J. Schwartz
Philip J. Leggio
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
Email: cvillegas@labaton.com
        ivasilchenko@labaton.com
        dschwartz@labaton.com
        pleggio@labaton.com

*Counsel for Lead Plaintiff*
*Leadersel Innotech ESG and*
*Lead Counsel for the Proposed Class*
[*additional counsel on signature page*]

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

I.    INTRODUCTION .......................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................. 3

    A.    Teladoc Acquired Livongo to Protect Its Competitive Position ............................ 3

    B.    Teladoc Failed to Fully Integrate Livongo in Multiple Key Areas ....................... 4

        1.    Technology Integration Failures ................................................... 4

        2.    Business Process and Personnel Integration Failures ................................. 5

    C.    Growing Competition Adversely Impacted Teladoc's Business .......................... 6

    D.    Defendants Misled Investors About the Integration and Competition Issues ......... 7

    E.    The Truth Gradually Emerged, Causing Billions in Shareholder Losses .............. 8

III.  ARGUMENT .................................................................................................. 9

    A.    The SAC Adequately Alleges Actionable Misrepresentations ............................ 9

        1.    The SAC Adequately Alleges Falsity of Integration Statements ............... 10

        2.    The SAC Adequately Alleges Falsity of Competition Statements ........... 19

        3.    Defendants' Other Actionability Arguments Fail .................................... 21

            a.    The Misstatements Are Not Puffery ............................................. 21

            b.    The Misstatements Are Not Inactionable Opinions ..................... 23

            c.    The Misstatements Are Not Protected by the Safe Harbor ........... 24

    B.    The SAC Adequately Alleges a Strong Inference of Scienter ............................ 25

        1.    The SAC's CW Allegations Plead a Strong Inference of Scienter .......... 25

        2.    Core Operations Allegations Further Support Scienter .......................... 27

        3.    Defendants' Insider Sales Further Bolster Scienter ................................. 30

        4.    The SAC Adequately Alleges Corporate Scienter .................................. 31

C.      The SAC Adequately Alleges Loss Causation ...................................................... 33

D.      The SAC Adequately Alleges Section 20(a) Claims ............................................ 36

IV.     CONCLUSION ................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................24

*In re Acadia Pharms. Inc. Sec. Litig.*,
2020 WL 2838686 (S.D. Cal. June 1, 2020)............................................................21

*In re Acuity Brands, Inc. Sec. Litig.*,
2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ......................................................20

*In re AnnTaylor Stores Sec. Litig.*,
807 F. Supp. 990 (S.D.N.Y. 1992) .........................................................................25

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ........................................................24

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017).....................................................................25

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).................................................................. 22-23

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012).....................................................................14

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008).......................................................... 18-19, 33

*Buxbaum v. Deutsche Bank A.G.*,
2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000) ........................................................29

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002).................................................................................14

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009).....................................................................27

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)..................................................................................33

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...................................................22, 24

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
   552 F. Supp. 3d 406 (E.D.N.Y. 2021) ........................................................... *passim*

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ........................................................... *passim*

*City of Taylor Gen. Emps. Ret. Sys.* v. *Magna Int'l Inc.*,
   967 F. Supp. 2d 771 (S.D.N.Y. 2013) ...................................................................31

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020) ..................................................................18

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
   2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ......................................17, 19, 23

*Dolgow v. Anderson*,
   438 F.2d 825 (2d Cir. 1970) .................................................................................30

*In re Emex Corp. Sec. Litig.*,
   2002 WL 31093612 (S.D.N.Y. Sept. 18, 2002) .................................................23

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) .............................................................................9, 31

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ....................................15, 17, 22

*In re EZCorp, Inc. Sec. Litig.*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016) ..................................................................36

*In re Facebook, Inc.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013) ..................................................................18

*Feasby* v. *Industri-Matematik Int'l Corp.*,
   2000 WL 977673 (S.D.N.Y. July 17, 2000) ........................................................31

*In re Ferrellgas Partners, L.P. Sec. Litig.*,
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ....................................................23

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................................29

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................... *passim*

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018) ........................................................... *passim*

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)...................................................................18, 20, 34

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................27

*Hall v. The Child.'s Place Retail Stores, Inc.*,
580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008)...........................................................18

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019)...............................................22, 27, 28, 29

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..................................................27, 29

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003).................................................................30

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017).............................................................. 9-10

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
564 U.S. 135 (2011).........................................................................................32

*In re JPMorgan Chase & Co. Sec. Litig.*,
2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) .......................................................12

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019) .........................................................29

*Kovtun v. VIVUS, Inc.*,
2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ....................................................28

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006)..................................................................18

*Levy v. Gutierrez*,
2017 WL 2191592 (D.N.H. May 4, 2017)............................................................30

*In re Lihua Int'l, Inc. Sec. Litig.*,
2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) ......................................................12

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)...............................................................32, 33, 36

*In re MBIA, Inc. Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010)............................................................19, 35

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..................................................................9

*Monroe Cnty. Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)..................................................34

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009)................................................32

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ............................................24, 28, 29

*In re Nokia Corp. Sec. Litig.*,
  2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ............................19, 23

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)................................................24

*In re NovaGold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) (Cote, J.) ........................31, 32

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................ *passim*

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
  563 F. Supp. 3d 259 (S.D.N.Y. 2021)....................................33, 34, 36

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................24

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)...............................................................34

*In re OmniVision Techs., Inc. Sec. Litig.*,
  937 F. Supp. 2d 1090 (N.D. Cal. 2013) .............................................25

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................30

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)................................................32

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)..........................................21, 22

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
  679 F.3d 952 (7th Cir. 2012) .............................................................29

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................27

*In re Razorfish, Inc. Sec. Litig.*,
  2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001)................................17, 23

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ..........................................27

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)..............................................................25, 30

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) .....................................................................17

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019)....................................................36

*In re SLM Corp., Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010)....................................................31

*Solomon v. Sprint Corp.*,
  2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) .........................................34

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021)...................................................................23

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008)...................................................................31

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).........................................................9, 25, 30, 32

*Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police
  Officers' & Firefighters' Ret. Plan*,
  2021 WL 5142702 (2d Cir. Nov. 5, 2021) ............................................29

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022)....................................21, 23

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)....................................................31

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)......................................................... *passim*

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
  461 F. Supp. 3d 46 (S.D.N.Y. 2020)......................................................23

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) (Cote, J.) .......................................................36

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437 (S.D.N.Y. June 21, 2021) ........................................................25

**Statutes & Rules**

PSLRA ........................................................................................................... *passim*

Fed. R. Civ. P. 8 ...................................................................................................33

Fed. R. Civ. P. 9(b) ...........................................................................................9, 25

Court-appointed Lead Plaintiff Leadersel Innotech ESG and additional Plaintiff Hui Ma (together, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss ("Motion") the Second Amended Complaint (ECF No. 63, "SAC") filed by Defendants Teladoc Health, Inc. ("Teladoc," or the "Company"), Jason Gorevic, Mala Murthy, Stephany Verstraete, Bimal Shah, and Richard Napolitano (together, "Defendants").[1]

## I.    INTRODUCTION

This securities fraud action arises out of a failure by Teladoc, a telehealth company, to fully integrate one of its key competitors, Livongo, which it acquired in October 2020 for *$18.5 billion*. Defendants falsely assured investors throughout the Class Period (February 11, 2021–July 27, 2022, inclusive) that the integration was either progressing smoothly or fully complete in key respects, including specifically the companies' technology (such as product and data platforms), and Sales teams. Defendants also falsely assuaged investor concerns about growing competition, repeatedly denying that it was a credible threat. In reality, however, according to numerous, corroboratory sources—eleven confidential witnesses ("CWs"); many internal Teladoc documents provided by a CW; a November 10, 2021 *Business Insider* Article that constituted the first partial corrective disclosure; and Defendants' own admissions at the end of the Class Period—the integration was ***not complete or on track*** in any of these aspects. Further, these material integration struggles compounded Teladoc's competition problem, as new competitors exploited the integration issues to steal key business from the Company.

These sources confirm, *inter alia*, that Teladoc was unable to integrate critical technological systems—notably, the companies' product platforms, which were essential for

---

[1] Capitalized terms herein have the same meaning as set forth in the SAC. Citations to "¶__" refer to paragraphs of the SAC. References to "MTD at __" are to the memorandum in support of the Motion (ECF No. 75). Unless otherwise noted, all emphasis is added, and all citations and internal quotation marks are omitted.

Teladoc to provide the comprehensive, "whole-person" telecare that it touted as its key competitive advantage. Indeed, on the corrective disclosure dates, Defendants admitted that they still had "***not finished*" "*integrating the Livongo products into our whole-person care experience*" and that this had adversely impacted sales, as it was a "challenge [] getting into a client and saying we'll be a ***one stop shop when we can't show that yet.***" Notably, CWs and internal documents show that Defendants had contemporaneous knowledge of these and other integration failures—like an inability to integrate the companies' Sales teams, contrary to Defendants' representations that they had been "***fully integrated***." For example, Defendant Shah, the former CMO, received multiple emails from a CW informing him of such integration challenges before his misstatements touting the integration progress. And Defendant Gorevic, the CEO, acknowledged to CW 4 in September 2021 that Teladoc still lacked an effective integration plan—almost ***a year*** after the acquisition.

Unable to dispute these detailed factual allegations on their face, Defendants simply ignore them, while labeling the SAC's allegations as conclusory. Defendants' other falsity challenges fare no better. For example, they repeatedly assert that the statements were not literally false, even though it is black letter law that misleading half-truths that omit material facts, as here, are actionable. Defendants' other recurrent argument—that they disclosed integration and competition risks—also fails because the ***hypothetical*** risks warned of had ***already*** occurred, rendering Defendants' disclosures misleading and inadequate. Nor did Defendants sufficiently disclose the specific, material problems related by the CWs, especially given Defendants' specific denials, *e.g.*, that the integration was "behind" schedule. Defendants' puffery argument likewise is unavailing. Courts have repeatedly upheld such progress statements as misrepresentations of existing facts, rather than simply rosy optimism, under similar circumstances. Further, the PSLRA safe harbor offers no protection here because (1) the statements were not forward-looking as they related to

past or present facts about integration status, and (2) any cautionary language was not meaningful.

