**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TELADOC HEALTH, INC.
SECURITIES LITIGATION

Case No. 1:22-cv-04687 (DLC)

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO**
**DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000

*Attorneys for Defendants Teladoc Health,*
*Inc., Jason Gorevic, Mala Murthy, Stephany*
*Verstraete, Bimal Shah, and Richard*
*Napolitano*

Dated: March 31, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.    The Complaint Fails to Allege Any Actionable Material Misstatements ......................... 2

    A.    The Alleged Misstatements About Integration Are Not Alleged to Be False ..................................................................................................... 2

    B.    The Alleged Misstatements About Competition Are Not Alleged to Be False ..................................................................................................... 6

    C.    Defendants' Alleged Misstatements Are Non-Actionable Puffery, Opinion, or Forward-Looking Statements ............................................... 8

    D.    Teladoc's Warnings to the Market Contextualize the Challenged Statements ..................................................................................... 9

II.    The Complaint Fails to Allege a Strong Inference of Scienter ....................................... 11

    A.    Plaintiffs Fail to Plead Motive and Opportunity .................................... 12

    B.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness ........................ 13

        1.    No Conscious Misbehavior or Recklessness Regarding Integration Issues ............................................................................... 13

        2.    No Conscious Misbehavior or Recklessness Regarding Competition ...... 14

    C.    The "Core Operations" Theory Does Not Rescue Plaintiffs' Claims ................. 15

    D.    Plaintiffs Fail to Allege Corporate Scienter ........................................ 16

III.    The Complaint Fails to Allege Loss Causation ............................................... 17

IV.    The Complaint Fails to Allege a Control Person Claim under Section 20(a) Against the Individual Defendants ............................................................ 18

CONCLUSION .............................................................................................. 18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)..................................................................................9

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................................9

*Buxbaum* v. *Deutsche Bank A.G.*,
    2000 WL 33912712 (S.D.N.Y. 2000).....................................................................16

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) .....................................................4, 9

*City of Hollywood Police Officers' Ret. Sys.* v. *Henry Schein, Inc.*,
    552 F. Supp. 3d 406 (E.D.N.Y. 2021) ....................................................................4

*City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)...................................................................10

*Constr. Laborers Pension Tr.* v. *CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)...................................................................10

*In re Diebold Nixdorf Inc. Sec. Litig.*,
    2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .......................................................8

*In re Doral Fin. Corp. Sec. Litig.*,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008)...................................................................15

*ECA & Loc. 134 IBEW Joint Pension Tr.* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..................................................................................13

*Elliott Assocs.* v. *Covance, Inc.*,
    2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ........................................................5

*Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (C.D. Cal. Mar. 21, 2018) ........................................................5

*Galestan* v. *OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)..................................................................4, 9

*Ganino* v. *Citizens Utils. Co.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................................11

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).............................................................12, 15

*Hawaii Structural Ironworkers Pension Tr. Fund* v. *AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) ........................................................................ 8, 9, 16

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) .................................................................................. 12

*Jackson* v. *Abernathy*,
    960 F.3d 93 (2d Cir. 2020) ..................................................................................................... 16

*Lau* v. *Opera Ltd.*,
    527 F. Supp. 3d 537 (S.D.N.Y. 2021) .................................................................................. 11

*Levy* v. *Gutierrez*,
    2017 WL 2191592 (D.N.H. May 4, 2017) .......................................................................... 12

*New Orleans Emps. Ret. Sys.* v. *Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ............................................................................................ 12

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................................................................. 16

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................................................... 12

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013) ..................................................................................................... 10

*In re Razorfish Sec. Litig.*,
    2001 WL 1111502 (Sept. 21, 2001) ....................................................................................... 8

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) ........................................................................... 12, 13

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) ................................................................................................... 11

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008) ........................................................................................... 15, 16

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ......................................................................... 9

*Van Dongen* v. *CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013) ........................................................................... 12, 13

*White* v. *H&R Block, Inc.*,
    2004 WL 1698628 (S.D.N.Y. July 28, 2004) ...................................................................... 11

*Wilamowsky* v. *Take-Two Interactive Software, Inc.*,
    818 F. Supp. 2d 744 (S.D.N.Y. 2011)........................................................................8

*Woolgar* v. *Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)........................................................................3

Defendants Teladoc Health, Inc., Jason Gorevic, Mala Murthy, Stephany Verstraete, Bimal Shah, and Richard Napolitano respectfully submit this reply in further support of their motion to dismiss the Second Amended Class Action Complaint.

### PRELIMINARY STATEMENT

In their opposition brief, Plaintiffs cobble together selective snippets of Defendants' statements, contrast those snippets with anecdotal CW allegations, wave aside Teladoc's warnings to the market, and thereby attempt to manufacture securities fraud based on routine challenges encountered in integrating two multibillion-dollar companies. But Defendants' high-level progress reports on the status of merger integration efforts—none of which claimed that zero challenges had been encountered, and most of which are puffery, forward-looking, and opinions incapable of objective verification—are not rendered false simply because a few former employee CWs professed displeasure with the speed of integrating particular systems or observed confusion among employees about product offerings in the wake of the merger. Similarly, with respect to their competition theory, Plaintiffs rely on sound bites of public statements to suggest that Defendants were telling the market that Teladoc was not facing competition, even though Defendants clearly signaled risk to Teladoc's projections for the chronic care business, which, as warned, later experienced increased competition. In sum, Plaintiffs have failed to plead that any of the challenged statements are materially false.

