UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                          :
                                          :    22cv4687 (DLC)
                                          :
IN RE TELADOC HEALTH, INC. SECURITIES     :
LITIGATION                                :    OPINION AND
                                          :        ORDER
                                          :
---------------------------------------- X

APPEARANCES:

For lead plaintiff and the proposed class:
Carol C. Villegas
Irina Vasilchenko
David J. Schwartz
Philip J. Leggio
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

For additional plaintiff Hui Ma:
Brian Schall
The Schall Law Firm
2049 Century Park East, Suite 2460
Los Angeles, California 90067

James W. Johnson
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005

For defendants:
Daniel J. Kramer
Audra J. Soloway
Caitlin E. Grusauskas
Marisa A. Papenfuss
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

DENISE COTE, District Judge:

    Investors in Teladoc Health, Inc. ("Teladoc" or "the

Company") have brought this putative securities class action

against the Company and several of its senior executives.  Lead
plaintiff alleges that the defendants made misleading statements
following Teladoc's $18.5 billion acquisition of Livongo Health,
Inc. ("Livongo").  According to lead plaintiff, the defendants'
statements artificially inflated the price of Teladoc's stock
between February 11, 2021 and July 27, 2022 (the "Class
Period").  The defendants have moved to dismiss the complaint.
The defendants' motion to dismiss is granted.

## Background

The following facts are drawn from the Second Amended
Complaint ("SAC") and documents relied upon by the SAC.  For the
purposes of deciding this motion, the SAC's factual allegations
are accepted as true, and all reasonable inferences are drawn in
the plaintiffs' favor.

Teladoc is a leading provider of virtual healthcare
services.  Traditionally, the Company focused on "treating acute
conditions (such as providing short-term solutions to a sudden
onset of an injury or illness)."  In the midst of growing
competition in the telehealth industry, Teladoc expanded its
product portfolio through a series of acquisitions, "with the
goal of staying competitive by providing full-spectrum, 'whole-
person' virtual care."  The whole-person approach "seeks to
treat the entire person -- i.e., both their physical and mental

health, their acute episodic needs as well as their chronic and complex needs and taking care of them on a preventive basis."

The individual defendants, Jason Gorevic, Mala Murthy, Bimal Shah, Richard Napolitano, and Stephany Verstraete are, respectively, Teladoc's Chief Executive Officer; Chief Financial Officer; former Chief Medical Officer; Senior Vice President, Chief Accounting Officer and Controller; and Chief Marketing and Engagement Officer.  This lawsuit stems from the Company's merger with Livongo in October 2020.

I.    The Livongo Merger

On August 5, 2020, Teladoc entered into a merger agreement with Livongo, a leading provider of virtual chronic disease management.  The Teladoc-Livongo merger substantially expanded the Company's chronic care business and, according to the registration statement, represented a "significant opportunity to provide whole-person care as a comprehensive partner."  The merger closed on October 30, 2020.  The combined entity remained under the Teladoc name and ticker.  Teladoc paid approximately $18.5 billion in consideration for Livongo.  The Company's chronic care business is now referred to as Livongo.

The Company's S-4 registration statement, filed in connection with the merger on September 11, 2020, explained several of the key risks involved with the deal, including:

- "Combining the businesses of Teladoc and Livongo may be more difficult, costly or time-consuming than expected and the combined company may fail to realize the anticipated benefits of the merger, which may adversely affect the combined company's business results and negatively affect the value of the common stock of the combined company following the merger."

- "The failure to integrate successfully the businesses and operations of Teladoc and Livongo in the expected time frame may adversely affect the combined company's future result."

- "Failure to attract, motivate and retain executives and other key employees could diminish the anticipated benefits of the merger."

The registration statement gave "no assurances" that Teladoc and Livongo could be "integrated successfully."