Defendants' scienter arguments are also meritless. The SAC is replete with specific factual allegations, including direct links to the Individual Defendants and other senior executives, showing that Defendants knew of, or had access to, information contrary to their public statements—classic evidence of recklessness, at the very least. Scienter is further supported by the core operations doctrine—the successful integration of this $18.5 billion, strategically important acquisition was critical to Teladoc's success—and allegations of suspicious insider trading.

Finally, Defendants' loss causation challenge ignores that mirror-image disclosures are not required and raises fact-intensive disaggregation and truth-on-the-market arguments inappropriate at this stage. The SAC amply pleads a causal link between the misstatements and corrective disclosures, which included Defendants' admissions of a failure to integrate Livongo products and a sales slowdown due to increased "competitive noise." Thus, the Motion should be denied.

## II. STATEMENT OF FACTS

### A. Teladoc Acquired Livongo to Protect Its Competitive Position

After the Covid-19 pandemic began in March 2020, demand for telehealth services, by Teladoc and its competitors, skyrocketed. ¶¶74-77. Teladoc sought to protect its leading market position through strategic acquisitions. ¶¶78-81. In particular, on August 5, 2020, Defendants announced a "transformative" acquisition of a key competitor, Livongo, a leading provider of virtual chronic disease management. ¶¶82, 89. Defendants rushed the acquisition process, with the deal closing on October 30, 2020 for approximately *$18.5 billion*—a record in the telehealth industry. ¶103. Because Teladoc had only a small chronic care business, the acquisition was also crucial to solidifying the Company's position as the only provider of "whole person" virtual care, which Defendants repeatedly touted as a key competitive advantage. ¶¶68, 83, 88-102.

### B.    Teladoc Failed to Fully Integrate Livongo in Multiple Key Areas

Teladoc's $18.5 billion bet on Livongo, however, did not pay off. During the Class Period, Teladoc experienced major problems integrating Livongo with respect to its technology, processes, and personnel, including: (a) an inability to integrate critical technological systems, *e.g.*, the companies' product, data, and customer relationship management ("CRM") platforms; (b) a lack of an integration plan to reconcile the companies' different business models, processes, and organizational structure; and (c) personnel challenges, such as a loss of crucial Livongo talent and organizational dysfunction that resulted in a failure to fully integrate the Sales teams. ¶105.

### 1.    Technology Integration Failures

**Product Platforms:** Per many CWs, during the Class Period, Teladoc was unable to fully integrate Livongo's technology—including, critically, its product platforms—which adversely impacted daily operations and sales as Teladoc could not provide the seamless "whole person" virtual care that Defendants repeatedly touted as its key competitive differentiator. ¶106. In particular, CW 2, a Sales Vice President, said that newly hired Teladoc executives, who replaced the departed Livongo personnel after the acquisition and did not know anything about Livongo products, made things up in client meetings, pitching them on a "whole person platform," while Livongo only had standalone products for diabetes and other diseases, but had not yet integrated them. ¶¶57, 132. Notably, such new personnel told clients that Livongo had remote patient monitoring ("RPM") capabilities, which were non-existent during the Class Period. ¶¶133-34.

As confirmed by internal Teladoc documents, in October-December 2020, CW 2 repeatedly emailed senior executives, ***including Defendant Shah***, warning them that many Teladoc employees—including ***Defendant Gorevic personally***—were touting to clients these Livongo RPM capabilities that were ***not "anchor[ed] [] in reality***." ¶¶134-50. Importantly, Shah directly admitted in an October 30, 2020 response to CW 2 that "[w]e know that there is an

imperative to have this together **by H1 [first half] 2021, but don't have details yet nor are ready for a client.**" ¶140. In fact, Defendants still did not have even a plan to integrate Livongo and such RPM capabilities by June 2021, as COO Sides acknowledged internally in response to a question by CW 2 at a June 17-18, 2021 meeting in Nashville. ¶144. Ultimately, Teladoc still did not have such RPM capabilities in Fall 2021 (¶134), as corroborated by internal documents. ¶¶145-50.

Further, other CWs corroborated CW 2's account, and detailed other Livongo product integration failures. *E.g.*, ¶151 (CW 6); ¶152 (CW 1). The *Business Insider* Article similarly revealed that the companies' "rushed union . . . made it difficult for Teladoc . . . to iron out its plan for new products," and that, as of November 2021, the companies' patient portals were "still separate apps." ¶¶161-62. These sources are further corroborated by Defendants' own admissions at the end of the Class Period that they still had "**not finished**" "**integrating the Livongo products into our whole-person care experience**," and that this had hurt sales. ¶267; *see also* ¶¶282, 294.

**Salesforce and Tableau Systems:** Similarly, multiple CWs stated that Teladoc was unable to integrate the companies' Salesforce CRM systems. ¶¶107-16. For example, CW 3 said that Teladoc hired PricewaterhouseCoopers ("PwC") to integrate the Salesforce systems, but that in Spring 2022, Teladoc was still only five months—or less than a **third** of the way—into PwC's 18-month timeline for the project. ¶¶113-14. CW 2 and CW 6 corroborated these unresolved problems, and their adverse impact on sales. ¶¶115-16. Likewise, CW 11, a Senior Director of Analytics, said that the integration of the companies' data analytics platforms, Tableau, which stored and was used to analyze client, patient, and other data for marketing, sales, and other purposes, had not **started** by June 2021, or even by the end of the Class Period. ¶¶117-31.

### 2. Business Process and Personnel Integration Failures

CWs also discussed significant integration challenges with respect to the companies' business models and processes, such as how to market the combined companies' products, and an

inability to fully integrate Livongo's teams into Teladoc's structure. For example, according to multiple CWs, *e.g.*, CW 4, Teladoc had ***no integration plan*** at least through September 2021. ¶¶165-70; *see also* ¶¶190-93 (CW 11: Teladoc had "no clear integration plan" for integrating the companies' patient and client data in Tableau); ¶194 (CW 8: no marketing strategy, *e.g.*, whether to keep "Livongo" brand name, through December 2021); ¶¶171, 177 (CW 2: Teladoc "had no idea" where to put Livongo personnel and still had no integration plan by June 2021).

Numerous CWs and the *Business Insider* Article also described the resulting internal confusion, "misalignment," and division between the two companies' personnel—including a "hemorrhaging" of key Livongo employees and an inability to fit Livongo teams into Teladoc's structure—which persisted throughout the Class Period. ¶¶171–219. For example, per multiple CWs in Sales roles, the two businesses were still ***running separately*** throughout 2021, with the Livongo teams "***siloed***" or ***carved out*** from their Teladoc counterparts. ¶¶145, 148-49, 179, 182-88. Internal documents corroborated these issues. ¶¶173-75,181-82, 206. Crucially, CW 5, who was part of a group responsible for integrating the two companies' sales forces, confirmed that the ***sales force integration was not complete*** by the time she left in June 2021. ¶212.

Defendants knew about these integration problems. For example, CW 4 had a personal conversation with Defendant Gorevic at a Company leadership meeting in September 2021 wherein Gorevic acknowledged the lack of an integration plan and other integration difficulties. ¶¶169-70; *see also* ¶¶144, 177 (CW 2: COO Sides internally admitted the continued lack of an integration plan at June 17-18, 2021 Nashville meeting). Further, per CW 2, Gorevic personally fielded questions about integration difficulties at monthly townhall meetings, either avoiding answering them entirely or providing evasive answers. ¶¶101-02; *see also* ¶168 (CW 1: similar).

### C.    Growing Competition Adversely Impacted Teladoc's Business

Growing competition also negatively affected Teladoc's business, including as competitors

exploited Livongo's integration struggles to their advantage. For example, several CWs said that CVS (which had a partnership deal with Livongo to sell its diabetes programs), terminated their contract in late 2020, became a competitor, and stole Teladoc's clients—leveraging the Livongo integration issues—which caused "tremendous" annual recurring revenue loss. ¶¶220-31; *see* ¶223 (CW 2 detailing other examples of client losses). CW 3, CW 10, and the *Business Insider Article* also stated that health plan clients, like Aetna, had developed their own telehealth solutions to compete with Teladoc during the Class Period. ¶¶225-26, 229. Client losses to competitors were logged into Salesforce and reviewed by management, and Defendants Murthy (the CFO) and Verstraete (the CMEO) discussed increased competition at all-hands meetings. ¶¶226-28.

**D.    Defendants Misled Investors About the Integration and Competition Issues**

**Integration**: During the Class Period, Defendants repeatedly, falsely reassured investors that the Livongo integration was either fully complete or "on track" toward successful completion. ¶¶105, 213. For example, on February 11, 2021, the first day of the Class Period, when directly asked by a reporter for an update on the Livongo integration, Shah assured that the integration was "going really great," including because the two companies "***really do fit together" "from a technology perspective" "to provide . . . a continuum of care, a whole person experience***" and that "***we're already well on our way of building*** . . . that highway to quickly deliver that to . . . our clients." ¶298. Similarly, Gorevic told investors on February 24, 2021 that Teladoc had completed the integration of the Sales teams, asserting that "***[o]ur commercial organization is now fully integrated***," and further represented that the "***[t]he integration of our data platform and assets [i.e. products] also continues to progress***." ¶¶308-09; *see also* ¶¶178-79.

Defendants repeated similar misrepresentations throughout the Class Period. For example, on April 28, 2021, Murthy touted, in response to an analyst question about an "update on the platform integration side[,]" the Company's "***very, very clear road map***" to integrating the

products, and that they were "***well on our way to*" a "*deep integration" of the companies "data.*" ¶¶240, 338. Gorevic also reaffirmed that "***our commercial organization has been fully integrated***" that same day, (¶336), and again on October 27, 2021, stating that the "teams" were "***fully integrat[ed]***" (¶367). On that day, Defendants also denied delays when confronted by analysts, "***push[ing] back on the claim that TDOC is behind when it comes to the actual integration of Livongo.***" ¶381. The market was comforted by such reassurances. *E.g.*, ¶¶313, 343.

**Competition:** Defendants also repeatedly, falsely assuaged investors' concerns about growing competition. For example, in response to an analyst's question on April 28, 2021 about new competitors, Gorevic reassured that "for the most part, ***many of them we almost never bump into, and some of the new entrants we're just not seeing gain traction***." ¶344. The market was also materially misled by such statements, as evidenced by analyst and press reactions. ¶¶347-50.