Plaintiffs' scienter argument fails as well. Plaintiffs offer a feeble motive argument based on proceeds from stock sales, which is doomed by the fact that Gorevic, Murthy, and Verstraete actually increased their Teladoc holdings during the Putative Class Period, are not alleged to have sold at suspicious times or quantities, and sold pursuant to 10b5-1 trading plans or to cover tax obligations. Plaintiffs also attempt to plead conscious misbehavior and recklessness, but cannot show, whether through a CW or otherwise, that any Individual Defendant was provided internal

information that contradicted public statements. Plaintiffs thus fall back on the "core operations" theory and "corporate" scienter, neither of which salvages Plaintiffs' scienter argument.

Finally, Plaintiffs' loss causation theories are fatally undercut by Plaintiffs' inability to identify new information revealed on any of the alleged corrective disclosure dates that actually "corrects" the challenged statements made by Defendants.

For these reasons, the Complaint should be dismissed with prejudice.

## **ARGUMENT**

I.  **The Complaint Fails to Allege Any Actionable Material Misstatements**

A.  **The Alleged Misstatements About Integration Are Not Alleged to Be False**

As Defendants' motion showed, far from expressing that integration was a *fait accompli*, Defendants' challenged integration statements were highly general statements about integration progress that were not pleaded to be false. (Mot. 11-16.)[1] In response, Plaintiffs mischaracterize the statements, arguing they were more concrete and definitive than they actually were, and cherry-pick snippets in an attempt to manufacture contradictions with CW allegations. When read in context, however, there are no well-pleaded factual allegations actually contradicting the challenged integration statements.

***General Statements about Progress.*** Plaintiffs cite five statements that they claim concern technology integration (Opp. 10-15), but fail to plead that any of these general progress reports were materially false when made:

***Shah's February 11, 2021 Statement.*** A few months after the merger, Shah stated generally that the integration was "going *really great*" and then, specifically describing the combined business of Teladoc, Livongo, and InTouch (a July 2020 acquisition not at issue here),

---

[1] Plaintiffs do not address the statement "the company is busy and making great progress" and concede lack of falsity as to "significant investments to integrate . . . products and services." (Opp. 13 n.4.)

he said, "what's been really exciting is now understanding how these three chassis from a technology perspective, a consumer engagement perspective really do fit together to provide you know a continuum of care, a whole person experience," but that "it's really the onus on the internal teams to execute to deliver that vision, and we're already well on our way of building . . . that highway to quickly deliver that to the consumers and to our clients."  (¶ 298; Opp. 10-11.) Plaintiffs seize on the phrase "technology perspective" and argue the statement was false because Teladoc was "struggling to integrate Livongo's product technology and thus provide whole-person products, like RPM, to customers."  (Opp. 10-11.)  But Shah's statement says nothing about the integration of specific Livongo technological systems or the availability of remote patient monitoring ("RPM") capabilities.  And, even if it had, as explained in Defendants' opening brief (Mot. 13), Plaintiffs do not specify what RPM capabilities were being discussed or developed at that time.  Further, Plaintiffs do not dispute that Shah's statement is opinion and forward-looking, and ignore context by arguing that puffery does not apply to "specific integration aspects," (Opp. 22), which this statement does not address.  (Mot. 20; Ex. 1.)

Plaintiffs argue that Shah's statement is contradicted by CW 2.  But CW 2 merely claims to have emailed Shah two months prior that she was "starting to feel uncomfortable" about RPM messaging, requesting "input and guidance."  (Opp. 11; ¶ 136.)  The thrust of CW 2's concern is that certain Teladoc clients were interested in RPM capabilities, but those capabilities were either not available or misdescribed by salespeople.  But the allegation that a single employee expressed concern to Shah about a single product feature months earlier does not render his opinion statement false.  At most, Plaintiffs complain about confusion or mismanagement of RPM capabilities, which is not actionable.  *Woolgar* v. *Kingstone Cos.*, 477 F. Supp. 3d 193, 227-28 (S.D.N.Y. 2020).

***Gorevic's February 24, 2021 Statement***.  Plaintiffs argue that Gorevic's statement that

3

"[t]he integration of our data platform and assets also *continues to progress* as we work to unlock the power of our combined data sets" was false because the integration of two specific programs, Tableau and Salesforce, was "behind schedule." (Opp. 12-14 (emphasis added); ¶ 308.) But Gorevic never referred to those specific programs, much less set any deadline for their completion, and his puffery statement about continued progress is not pleaded to be false.[2]

**Murthy's April 28, 2021 Statement.** Plaintiffs assert Murthy spoke falsely when, in referencing "the platform integration side," she mentioned Teladoc's expected "investments" in the "priorities in the R&D [research & development] road map," noting that "data integration" requires "deep integration" and "we are *well on our way* to do it." (Opp. 14; ¶ 338.) But "well on our way" necessarily means the work is incomplete[3] and Plaintiffs do not claim Teladoc failed to invest in its "R&D road map." Further, this statement is puffery, opinion, and forward-looking (Mot. 20; Ex. 1), and Plaintiffs do not credibly argue otherwise.