II.   Class Period Events

The Class Period runs from February 11, 2021 to July 27, 2022.   Although the SAC is lengthy and the allegations are voluminous, its contentions center around two themes.   It asserts that (1) the defendants painted an unjustifiably positive picture of the status of the Teladoc-Livongo integration, and (2) the defendants downplayed rising competition within the virtual healthcare industry.   The alleged misrepresentations, which are also described in the discussion that follows, largely arose in the context of the following events and filings.

A.   Q4 and FY 2020 Earnings, WTF Health Interview, and
     Bill Frist Interview

On February 11, 2021, Shah participated in an interview
with WTF Health.  In that interview, Shah spoke optimistically
about the Livongo integration, noting it was "going really
great."

On February 24, the Company hosted a conference call to
discuss its Q4 2020 financial results, the Company's first
quarterly report following the merger.  On that call, Gorevic
provided an update on the progress of the integration.  Gorevic
also discussed the Company's competitive advantage within the
telehealth industry and discussed market opportunities for
BetterHelp, the Company's mental health platform.

On March 1, the Company filed its 2020 Form 10-K.  In the
2020 10-K, Teladoc disclosed several risks related to the
merger, including:

- Teladoc "may have difficulty integrating the Livongo
  business, and the anticipated synergies and other benefits
  of the combined company may not be realized[;]"

- The success of the merger "will depend in large part on the
  success of the management of the newly combined company in
  integrating the operations, strategies, technologies, and
  personnel of the two companies[;]" and

- "[P]otential difficulties" could arise with regard to "the
  retention of and possible decrease in business from the
  existing customers," "the integration of corporate cultures
  and maintenance of employee morale," and "the retention of
  key employees," among others.

Moreover, the Company warned that "[e]ven if integration is successful, anticipated cost savings, synergies and other benefits may not be achieved."

As for the Company's competitive positioning, the 2020 10-K warns: "[w]e operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition and results of operations will be harmed;" competition within the virtual care market was "expect[ed] to [] increase[], which could make it difficult for [Teladoc] to succeed;" and that "[Teladoc's] competitors could also be better positioned to serve certain segments of our markets, which could create additional price pressure."

On March 15, Gorevic discussed the progress of the Livongo integration in an interview with former Senator Bill Frist.  He touted the companies' "cultural alignment" but admitted their integration "certainly [faced] challenges."

B.   Q1 2021 Earnings and CNBC Interview

On April 28, 2021, Teladoc held its Q1 2021 earnings call. Gorevic provided an update on the integration, reporting "considerable progress."  Gorevic also discussed the competitive landscape in response to an analyst's question about the Company's "most recent thoughts on competition" and how the

"competitive landscape has [] changed over the last couple of years."

On May 11, Gorevic participated in an interview with CNBC. In that interview, Gorevic discussed the growing competition in the telehealth industry and spoke optimistically about "the market demand and consumer demand for unified integrated solutions."

C.   June 2021 Investor Meetings

On June 1 and 8, 2021, the Company held investor meetings. At the June 1 meeting, Gorevic was asked about Teladoc's competitive positioning given the entry of "retail giants like Amazon and more recently, Walmart" into the telehealth market.

Credit Suisse issued an analyst report on June 8, following a meeting with Teladoc.[1]  In their report, the analyst summarized positive remarks management had made about the Livongo integration.

D.   Q3 2021 Earnings and October and November 2021 Reports

On October 27, 2021, Teladoc hosted its Q3 2021 earnings call.  Gorevic briefly discussed the status of the Livongo integration.

---

[1] The parties have not provided the June 8, 2021 Credit Suisse report.

7

On October 28, Credit Suisse issued another analyst report that contained a post-quarterly conference call discussion with Teladoc management.  Management commented on the status of the Livongo integration, and the analyst reported that "management pushe[d] back on the claim that [Teladoc] is behind [schedule] when it comes to the actual integration of Livongo."

On November 10, Business Insider published an article detailing challenges that Teladoc was facing with the integration, including a "culture clash" between the two companies.  Teladoc's stock price fell 4.21% that day.  The Business Insider article contained an interview with Gorevic in which he responded that the integration efforts remained "on track."