### E.    The Truth Gradually Emerged, Causing Billions in Shareholder Losses

On November 10, 2021, the *Business Insider* Article partially revealed, for the first time, that Teladoc was struggling to integrate Livongo, causing Teladoc's stock price to fall over 4%. ¶¶437-46. But Defendants falsely minimized the integration problems in the same article, with a Company spokesperson reassuring that they were "***less of an issue today***[,]" and Gorevic insisting that the integration was still "***on track.***" ¶447. In an April 27, 2022 earnings announcement, Defendants further partially disclosed that the Livongo integration issues and increased competition were adversely affecting the Company's financial results. ¶¶448-77. For example, Defendants reported reduced financial guidance and a goodwill impairment charge of ***$6.6 billion***, which the market linked to Teladoc's poor integration of Livongo. *Id.* Defendants also admitted that Teladoc still had "***not finished***" integrating Livongo's products, and that increased competitive "noise in the marketplace" had affected sales, including in Teladoc's chronic care (i.e., Livongo) business. ¶¶451-54. Teladoc's stock price collapsed ***over 40%*** on this news. ¶459.

Finally, on July 27, 2022, Defendants revealed the true extent of the Company's integration and competition problems. Teladoc disclosed another quarter of disappointing financial performance, which Defendants again attributed to the impact of continuing Livongo integration issues and "competitive noise," as well as another goodwill impairment charge of $3 billion, which the market again connected to the Livongo issues. ¶¶478-99. Teladoc's stock price tumbled over *17%*. ¶486.

## III.    ARGUMENT

On a "motion to dismiss a § 10(b) action, courts must . . . consider the complaint in its entirety," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007), and "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor," *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). "At this early stage of litigation, and even with the heightened pleading standards of Rule 9(b) and the PSLRA, the Court [does] not require the pleading of detailed evidentiary matter[s] in securities litigation." *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 302 (S.D.N.Y. 2018).

### A.    The SAC Adequately Alleges Actionable Misrepresentations

A statement is false if it is "untrue outright." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). A statement can also be "misleading by virtue of what it omits to state." *Id.*; *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) ("A statement is misleading if a reasonable investor would have received a false impression from the statement."). Thus, "[t]he law is well settled . . . that so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Vivendi*, 838 F.3d at 240. In assessing falsity, courts must review the statements "taken together and in context." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty ***to tell the whole truth***." *Id.* Falsity "is generally a question reserved for the

trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).

### 1.    The SAC Adequately Alleges Falsity of Integration Statements

During the Class Period, Defendants repeatedly misrepresented the progress of the Livongo integration. Defendants argue that these statements—providing only some cherry-picked, selectively quoted examples—are too "generalized" and were not "actually false." MTD at 11-12. They are wrong. First, as shown below, Defendants ignore that many of the misstatements, when viewed in their full context, touted specific aspects of the integration and were false because they were directly contradicted by internal facts about the poor progress of those integration efforts, as related by numerous CWs and corroborated by multiple sources—namely, ***internal documents***, the *Business Insider* Article, and Defendants' own later admissions. Second, statements need not be actually false because even "literally true" statements are actionable if they omit facts and create a "materially misleading impression," as here. *Vivendi*, 838 F.3d at 240.

**Technology Integration Statements:** Contrary to Defendants' assertion, they made multiple statements regarding the integration of the companies' "technological systems" and "availability" of whole-person product capabilities (MTD at 12), of which RPM was an example. ¶¶147, 203. For example, on February 11, 2021, when asked by a reporter for an update on the Livongo integration, Shah represented that it was "going really great," including specifically that the two companies "***really do fit together***" "from a ***technology perspective***" "***to provide . . . a continuum of care, a whole person experience***" and that Teladoc was "***well on [its] way of building*** . . . that highway to quickly deliver" those integrated products. ¶298. These statements, and similar later ones, were false and misleading because, per many CWs and other sources, Teladoc experienced severe problems in integrating the companies' technological systems, including product platforms, throughout the Class Period. ¶¶106-64. Such problems show that the companies did not actually "fit together" from a "technology perspective" and Teladoc was not

"well on [its] way" to integrating these platforms to "quickly deliver" such "whole person" products. *See Galestan*, 348 F. Supp. 3d at 299 (statements about integration progress actionable based on CW accounts of problems in integrating companies' systems); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 410-12 (S.D.N.Y. 2020) (that company "faced serious problems with integrations" pled falsity of integration statements).

In particular, Shah knew by the time of his misstatements that Teladoc was struggling to integrate Livongo's product technology and thus provide whole-person products, like RPM, to customers because CW 2 repeatedly informed him of the lack of such integrated product capabilities—contrary to what Teladoc salespeople, and **Gorevic** personally, were telling customers.[2] ¶¶132-43. For instance, on November 30, 2020, CW 2 emailed Shah and other senior executives that she was "***starting to feel uncomfortable on making up 'futures***[,]'" i.e., the capabilities of these future Livongo-Teladoc products, because "Teladoc colleagues [who were] . . . pushing the RPM messaging," to numerous customers were pitching RPM capabilities that were not "anchor[ed] . . . in reality." ¶¶135-38. Indeed, in response to a prior email from CW 2 raising these same concerns, Shah acknowledged that "[w]e know that there is an ***imperative*** to have this together by H1 [first half] 2021, but don't have details yet ***nor are ready for a client***." ¶¶139-40. Thus, Shah knew that Teladoc was nowhere near ready to provide such integrated products to customers when the Class Period began soon thereafter, and would not be for a while. Though CW 2 repeatedly followed up with Shah for guidance, as "R[P]M keeps coming up as a main talking point" in client meetings, they just "kick[ed] the can down the road." ¶¶142-43.

In fact, CW 2 and internal documents confirm that, during the Class Period, Teladoc had not integrated Livongo's product technology to achieve the "whole person platform," including

---

[2] Defendants' critique that the SAC does not provide a definition of RPM (MTD at 13) ignores that the SAC in fact does so. ¶¶133-34; 147. And Plaintiffs need not plead "detailed evidentiary matter." *Galestan*, 348 F. Supp. 3d at 302.

these RPM capabilities, through at least Fall 2021. ¶¶132-34; ¶¶145-50 (internal presentation that CW 2 created in early 2021 and updated through late July 2021, confirming continued lack of RPM). Other CWs and the *Business Insider* Article corroborated this failure during the Class Period. ¶151 (CW 6); ¶152 (CW 1: Teladoc ***began*** to sell a ***beta*** version of a "whole person solution" based on Livongo products to a few clients only in January 2022); ¶¶161-62 (*Business Insider* Article: "The rushed union led to confusion and made it difficult for Teladoc to work with customers and ***iron out its plan for new products***, four people said[;]" the companies' patient portals ***were "still separate apps"*** as of November 2021).[3]

Importantly, Defendants' own later admissions of this failure to integrate Livongo's product platforms during the Class Period further establish falsity. *Freudenberg*, 712 F. Supp. 2d at 192 (defendants' "subsequent admissions . . . established the falsity of representation"). For example, Gorevic acknowledged in the April 2022 corrective disclosure that "***admittedly, we're not with that yet***"—referring to "integrating the Livongo products into our whole-person care experience." ¶267; *see also* ¶282. In the July 2022 disclosure, Defendants further admitted that these failures had adversely impacted sales: "The company's products ***are not [] fully integrated yet***. For example, TDOC has three separate apps. So there is a bit of a challenge of getting into a client and saying we'll be a one stop shop when we can't show that yet." ¶294; *see also* ¶¶281-84.

These allegations of product integration problems also render false and misleading Gorevic's February 24, 2021 statements touting that "***[t]he integration of our data platform and assets [i.e. products] also continues to progress*** as we work to unlock the power of our combined

---

[3] *See In re Lihua Int'l, Inc. Sec. Litig.*, 2016 WL 1312104, at *12 n.8 (S.D.N.Y. Mar. 31, 2016) (news article was "sufficiently specific to support [p]laintiffs' claim"). Indeed, an investigative account by an "independent ... reputable newspaper ... provides an ***additional*** layer of reliability" "where an independent investigation [by plaintiff's counsel] was conducted," as here. *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007).

data sets." ¶308.[4] *See Galestan*, 348 F. Supp. 3d at 292, 300 ("***we have made meaningful progress*** on implementing the technology integration required of the two networks" actionable). The surrounding context further illustrates the falsity of this statement—Gorevic immediately mentioned the companies' combined "blood glucose data points" as an example of Teladoc's purported good progress in integrating the companies' "data platform and assets." ¶308. But this statement is directly contradicted by CW 6's description of Teladoc's failure to integrate Livongo's diabetes glucometer app with Teladoc's services to enable doctors to access such data during virtual sessions, as it had planned but still could not do by Fall 2021. ¶151.[5]

Such statements touting the successful integration progress of the "***data*** platform[s]" were also false and misleading because the integration of other critical data platforms was similarly behind schedule and nowhere near completed during the Class Period. First, multiple CWs described extensive problems integrating the companies' (and InTouch's) Salesforce systems, which is a CRM database that stores and tracks sales, customer, and product data (¶107, n.17); CWs confirmed that the systems operated as separate platforms throughout the Class Period, which adversely impacted sales through delays and inefficiencies that led to customer losses. ¶¶107–14 (CW 3); ¶115 (CW 6); ¶116 (CW 2); ¶¶121-22 (CW 11); *see also* ¶161 (*Business Insider* Article corroborating that sales personnel "had a hard time navigating two separate internal systems" and had to pitch "customers without each other's full product details"). In particular, per CW 3, although Teladoc hired PwC to help integrate the Salesforce systems, in Spring 2022 (near end of Class Period), Teladoc was still only five months—or less than a ***third*** of the way—in PwC's 18-month timeline for the project. ¶¶113-14. Second, per CW 11, during the Class Period, Teladoc

---

[4] Defendants' argument that the statement "[w]e are also making significant investments to integrate our products and services" is too general (MTD at 11) ignores that the SAC did not allege it as false or misleading. ¶308; *see* ¶295.