**Gorevic's November 10, 2021 Statement.** Plaintiffs argue Gorevic's statement to *Business Insider* about Teladoc's "vision" being "on track" was false because Teladoc purportedly lacked "a clear road map" for product and data integration. (Opp. 14.)[4] But what Gorevic actually said is: "The *vision* that we laid out then—about whole-person care and bringing together the unique

---

[2] Plaintiffs cite Gorevic's statement that "we are now capturing 2 million blood glucose data points per week," claiming it contradicts CW 6's allegation that Teladoc failed "to integrate Livongo's diabetes glucometer app with Teladoc's services to enable doctors to access such data during virtual sessions." (Opp. 13; ¶ 308.) But Gorevic's statement simply conveyed the number of blood glucose data points per week, unrelated to integration efforts, and Plaintiffs do not allege the statement was false, much less that Gorevic knew it was false.

[3] Unlike *City of Hollywood Police Officers' Retirement System* v. *Henry Schein, Inc.*, which Plaintiffs cite, Murthy did not represent that the "integration" had been completed. 552 F. Supp. 3d 406, 412 (E.D.N.Y. 2021). There, the defendant "assured the public that the integration of the sales force had been completed" although "even a year after the merger, this was still not the case," as the company later admitted. *Id.* at 416. Teladoc made no such admission here. Further, *Henry Schein* noted that opinion-based statements about a company "continu[ing] to make progress" on integration, similar to Murthy's here (and others at issue), were *not* actionable. *Id.*

[4] *In re Chicago Bridge & Iron Co. N.V. Securities Litigation*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018), is inapposite; there, defendants claimed their nuclear projects "were meeting . . . milestones without delay" when in fact they were under a three-month stop-work order. *Galestan* v. *OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 287, 292-93 (S.D.N.Y. 2018), is distinguishable because the challenged statements concerned specific "integration initiatives" that were measurably and verifiably not "on track," causing the company to miss its earnings guidance. *Id.*

capabilities of two complementary companies to deliver something that really hasn't been done before—is *on track*." (Opp. 14; ¶¶ 386, 447 (emphasis added)).  Gorevic was talking about his "vision" for the combined company—not specific product and data integration projects—and this statement is clear puffery and opinion, lacking any concrete or verifiable factual assertions. (Mot. 21-24); *see, e.g.*, *Elliott Assocs.* v. *Covance, Inc.*, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) (finding "on track" statement to be an opinion).  Further, Plaintiffs' supporting factual allegations—from CW 2, that Teladoc's COO (not Gorevic) declined to address RPM capabilities at a June 2021 meeting; that CW 4 was "underwhelm[ed]" by Gorevic's presentation in September 2021 regarding integration; and that CW 11 felt Teladoc failed sufficiently to integrate the Tableau platform and that data integration plans were not sufficiently "clear" (Opp. 4-6; ¶ 372)—are subjective CW opinions that are irrelevant to Gorevic's "vision" for the combined company.[5]

***Verstraete's November 18, 2021 Statement.***  Plaintiffs argue Verstraete's statement— "we've significantly deepened our capabilities as we brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks"—was false because Tableau—a data visualization platform used to analyze patient and client information (¶ 392)—was not yet integrated.  (Opp. 15; ¶¶ 189-94, 392-94.)  But Verstraete never mentioned Tableau, or any specific technology, and Plaintiffs do not plead that Tableau was part of the "marketing data and tech stacks," other than to say that the marketing team mined Tableau data to use for the "stacks." (¶ 397.)  Indeed, CW 11 was not sure what "tech stacks" meant but "*believed*" that it referred to "applications used for marketing purposes," like email blasts or text messages to customers, which used Tableau data (¶¶ 392-98), and Plaintiffs do not allege that, post-merger, the marketing team

---

[5] Plaintiffs cite *Extreme Networks, Inc. Securities Litigation*, but the defendant there publicly extolled that the company's integration progress was "on track" and "ahead of plan" while privately admitting that the integration plan "was still TBD." 2018 WL 1411129, *5, *16-18 (C.D. Cal. Mar. 21, 2018).

was unable to send such blasts and messages.  Plaintiffs also rely on former Livongo CWs who felt Livongo had a superior data science team (Opp. 15), but CWs' subjective views on the quality of the companies' data science teams also do not render this statement false.

***Statements About the "Commercial Organization."***  Plaintiffs cite two Gorevic statements about sales team integration: (i) a February 24, 2021 statement that "[o]ur commercial organization is now fully integrated," and (ii) an April 28, 2021 statement that Teladoc had "made considerable progress across our key work streams" on the integration, including that "our commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products."  (Mot. 12; ¶¶ 308, 336.)  Plaintiffs urge that these statements were false because, according to CWs 2 and 5, there was "internal confusion, 'misalignment,' and division between the two companies' personnel," including "a 'hemorrhaging' of key Livongo employees" (Mot. 12), and CW 5 opined the integration of the "sales forces" was not complete.  (Opp. 16-17.) Plaintiffs, however, do not offer well-pleaded facts that the commercial organizations were not integrated and cross-selling both companies' products.  While Plaintiffs tout CW 2's "internal documents," at most they show staff infighting, issues with the integration of InTouch (not at issue here), confusion among the sales team over the availability of RPM capabilities, Teladoc's possible development of a "patient focused 'subscription' model," and CW 2's personal dismay that a proposal she made was not implemented (for reasons she does not know).  (Opp. 10, 16, 17 n.8; ¶¶ 135-50, 173-75, 181-82, 206, 522.)  Neither these allegations nor the alleged corrective disclosures suggest that the commercial organization was not integrated and selling the full suite of products, and so these statements are untethered from Plaintiffs' supposed losses.