On November 18, the Company hosted its 2021 Investor Day. Verstraete commented on the integration and Gorevic touched on the Company's competitive advantages.  Also on November 18, Gorevic was interviewed by CNBC.  CNBC questioned Gorevic about increasing competition in the telehealth industry.

E.   Q4 and FY 2021 Earnings and JPM Healthcare Conference

On January 10, 2022, Teladoc participated in JPMorgan's annual healthcare conference.  Defendants again discussed competition within the telehealth industry.  On February 22, Teladoc held its Q4 2021 earnings call.  Gorevic spoke about

8

Teladoc's online mental health platform, BetterHelp, noting its "tremendous track record."

On February 28, Teladoc filed its 2021 Form 10-K.  The 2021 10-K included cautionary language about the Livongo integration, including that Teladoc "may" not realize all of the anticipated synergies and benefits of the Livongo merger "if the integration process takes longer than expected or is more costly than expected."  It added that the integration "will continue to be a time-consuming and expensive process that, without proper planning and effective and timely implementation, could significantly disrupt our business."  The 2021 10-K then listed a number of "potential difficulties [that Teladoc] may encounter in the integration process."

The 2021 10-K also warned about competition in the telehealth industry.  For instance, it noted that Teladoc "operate[s] in a competitive industry, and if we are not able to compete effectively, our business, financial condition, and results of operations will be harmed."  It also cautioned that increased competition in the virtual healthcare market "could": (1) "make it difficult for [Teladoc] to succeed," (2) "negatively impact [] sales,

profitability, and market share," and (3) "create additional price pressure."

F.   Q1 and Q2 2022 Earnings

On April 27, 2022, the Company issued a press release and held an earnings call regarding its Q1 2022 earnings.   In the press release, Teladoc reported a net loss per share of $41.58, primarily driven by a non-cash goodwill impairment charge of $6.6 billion.   Teladoc also revised its FY 2022 revenue and adjusted EBITDA projections down "to reflect dynamics" the Company was "currently experiencing in the direct-to-consumer (D2C) mental health and chronic condition markets."   In the press release, Gorevic further explained that:

> In the D2C mental health market, higher advertising costs in some channels are generating a lower-than-expected yield on our marketing spend.   In the chronic condition market, we are seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care that their populations need.

Later that day, Teladoc held its Q1 2022 earnings call. Murthy explained that "[t]he goodwill impairment was triggered by the sustained decline in Teladoc Health share price." Gorevic also addressed the revised guidance figures, citing lower expected growth at BetterHelp and a lowered outlook for chronic care revenue (i.e., Livongo).   In the Q&A portion of the call, Gorevic discussed the status of the Livongo integration,

and expressed continued optimism about the benefits of the
merger.  The following day, Teladoc's shares fell 40.15%.

On July 27, 2022, Teladoc issued a press release and held
an earnings call regarding its Q2 2022 earnings.  Teladoc
reported a net loss per share of $19.22, driven by a second non-
cash goodwill impairment charge of $3 billion.  Again, Teladoc
attributed the goodwill impairment to "the decline in Teladoc
Health share price."  On the earnings call, Murthy stated that
the integration process remained ongoing.  Gorevic acknowledged
that, as with the first quarter, the growth in the Company's
chronic care business (i.e., Livongo) continued to slow.
Gorevic attributed the slowed growth "at least in part due to
competitive noise as the market transitions from stand-alone
point solutions to integrated whole-person virtual care."   On
the heels of the news, Teladoc's stock price fell 17.67%.

III. Procedural History

This action was filed on June 6, 2022, as a putative class
action.  On August 17, the case was reassigned to this Court.
On August 23, Leadersel Innotech ESG was appointed as lead
plaintiff.  Also on that day, a schedule was set for filing
amended pleadings.