[5] In discussing the benefits of "[t]he combination with Livongo," Gorevic also falsely claimed on this call that "***[w]e have the capabilities*** to deliver" whole-person integrated products. ¶309.

similarly failed to integrate Tableau, a platform that stored patient and client data used for marketing, advertising, and sales efforts. ¶¶117–31. Further, Teladoc's failure to integrate the Tableau platforms materially impacted Teladoc's marketing and sales efforts. ¶¶122–26.[6]

Likewise, Defendant Murthy's April 28, 2021 statements—in response to an analyst's question about "an update on the **platform integration side**"—that "**we have a very, very clear road map**," referencing Teladoc's "R&D [*i.e.*, product] road map," and that "in terms of **data integration**," *"**we are well on our way to**"* achieving "**deep integration**" were false and misleading for the same reasons. ¶338. *See City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 411, 416 (E.D.N.Y. 2021) (upholding "statements about [] IT integration," *e.g.*, those touting "'**deep integration**' of software" based on CW accounts and later admissions).

In addition, these and similar statements touting the Livongo integration as "**on track**" to deliver such whole-person products (*e.g.*, ¶386; *see also* ¶¶422, 423) were false because Defendants in fact did ***not*** have a clear road map or plan for combining the companies' products and data. *See Galestan*, 348 F. Supp. 3d at 292 ("integration . . . remains on track" actionable). In fact, when CW 2 asked COO Sides about the Company's plan to integrate Livongo, including RPM products, at a June 17-18, 2021 meeting in Nashville, Sides admitted that there was still no such plan. ¶144; *see also* ¶181 (CW 2's notes: "David Sides had no answer" to "[w]hat is integration plan" under "InTouch").[7] Similarly, per CW 4, Teladoc still had no adequate

---

[6] Defendants' attempt to minimize the Salesforce and Tableau failures (MTD at 12-13) fails. These platforms provided critical software and data for sales and marketing efforts, including by providing "a holistic picture" of clients and patients and analysis of key performance indicators. ¶¶107, 115-16, 119, 122-26. Further, such "materiality determinations entail delicate, fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). Plaintiffs also do not claim that Defendants had a duty to disclose "each time" Teladoc encountered an integration issue. MTD at 16. But "upon choosing to speak, [defendants] must speak truthfully about material issues," including disclosing the significant integration problems here. *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

[7] Per CW 2 and others, Teladoc also struggled to integrate InTouch (acquired just a few months before Livongo), and these issues compounded the Livongo integration problems. ¶¶115, 123, 157-59, 171, 180-81, 185, 205, 195-96, 250.

integration plan for Livongo **as late as September 2021**, almost a year after the acquisition—as Gorevic effectively acknowledged to CW 4 during their conversation at a meeting in Chicago, wherein Gorevic unveiled their integration plan, which was still lacking in any specifics. ¶¶165, 169-70; *see also* ¶¶120, 128 (CW 11: Teladoc had "no clear integration plan" for integrating data). *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *17-18 (N.D. Cal. Mar. 21, 2018) (falsity pled for statements that, *e.g.*, the integration was "on track," based on CW accounts of the **lack of an "integration plan, including [a] product roadmap** for the combined company").

Defendant Verstraete's November 18, 2021 statement that "we brought together and **integrated the legacy Livongo and Teladoc marketing data and tech stacks** [i.e., applications used for marketing purposes]" was false and misleading for the same reasons. ¶392. In particular, CW 11's account of the failure to integrate the Tableau data platforms, from which the marketing team mined data to market products to customers, e.g., through emails blasts or text messages (examples of marketing "tech stacks") confirms that this statement was false. ¶¶397-98; *see also* ¶¶189-94, 392-94 (CW 8 and CW 11 describing other persisting integration problems in marketing group, *e.g.*, lack of marketing strategy, such as whether to keep or rebrand the Livongo name).

**Sales Teams Integration Statements:** Defendants repeatedly assured investors that the Livongo integration was completed from a Sales teams perspective and thus achieving positive "cross-selling" synergies to drive sales. ¶308. For example, on February 24, 2021, Gorevic claimed: "***Our commercial organization is now fully integrated***, and our teams responsible for cross-selling have been collaborating for months." ¶308. He reiterated this statement on April 28, 2021, assuring that Teladoc had "made considerable progress across our key work streams" on the integration, including that "our commercial organization **has been fully integrated** with sales teams selling across the entire whole-person portfolio of products since early this year." ¶336.

Defendants made similar claims later in the Class Period. *E.g.*, ¶¶337, 367, 380; *see* ¶¶329, 360.

Numerous sources, however, show that Teladoc's commercial organization—which "consists of the Company's sales infrastructure" and is "responsible for sales to commercial clients" (MTD at 4, 12)—was in fact *not* "fully integrated" and cross-selling effectively by the time of any of these misstatements. Notably, many CWs and the *Business Insider* Article described the internal confusion, "misalignment," and division between the two companies' personnel—including a "hemorrhaging" of key Livongo employees, who were replaced by Teladoc personnel that did not know Livongo products and business, that CWs dubbed an "integration through attrition," and an inability to fit Livongo teams into Teladoc's organization structure—which persisted throughout the Class Period. ¶¶171-219. For example, per multiple CWs in Sales roles, the two businesses were still *running separately throughout 2021*, with the Livongo teams "*siloed*" or *carved out* from their Teladoc counterparts; and there were *no synergies* and very little overlap between the sales teams, nor training materials on how to sell the two companies' products together, which all impaired cross-selling efforts. ¶¶145, 148-49, 179, 182-88.

Indeed, an internal document that CW 2 co-drafted in late 2020-January 2021—shortly before Gorevic's first statement touting the sales teams as "fully integrated"—as talking points regarding "Open Issues" about how their Livongo Sales team fit into Teladoc's HHS division, which they discussed with management, shows that at the start of the Class Period the two Sales teams were not integrated given the lack of clarity on such basic questions as: "What are we called?," "How do we work with Teladoc," "What can we sell?" "Clients (who we can target?)," and many others. ¶¶173-75. This is further corroborated by other internal documents provided by CW 2, which note, for instance, that Teladoc sales management had "built fence – put us [Livongo] on an island," "cut off communications with ex-LVGO team," and told them to "stay out of our

swim lane," contributing to "no synergy" among the Sales teams. ¶¶181-82, 206.[8] Indeed, CW 5, who was part of a group responsible for integrating the two companies' sales forces, confirmed that the ***integration was not complete*** by the time she left in June 2021. ¶212. In sum, such detailed, corroboratory allegations about "***the woeful state of the sales force integration efforts***" adequately plead the falsity of Defendants' statements that "suggest that the company had ***successfully completed integration of the sales force***." *Henry Schein*, 552 F. Supp. 3d at 416; *see also Extreme Networks*, 2018 WL 1411129, at \*19-20 (statements that company had "***fully integrated***" sales and marketing teams" false based on CWs who "paint a vastly different picture" through accounts of significant "sales force integration problems that still existed" at time of statements).[9]

Unable to challenge these factual allegations on their face, Defendants largely ignore them. Instead, Defendants pivot to their general disclosures of integration risks and "setbacks" that purportedly absolve them. MTD at 14–15. Not so. First, Defendants' so-called risk warnings themselves were misleading, and thus insufficient as they warned about ***potential*** risks that "may" or "could" occur when those risks—*i.e.*, significant integration problems—had ***already*** materialized, as discussed above. ¶¶319-27, 407-19. "[C]autionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021); *Evoqua*, 450 F. Supp. 3d at 411-12 (that company "***might*** 'have difficulty in operating or integrating any acquired businesses'"

---

[8] Defendants ignore these allegations, pointing to only one statement by CW 2, which they label as "conclusory." MTD at 12. But CW 2 supported her statement that the commercial business was not "'fully integrated'. . . because the businesses were all running separately" with many specific examples and documents. ¶¶148, 178-86.

[9] For this reason, Defendants' reliance on *In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at \*10 (S.D.N.Y. Mar. 30, 2021) (MTD at 15-16) fails. *Henry Schein*, 552 F. Supp. 3d at 416 (distinguishing *Diebold* as it "held that the optimistic assessments of progress were tempered by other disclosures and plaintiffs had failed to set forth allegations demonstrating that the statements were misleading when they were made"). *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at \*2 (S.D.N.Y. Sept. 21, 2001) (MTD at 12, 14) is also inapposite—the statements did not "specif[y] the respects as to which such integration is said to have occurred" and, for the one that did, plaintiffs had "conceded" that "the [c]omplaint ***nowhere*** alleges that such convergence of pricing had not in fact occurred." *Id.*

misleading because "[integration] was *already* going poorly").[10] Second, Defendants' argument that the integration problems and risks were "already known to the market" is the truth-on-the-market defense, which "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). "[T]he corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.* Defendants cannot meet their burden here because "many" integration "problems" and their financial impact were not "adequately disclosed" until the end of the Class Period. *Hall v. The Child.'s Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008).

Further, Defendants repeatedly, falsely reassured investors that specific aspects of the integration were either complete or making substantial progress. *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting truth-on-the-market defense because any investor concern "was counteracted by [defendants'] contemporaneous statements"). Notably, even when analysts directly raised such concerns, Defendants "***pushe[d] back on the claim that [Teladoc] is behind when it comes to the actual integration of Livongo***." ¶381. Defendants also made contemporaneous denials on and after the partial corrective disclosures. *E.g.*, ¶¶386-87 (in *Business Insider* Article), 392, 422-23. Indeed, positive analyst coverage echoing Defendants' misstatements during the Class Period confirms that the market remained misled despite Defendants' purportedly curative disclosures. *E.g.*, ¶¶313, 343, 378. *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 161 (S.D.N.Y. 2008) (rejecting the defense where analyst

---

[10] The SAC also alleges more than simply an "increase" in these risks given the allegations of existing, severe problems, rendering inapposite *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020) (MTD at 19). And Plaintiffs do not "seek to transform disclosures that certain risks *might* affect a business into promise that such events will *never* happen." MTD at 19-20 (emphasis in original). Rather, securities laws prohibit Defendants from making such "misleading" risk disclosures that "warn[] only that a risk *may* impact its business when that risk has already materialized." *In re Facebook, Inc.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013).