### B.    The Alleged Misstatements About Competition Are Not Alleged to Be False

Ignoring many of the allegedly false "competition" statements, Plaintiffs focus on

statements about "bump[ing] into" certain competitors and "winning" business.[6]  (Opp. 19, 20 (citing ¶¶ 344, 358, 363, 373).)  None of these general statements is pleaded to be false.

***Gorevic's "Bump Into" Statement.***  Plaintiffs rely heavily on a selective quote from Gorevic during an April 28, 2021 earnings call.  A reporter asked Gorevic about three competitive trends, "how do we think about Amazon Care, the fact that MDLive has been sold to Cigna, doctors on demand and grand rounds coming together," and he responded, "I'm not going to call out individual solutions that you mentioned or competitors that you mentioned.  But for the most part, *many of them we almost never bump into, and some of the new entrants we're just not seeing gain traction*." (¶ 344; Ex. 17 at 7.)  While Plaintiffs assert that Gorevic's answer was false because he did not mention that CVS, Omada, Virta, and American Well stole customers from Teladoc (Opp. 19), his statement plainly referred to *other* specific competitors about which he had been asked.  Moreover, Plaintiffs do not dispute that Teladoc *explicitly* disclosed the CVS contract termination (Mot. 17; Ex. 14 at 4), and repeatedly warned the market about competition, including the March 1, 2021 warnings that the virtual care market "is competitive," that Teladoc "expect[s] . . . increased competition," that Teladoc "currently face[s] competition" from "a range of companies," and  that "potential Clients may accept competitive solutions in lieu of" Teladoc solutions.  (Ex. 6 at 26-27.)  Gorevic certainly did not promise that Teladoc was immune from competition.

***"Winning" Statements***.  Plaintiffs also argue that Defendants understated "the impact" of competition (Opp. 20) when extolling sales Teladoc successfully booked: "We win because of our multiproduct breadth" (June 1, 2021); "We're winning because of the full suite of our products

---

[6] Plaintiffs do not address Defendants' statements that "we're probably 10 times larger than the next closest competitor and what we have is a unique set of capabilities that positions us as the only one who can deliver on true whole person care" (¶ 400); "about 2/3 of our bookings [in the 2020 selling season] were multi-product bookings and I think that really speaks to the market demand and consumer demand for unified integrated solutions" (¶ 352); and we have "an unmatched competitive advantage" that is "virtually impossible for an upstart to cross . . . and sets us up for the future of virtual care." (¶¶ 263, 399.)  Plaintiffs thus concede lack of falsity as to these statements.

and services" (October 27, 2021); and "Overall, in spite of the market noise, management believes

that [Teladoc]'s competitive positioning is as strong as it has ever been" (June 8, 2021).  (*Id.* at 19,

20 (citing ¶¶ 358, 363, 373).)  These statements are classic puffery, statements of opinion, and

forward-looking (Ex. 1), and are not rendered false simply because, months later, Teladoc faced

increased competitive pressures causing it to lower its outlook as to specific businesses.

### C.    Defendants' Alleged Misstatements Are Non-Actionable Puffery, Opinion, or Forward-Looking Statements

As explained in Defendants' opening brief, statements about things "going great," being

"well on our way," "continu[ing] to progress," making "considerable progress," making "great

progress," "rapid progress," or being "on track" or "in line," *without* commitments to any plan,

benchmark, or baseline; "very strong" cultural alignments; why Teladoc believes it "wins" sales;

and what Defendants "think," "believe," had "hoped for," "would say," or "would argue" are

classic statements of puffery, opinion, or forward-looking statements.  (Ex. 1.)  The challenged

statements are summarized in a chart to assist the Court.  *Id.*[7]

In response, Plaintiffs rely on a series of cases showing that, in certain contexts, the puffery

language used by Defendants can have a different meaning.[8]  But those cases concern far more

specific, concrete, and measurable factual assertions than those at issue here.  In *Hawaii Structural

Ironworkers Pension Trust Fund* v. *AMC Entertainment Holdings, Inc.*, the defendants described

---

[7] Plaintiffs argue that the Court should disregard the chart Defendants provided to aid the Court by summarizing the nearly 40 alleged misstatements Plaintiffs identify in their 205-page Complaint. (Opp. 21 n.14.)  This demonstrative lacks any legal argument and is merely intended to assist the Court by showing how the arguments apply to each of the alleged misstatements.  Courts routinely consider such demonstratives in similar contexts.  *See, e.g.*, *Wilamowsky* v. *Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 748 n.2 (S.D.N.Y. 2011).

[8] Plaintiffs' attempts to distinguish Defendants' authorities fall flat.  (Opp. 17 n.9, 19 n.11, 23 n.16.)  Plaintiffs fail to show how the statements in *In re Diebold Nixdorf, Inc. Securities Litigation* meaningfully differ from those at issue here. 2021 WL 1226627, *9 (S.D.N.Y. Mar. 30, 2021).  Plaintiffs' arguments regarding *In re Razorfish, Inc. Securities Litigation* fare no better as they fail to show how the statements at issue here (*e.g.*, "commercial organization is now fully integrated" (¶ 308)) are more concrete or specific than those in that case ("major integration efforts [were] complete"), which were inactionable under Judge Rakoff's reasoning that "integration" is "far too loose and uncertain a term on which to premise a claim of securities fraud."  2001 WL 1111502, at *1-2 (S.D.N.Y. Sept. 21, 2001).