Lead plaintiff filed its first amended complaint on
September 30.  On November 3, the defendants moved to dismiss

the first amended complaint.  Instead of opposing the motion to dismiss the first amended complaint, lead plaintiff filed a second amended complaint (the "SAC") on December 6.[2]  The SAC alleges (1) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b); and (2) "control person" liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  The SAC asserts that defendants made a variety of misleading statements that masked the true extent of Teladoc's difficulties integrating Livongo and the competitive pressures it faced.

Defendants moved to dismiss the SAC on January 20, 2023. The motion became fully submitted on March 31.

## Discussion

To survive a motion to dismiss for failure to state a claim, a complaint "must plead enough facts to state a claim to relief that is plausible on its face." Green v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In securities fraud actions,

---

[2] The lead plaintiff was warned on August 23, 2022 that, after filing the SAC, it would likely not have a further opportunity to amend the complaint.

> [t]he Court may also consider any written instrument
> attached to the complaint, statements or documents
> incorporated into the complaint by reference, legally
> required public disclosure documents filed with the
> SEC, and documents possessed by or known to the
> plaintiff upon which it relied in bringing the suit.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation
omitted).

Under SEC Rule 10b-5, it is unlawful to "make any untrue
statement of a material fact or to omit to state a material fact
necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading . . .
in connection with the purchase or sale of any security."  17
C.F.R. § 240.10b-5; see also 15 U.S.C. § 78j(b).  "Section 20(a)
provides that individual executives, as controlling persons of a
company, are secondarily liable for their company's violations
of the Exchange Act."  Altimeo Asset Mgmt. v. Qihoo 260 Tech.
Co. Ltd., 19 F.4th 145, 152 (2d Cir. 2021) (citation omitted).

Complaints alleging securities fraud violations are subject
to a heightened pleading standard pursuant to the PSLRA and Rule
9(b), Fed. R. Civ. P.  To state a claim for relief under § 10(b)
and Rule 10b-5, a plaintiff must allege that a defendant:

> (1) made misstatements or omissions of material fact,
> (2) with scienter, (3) in connection with the purchase
> or sale of securities, (4) upon which the plaintiff
> relied, and (5) that the plaintiff's reliance was the
> proximate cause of its injury.  In addition, because
> such a claim sounds in fraud, the plaintiff must state

with particularity the circumstances constituting
fraud.

Altimeo Asset Mgmt., 19 F.4th at 149-50 (citation omitted).
"The PSLRA requires plaintiffs to specify each misleading
statement; set forth the facts on which a belief that a
statement is misleading was formed; and state with particularity
facts giving rise to a strong inference that the defendant acted
with the required state of mind." In re Synchrony Fin. Sec.
Litig., 988 F.3d 157, 167 (2d Cir. 2021) (citation omitted).

The defendants argue that the SAC fails to adequately plead
(1) statements that qualify as material misrepresentations, (2)
scienter, and (3) loss causation.  Because the SAC fails to
identify a material misrepresentation, it is not necessary to
assess the adequacy of its assertion of scienter or loss
causation.

I.   Legal Standard

A.   Material Misrepresentations or Omissions

"A statement is materially misleading when the defendants'
representations, taken together and in context, would have
misled a reasonable investor."  Altimeo Asset Mgmt., 19 F.4th at
151 (citation omitted).  "To be material, a statement must, in
the view of a reasonable investor, have significantly altered
the total mix of information available."  Plumber & Steamfitters
Local 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 100-01

14

(2d Cir. 2021) (citation omitted).  "Omissions are material when
there is a substantial likelihood that the disclosure of the
omitted fact would have been viewed by the reasonable investor
as having significantly altered the total mix of information
made available."  Altimeo Asset Mgmt., 19 F.4th at 151 (citation
omitted).[3]

   B.   Opinion

   To adequately plead a misleading statement of opinion,

   [t]he investor must identify particular (and material)
   facts going to the basis for the issuer's opinion -- facts
   about the inquiry the issuer did or did not conduct or the
   knowledge it did or did not have -- whose omission makes
   the opinion statement at issue misleading to a reasonable
   person reading the statement fairly and in context.