18

reports indicate that "analysts were unaware"). The substantial (*e.g.*, **40%**) drops in Teladoc's stock price upon the alleged corrective disclosures further support that the market did not know the truth previously. *In re MBIA*, *Inc. Sec. Litig.,* 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010).[11]

### 2.    The SAC Adequately Alleges Falsity of Competition Statements

Defendants also repeatedly falsely assuaged investors' concerns about increased competition. For example, Defendants, in response to direct analyst or reporter questions about growing competition, assured that "***we almost never bump into***" such new competitors and that "***some of the new entrants we're just not seeing gain traction***." *E.g.*, ¶¶344, 358, 363, 373. In reality, however, growing competition had significantly affected Teladoc's sales during the Class Period, particularly as a result of its Livongo integration struggles, which competitors exploited to their advantage. ¶¶220-31. For example, multiple CWs stated that CVS turned from a Livongo partner to a competitor after the Acquisition, stealing many of Teladoc's clients. ¶¶221-24, 227. Notably, CW 1 said that Livongo lost a "tremendous" amount of annual recurring revenue after CVS terminated its contract with Livongo, explaining that CVS accounted for 45-60% of Livongo's partnership business. ¶224. Likewise, per CW 2, Livongo received a "huge percentage" of its business through CVS, which was lost as CVS leveraged Teladoc's integration issues. ¶¶221-22, 227. Other competitors besides CVS, such as Omada, Virta, and American Well, also exploited the integration problems during the Class Period to steal customers, including Northwell and Temple University, and such lost business was "impactful." ¶223; *see also* ¶225 (CW 10). These

---

[11] Defendants' cases (MTD at 15, 19), which involved much more general, vague misstatements and allegations of integration problems and more specific disclosures, are thus distinguishable. *See Diebold*, 2021 WL 1226627, at *8-10 (statements were mere "rosy outlook regarding the Merger" that were adequately "temper[ed]" by disclosures, refuting plaintiffs' claim that "the Company's Merger-related reporting was all roses"); *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *15-16 (S.D.N.Y. Mar. 29, 2021) (plaintiff did not "meaningfully specif[y] the respects as to which [the] integration is said to have occurred which had not actually occurred" and instead "relie[d] on vague references to 'integration' and alleged 'significant problems[,]'" based only on post-hoc "identification of a compliance issue [which] is not necessarily at odds" with the alleged misstatements).

allegations are further confirmed by Defendants' own later admissions that increased competitive "noise" had materially affected sales, including in the chronic care (Livongo) business. ¶¶453-54.

Defendants primarily argue that such statements were not false because Teladoc disclosed the risks of increased competition, including the CVS contract termination. MTD at 17. But "Defendants' argument misses the mark" because "[t]he crux of Plaintiffs' allegations is that Defendants failed to disclose, or deliberately understated, the ***impact*** increased competition was having on [Teladoc's] business, not that there was increased competition, generally." *In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at \*17 (N.D. Ga. Aug. 12, 2019). In particular, Teladoc's disclosure of the CVS partnership termination did not adequately inform investors of the financial impact of this loss, which per CWs was significant. Instead, Defendants minimized this issue, reassuring the Credit Suisse analysts in the cited report that Teladoc had "***retained the vast majority of that book of business***" and that any customer losses were just "***a little bit*** of churn" that "always" follow such acquisitions. Ex. 14 at 4.  This argument is also the truth-on-the-market defense, which fails as discussed above. *Ganino*, 228 F.3d at 167. Indeed, positive analyst and media reactions confirm that Teladoc's purported disclosures did not sufficiently apprise the market of the truth given Defendants' denials. *E.g.*, ¶¶347-50, 355 ("the [C]ompany did say that some of 'the new entrants into the market' ***have yet to gain any traction***" and "***TDOC is essentially not running into new competitors/entrants***"). Likewise, Defendants' general warnings about ***potential*** risks of increased competition were insufficient and themselves misleading (¶¶323-27, 413-19) because such risks had already materialized. *See supra* at 17–18. Defendants' other argument, that the SAC did not allege such statements were actually false (MTD at 16-18), again ignores that "literal tru[th]" is not the standard for falsity. *Vivendi*, 838 F.3d at 240.[12] The

---

[12] Defendants' cherry-picked discussion of the competition statements also ignores many of the misstatements and
Footnote continued on next page

statements were at least misleading because they minimized the competition threat.[13]

### 3.    Defendants' Other Actionability Arguments Fail

Defendants' remaining arguments against the "actionability" of the misstatements (MTD at 20-24)—that some of the statements are mere puffery, opinions, or forward-looking projections protected by the PSLRA safe harbor—are equally meritless.

### a.    The Misstatements Are Not Puffery

*Integration.* Defendants argue that "most" of the integration progress statements are puffery, while citing only *four*.[14] MTD at 20. They are wrong. "The key inquiry in deciding whether a statement constitutes puffery is 'the nature of the specific statement and whether it concretely assured investors of anything.'" *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *39 (S.D.N.Y. Sept. 2, 2022). The statements here assured investors that the integration was completed or progressing successfully in several specific, key respects, while Defendants "knew that the contrary was true," rendering their statements "misrepresentations of existing facts" and thus not puffery. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that "the inventory situation was 'in good shape' or 'under control'" were "more than just [] rosy predictions" or "expressions of optimism, and other puffery" for this reason); *see also Freudenberg*, 712 F. Supp. 2d at 189 (same).

Many courts thus have upheld similar statements that the integration was making

---

instead focuses on other portions (*e.g.*, that Teladoc was "probably 10 times larger than the next closest competitor") that were primarily provided as context and not alleged to be false and misleading. MTD at 16-18.

[13] Defendants' assertion that the alleged competition and integration problems were not sufficiently "significant [or] widespread" (MTD at 18-19) is a materiality challenge, which "is rarely a basis for dismissal on the pleadings." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015). Plaintiffs also need not "quantify the scope, magnitude, or duration of the integration problems" at the pleading stage. *Galestan*, 348 F. Supp. 3d at 302. That many CWs in different positions and areas of the Company related widespread, severe problems in key aspects of the integration, which adversely affected operations and sales, is sufficient at "this early stage." *Id.*

[14] Thus, Defendants concede the rest are not puffery. Their Exhibit 1, a misstatements chart that includes a column with puffery and other substantive challenges for each statement, most of which were not made in their brief, should be stricken as violating the page limit, which was already extended at their request (ECF No. 72). *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *3 (S.D. Cal. June 1, 2020) (striking misstatements chart appendix on this basis).

"considerable progress" and "on track," ¶¶336, 386, as "misrepresentation of existing facts," rather than mere "rosy predictions" given the integration problems described by CWs. *E.g.*, *Galestan*, 348 F. Supp. 3d at 298.[15] Likewise, courts have deemed similar misstatements that the Sales teams were "fully integrated" and the like, *e.g.*, ¶¶308, 336, 367, as not puffery because they are "concrete, factual representations in which [defendant] assured the public that the integration of the ***sales force had been completed***." *Henry Schein*, 552 F. Supp. 3d at 416-17; *Extreme Networks*, 2018 WL 1411129, at *19-20 ("***fully integrated sales [] teams***" statement actionable).

Further, "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *Petrobras*, 116 F. Supp. 3d at 381. Defendants here repeatedly omit key context from the misstatements they quote. For example, in asserting that Gorevic's statement that "[w]e've made considerable progress across our key work streams" is puffery (MTD at 20), Defendants omit the subsequent sentence where he specified which "key work stream[]" he was referring to: "our commercial organization has been fully integrated." ¶336. Defendants similarly isolate Shah's statement about the integration "going really great" (MTD at 20), omitting his subsequent explanation discussing specific integration aspects, such as the companies' purported "fit" from "a technology perspective" and that they were "well on their way" to building the integrated, whole-person products. ¶298. *See Galestan*, 348 F. Supp. 3d at 303 ("Defendants offered more than 'rosy predictions' because they stated that ***the integration was going smoothly***," and "statements such as '***the combined companies fit perfectly together***'" were actionable).

Finally, that the statements were "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors" in response to direct

---

[15] *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845-46 (S.D.N.Y. 2019) ("statements that integration was 'flawless'" not puffery); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (not puffery where "Progress Statements [] definitively claimed that CBI '***continue[s] to make progress and substantial progress*** on [the projects]' despite reports of delays").

analyst or media questions is key context that supports materiality. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017); ¶¶297, 329, 337–38, 360, 380–81.[16] For example, Defendants "**pushe[d] back on the claim that [Teladoc] is behind when it comes to the actual integration of Livongo**." ¶381. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167-70 (2d Cir. 2021) ("**pushback** statement" held not puffery); *Turquoise Hill*, 2022 WL 4085677, at *34-35 ("statement that 'lateral development has **progressed well**'—viewed in context—was" not puffery as it "reassured investors that [such] construction was not substantially impaired by any delay").

*Competition.* Similarly, Defendants' competition statements were not "mere puffery" but misrepresentations of existing facts when viewed in context—*i.e.*, that they "were made to reassure investors as to specific risks regarding [] competition."[17] *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 73-74 (S.D.N.Y. 2020) (upholding statements about "competitive advantage"); *Turquoise Hill*, 2022 WL 4085677, at *34 ("where a company makes a statement in direct response to concerns raised by investors about a specific risk," such "context" renders it actionable).[18] That these statements were made in response to analysts' repeated questions about competition thus supports their materiality. ¶¶314-15, 344, 352, 358, 363, 373, 404.

### b.    The Misstatements Are Not Inactionable Opinions

Defendants argue that some integration statements (¶¶329, 386, 337) and competition statements (¶¶314, 352) are inactionable opinions. MTD at 22-23.[19] Even if these are considered

---

[16] Defendants' reliance on *Diebold* (MTD at 21) is again misplaced. *See supra* n.9 & 11. Nor do *Nokia, Razorfish*, or *In re Ferrellgas Partners, L.P. Sec. Litig.,* 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) (MTD at 20-21) compel a contrary conclusion; the statements there only made general references to the term "integration," unlike here where the misstatements refer to specific integration aspects. *See In re Emex Corp. Sec. Litig.*, 2002 WL 31093612, at *7 (S.D.N.Y. Sept. 18, 2002) (distinguishing *Razorfish* on this basis).

[17] Defendants' brief cites only two competition statements (¶¶363, 373; MTD at 21), conceding the rest are not puffery.