integration efforts as 'flawless,'" claiming that "[t]here have literally been no operational snafus of any note," and the court found it plausible that a reasonable investor would rely on this to mean that "zero significant obstacles had occurred."  422 F. Supp. 3d 821, 845-46 (S.D.N.Y. 2019). Similarly, *Galestan* concerned positive assertions about a loan program that were contradicted by the defendants' awareness of declining productivity and increasing delinquencies, which caused the company to miss its forecasted guidance.  348 F. Supp. 3d at 299, 303.  *In re Turquoise Hill Resources Ltd. Securities Litigation* concerned "specific" statements laying out a verifiable schedule that the company failed to meet.  2022 WL 4085677, at *39 (S.D.N.Y. Sept. 2, 2022). *Chicago Bridge & Iron* concerned statements about progress on nuclear projects when, to the contrary, a three-month stop-work order had been imposed.  2018 WL 2382600, at *8.  And *In re BHP Billiton Ltd. Securities Litigation* involved safety-related representations that were "not mere generalities, but contain[ed] quite specific representations or guarantees of some concrete fact or outcome."  276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (quotation omitted).  Plaintiffs' other cases declined to find statements were opinions where, unlike here, they conveyed certainty and/or lacked prefatory language signifying them as opinions.[9]

### D.    Teladoc's Warnings to the Market Contextualize the Challenged Statements

Plaintiffs do not dispute that Defendants' statements about integration and competition must be read in context with Teladoc's repeated warnings to the market about the risks of integration and numerous statements qualifying its progress, as well as competitive challenges in the market that increased over time.  (Mot. 14-18.)  Plaintiffs assert that the disclosures were

---

[9] *See, e.g., Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 176-77 (2d Cir. 2020) (statements conveyed certainty, did not use opinion "prefatory language like 'I believe' or 'In my estimation,'" and suggested there were no hurdles to overcome).  Many of the statements at issue here included this sort of prefatory language, and, far from conveying certainty, noted that there was still work to do.  (¶ 314 (stating "*I believe*" Teladoc would "take away" Blue plan "from a competitor"); ¶ 337 ("*I think* the team has just done incredible work to bring [the commercial integration] together"); ¶ 338 ("*I would say* we are well on our way to do it") (emphasis added).)

misleading because the "risks had already materialized." (Opp. 17-20.) But Plaintiffs do not actually plead that the complained-of integration risks all somehow materialized in the **four months** between the October 30, 2020 merger closing and the March 1, 2021 risk disclosures in Teladoc's 10-K. The CW accounts on which Plaintiffs rely merely cite supposed confusion among salespeople in the weeks after the merger about reporting lines, whether there would be layoffs, which Salesforce database to use, uncertainty about login passwords, how to do "customer centric integrated marketing," and attrition of Livongo employees.[10] (¶¶ 107-08, 112, 155, 251, 301-06.) These are the sorts of issues that one would expect to arise in the aftermath of an $18 billion merger, and such routine challenges cannot be the basis for a securities fraud claim. *See Constr. Laborers Pension Tr.* v. *CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020).[11] As to Plaintiffs' competition theory, Teladoc's disclosures explained that competitive pressures increased over the proposed class period, causing Defendants ultimately to decrease guidance in April 2022 that had been issued in October 2021 (Mot. 8-9), and Plaintiffs do not cite any facts to the contrary.

Plaintiffs ask the Court to disregard Teladoc's warnings because the "truth-on-the-market" defense purportedly is unavailable at the pleading stage. (Opp. 17-18, 20.) This is wrong. Defendants are not invoking the truth-on-the-market defense (which looks at whether *other* public information revealed the purportedly concealed information). Rather, Defendants argued that the "truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013). Further, to the extent a "truth-on-the-market" defense is implicated

---

[10] Plaintiffs cite *Business Insider*'s account of an unnamed Teladoc spokesperson noting that "integration was an issue in the first six months" post-merger, without further detail as to the subject matter or specific timing. (¶ 383.)

[11] *City of Omaha Police & Fire Retirement System* v. *Evoqua Water Technologies Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020), is distinguishable; there, an IPO registration statement's integration risk disclosures were insufficient because, at the time they were made, the company had systematically fired key integration staff members and the integration of one of its eight recent acquisitions was already going poorly.

at all, courts may, and routinely do, grant motions to dismiss where the allegedly omitted information was publicly available. *See, e.g.*, *White* v. *H&R Block, Inc.*, 2004 WL 1698628, at *12-13 (S.D.N.Y. July 28, 2004); *Lau* v. *Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021).[12]

Plaintiffs also assert that Defendants falsely reassured the market, and thereby undercut Teladoc's risk disclosures. Specifically, Plaintiffs rely on an October 28, 2021 report from Credit Suisse, which expressly disclaims quoting management verbatim, offering Credit Suisse's view that "[o]verall, management pushes back on the claim that [Teladoc] is behind when it comes to the actual integration of Livongo."[13] (Opp. 18; ¶ 381; Ex. 14 at 7.) But Credit Suisse did not identify any specific aspect of the integration that was behind, against which management "pushe[d] back." And Plaintiffs ignore the surrounding text that refers to demonstrated success with "multi-product sales" as "a good proof point," and cites Teladoc's successful launch of a product "just eight months" after the merger. (Ex. 14 at 7.) This does not undercut the warnings.