Tongue, 816 F.3d at 209 (quoting Omnicare, Inc. v. Laborers
Dist. Council Constr. Ind. Pension Fund, 575 U.S. 175, 194
(2015)).  The investor must show (1) "that a statement of
opinion contained one or more embedded factual statements that
can be proven false," or (2) "that a statement of opinion,
without providing critical context, implied facts that can be
proven false."  Abramson v. Newlink Genetics Corp., 965 F.3d
165, 175 (2d Cir. 2020).  A reasonable investor understands,
however, that "opinions sometimes rest on a weighing of

---

[3] The plaintiffs assert that the defendants omitted key
information from their statements about competition and the
Livongo integration, which rendered those statements misleading.

competing facts," and that it "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." Tongue, 816 F.3d at 210 (citation omitted). Moreover, "[g]eneric, indefinite statements of corporate optimism typically are not actionable." Abramson, 965 F.3d at 173.

   C.   Forward-Looking Statements

      Forward-looking statements are not actionable under the PSLRA "if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (citation omitted). "[A] forward-looking statement is protected . . . if any of the three prongs applies." Id. at 245-46. When the forward-looking statement is made at the time a company makes a filing with the SEC that contains meaningful cautionary language on the topic, the cautionary language in the filing protects the contemporaneous forward-looking statement.

II.  Application

      The SAC asserts that a host of statements made by the defendants during the Class Period are actionable as false and

materially misleading, even though Teladoc accurately reported
its financial results during the same period.  Those statements
can be grouped into two categories -- statements of optimism
regarding Teladoc's integration of the Livongo business
("Integration Statements"), and statements regarding Teladoc's
position within the telehealth industry ("Competition
Statements").[4]

A.   Integration Statements

The SAC's Integration Statements are largely non-actionable
statements of opinion and/or expressions of corporate optimism.
The following are representative examples taken from the SAC:

- Defendants spoke repeatedly about the two companies'
  "aligned" cultural values, their "shared mission," and how
  they "really do fit together."

- Defendants referred to the Company's "progress" integrating
  Livongo, commenting, inter alia: it "continues to
  progress," was "well on [its] way," "on track," or "so far,
  so good."

- Defendants stated that the merger would create "new
  opportunities" and was "resonating in the marketplace."

To the extent these are statements of corporate optimism, they
are "precisely the type of puffery that [the Second Circuit] and
other circuits have consistently held to be inactionable."  In

---

[4] The SAC also points to several statements that were made by
unnamed individuals and summarized in the Credit Suisse analyst
report and the Business Insider article.  Those statements are
not pled with the particularity required by the PSLRA.

re Synchrony Fin. Sec. Litig., 988 F.3d 157, 170 (2d Cir. 2021)

(citation omitted).[5]

Only five of the Integration Statements warrant further
discussion.  They are:

1) A February 24, 2021 statement that "our commercial
   organization is now fully integrated."[6]

2) A February 24, 2021 statement that Teladoc "[had] the
   capabilities to deliver and manage care virtually across
   the spectrum for consumers."

3) An April 28, 2021 statement that Teladoc had "made
   considerable progress across our key work streams" on the
   integration, including that the "commercial organization
   has been fully integrated with sales teams selling across
   the entire whole-person portfolio of products."

4) A November 10, 2021 statement that Teladoc had launched a
   new service which "fully blends Livongo's assets with
   Teladoc's."

5) A November 18, 2021 statement that Teladoc "integrated the
   legacy Livongo and Teladoc marketing data and tech stacks."