[18] For this reason, Defendants' cited cases (MTD at 21-22), which lacked such context, are inapplicable.

[19] Even if the Court considers Defendants' chart (Ex. 1), they consolidated into one column their "forward-looking" and "opinion" objections, rendering it unclear which particular challenge they assert for those statements.

opinions,[20] it is "irrelevant" if Defendants subjectively believed them (MTD at 23-24)—the "core inquiry" is whether "omitted facts 'conflict with what a reasonable investor would take from the statement.'" *In re Avon Sec. Litig.*, 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (quoting *Omnicare*, 575 U.S. at 189). Here, such statements omitted many material facts about Teladoc's integration and competition problems, as discussed above, which "substantially undermine" the positive statements. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020); *see also Galestan*, 348 F. Supp. 3d at 303 (integration statements actionable based on omissions).

### c.    The Misstatements Are Not Protected by the Safe Harbor

Defendants also claim that "[m]any" statements, citing ***only two*** (¶¶315, 338), are protected by the PSLRA safe harbor. MTD at 24; *see also supra* n.19. But the challenged statements refer to existing or past facts, which are paradigmatically not forward-looking. *E.g.*, ¶315 ("we ***continue to*** see" and "***we don't*** see,"); ¶338 ("***we have*** a very, very clear road map").[21] *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("that the restructuring ***was going according to plan***" statements not forward-looking as they "reported on past or present circumstances"); *Galestan*, 348 F. Supp. 3d at 304 (same for integration progress statements). And, for any statements that are "mixed," the safe harbor does not shield the non-forward-looking parts. *Vivendi*, 838 F.3d at 246; *Chi. Bridge*, 2018 WL 2382600, at *8 (progress statements not protected even though they "included [] forward looking aspect[s]" as they also contained "misrepresentation of present fact"). Even if any of the statements are deemed forward-looking,

---

[20] Gorevic's statement that the integration "is on track" was not accompanied by any opinion qualifiers, such as "I think," and instead implied "certainty;" thus, it is not an opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183, 187 (2015). Likewise, while Defendants emphasize the words "I think" preceding Gorevic's statement that "the team has just done incredible work to bring that together" (MTD at 22), the SAC did not allege that portion as a misstatement; rather, the alleged misstatement was his assurance about Teladoc's "***rapid progress on the commercial side***," which was not accompanied by such opinion qualifiers. ¶337.

[21] Thus, Defendants' reliance on *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364 (S.D.N.Y. 2006) (MTD at 24), which involved statements, *e.g.*, about what defendants "***expect***" to see and their "hopeful outlook" that their product road map will yield new products that "will be competitive ***in the future***," is misplaced. *Id.* at 398, 401.

they fall outside of the safe harbor because they (i) were not accompanied by meaningful cautionary language for the reasons discussed above (*see supra* at 17–18) and (ii) were made with actual knowledge of falsity (*see* Section III.B., *infra*). *See Freudenberg*, 712 F. Supp. 2d at 194.[22]

### B.    The SAC Adequately Alleges a Strong Inference of Scienter

Plaintiffs can plead scienter by alleging facts showing *either* "motive and [] opportunity" *or* "strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). The latter prong is met by allegations that defendants "knew facts or *had access* to information suggesting that their public statements were not accurate," or "*failed to check information* they had a duty to monitor." *Novak*, 216 F.3d at 308, 311. In analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre;" rather, "it must be cogent and *at least as* compelling as any opposing inference." *Id.* at 314, 324. That is, "a tie on scienter goes to the plaintiff." *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021).

### 1.    The SAC's CW Allegations Plead a Strong Inference of Scienter

Contrary to Defendants' arguments (MTD at 28-31), the SAC adequately pleads scienter because CW accounts and internal documents show that Defendants knew or recklessly

---

[22] Defendants cursorily argue that statements "made by unnamed individuals" in analyst and news reports are not actionable. MTD at 17 n.8. But they are because the reports "incorporated" and "disseminated" statements Defendants made to the analysts in specified interviews, as the reports made clear by either quoting or otherwise attributing the statements to Defendants. *Novak*, 216 F.3d at 314–15; ¶¶360, 379-81, 386-87. Further, the Credit Suisse report in the ¶363 statement identified the meeting date and Teladoc "management" interviewed, which included Gorevic and Murthy (¶360), rendering the statements "particularized." *Novak*, 216 F.3d at 314-15. The other reports attributed the statements to Teladoc "management" (¶379) or "spokesperson for Teladoc" (¶387), which is also sufficient. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 663–64 (S.D.N.Y. 2017) (statement "attributed in [] article to an unidentified speaker at [company]" adequately pled). "Indeed, to require more would defeat the purpose of the securities laws since any corporation could avoid liability [] through the abuse of Rule 9(b), by simply issuing statements through an anonymous spokesperson." *In re AnnTaylor Stores Sec. Litig.*, 807 F. Supp. 990, 1004 (S.D.N.Y. 1992); *see also In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1105-06 (N.D. Cal. 2013).

disregarded the falsity of their statements.[23] Notably, CW 2 and internal documents confirm that Shah was directly informed that Teladoc was struggling with integrating the companies' products and Sales personnel in late 2020, contrary to his February 11, 2020 misstatements touting the progress of the Livongo integration, including the companies' seamless "fit" from a "technology perspective" to provide such "whole person" products. ¶¶233, 298. Specifically, CW 2 repeatedly informed Shah in multiple emails of a widespread, continuing integration issue—that in client pitches Teladoc Sales personnel were "making up" RPM product capabilities that Livongo did not have and the combined Company would not have for a while, admitting that while they were working on the "integration of [Livongo and Teladoc] services," "*[w]e know* that there is an *imperative* to have this together by H1 [first half] 2021, but don't have details yet *nor are ready for a client*." ¶¶134-43, 517-21.[24] Further, per these documents, Gorevic was personally involved in pushing the Company's non-existent RPM capabilities in client meetings at that time, which also supports that he was at least reckless when he later assured investors of the smooth progress of the integration, including as to product platforms and Sales teams. ¶517.

Other CW allegations corroborate that Gorevic knew of or recklessly disregarded the Livongo integration problems throughout the Class Period. *Freudenberg*, 712 F. Supp. 2d at 197 ("corroboration from multiple sources also supports an inference of scienter"). For example, CW 4 attended a leadership meeting with Gorevic in or around September 2021 in Chicago where she had a direct conversation with him about the integration difficulties and he acknowledged these issues, including the lack of an adequate integration plan up to that point. ¶523. Further, CW 2

---

[23] Further, the SAC does not rely on group pleading, distinguishing Defendants' cases (MTD at 29), as the allegations here show that each Individual Defendant knew or had access to material, contrary information, as discussed herein.
[24] Shah's knowledge of and concealment of these significant integration difficulties by the time of his positive public reassurances about the integration refutes Defendants' claim that his "optimism" was "reasonable." MTD at 29 n.15. While "corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects," their public statements must be "consistent with reasonably available data." *Novak*, 216 F.3d at 309.

stated that Gorevic often personally fielded questions about the Livongo integration difficulties, providing evasive responses, at townhall meetings that CW 2 attended. ¶¶514-15.[25] Further, COO Sides—who admitted that there was no integration plan—reported directly to Gorevic, which further supports the inference that Gorevic was apprised of underlying integration issues. ¶¶179, 512; *see Robb v. Fitbit Inc.*, 2017 WL 219673, at *6 & n.6 (N.D. Cal. Jan. 19, 2017) (scienter pled based on similar "allegations tracing the knowledge of [non-defendant executive] to the individual defendants includ[ing] that *[he] reported directly to defendant [CEO]*").

CWs also confirm that Defendants had "access to" and closely monitored sales losses to competition via Salesforce. *Novak*, 216 F.3d at 308-09, 311; ¶¶228, 525. Further, Murthy and Verstraete discussed increased competition at quarterly and monthly all-hands meetings (¶226), supporting their knowing or reckless disregard that competition was adversely affecting Teladoc. Such allegations plead recklessness at the very least, as they show that Defendants "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 308, 311.

## 2. Core Operations Allegations Further Support Scienter

The core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business," which are matters "critical to the long term viability" of a company and affect a "significant source of income." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). This includes facts relating to important transactions like a large acquisition. *AMC*, 422 F. Supp. 3d at

---

[25] Thus, Defendants are wrong that the SAC alleges "only two [] direct interactions" between CWs and the Individual Defendants. MTD at 29-30. Besides, there is "no baseline requirement" of such direct contact to plead scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015). Defendants' cases do not hold otherwise and instead are distinguishable. *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (two of three CWs left before the class period, and the reports all CWs described were produced long before the class period); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013) (plaintiff "has not alleged that any of the CWs had 'any contact with ... Gentiva Executives *or* would have knowledge of what they knew *or should have known* during the Class Period'").

852-53; *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *19 (N.D. Cal. Sept. 27, 2012) ("knowledge of facts critical to . . . an important transaction" may be imputed to "key officers").

Defendants assert that the core operations doctrine may no longer apply after the passage of the PSLRA and the Second Circuit has not "endorsed" it. MTD at 31. First, the "enactment of [the PSLRA] did not change the basic pleading standard for scienter." *Novak*, 216 F.3d at 311. Second, the Second Circuit has noted that core operations "***can*** provide ***supplemental*** support for [] scienter . . . [a] view that finds support in decisions by this court and district courts within this circuit." *Celestica*, 455 F. App'x at 14 n.3. The SAC does not rely on this theory ***alone***, mooting Defendants' claim that "it can only provide ***additional*** support." MTD at 31 (emphasis original).[26]

Defendants' other argument—that the Livongo Acquisition and chronic care segment were not a core operation—is similarly meritless. MTD at 31-32. The sheer size of the transaction, ***$18.5 billion***, establishes that the acquisition, and thus its successful integration, were critical to Teladoc. *AMC*, 422 F. Supp. 3d at 853 (core operation applied where acquisition was "biggest part of [company's] ambitious growth strategy" and "significant source of income"). In addition, the acquisition was critical for Teladoc's business strategy because it removed a major competitor and added a chronic care business that was essential for Teladoc to provide the vaunted "whole person" products that Defendants touted as its key competitive advantage. ¶¶88-99, 501-03. Indeed, Defendants repeatedly highlighted the importance of this "transformative" acquisition to Teladoc's financial success for these reasons, and the market recognized as much—for example: "***Gorevic said Teladoc's future was 'whole-person care'***. . . with different kinds of products that talk to each other. ***And it's using Livongo's assets to make that happen***." ¶¶89-98, 504-08.[27]

---

[26] Defendants' similar claim that "positions" allegations ***alone*** are insufficient (MTD at 31) fails for the same reason.