## II.    The Complaint Fails to Allege a Strong Inference of Scienter

Plaintiffs' opposition does not marshal allegations supporting a cogent, much less compelling, inference that Defendants intentionally lied to the market about the status of the integration or competitive challenges. Indeed, they do not even attempt to address the far stronger inference of a non-fraudulent intent: that Teladoc clearly warned the market both about difficulties it might face in the integration and its "conservative" expectations about the chronic care business, and these express warnings are entirely inconsistent with an intent to defraud.[14] (Mot. 25.)

---

[12] Unlike Defendants' argument here, the defendant in *Ganino* v. *Citizens Utilities Co.*, which Plaintiffs cite, relied on the lack of movement in its stock price after a corrective statement to suggest that the market already knew the truth. 228 F.3d 154, 167 (2d Cir. 2000). That is not Defendants' argument here.

[13] Plaintiffs purport to analogize this statement to *In re Synchrony Financial Securities Litigation*, 988 F.3d 157 (2d Cir. 2021), (Opp. 23), but *Synchrony* did not concern a *defendant*'s purported "pushback" against detractors; it concerned a defendant's *own statement* that it was "not getting any *pushback*." *Id.* at 168 (emphasis added).

[14] Plaintiffs do not dispute that the Defendants' opinion statements were not sincerely held. (Mot. 23-24.) They merely argue that Defendants omitted contradictory facts, which is wrong for the reasons stated above. *See supra* Section I.A. Plaintiffs also appear to acknowledge that forward-looking statements cannot be pleaded under a

## A.    Plaintiffs Fail to Plead Motive and Opportunity

Retreating from their stock sales theory, Plaintiffs state they "have no obligation to plead motive." (Opp. 30.) And the weakness of this theory justifies this retreat: Plaintiffs do not dispute that Gorevic, Murthy, and Verstraete each *increased* their overall holdings of stock during the Putative Class Period.[15] Plaintiffs also concede by their silence that all of Gorevic's, Murthy's, and Verstraete's sales during the Putative Class Period (excluding gifts) were either pursuant to a 10b5-1 plan or to cover tax withholding obligations. None of those sales can support scienter here. (Mot. 27-28.) Plaintiffs fall back on two other arguments, both unsupported:

*First*, Plaintiffs argue that the Individual Defendants increased their holdings largely from grants or options, which somehow are less meaningful. But *Levy* v. *Gutierrez*, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017), cited by Plaintiffs, recognized that it *was* appropriate to consider vesting stock options alongside other holdings, ultimately finding scienter based on a "stark contrast" between defendants' "pre-class dormancy and their class period [sales] activity." Here, Defendants' trades during the Putative Class Period were similar to the prior period and resulted in a net increase of Teladoc holdings (Mot. 27), "rais[ing] precisely the contrary inference from the one suggested by plaintiffs." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011).

*Second*, Plaintiffs focus on aggregate proceeds rather than identifying specific transactions that are unusual or suspicious, as they must. (Mot. 26-27.) Plaintiffs' reliance on *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999), *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003), and *Van Dongen* v. *CNinsure Inc.*, 951 F. Supp.

---

recklessness theory, but do not show that the statements were made with actual knowledge of falsity or without cautionary language. (Mot. 24.) *New Orleans Employees Retirement System* v. *Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011), is inapposite. The court found certain statements not forward-looking where defendants gave assurances that "restructuring was going according to plan" despite knowledge of serious inventory issues at that time.

[15] Plaintiffs concede the Complaint does not plead that either Shah or Napolitano had any unusual or suspicious sales (Opp. 31 n.31), which "undermines the claim of scienter" against them, and sales by others do "not change [their] culpability." *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (citation omitted).

2d 457 (S.D.N.Y. 2013), is misplaced, as the trades at issue in those cases were suspiciously timed in advance of a negative public announcement.  No such facts are pleaded here.  And none of the Defendants are accused of dumping anywhere close to "97%" of their stock, as in *SLM Corp.*, 740 F. Supp. 2d at 558.

### B.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness

Absent motive, Plaintiffs' circumstantial allegations of conscious misbehavior or recklessness "must be correspondingly greater."  *ECA & Loc. 134 IBEW Joint Pension Tr.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009).  Plaintiffs do not dispute that there are no scienter allegations for Napolitano (Mot. 29 n.14), and they miss the mark for the other Individual Defendants.

### 1. No Conscious Misbehavior or Recklessness Regarding Integration Issues

For their integration theory, Plaintiffs cite a handful of CW anecdotes, none of which show that any Defendant possessed non-public information conflicting with contemporaneous public statements.  In particular, as to Gorevic, Plaintiffs rely on the following allegations:

- CW 4 allegedly spoke to Gorevic at a leadership meeting "in or around September 2021" about "plans" for the integration, and he suggested she wait for his presentation the following day.  She then found the presentation "underwhelming," without resolving unspecified "integration issues" that concerned her.  (¶ 523.)

- CW 2 had no personal interaction with Gorevic, but says that Gorevic personally fielded questions regarding integration at townhall meetings CW 2 attended.  CW 2 provides no examples of statements by Gorevic, but opined that she found his answers evasive or insufficiently responsive.  (¶ 515.)