The SAC does not adequately plead that any of these

representations was false or materially misleading.  The first

---

[5] Because defendants only cited four statements as examples of
puffery, lead plaintiff argues that the defendants "concede the
rest are not puffery."  This argument fails.  In their motion,
the defendants argue that "many of the statements about
integration efforts . . . are quintessential corporate puffery
and subjective statements of opinion."  That they only discuss
four examples in depth does not waive this objection.

[6] This representation was repeated with slight variations
throughout the Class Period.  The February 24, 2021 statement is
the earliest identified in the SAC.

three statements appear in the earnings calls for Q4 2020 and Q1 2021.

In the first statement, made roughly four months after the merger, Gorevic refers to the integration of the companies' commercial organization.  He does not define what he means by Teladoc's "commercial organization," but the parties agree that the commercial organization is responsible for sales to commercial clients such as health plans and employers.  The SAC pleads that Confidential Witness ("CW") 2, who was a Vice President in the Livongo and then Teladoc sales organization until the fall of 2021, "would not have considered the commercial business 'fully integrated'" because "the businesses were all running separately."  This difference of opinion is insufficient to plead a claim of falsity.

In opposing this motion, the lead plaintiff points to other statements from the SAC in which CWs opined on "internal confusion, 'misalignment,' and division" between the personnel from the two companies as well as a "hemorrhaging of key Livongo employees."  Descriptions of general corporate discontent or upheaval are not sufficiently tied to the work of the commercial organization to render Gorevic's opinion about the integration of its operations false.  The lead plaintiff relies as well on a statement by CW 7, who worked as a Growth Acquisition Manager at

19

Livongo and then Teladoc until October 2021, that "many" of the business segments at Teladoc were "siloed."  Again, CW 7's judgment about unidentified business segments within Teladoc is not sufficiently tethered to the commercial organization's integration to render Gorevic's statement false.  More is required to allege a plausible claim of falsity than is pleaded in the SAC.  Gorevic's statement of opinion is made at a high level of generality and was made at a time when the company was describing its integration efforts as complex, challenging, and a work in progress.

The second statement, which was also made during the Q4 2020 earnings call, was that Teladoc had the "capabilities to deliver and manage care virtually across the spectrum for consumers."  This is a classic statement of opinion.  The statement was made in the course of a description of how the merger with Livongo had expanded Teladoc's capabilities.  The SAC does not explain how this statement of opinion contained any embedded fact statements that were false or was otherwise actionable.

The SAC does not plausibly plead that the third statement, made in the Q1 2021 earnings call, is false.  When read in context, the "progress" to which the speaker refers appears to be the integration of the commercial organizations.  The SAC

20

does not plead facts to support a claim that the remainder of
the statement was false, to wit, that Teladoc did not have sales
teams selling the entire whole-person portfolio of products by
April 28, 2021.

The fourth statement, which appeared in the report of an
interview with Teladoc's CEO published in Business Insider, is
about a service that "fully blends" the assets of Livongo with
those of Teladoc.  The SAC asserts that the statement created
the false impression that Teladoc had fully integrated
"Livongo's product platforms" with Teladoc's.  That is not a
fair reading of the statement.  The article explored why it was
taking Teladoc and Livongo "longer than expected" to accomplish
their original vision.  Teladoc's CEO expressed pride about the
Company's progress but did not represent at any point that all
product platforms had been fully integrated or that the aim of
the merger had been fully accomplished.

Lastly, the SAC asserts that the statement made at a
Teladoc Investor Day on November 18, 2021 -- that Teladoc had
"integrated the legacy Livongo and Teladoc marketing data and
tech stacks" -- was false.[7]  The SAC, however, does not include
allegations about the failure to integrate "marketing data" or

---

[7] The parties have not provided the complete transcript of the
Investor Day remarks.  The few pages provided by the defendants
do not include the passage on which the SAC relies.