[27] *Evoqua* (MTD at 31) did not hold that acquisitions can never plead scienter under this theory, but instead only found that the acquisition at issue "was one of ***eight*** acquisitions completed [] during this time period," and there were no

Footnote continued on next page

Indeed, because the Livongo Acquisition was so critical to Teladoc, the Individual Defendants were personally involved in its integration, as they publicly confirmed. *Buxbaum v. Deutsche Bank A.G.*, 2000 WL 33912712, at *19 (S.D.N.Y. Mar. 7, 2000) (that defendant was "personally involved in [relevant] talks" "provide[d] strong circumstantial evidence of conscious misbehavior"). For example, Gorevic publicly touted that he "personally" met and spoke with Livongo employees, and announced "an Integration Management Office [] steering committee to oversee our combination, meeting weekly to lay out integration milestones and ensure steady progress." ¶511. Murthy told investors that "*[w]e spent all day looking at integration from every possible function and within every function*." ¶¶511-13. CWs further confirm that Defendants closely monitored the integration and competition issues, including through their access to Salesforce and discussions at Company meetings.[28] ¶¶101-02, 138-43, 169-70, 228, 514-25.

Further, Defendants repeatedly denied or minimized integration and competition problems even in response to direct analyst and press questions about such concerns, further evidencing scienter. ¶¶297-98, 314-315, 329, 337-38, 344, 352, 358, 360, 363, 373, 380-81, 404, 422-23. *See Celestica*, 455 F. App'x at *14 (that these were "subject[s] about which investors and analysts often inquired" supported scienter); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552–53 (S.D.N.Y. 2017) ("false assurances" to analyst inquiries bolstered scienter).

---

facts showing it was core to the business. 450 F. Supp. 3d at 424. *In re Kandi Techs. Grp., Inc. Sec. Litig.* also offers no help as it merely held that the doctrine "***alone***" did not establish scienter, not that segments comprising "25%" of revenues (MTD at 32) cannot be core. 2019 WL 4918649, at *8 (S.D.N.Y. Oct. 4, 2019) ("assuming" 61% was "enough"); *see AMC*, 422 F. Supp. 3d at 853 (23% core); *Hi-Crush Partners*, 2013 WL 6233561, at *26 (18% core).
[28] Defendants' claim that the meeting allegations were "unspecified" (MTD at 28) is wrong. The SAC alleges many details about the meetings, including dates, attendees, and what was discussed—unlike the allegation in *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012). *Town of Davie Police Officers Ret. Sys.* v. *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* is also distinguishable because while plaintiffs alleged "materials" were distributed at meetings, they never alleged that the materials "contained incriminating information." 2021 WL 5142702, at *2 (2d Cir. Nov. 5, 2021).

### 3.    Defendants' Insider Sales Further Bolster Scienter

Plaintiffs have no obligation to plead motive. *Tellabs*, 551 U.S. at 325 ("absence of a motive . . . is not fatal."). Nevertheless, the SAC adequately does so. The "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *Scholastic*, 252 F.3d at 74. Here, Teladoc insiders' substantial stock sales during the Class Period—particularly those by Defendants Gorevic, Murthy, and Verstraete—support a strong inference of scienter. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 365-66 (S.D.N.Y. 2003) ("hundreds of thousands of dollars" in stock sales "plainly satisfied" motive) ("*IPO*"). Gorevic alone reaped almost ***$30 million*** in proceeds. ¶531. Murthy reaped almost ***$2 million***, and Verstraete reaped over ***$4 million*** in proceeds. ¶532. Additionally, Verstraete, Murthy, and Gorevic, respectively, sold the equivalent of 43.1%, 29%, and 21.6%, of their Class Period Teladoc stock holdings. ¶¶531–32. *IPO*, 241 F. Supp. 2d at 367–68 (10% threshold for "unusual" trading); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (sales ranging from 11–100% sufficiently unusual).

That Defendants purportedly increased their stock holdings during the Class Period (MTD at 25-27) does not negate scienter because "[w]here a defendant may have believed that ***he could eventually*** sell his shares at a profit by continuing to hide the fraud or by resolving undisclosed problems without the public learning of the true facts, courts refuse to hold that defendants' stock purchases were inconsistent with fraud." *Freudenberg*, 712 F. Supp. 2d at 201. Further, virtually all of these increases were from grants or options, not open market purchases (*see* Exs. 11-13), and thus do not render Defendants' sales less suspicious. *See Dolgow v. Anderson*, 438 F.2d 825, 828 (2d Cir. 1970); *Levy v. Gutierrez*, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017). Defendants' claim that their Class Period sales are consistent with prior trading (MTD at 27) ignores that: (i) Murthy sold over ***four times*** more shares (for more than ***double*** the proceeds) during the Class

Period than in the Control Period (¶534); and (ii) Gorevic's and Verstraete's pre-Class Period sales can be explained by his taking advantage of the pandemic-driven surge in Teladoc's stock price at that time. ¶540 n.42. "The number of corporate insiders who sold shares is also relevant." *In re SLM Corp., Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475–76 (S.D.N.Y. 2013) (sales by non-party executives supported scienter).[29] Thus, that twelve Teladoc insiders collectively sold almost ***$168 million*** during the Class Period supports scienter—particularly, the sales by: (i) Livongo founder and Teladoc director Tullman, who sold ***$97 million*** before the *Business Insider* Article quoted him as saying the integration was "not going [] well;" and (ii) COO Sides, who internally admitted the lack of an integration plan at a June 2021 meeting and sold $1.2 million around the same time.[30] ¶¶537-39.[31]

### 4.    The SAC Adequately Alleges Corporate Scienter

Plaintiffs may "raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *e.g.*, *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 300, 303 (S.D.N.Y. 2009) (Cote, J.) (corporate scienter pled based on CW accounts of "widespread knowledge at [company]" of contrary facts even though individual defendants' scienter was not pled). Further, corporate scienter may be established through non-

---

[29] That ***some*** of Defendants' trades were made pursuant to a 10b5-1 plan (MTD at 27-28) is unavailing as this is "an affirmative defense that must be pled and proved." *Freudenberg*, 712 F. Supp. 2d at 200-01. ***None*** of Murthy's sales were pursuant to such a plan and ***most*** of Verstraete's were not. ¶535. Further, where 10b5-1 plans are entered into during the class period—like one of Verstraete's—they "provide[] no defense to scienter allegations." *Blanford*, 794 F.3d at 309. Likewise, that some sales were made ostensibly to cover taxes (MTD at 27) does not negate scienter. *Freudenberg*, 712 F. Supp. 2d at 201 (considering such sales for scienter purposes).

[30] Defendants' claim that Tullman's and Sides' sales are not suspicious because they were close to their departures (MTD at 26 n.12) fails. Their cases are distinguishable—the executive either sold his stock "at the time he resigned," *Feasby* v. *Industri-Matematik Int'l Corp.*, 2000 WL 977673, at *4 n.5 (S.D.N.Y. July 17, 2000), or "in conjunction with a publicly-disclosed plan to 'exit from the Company,'" *City of Taylor Gen. Emps. Ret. Sys.* v. *Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013)—not months before their departures without any such plan, as here.

[31] Shah or Napolitano's lack of stock sales (MTD at 26 n.11) "does not exculpate" any other Defendant, and, regardless, motive is not required. *SLM*, 740 F. Supp. 2d at 558.

defendant employees who did not make any misstatements when they are sufficiently senior. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015) (imputing the scienter of a "high-level" managing director who did not make any misstatements); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) (the "individual making an alleged misstatement and the one with scienter do not have to be one and the same"). "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by ***management-level*** employees is generally sufficient." *Id.* at 515-16.[32]

Here, the accounts of eleven CWs, as corroborated by internal documents, the *Business Insider* Article, and Defendants' own admissions at the end of the Class Period, establish "widespread knowledge" within Teladoc—including by non-defendant senior executives like COO Sides and HHS President DeVivo—of severe integration challenges, which pleads corporate scienter. *NovaGold*, 629 F. Supp. 2d at 303. *E.g.*, ¶144 (Sides' knowledge); ¶516 (President, U.S. Group Health, Kelly Bliss, and DeVivo, discussing integration problems in department meetings); ¶¶173-75, 522 (January 2021 internal document showing that DeVivo and other senior executives were apprised of the lack of direction, synergy, and fit regarding integration of HHS teams).[33]

Finally, under the requisite "holistic" analysis, the above allegations together amply plead an inference of scienter that is "at least as compelling," *Tellabs*, 551 U.S. at 324-26, as Defendants' proffered nonculpable inferences—*e.g.*, that they were just overly optimistic (MTD at 8, 23, 29) and transparent about the issues (MTD at 25). "***[T]he repeated representations made***, compared to the factual material concerning the ***actual state of the integration***, leads to an inference that, at

---

[32] *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011) (*see* MTD at 29) is not to the contrary. *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371 (S.D.N.Y. 2012) (*Janus* did not hold that only the creator of the statement's "maker" could be imputed to company as "*Janus* does not concern corporate scienter").
[33] The document on its face indicates that these "Open Issues" were intended for discussion with "Joe D [DeVivo]," among others (¶¶174, 522), refuting Defendants' claim that he never "reviewed it." MTD at 30. Further, Defendants ignore that CW 2 made clear that she used this document as "'talking points' with management, ***such as Joe DeVivo***, when discussing their concerns." ¶173. *See also* ¶¶149, 180 (corroborating Bliss's and DeVivo's knowledge).

a minimum, [Defendants] acted recklessly." *Henry Schein*, 552 F. Supp. 3d at 416.

### C.    The SAC Adequately Alleges Loss Causation

Plaintiffs' burden of pleading loss causation "is not a heavy one." *Loreley*, 797 F.3d at 187.