- CW 2 also was "informed" that Gorevic had a call with a prospective client the day before the merger closed where he "apparently discussed" the "possibility" of Teladoc developing a subscription model that would include urgent care with chronic care. (¶ 517.)  From this bare allegation, Plaintiffs argue that Gorevic was "personally involved in pushing" RPM capabilities in meetings with clients.  (Opp. 26.)  This does not plead that Gorevic was aware of salesforce confusion about RPM following the merger (about which Plaintiffs complain), much less that he knowingly made false statements to shareholders about any integration-related issue.

- Plaintiffs argue that COO David Sides "admitted that there was no integration plan," and because Sides reported to Gorevic, Gorevic must have known the "underlying integration issues." (Opp. 27.) But the Complaint does not actually plead this. Rather, it says that CW 2 asked Sides about the integration plan, and his response "That's a great question" "worried CW 2." (¶ 342.) Plaintiffs do not allege that Sides believed there was "no integration plan," much less communicated that to Gorevic.[16]

In short, the CWs' subjective dissatisfaction with Gorevic, and speculation about his knowledge, is plainly insufficient to plead strong circumstantial evidence that Gorevic acted with intent to deceive shareholders in making any challenged statement about integration.

Likewise, as to Shah, Plaintiffs claim that CW 2 "repeatedly informed Shah in multiple emails of a widespread, continuing integration issue." (Opp. 26.) But this is not pleaded. Rather, the SAC alleges that (i) CW 2 received an email from Shah on *the day the merger closed* where he explained—unsurprisingly—that they "don't have details yet" on an integration workstream (¶ 140); and (ii) that CW 2 emailed Shah and several others just one month later about issues with "RPM messaging" to customers. (¶¶ 135-36.) But Shah made no public statements about RPM capabilities, and CW 2's subjective concerns about not being "quite on the same page on the definition of what exactly is RPM" hardly contradict Shah's general statements months later about a "shared mission and a shared culture" and work to be done to deliver on Teladoc's "vision." (¶¶ 136, 298; *supra* Section I.A.) These paltry allegations do not plead scienter as to Shah.

### 2. No Conscious Misbehavior or Recklessness Regarding Competition

As Defendants showed, Teladoc issued guidance in October 2021, disclosing a "conservative" outlook for its chronic care business due to competition issues, and then lowered that guidance in April 2022 "to reflect dynamics" Teladoc was "currently experiencing" from an increase in competitive pressures. (Mot. 33-35.) Plaintiffs argue that "Defendants had 'access to' and closely monitored sales losses to competition via Salesforce," and thus knew or should have

---

[16] At most, Sides allegedly said he "didn't know" the plan, or that it was "a great question." (¶¶ 304, 342, 539.)

known that competition was adversely affecting Teladoc.  (Opp. 27.)  But Plaintiffs do not cite any data known to any Individual Defendant that is inconsistent with public disclosures about increased competition in the chronic care business.  The mere ability to access sales data does not plead scienter.  *Glaser*, 772 F. Supp. 2d at 587-88 (noting "broad reference to raw data," and "generalized forecasting and speculation" in the media is insufficient); *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (similar).  Moreover, any purported knowledge of increased competition that might have been gleaned from these hypothetical data would be consistent with Defendants' public statements.

Plaintiffs' CW allegations about Murthy and Verstraete fare no better.  Relying on CW 3, Plaintiffs allege that Murthy and Verstraete discussed increased competition at "quarterly and monthly all-hands meetings," which CW 3 attended at unspecified times.  (¶ 226.)  CW 3 claims that the discussions "generally asserted" that Teladoc was doing so well it "attracted increased competition in the telehealth space."  (*Id.*)  Neither Murthy nor Verstraete said anything publicly to the contrary, and these CW 3 allegations are entirely consistent with other Defendants' public statements about increased competition.  In any event, the absence of details about dates and substance of discussions observed by CW 3 makes it impossible to determine how any supposed discussion at those meetings relates to the public statements at issue.  *See In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (finding, absent timing and details, CW's allegation about meetings where reports were discussed was "so vague as to be meaningless").

## C.    The "Core Operations" Theory Does Not Rescue Plaintiffs' Claims

Notwithstanding that "the Second Circuit has not endorsed" the "core operations" theory (Mot. 31), Plaintiffs double down on this theory, even while admitting it can provide at most only supplemental support.  (Opp. 28.)  Even assuming this theory were "supplemental" to another well-pleaded scienter theory (it is not), Plaintiffs do not—and cannot—cite any case supporting the

15

proposition that the integration of certain software programs, confusion by the sales team about RPM capabilities, or any other routine integration challenges that Plaintiffs now cite constitute "core operations." *Buxbaum* v. *Deutsche Bank A.G.*, on which Plaintiffs rely, turned on the defendant's "personal involve[ment]" in takeover talks, where the alleged misstatements at issue included his own statements *denying* that such talks had occurred in the first place. 2000 WL 33912712, at \*19 (S.D.N.Y. 2000). And while *Hawaii Structural Ironworkers* found that the acquisition and renovation of theaters could be a core operation of a theater company, it found that "insufficient to allege a strong inference of scienter." 422 F. Supp. 3d at 852-53.[17]

### D.     Plaintiffs Fail to Allege Corporate Scienter

Lacking facts showing management's intent to deceive, Plaintiffs focus on a "corporate scienter" theory. But corporate scienter requires "pleading facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Dynex*, 531 F.3d at 195). "[T]he 'most straight forward' way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.* at 98 (quoting *Dynex*, 531 F.3d at 195). The Second Circuit has cautioned that only "[i]n exceedingly rare instances" where a statement is so "dramatic" can collective corporate scienter be inferred despite a lack of individual scienter. *Id.* at 98-99. That standard is not met here: the SAC is devoid of well-pleaded allegations that any Individual Defendant (or anyone else) acted with scienter.[18]

---

[17] Plaintiffs do not appear to argue that the core operations theory applies to their competition theory (Opp. 27-29; ¶¶ 501-09), but to the extent they do, it fails (Mot. 31-32).