"tech stacks."  Instead, it relies on complaints by its CWs about Teladoc's "marketing strategies," about Teladoc relying on Livongo to provide "data science personnel," and about delays in integrating "data systems."  The most relevant allegations in the SAC are provided by CW 11, who was a Senior Director of Analytics at Livongo and held the same role at Teladoc until June 2021.  According to the SAC, CW 11 "believed" that the term "tech stacks" refers to applications used for marketing purposes, such as email blasts or text messages sent to customers.  CW 11 reported that Teladoc's marketing team mined data from a data system named Tableau to populate its tech stacks, but that Teladoc did not begin, much less complete, the process of integrating Teladoc's and Livongo's Tableau data systems during the Class Period.  This is insufficient to plausibly plead falsity.  Precision matters.  The Investor Day statement refers specifically to marketing data and tech stacks. It does not refer to data systems or to Tableau.  Therefore, even if the SAC adequately pleads that the term "tech stacks" is a reference to email blasts and text messages, it does not adequately plead that they had not been "integrated" by November 2021.

In its opposition to this motion, the lead plaintiff argues that Teladoc's general statements of optimism about the

integration of the two companies are actionable because they created the false impression that the integration "was completed or progressing successfully."  For example, the SAC alleges that Gorevic mislead investors during the March 15, 2021 interview with Bill Frist when he stated that the integration was going "very well" and that the "the cultural alignment [was] very strong," but failed to mention "substantial personnel integration problems, . . . heavy attrition, and other company culture clash issues."  In another example, the SAC alleges that Gorevic misled investors, in connection with his November 10, 2021 Business Insider interview, when he described the integration as "on track" and did not mention that "Teladoc was nowhere near completing the integration of the [companies'] Salesforce systems."

There are several difficulties with the lead plaintiff's omissions theory.  The generality of many of the statements of opinion and optimism to which the SAC points "prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."  Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 97-98 (2d Cir. 2016).  Moreover, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." Dalberth v. Xerox Corp., 766 F.3d 172, 183 (2d Cir. 2014).

23

Teladoc was only obligated to disclose additional facts if doing
so was necessary to make a statement "not misleading." Matrixx
Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)
(citation omitted).  In light of defendants' contemporaneous
robust disclosures of the challenges and risks it was facing,
the SAC has failed to plead that the statements it has
identified misled a reasonable investor.  For example, even
before the Livongo merger closed, Teladoc warned that
"[c]ombining the businesses of Teladoc and Livongo may be more
difficult, costly or time-consuming than expected" and "any
delays encountered in the integration process[] could have an
adverse effect" on the combined Company's financial results.
Teladoc also expressly disclaimed any assurances "that
[Teladoc's and Livongo's] businesses [could] be integrated
successfully."  Teladoc warned investors in its 2020 and 2021
Form 10-Ks that "the overall integration of Livongo post-merger
will continue to be a time-consuming and expensive process that
. . . could significantly disrupt our business."  These and many
other warnings made clear to any reasonable investor that the
integration process was complex and that different components of
the integration effort might progress at different rates.

B.   Competition Statements

The second category of alleged misstatements concerns Teladoc's place in the competitive landscape.  The SAC does not plausibly allege that any of the Competition Statements are misleading.

Again, most of the identified Competition Statements are classic statements of opinion for which there is no plausible pleading of falsity.  For example, the SAC points to Gorevic's response in the February 24, 2021 earnings call to a question about employers' expansion of their own telehealth services.  Gorevic stated that Teladoc saw that market as an "underpenetrated" opportunity.  At a June 1, 2021 conference, in response to a question about small-sized competitors, Gorevic explained that Teladoc wins in that match-up because of its "multiproduct breadth of solutions."  During an April 27, 2022, earnings call, Gorevic asserted that the market was "responding well to" Teladoc's multiproduct sales.  The SAC does not plead that these statements of opinion were embedded with factual statements that were false or implied facts that were false.

Many of the other Competition Statements identified in the SAC express optimism about Teladoc's ability to compete within the telehealth market, and specifically about its new "whole-person" product offerings.  Expressions of optimism are not

generally actionable, and the SAC does not plausibly allege that these statements are so.