"The complaint must simply give [d]efendants '***some*** indication' of the actual loss suffered and of

a ***plausible*** causal link between that loss and the alleged misrepresentations." *Id.* Thus, "[t]here is

no heightened standard for pleading loss causation," and plaintiffs "need only plead a short and

plain statement, pursuant to [Rule] 8(a)." *Freudenberg,* 712 F. Supp. 2d at 202; *see also In re

Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 266 n.7 (S.D.N.Y. 2021); ("the vast

majority of courts in this district have required that loss causation only meet the notice

requirements of Rule 8"). Further, loss causation may be shown by a "corrective disclosure" of the

fraud, or by the "materialization of [a] risk" that the fraud had concealed or obscured. *Carpenters

Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). Such

revelation "need not take the form of a single announcement, but rather, can occur through a series

of disclosing events." *Bristol Myers*, 586 F. Supp. 2d at 165.

The three alleged disclosures here incrementally revealed that—contrary to Defendants'

prior statements touting the successful progress of the Livongo integration and downplaying

increased competition—the integration was a disaster and competitors had become a real threat,

both of which materially, adversely affected Teladoc's business. These disclosures resulted in

substantial drops in Teladoc's stock price. Such allegations amply plead the requisite "causal link."

First, on November 10, 2021, the *Business Insider* Article partially disclosed, for the first time,

that the Livongo integration was struggling, causing Teladoc's stock price to fall over 4.2%. ¶¶437-

46. Defendants try to trivialize the disclosure as revealing only immaterial "culture clash" and

"attrition" issues. MTD at 32. But Defendants ignore that the Article disclosed not only ongoing,

major problems integrating the companies' personnel (contrary to earlier statements that the teams

were "fully integrated"), but also the companies' product and other technological systems (*e.g.*, patient portals, which were "still separate apps"). ¶¶437-46, 160-61, 217-19, 229-30.

These disclosures also refute Defendants' assertion that the Article did not disclose "anything new" (MTD at 33), which they also repeat as to the later two disclosures. MTD at 33-36. This argument is again the "fact-specific" truth-on-the-market defense (*Ganino*, 228 F.3d at 167), which fails for the reasons above. *See supra* at 18. Notably, Defendants provided contemporaneous denials in the *Business Insider* Article, *e.g.*, that the issues were "***less of an issue today***," and the integration was "***on track***." ¶447; *Omega*, 563 F. Supp. 3d at 270-71 (disclosures unavailing where defendants "at the same time downplayed the full extent of the issues").[34]

On April 27, 2022, Teladoc issued its quarterly earnings results, including lowered financial guidance and ***$6.6 billion*** goodwill impairment charge, which further partially disclosed the continuing nature and financial impact of Teladoc's integration and competition problems, causing its stock price to tumble over ***40%***. ¶¶448-75. Notably, Defendants linked the reduced guidance to a sales slowdown in the Livongo chronic care and BetterHelp segments, including due to ***competitive*** "***noise in the marketplace***," thus acknowledging that competition was in fact adversely impacting its business, contrary to prior assurances.[35] ¶¶453-54.[36] Further, Gorevic

---

[34] *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 357 (S.D.N.Y. 2014) (*see* MTD at 33) is inapposite as it involved "***extensive*** media coverage about the risk" over several months preceding the alleged disclosure, rendering "plaintiffs' theory" that it was the "first time" investors discovered the risk "not plausible." Likewise, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) (*see* MTD at 32), a ***summary judgment*** decision, is easily distinguishable, because plaintiffs in that case, even after a full discovery record, including expert reports and testimony, were unable to show the alleged disclosure revealed "***any*** new information." *Id.* at 513.

[35] Thus, Defendants' assertion that such competitive "noise" is an "unrelated external factor" that must be disaggregated (MTD at 34) entirely ignores the SAC's allegations about competition, which are tied to integration issues. ¶¶221-23, 227-28. Further, whether this and other disclosures cited by Defendants as "unrelated" to the fraud, including the BetterHelp slowdown, are confounding information that needs to be "disaggregate[d]" are "arguments . . . inapplicable at this stage." *Solomon v. Sprint Corp.*, 2022 WL 889897, at *10 (S.D.N.Y. Mar. 25, 2022). *See also e.g.,* ¶¶315, 404 (alleging misstatements about competition in BetterHelp market); ¶¶225-26, 228-29 (alleging Company-wide competition problems, not just in Livongo segment).

[36] Defendants assert, without citation, that they "transparently disclosed competition issues" in October 2021. MTD at 35. Again, this truth-on-the-market argument is unavailing at this stage, particularly as their vague, tepid disclosures of some ***potential*** impact from competition did not adequately inform investors of the truth. *See supra* at 18.

admitted that Teladoc still had **"not finished" "integrating the Livongo products**" (¶¶450-51), contrary to prior claims that the integration, including of products, was progressing well. Thus, Defendants' claim that this disclosure did "not contradict any" misstatements (MTD at 35) fails. And they did not have to directly "attribute any of the lowered projections" or the goodwill write-down "to the integration" (MTD at 33, 33 n.17, 34) because courts do not require such a "mirror image" corrective disclosure. *Freudenberg*, 712 F. Supp. 2d at 202. Moreover, the market directly linked (*see* MTD at 33, n.17) the goodwill write-down to the disclosures about the struggling Livongo integration, as evidenced by analyst and media coverage. ¶¶274-77 (*e.g.*, "the $6.6B goodwill impairment charge is **an admission of the destruction of Livongo's value**. . . . Teladoc's management has **failed to complete the integration of Livongo into its platform**.").[37]

Finally, on July 27, 2022, Defendants disclosed a second quarter of disappointing financial results, which Defendants again attributed to the impact of unresolved Livongo integration issues—*e.g.*, that the product and data integration "**still continues**"—and "**competitive noise**" in the Livongo and BetterHelp segments, as well as another goodwill impairment charge of $3 billion, prompting a stock price drop of over 17.6%. ¶¶478-99. Defendants also directly linked the competition and integration issues, explaining, *e.g.*, that while Teladoc's "competitive advantage is really around integrated care," it has not been able to deliver that and thus effectively "compet[e] against various point solutions" because **"[t]he company's products are not yet fully integrated**" creating "a bit of a **challenge of getting into a client and saying we'll be a one stop shop when we can't show that yet.**" ¶¶498-99. These disclosures revealed the full, severe extent of Teladoc's

---

[37] Alternatively, as Plaintiffs need not allege a corrective disclosure at all, the revised guidance and goodwill write-down were materializations of the concealed risk about the Livongo integration failures. *See Vivendi*, 838 F.3d at 262 (truth may be revealed through "events **constructively** disclosing the fraud"). Further, the negative market reactions also refute Defendants' truth-on-the-market argument that their prior warnings of a **potential**, future write-down in a **much lower** range (Exs. 6, 9) adequately disclosed this risk. *E.g.*, ¶¶274-75. *See MBIA*, 700 F. Supp. 2d at 582.

integration and competition problems, as supported by the large stock price drop and analyst reactions.[38] *Omega*, 563 F. Supp. 3d at 269 (the "sharp drops in [company's] share price [on the disclosures] . . . suggest that the market had not fully internalized the extent of the risks" earlier).

### D.    The SAC Adequately Alleges Section 20(a) Claims

Control person claims must show a primary Section 10(b) violation, control, and culpable participation. *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 415 (S.D.N.Y. 2019). Defendants cursorily challenge only the first and third elements. MTD at 36. Fist, Plaintiffs have pleaded their predicate Section 10(b) claims. Second, while courts are split as to the pleading requirements for culpable participation, the SAC satisfies both standards. *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 212-14 (S.D.N.Y. 2016). The SAC adequately alleges scienter for each Defendant, as described above, and, *e.g.*, that they "directly participated in the management of the Company, [and] were directly involved in the day-to-day operations." ¶¶541-44; *EZCorp*, 181 F. Supp. 3d at 214 (similar facts pled culpable participation "under even the most rigorous pleading standard"). Further, "there is no required state of mind for a defendant's culpable participation." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003) (Cote, J.).[39]

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.[40]

---

[38] *E.g.*, ¶¶488, 490, 491, 496 ("***the challenges for . . . chronic care (Livongo) were less transitory than hoped for***"). Analysts also tied this new goodwill write-down to the Livongo integration issues. *E.g.*, ¶492.

[39] Contrary to Defendants' argument, each of these Defendants was "responsible" for the misstatements attributed to them (MTD at 36, n.19): Napolitano signed the 10-Qs containing the risk warning misstatements (¶¶319, 407); and Shah and Verstaete uttered their statements in a public interview or analyst conference, respectively (¶¶297, 392).

[40] Plaintiffs respectfully request another opportunity to amend if the Court grants the Motion, despite its prior comment on further amendment (ECF No. 40). *See Loreley*, 797 F.3d at 190-91 ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). Such amendment may include adding new, relevant developments that occurred after the SAC filing, which Plaintiffs are still investigating. For example, just over a week ago, on February 22, 2023, Teladoc disclosed, *inter alia,* another $3.8 billion goodwill impairment charge that analysts again linked to the Livongo integration issues, causing Teladoc's share price to fall nearly 7%.

Dated: March 3, 2023                         Respectfully Submitted,

                                             **LABATON SUCHAROW LLP**

                                             */s/ Irina Vasilchenko*
                                             Carol C. Villegas
                                             Irina Vasilchenko
                                             David J. Schwartz
                                             Philip J. Leggio
                                             140 Broadway
                                             New York, NY 10005
                                             Tel: (212) 907-0700
                                             Fax: (212) 818-0477
                                             Email: cvillegas@labaton.com
                                                     ivasilchenko@labaton.com
                                                     dschwartz@labaton.com
                                                     pleggio@labaton.com

                                             *Counsel for Lead Plaintiff*
                                             *Leadersel Innotech ESG and*
                                             *Lead Counsel for the Proposed Class*

                                             **THE SCHALL LAW FIRM**
                                             Brian Schall
                                             2049 Century Park East, Suite 2460
                                             Los Angeles, California 90067
                                             Telephone: (424) 303-1964
                                             Facsimile: (877) 590-0482
                                             brian@schallfirm.com

                                             *Counsel for Additional Plaintiff Hui Ma and*
                                             *Additional Counsel for the Proposed Class*