[18] Plaintiffs point to *In re NovaGold Resources Inc. Securities Litigation* to argue that corporate scienter can be successfully pleaded by showing "widespread knowledge" at the company of facts refuting corporate statements. 629 F. Supp. 2d 272, 299-300 (S.D.N.Y. 2009). That case, however, involved a "massive revision" of earlier project cost estimates, which supported an inference that the company knew its earlier estimates were unreliable. *Id.* at 299. Here, Plaintiffs rely only on the subjective opinions of a few CWs about granular integration issues, different in kind and magnitude from the disparities in *NovaGold*.

**III.    The Complaint Fails to Allege Loss Causation**

Only one of the two alleged corrective disclosures—the November 2021 *Business Insider* article—has anything to do with integration (and nothing to do with competition); the other two concern competitive pressures.  None suffices to plead loss causation.

***November 10, 2021 Business Insider Article.***    As Defendants showed, the routine integration challenges described in this article revealed nothing new about integration that either contradicted Defendants' statements or was not already encompassed in Teladoc's risk disclosures. (Mot. 32-33.)  Plaintiffs focus on minutiae to argue the commercial organization was not "fully integrated."  (Opp. 33-34.)  But a commercial organization can combine sales teams and cross-sell products and *also* experience personnel issues such as attrition, confusion about product offerings, and difficulties navigating internal systems and meeting quotas.  (Ex. 15 at 2, 4.)  The *Business Insider* article acknowledged "[t]he department in charge of client operations . . . had to *fully combine* with Livongo's by January 1," and thus describes *post*-integration challenges.  (*Id.* at 4 (emphasis added).)

***April 27, 2022 Guidance Revision.***    Teladoc's revised guidance was attributed to recent competitive pressures for Teladoc's BetterHelp and chronic care businesses, not integration issues. (Mot. 33-35.)  Plaintiffs do not dispute this, and have no answer to the fact that the revision was based on *recent* market trends and could not have "corrected" alleged misstatements made before the guidance was issued five months earlier in October 2021.  *Id.*  As to integration, Plaintiffs rely on Gorevic's statement on the earnings call that Teladoc was "not finished" with integration, but that was neither new nor corrective because Defendants never said the integration was complete.[19]

---

[19] In a tortured attempt to tie the April 27, 2022 earnings disclosure to integration issues, Plaintiffs cite to an analyst report opining that the goodwill impairment charge announced that day "is an admission of the destruction of Livongo's value."  (Opp. 35; ¶ 277.)  But the analyst was focused on the value of Livongo as an asset, and the ultimate realization of the benefits of the merger, not the day-to-day progress of integration.

*July 27, 2022 Earnings Call.*  As Defendants showed, Teladoc did not attribute its second-quarter financial results to the integration.  (Mot. 35.)  In response, Plaintiffs cite snippets of statements—untethered to the financial results—about the fact that "the company's products are not yet fully integrated."  (Opp. 35 (citing ¶¶ 498-99).)[20]  But, as discussed above, this is not new; Defendants never represented that the integration was completed, so these statements are corrective of nothing.  As for competition, Gorevic's passing reference to "competitive noise" while explaining slower-progressing deals is nothing new—he even explained that these trends were "discussed in our first quarter call [in April 2022.]"  (¶ 482.)

## IV.    The Complaint Fails to Allege a Control Person Claim under Section 20(a) Against the Individual Defendants

Plaintiffs' control claims must be dismissed for failure to allege predicate "primary" violations of Section 10(b) as well as culpable participation.  (Mot. 36.)  Plaintiffs state that Defendants do not contest "control," but Defendants showed that Shah, Napolitano, and Verstraete are not alleged to have had the power or authority to control Teladoc or its other officers' and employees' statements (apart from their own).  (Mot. 36 n.19.)  Plaintiffs do not respond to this point, and thus concede it.

<u>**CONCLUSION**</u>

For these reasons, and those set forth in Defendants' opening brief, the Court should dismiss the Complaint with prejudice.  Plaintiffs have already been given the opportunity to amend their Complaint once in response to a motion to dismiss, and their failure to correct the Complaint's deficiencies further supports dismissal with prejudice here.

---

[20] This statement was not even made on the July 27 earnings call and thus cannot be connected to the purported stock drop that day; it appeared in a Credit Suisse report on August 1, 2022 (days after the cited stock drop) and was part of a response to a question about how to "break this logjam and get deal activity going again."  (¶ 499.)

Dated: March 31, 2023
New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: */s/ Audra J. Soloway*
Daniel J. Kramer
Audra J. Soloway
Caitlin E. Grusauskas
1285 Avenue of the Americas
New York, NY 10019-6064
Phone:  (212) 373-3000
dkramer@paulweiss.com
asoloway@paulweiss.com
cgrusauskas@paulweiss.com

*Attorneys for Teladoc Health, Inc., Jason
Gorevic, Mala Murthy, Stephany Verstraete,
Bimal Shah, and Richard Napolitano*