Lastly, the SAC asserts that the Company improperly downplayed the impact on Teladoc's business of the growing competition in the virtual healthcare market.  Lead plaintiff points to Gorevic's statement in the April 28, 2021 earnings call that Teladoc "almost never" bumped into many of the competitors that an analyst had just listed, and that Teladoc was not seeing some of the new entrants "gain traction."  The SAC does not plead that either of these observations was false. The SAC relies on statements from CW 1 that Teladoc was experiencing increased competition with CVS and from CW 2 that Teladoc competitors "were able to steal clients from Teladoc by citing the integration problems."  Neither of these statements contradicts Gorevic's statements.

Moreover, Teladoc repeatedly warned investors of the risks posed by competition.  For example, in the Company's 2020 Form 10-K filed on March 1, 2021, Teladoc cautioned "[w]e operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition and results of operations will be harmed."  The 2020 10-K added that Teladoc "currently face[s] competition . . . from a range of [named] companies," and noted that "potential Clients may accept

competitive solutions in lieu of purchasing [Teladoc's]

solutions."  These warnings were repeated in Teladoc's 2021 Form

10-K filed on February 28, 2022.[8]

There is a separate reason that many of the statements

about competition identified in the SAC are not actionable.  The

forward-looking Competition Statements challenged in connection

with the Company's earnings announcements were accompanied by

cautionary language throughout the Class Period.  For example,

in Q1 2022, the Form 10-Q stated:

> Many statements made in this Quarterly Report on Form
> 10-Q that are not statements of historical fact,
> including statements about our beliefs and
> expectations, are forward-looking statements and
> should be evaluated as such. . . . these statements
> are not guarantees of performance or results.

The accompanying Press Release included similar language:

> This press release contains "forward-looking
> statements" within the meaning of the safe harbor
> provisions of the [PSLRA]. . . . Our actual results
> and financial condition may differ materially from
> those indicated in the forward-looking statements.

And in the quarterly earnings call, Gorevic prefaced his

comments with a "disclaimer," stating:

> [C]ertain statements made during this call will be
> forward-looking statements as defined by the [PSLRA].

---

[8] Lead plaintiff argues that these risk disclosures were
"insufficient and themselves misleading because such risks had
already materialized."  There is nothing misleading in these
disclosures.  Teladoc repeatedly disclosed the impact that
competitive pressure was having on the Company's financials.  It
lowered its financial projections in part to account for that
competitive pressure in April 2022.

> Such forward-looking statements are subject to risks,
> uncertainties and other factors that could cause the
> actual results for Teladoc Health to differ materially
> from those expressed or implied on this call.

Teladoc repeated these risk disclosures in quarterly SEC filings throughout the Class Period.[9]

III. Request for Leave to Amend

Lead plaintiff requests that, if the defendants' motion to dismiss is granted, it be given leave to amend the SAC.  In general, leave to amend should be "freely give[n] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave to amend may be denied, however, "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 98 (2d Cir. 2019) (citation omitted).  Additionally, a plaintiff "need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint."  TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014).

Lead plaintiff's request for leave to amend is denied. Lead plaintiff has not identified how further amendment would address the deficiencies in SAC.  Nor has it attached a proposed amended complaint.  Moreover, lead plaintiff was warned that,

---

[9] Because lead plaintiff has failed to state a claim under § 10(b) of the Securities Exchange Act, the claims under § 20(a) are also dismissed.

after filing the SAC, it would likely not have a further opportunity to amend the complaint.  It has not shown that this warning should be ignored.  For instance, it has not identified any argument made by the defendants in their pending motion to dismiss which could not have been anticipated from the arguments the defendants made in their original motion.

### Conclusion

The defendants' January 20, 2023 motion to dismiss is granted.  The Clerk of Court shall enter judgement for the defendants and close the case.

Dated:     New York, New York
           July 5, 2023

                                    _____
                                         DENISE COTE
                                    United States District Judge