```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                       :    22cv4687 (DLC)
IN RE TELADOC HEALTH, INC. SECURITIES  :
LITIGATION                             :    OPINION AND
                                       :        ORDER
--------------------------------------- X
```

APPEARANCES:

For lead plaintiff and the proposed class:

Carol C. Villegas
Irina Vasilchenko
David J. Schwartz
Matthew J. Grier
Labaton Keller Sucharow LLP
140 Broadway
New York, NY 10005

For defendants:

Daniel J. Kramer
Audra J. Soloway
Caitlin E. Grusauskas
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Matteo Godi
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, N.W.
Washington, DC 20006

DENISE COTE, District Judge:

Investors in Teladoc Health, Inc. ("Teladoc") brought this putative securities class action against Teladoc and several of its senior executives. The lead plaintiff alleges that the defendants are liable for making misleading statements that

artificially inflated the price of Teladoc's stock following Teladoc's merger with Livongo Health ("Livongo").

An Opinion of July 5, 2023 granted the defendants' earlier motion to dismiss the Second Amended Complaint ("SAC"), finding that no statements are adequately alleged to have been material misrepresentations.  On appeal, the Second Circuit reversed that decision as to four statements.  <u>Leadersel Innotech ESG v. Teladoc Health, Inc.</u>, No. 23cv1112, 2024 WL 4274362 (2d Cir. Sept. 24, 2024).

The defendants have renewed their motion to dismiss, arguing that the SAC does not adequately plead scienter or loss causation.  The defendants' motion is granted.

## <u>Background</u>

This Opinion summarizes only the facts necessary to decide this motion.  For purposes of this motion, the SAC's factual allegations are accepted as true, and all reasonable inferences are drawn in the lead plaintiff's favor.

Teladoc is a leading provider of virtual healthcare services.  The individual defendants are the following current or former Teladoc executives:  Jason Gorevic, Chief Executive Officer; Stephany Verstraete, Chief Marketing & Engagement Officer; Mala Murthy, Chief Financial Officer; and Richard

Napolitano, Senior Vice President, Chief Accounting Officer, and Controller.

This lawsuit stems from Teladoc's merger with Livongo, a leading provider of virtual management of chronic disease. For most of its history, Teladoc focused on treating acute conditions. It merged with Livongo as part of an effort to offer whole-person care. Teladoc announced the merger on August 5, 2020, in the midst of the Covid-19 pandemic. The merger closed on October 30, 2020, at a price of $18.5 billion. Teladoc's chronic care business is now referred to as Livongo.

I.   Statements at Issue

The allegations in the SAC are extensive, but only four statements remain at issue, all relating to the integration of Teladoc and Livongo. Specifically, these statements consist of: (1) two statements by Gorevic in February and April of 2021 that Teladoc had "fully integrated" the sales teams; (2) a statement by Verstraete in November of 2021 that Teladoc had integrated "marketing data and tech stacks"; and (3) the risk disclosures in Teladoc's February 2022 Form 10-K for the year 2021.

A.   Sales Team Integration

Jason Gorevic, Teladoc's CEO, stated on two occasions in early 2021 that Teladoc and Livongo had "fully integrated" their "commercial organization," which the parties identify as being

responsible for sales.  On a February 24, 2021 earnings call, Gorevic stated: "Our commercial organization is now fully integrated, and our teams responsible for cross-selling have been collaborating for months."  Gorevic made a similar statement on an April 28, 2021 earnings call: "As we previously noted, our commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products since early this year."

The Second Circuit found that the SAC adequately alleged that Gorevic's claims of "full integration" were misleading based on the allegations of confidential witnesses "who provided details as to the lack of integration in the sales teams." Teladoc, 2024 WL 4274362, at *4.  The primary confidential witness who offered such allegations is CW 2, who worked as a vice president in the sales organization at Livongo and then at Teladoc.

Among other allegations, CW 2 discussed sales staff being pressured to pitch remote patient monitoring functionality under the mistaken assumption that Teladoc had obtained that functionality from Livongo.  CW 2 described taking steps to share these concerns, including in a November 30, 2020 email. The recipients of that email included Bimal Shah, the Chief

Medical Officer of Product & Analytics, and Amar Kendale, the Chief Product Officer.

CW 2 also alleged that Teladoc "had no idea" where to place Livongo personnel. Some of these concerns related to Teladoc's acquisition of another company, InTouch Health ("InTouch"), in July 2020, which also brought new sales staff to the company. CW 2 stated that her Livongo team was merged with an InTouch team, and that these teams lacked "synergies" because they would pitch different groups at prospective clients. CW 2 and another employee prepared a set of "talking points" about how sales responsibilities were to be allocated between the Livongo and InTouch teams. These were used in discussions with management, including Joe DeVivo, who was the former CEO of InTouch and led the InTouch business within Teladoc after the acquisition.

The Second Circuit also referenced the views of other confidential witnesses that integration between the sales teams was incomplete at the time of Gorevic's statements. CW 5, who had worked at Livongo before the merger and was a member of the group responsible for integrating the two companies' sales forces, stated that integration between the sales teams was not complete as of June 2021, when she left Teladoc. CW 7, who was previously employed by Livongo and worked at Teladoc as a growth acquisition manager, stated that when she left Teladoc in

October 2021 she was working on a team that was exclusively focused on selling the Livongo product.

B.    Integration of Marketing Data and Tech Stacks

Stephany Verstraete, Teladoc's Chief Marketing & Engagement Officer, was one of the speakers at Teladoc's Investor Day conference on November 18, 2021.  There, Verstraete stated: "[W]e've significantly deepened our capabilities as we brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks."

The Second Circuit relied on the allegations of CW 11 in determining that the SAC adequately alleges that this statement was misleading.  CW 11 had been a senior director of analytics at Livongo and then at Teladoc.  CW 11 explained that term "tech stacks" generally "refers to one or more applications in a specific area to optimize operations."  In her view, Verstraete's statement used that term to refer to applications used for marketing, such as email blasts or text messages to customers.

CW 11 also stated that data was mined from the Tableau platform for such marketing purposes.  CW 11 described Tableau as a "tool that pulled data from different sources . . . for non-tech savvy employees to easily access and visualize data." According to CW 11, Teladoc did not begin to integrate its

Tableau system with Livongo's until after the Class Period.  The
SAC indicates that it was still possible to obtain "holistic
data" sourced from both Teladoc and Livongo before the Tableau
integration was completed, but this was an inefficient process
that required working with multiple platforms.  The Second
Circuit concluded that CW 11's allegations undermine
Verstraete's statement, reasoning that "if the Tableau system
was not integrated, as [CW 11] asserts, then there could be no
integration of the marketing data or tech stacks, as claimed by
Verstraete."  Teladoc, 2024 WL 4274362, at *5.

    C.    Warning of Potential Integration Risks

    Teladoc's 2021 Form 10-K was filed on February 28, 2022 and
signed by Gorevic, Murthy, and Napolitano.  It warned of
"potential difficulties [that Teladoc] may encounter in the
integration process," and listed eight categories of risks.

    The Second Circuit determined that the SAC had pleaded that
the reference to "potential difficulties" was misleading.  It
reasoned that the SAC adequately alleged that by February 2022
"the risks regarding the Livongo integration were not merely
'potential difficulties that Teladoc may encounter in the
integration process' as outlined in the cautionary disclosures,
but had already materialized and resulted in significant

disruption to Teladoc's business." <u>Teladoc</u>, 2024 WL 4274362, at *5.

II.  Stock Sales

The SAC describes sales of Teladoc stock by Gorevic, Verstraete, and Murthy.  Gorevic's proceeds from Class Period sales were almost $30 million, while Verstraete's were over $4 million and Murthy's were almost $2 million.  Each of these three defendants, however, increased their ownership of Teladoc stock during the Class Period, mostly by receiving shares through grants or options.  Gorevic and Verstraete sold less stock during the Class Period than during the period of equal length immediately preceding the Class Period, August 29, 2019 to February 10, 2021 (the "Control Period"), while Murthy sold more stock during the Class Period than during the Control Period.

Twenty-two of Gorevic's twenty-six Class Period sales were made pursuant to a 10b5-1 plan that he entered into before the Class Period.  Four of Gorevic's Class Period sales were made for tax withholding purposes.  All of Murthy's Class Period sales, and six of Verstraete's eight Class Period sales, were made for tax withholding purposes.

III. Procedural History

This action was filed on June 6, 2022 as a putative class action.  On August 17, the case was reassigned to this Court. On August 23, Leadersel Innotech ESG was appointed as lead plaintiff.  On November 3, the defendants moved to dismiss the First Amended Complaint.  Instead of opposing the motion to dismiss, the lead plaintiff filed the SAC on December 6.[1]

The SAC alleges (1) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b); and (2) "control person" liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  The SAC asserts that the defendants made many misleading statements that masked the true extent of Teladoc's difficulties integrating Livongo and the competitive pressures it faced.

The defendants moved to dismiss the SAC on January 20, 2023.  An Opinion of July 5, 2023 dismissed the SAC, finding that none of the statements it identifies were adequately alleged to have been material misrepresentations.  In re Teladoc Health, Inc. Sec. Litig., No. 22cv4687, 2023 WL 4351455 (S.D.N.Y. July 5, 2023).  The Opinion did not reach the issues

---

[1] The lead plaintiff had been warned that it would likely not have a further opportunity to amend after December 6.

of scienter or loss causation.  The lead plaintiff appealed only as to a subset of statements related to the integration of Teladoc and Livongo.  On September 24, 2024, the Second Circuit reversed in part this Court's dismissal of the SAC.  Teladoc, 2024 WL 4274362.  As discussed above, the Second Circuit found that the SAC adequately alleges that four statements were material misrepresentations, while affirming that no other statements are actionable.  The Second Circuit remanded to this Court to address the defendants' arguments regarding the adequacy of the pleading of scienter and loss causation.

The defendants renewed their motion to dismiss the SAC on November 22, 2024, arguing that scienter and loss causation are not adequately pleaded.  The motion became fully submitted on January 10, 2025.[2]

---

[2] On January 27, the lead plaintiff submitted a letter motion arguing that the defendants' reply brief improperly raised a new argument by claiming that certain drops in Teladoc's stock price undercut the lead plaintiff's effort to plead loss causation. The lead plaintiff asks the Court to disregard this argument or, alternatively, grant leave to file a sur-reply that is attached to the January 27 motion.  The defendants filed a letter responding to that letter motion on February 7.  Since the SAC does not adequately plead scienter, this Opinion does not reach the issue of loss causation.

**Discussion**

I.   Legal Standard

   A.   Motion to Dismiss

   To survive a motion to dismiss for failure to state a claim, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Green v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs."  Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted).  In securities fraud actions,

> [t]he Court may also consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

   B.   Securities Fraud

   Under SEC Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . .

11

in connection with the purchase or sale of any security."  17
C.F.R. § 240.10b-5; see also 15 U.S.C. § 78j(b).  "Section 20(a)
provides that individual executives, as controlling persons of a
company, are secondarily liable for their company's violations
of the Exchange Act."  Altimeo Asset Mgmt. v. Qihoo 260 Tech.
Co. Ltd., 19 F.4th 145, 152 (2d Cir. 2021) (citation omitted).

        To state a claim for relief under § 10(b) and Rule 10b-5, a
plaintiff must properly allege:

> (1) a material misrepresentation or omission by the
> defendant; (2) scienter; (3) a connection between the
> misrepresentation or omission and the purchase or sale of a
> security; (4) reliance upon the misrepresentation or
> omission (5) economic loss; and (6) loss causation.

In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417
(2d Cir. 2023) (citation omitted).  Complaints alleging
securities fraud violations are subject to a heightened pleading
standard pursuant to the PSLRA and Rule 9(b), Fed. R. Civ. P.,
such that "the plaintiff must state with particularity the
circumstances constituting fraud."  Altimeo Asset Mgmt., 19
F.4th at 150 (citation omitted).

        C.   Scienter

        In the context of a securities fraud claim, "[s]cienter may
be established by alleging facts (1) showing that the defendants
had both motive and opportunity to commit the fraud or (2)
constituting strong circumstantial evidence of conscious

misbehavior or recklessness." New Eng. Carpenters Guaranteed
Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 48 (2d Cir.
2023) (citation omitted).  Allegations of motive and opportunity
and allegations of conscious misbehavior or recklessness should
be "viewed holistically and together." Id. (citation omitted).
Under the PSLRA, a complaint must "state with particularity
facts giving rise to a strong inference that the defendant acted
with scienter." Id. (citation omitted).

II. Application

The SAC does not adequately allege scienter.  As explained
below, the SAC does not provide strong circumstantial evidence
of conscious misbehavior or recklessness with respect to any of
the four statements that remain at issue in this case, nor does
the SAC suggest that any of the relevant individuals had a
motive and opportunity to commit fraud.

A.   Conscious Misbehavior or Recklessness

The lead plaintiff primarily argues that scienter is
sufficiently pleaded through its allegations of conscious
misbehavior or recklessness.  A showing of

> scienter based on conscious misbehavior requires a
> showing of deliberate illegal behavior, a standard met
> when it is clear that a scheme, viewed broadly, is
> necessarily going to injure.  Recklessness, meanwhile,
> entails an extreme departure from the standards of
> ordinary care to the extent that the danger was either
> known to the defendant or so obvious that the
> defendant must have been aware of it.

13

New Eng. Carpenters, 122 F.4th at 49 (citation omitted).
Because, as described below, motive and opportunity have not
been pleaded, "the strength of the circumstantial allegations
must be correspondingly greater" to plead scienter through
conscious misbehavior or recklessness.  Set Cap. LLC v. Credit
Suisse Grp. AG, 996 F.3d 64, 83 n.73 (2d Cir. 2021) (citation
omitted).

> 1.  Gorevic's Sales Team Integration Statements

The lead plaintiff argues that Gorevic, Teladoc's CEO,
knowingly misled investors when he stated on two occasions, in
February and April of 2021, that Teladoc's "commercial
organization" -- that is, its sales organization -- was "fully
integrated."  The SAC does not plausibly plead, however, that
Gorevic made those statements with the requisite scienter.

None of the allegations in the SAC provide strong
circumstantial evidence that Gorevic knew these statements were
misleading.  The SAC does not describe any conversations with
Gorevic, or any written communications to or from him, regarding
sales team integration problems.  In particular, while the SAC
relies on confidential witnesses to plead that Gorevic's claims
of full integration were misleading, no confidential witnesses
identify any occasion when Gorevic was told about sales team
integration problems.  Thus, for example, there is no indication

that Gorevic was aware of confusion about where to place Livongo
sales personnel.  Nor is there anything to suggest that Gorevic
knew of the assessments of some confidential witnesses that
sales team integration was incomplete, or that one team was
focusing exclusively on selling Livongo products.  Likewise,
there is nothing to suggest that, at the time of his statements
in early 2021, Gorevic was aware of the sales-related problems
that were later described in a November 2021 Business Insider
article.  In sum, nothing in the SAC indicates that Gorevic "had
access to contrary facts" when he made his misleading statements
about sales team integration.  Novak v. Kasaks, 216 F.3d 300,
309 (2d Cir. 2000).

In opposing this motion to dismiss, the lead plaintiff
principally relies on the statements provided by CW 2 and CW 4.
As noted above, CW 2 worked as a vice president in the sales
organization at Livongo and then at Teladoc.  CW 2 headed one of
Teladoc's five sales regions until she left Teladoc in the fall
of 2021, and believes she was no more than three levels below
Gorevic in the reporting chain.  The lead plaintiff argues that
CW 2's description of her November 30, 2020 email and of the
monthly Teladoc town halls she attended support an inference
that Gorevic spoke with scienter.  They do not.  CW 2's November
30, 2020 email was not sent to Gorevic and there is no

allegation that he received or read it.  In any event, that
email was focused on the overselling of remote patient
monitoring capabilities, not the integration of sales teams.[3]  CW
2's description of the monthly town halls at which Gorevic spoke
fares no better.  While the SAC reports that Gorevic fielded
questions about the difficulties Teladoc faced with "the
integration and other issues," it does not state that he
discussed the integration of the sales teams.

CW 4's allegations are even further afield.  CW 4 was a
Senior Leader on a clinical team for Livongo and then Teladoc,
until she left Teladoc in early 2022.  CW 4 heard a presentation
by Gorevic about Teladoc's integration plans at a September 2021
leadership meeting, and CW 4 felt that the presentation was very
general and its description of plans was not sophisticated.  CW
4 also describes a conversation in which Gorevic acknowledged
difficulties with the overall integration.  But, like CW 2, CW 4
does not describe any communication to or from Gorevic regarding
the integration of the sales teams.  Awareness of broader

---

[3] The lead plaintiff also appears to reference CW 2's October 29,
2020 email, but that email is irrelevant as well.  That email
mentioned Gorevic having a conversation with a Teladoc client
about the possibility of a future development project that would
combine functionality from Teladoc and Livongo software.  This
discussion with a client about a potential future development
project is not evidence that Gorevic was aware of the lack of
integration of Teladoc's sales teams.

integration challenges is no substitute for awareness of the problems related to the integration of the sales teams, which are what rendered Gorevic's statements misleading.  Indeed, as the SAC recognizes, Gorevic regularly acknowledged Teladoc's general integration challenges.  For example, on the February 2021 call during which Gorevic made the first statement, he noted that the effort to integrate the two recently merged entities was ongoing, as Teladoc was still "making significant investments to integrate our products and services."

Next, the lead plaintiff argues that Gorevic's scienter may be inferred since at least two members of senior management -- David Sides, the COO, and Joe DeVivo, who led the recently acquired InTouch business -- were notified of problems related to the integration of the sales teams.  But the lead plaintiff is mistaken in suggesting that their knowledge can be imputed to Gorevic.  Likewise, simply pointing to Gorevic's position at the company is not enough to plead scienter.  See, e.g., Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc., 718 F. Supp. 3d 344, 388-89 (S.D.N.Y. 2024) (collecting cases).[4]

---

[4] The lead plaintiff makes a related argument regarding Sides and DeVivo, as well as Chief Medical Officer Shah.  It contends that these individuals were aware of, for instance, challenges associated with integrating the sales teams, and that their knowledge can be imputed to Teladoc.  This argument fails.

The lead plaintiff also argues that scienter can be inferred from the specificity and magnitude of Gorevic's statements. The SAC does not include allegations that support either characterization. Viewed in context, neither statement can be fairly characterized either as particularly specific or of great magnitude. Each statement was but a brief point about one aspect of the integration, made in the midst of a wide-ranging discussion.

Finally, the lead plaintiff briefly argues that Gorevic acted recklessly because he had a duty to monitor the integration of the sales teams. But the SAC does not plead that Gorevic had any specific duty to monitor sales team integration. Moreover, the lead plaintiff has not pleaded facts suggesting that the two statements by Gorevic about this particular aspect of Teladoc's integration with Livongo reflect an extreme departure from the standards of ordinary care, as would be necessary to establish scienter through recklessness.

---

Sides, DeVivo, and Shah are not alleged to have acted with fraudulent intent, they did not make the statements at issue, they are not alleged to have been "involved in the dissemination of the fraud," and other "exceedingly rare" circumstances in which the corporate scienter doctrine applies are not present here. Jackson v. Abernathy, 960 F.3d 94, 98-99 (2d Cir. 2020).

   2. Verstraete's Marketing Data and Tech Stacks
     Integration Statement

  The lead plaintiff argues that Verstraete, Teladoc's Chief
Marketing and Engagement Officer, intentionally misled investors
when she stated in November 2021, at Teladoc's Investor Day
conference, that Teladoc had "brought together and integrated
the legacy Livongo and Teladoc marketing data and tech stacks."
As explained above, the Second Circuit concluded Verstraete's
statement was misleading because, according to CW 11, a
particular software platform, Tableau, had not yet been
integrated, and Tableau was part of the "marketing data and tech
stacks" to which Verstrate was referring.  The SAC fails,
however, to plausibly plead that Verstraete made her statement
with the requisite scienter.

  There is nothing in the SAC, including the allegations of
confidential witnesses, indicating that Verstraete "had access
to contrary facts" that would alert her that the integration of
Tableau was incomplete.  <u>Novak</u>, 216 F.3d at 309.  In particular,
there is no indication that CW 11, who was the primary person
responsible for Livongo's Tableau system, ever spoke with
Verstraete, much less discussed Tableau integration with her.
CW 11 left Teladoc in June 2021, months before Verstraete made
the statement at issue.

The lead plaintiff also points to a general assessment by CW 8 that Livongo had a better data science team than Teladoc and that Verstraete, based on CW 8's observations, did not appear to be knowledgeable about Livongo products. This provides no support for a finding of scienter. The SAC does not allege, for instance, that CW 8 ever spoke with Verstraete, much less that they discussed Tableau. CW 8 worked at Teladoc as Head of Consumer Brands and Director of Growth Marketing until she left the company in December 2021. She was two reporting levels below Verstraete.

Finally, the lead plaintiff falls back, once again, on the argument that scienter can be inferred from the specificity and magnitude of Verstrate's statement. Not so. The description of "marketing data and tech stacks" as having been integrated was one remark among many made in a wide-ranging discussion during Teladoc's 2021 Investor Day. As the SAC makes clear, the term "tech stacks" refers to a range of products and not just Tableau. And while the SAC discusses the importance of Tableau to certain groups at Teladoc, it does not establish that the lack of Tableau integration was a problem of great magnitude for the company as a whole.

20

3.    Teladoc's Warning of Potential Integration Risks

The final alleged misrepresentation concerns Teladoc's description of the risks it was facing, and whether it failed to acknowledge that certain risks had already materialized.  The lead plaintiff argues that Gorevic, Murthy, and Napolitano knowingly misled investors in February 2022 when they signed Teladoc's 2021 Form 10-K, which warned of "potential difficulties we may encounter in the integration process."  This warning was followed by a list of eight categories of risks.  The Second Circuit concluded that warning investors of these "potential difficulties" was misleading because the SAC pleaded that the risks related to the integration of the two companies "had already materialized and resulted in significant disruption to Teladoc's business."  Teladoc, 2024 WL 4274362, at *5.

To analyze whether the SAC has adequately pleaded scienter with respect to this risk warning, it is first necessary to identify the particular risks within the risk warning that had already materialized, such that it was misleading to refer to them as "potential difficulties" that may arise in the future.  The SAC has not made that an easy task, and neither have the lead plaintiff's briefs.  But it is an essential task.  As the Second Circuit noted, for a statement's falsity to be "material," it must be "sufficiently specific" to be relied upon

21

so that it serves "as a guarantee of some concrete fact or outcome." Id. at *2 (citation omitted). It follows that the risk warning was misleading due at least one specific, concrete difficulty already encountered in the integration process.

This understanding is consistent with Exchange Act law regarding misleading risk disclosures. In cases in which a risk disclosure has served as a basis for liability, the plaintiff has pinpointed a precise problem that, contrary to what the risk warning suggested, had already materialized. For example, in Set Capital LLC, 996 F.3d 64, a risk warning stated that hedging activity "could" or "may" impact the prices of investment notes, but that the company had "no reason believe that it would." Id. at 86. This was misleading because three past episodes of market volatility had provided "virtual certainty" that this would happen. Id. at 85-86. Likewise, in Meyer v. Jinkosolar Holdings Co., 761 F.3d 245 (2d Cir. 2014), a warning about risks from Chinese chemical and waste regulations was misleading in light of specific problems that had already been identified in a report submitted to Chinese regulators. Id. at 248, 251-52.

To identify the SAC's relevant allegations regarding specific risks that had materialized by the time of the risk warning, the Court has reviewed both the SAC and the lead plaintiff's briefs. The SAC recites the eight categories of

risk that appeared in the 2021 Form 10-K but omits the paragraph
that introduces the risk warning.  That paragraph reminded
investors that the merger was recent and that its success
depended on management's successful integration of two large
companies, which was a complex and ongoing process.  It reads:

> On October 30, 2020, we completed the merger with
> Livongo.  The ultimate success of our merger with
> Livongo will depend in large part on the success of
> integrating the operations, strategies, technologies,
> and personnel of the two companies.  We may fail to
> realize some or all of the anticipated benefits of the
> merger if the integration process takes longer than
> expected or is more costly than expected.  Our failure
> to meet the challenges involved in successfully
> integrating the operations of the two companies or to
> otherwise realize any of the anticipated benefits of
> the merger, including additional cost savings and
> synergies, could impair our operations.  In addition,
> the overall integration of Livongo post-merger will
> continue to be a time-consuming and expensive process
> that, without proper planning and effective and timely
> implementation, could significantly disrupt our
> business.

(Emphasis supplied.)

The SAC quotes the eight risk factors that followed that
paragraph and that were given as examples of "potential
difficulties."  Those risk factors are:

- the integration of management teams, strategies,
  technologies and operations, products and services;
- the disruption of ongoing businesses and distraction
  of management from ongoing business concerns;
- the retention of and possible decrease in business
  from the existing customers of both companies;
- the creation of uniform standards, controls,
  procedures, policies and information systems;

23

- the reduction of the costs associated with each
  company's operations;
- the integration of corporate cultures and
  maintenance of employee morale;
- the retention of key employees; and
- potential unknown liabilities associated with the
  merger.

The SAC then indicates that confidential witnesses had confirmed that Teladoc was already facing challenges and difficulties associated with four of those eight risk factors: the first, third, sixth and seventh factors. The SAC states, in opaque and conclusory terms, that numerous confidential witnesses had shown that "these very problems had already materialized."

In its briefs, however, the lead plaintiff has abandoned any allegations not related to the first risk category. For instance, its November 17, 2023 brief to the Second Circuit stated that the risks that had already materialized "includ[e] specifically" the first category.[5]

But, of course, it cannot be that all the risks covered by the broadly worded, multifaceted first risk category had already materialized, and the FAC does not so allege. After all, there could be no reasonable expectation that the integration process

---

[5] Its March 3, 2023 brief in opposition to the 2023 motion to dismiss did not identify any specific basis for this portion of its claim; it simply asserted in general terms that integration problems had materialized.

in this recent, complex merger was complete and that all
problems associated with the first category of risks -- the
integration of management teams, strategies, technologies and
operations, products and services -- were already apparent by
February of 2022.  Moreover, as noted above, the paragraph
introducing the risk warning acknowledged that the integration
process was ongoing.

Construing the lead plaintiff's brief in opposition to the
instant motion to dismiss generously, it could be read to
contend that the following three integration problems covered by
the Form 10-K's risk disclosures had materialized by February
28, 2022: (1) sales team integration problems; (2) delays in
Tableau integration; and (3) delays in Salesforce integration.
The allegations of scienter for each of these issues are
addressed in turn.[6]

i.   Sales Team Integration

The sales team integration problems are the same problems
that rendered Gorevic's two statements regarding the "full
integration" of the sales teams misleading.  As discussed above,
the lead plaintiff has not adequately pleaded Gorevic's scienter

---

[6] This discussion assumes that these three issues are
sufficiently identified in the first risk category to support a
securities fraud claim.  Usually, as already explained, the risk
disclosure would be more concrete and map onto the problem that
had already materialized more precisely.

with respect to those two statements.  For the same reasons, the
SAC has not adequately alleged that Gorevic had enough knowledge
of that problem with respect to the risk warning in the 2021
Form 10-K.  The SAC offers no meaningful allegations that Murthy
or Napolitano had any awareness of these problems.

### ii.  Tableau Integration

The delay in Tableau integration has already been discussed
as well, as that is what rendered Verstraete's statement about
the integration of "marketing data and tech stacks" misleading.
For the reasons already explained, the SAC failed to plead
Verstraete's scienter regarding that statement.  It also offers
no meaningful allegations indicating that Gorevic, Murthy, or
Napolitano had awareness of problems regarding Tableau.

### iii. Salesforce Integration

The SAC alleges that Teladoc and Livongo stored sales data
in their Salesforce systems, and that the integration of their
Salesforce systems was still in the early stages as of spring
2022.  But, once again, the SAC offers no meaningful allegations
indicating that Gorevic, Murthy, or Napolitano had awareness of
that integration issue.  The lead plaintiff argues that Gorevic
"plausibly would have known" that Salesforce integration was
behind schedule "given the importance of such sales data systems
to Teladoc's operations."  But the lead plaintiff's burden is to

26

plead scienter with particularity, and merely referring to a
possibility that Gorevic might have known about Salesforce
integration delays is not sufficient.

    4.  Core Operations

As a final argument in support of its assertion that each
of the defendants acted with the requisite scienter, the lead
plaintiff relies on the core operations doctrine to "supplement"
the SAC's allegations.  Even if the Court were to adopt the core
operations doctrine, it would be of no assistance to the lead
plaintiff.  While the overall integration with Livongo would
certainly be part of Teladoc's core operations, the SAC's
allegations do not permit a finding that the more specific
subjects that are the basis of the misrepresentations that
remain at issue in this case, such as sales team and Tableau
integration, were so central to the integration process that
knowledge of them can be inferred to fill the gap in the SAC's
pleading of scienter.

B.  Motive and Opportunity

The lead plaintiff claims the SAC adequately alleges that
Gorevic, Verstraete, and Murthy had a motive to commit fraud
based on their stock sales.  It does not.

Insider stock trades must be "unusual" to raise an
inference of bad faith or scienter.  Arkansas Pub. Emps. Ret.

27

<u>Sys. v. Bristol-Myers Squibb Co.</u>, 28 F.4th 343, 355 (2d Cir. 2022) (citation omitted).  The factors to consider in determining whether trading activity is unusual "include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  <u>Id.</u> (citation omitted).

The sales by Gorevic, Verstraete, and Murthy were not unusual or suspicious when viewed in context.  These defendants increased, rather than decreased, their overall ownership of Teladoc stock during the Class Period.  The Forms 4 submitted by the defendants, of which the Court may take judicial notice, show that almost all their sales that were not pursuant to Rule 10b-1 plans were made to cover tax obligations.  Such sales are not suspicious, and do not contribute to an inference of scienter.  Moreover, Gorevic and Verstraete had made even greater sales during the Control Period than during the Class Period, which renders their stock sales during the Class Period "less unusual."  <u>New Eng. Carpenters</u>, 122 F.4th at 49.

The lead plaintiff principally emphasizes that Gorevic's sales yielded almost $30 million in profit.  But twenty-two of Gorevic's twenty-six sales were made pursuant to Rule 10b-1 plans that Gorevic entered before the class period.  Such sales are not suspicious and do not contribute to an inference of

improper motive.  See Arkansas Pub. Emps. Ret. Sys., 28 F.4th at
355-56.  While the lead plaintiff argues that the use of Rule
10b5-1 plans only provides an affirmative defense, that is not
correct.  Such plans may be considered when analyzing scienter
on a motion to dismiss.  See, e.g., id.

The lead plaintiff attempts to account for the fact that
Gorevic and Verstraete made greater sales during the Control
Period by arguing that the Covid-19 pandemic had a unique effect
of increasing Teladoc's stock price, leading to a peak in early
2021.  The SAC states in conclusory terms that Gorevic and
Verstraete "knew such unprecedented demand was short-lived and
would end once vaccines were widely rolled out and people
returned to in-person routines."  But the SAC does not provide
any basis to find that Gorevic and Verstraete took that view.
Moreover, the SAC does not demonstrate that the peak stock price
in early 2021 was confined to the Control Period, which ended in
February 2021.  Instead, that peak appears to have straddled the
end of the Control Period and the beginning of the Class Period.

Finally, the lead plaintiff suggests that sales by other
Teladoc insiders support scienter, noting that twelve insiders
sold almost $160 million worth of shares during the Class
Period.  But the SAC does not adequately allege that these sales
were unusual or suspicious.  For example, the lead plaintiff

points to Livongo's founder and its COO making sales shortly
before their departures from Teladoc in 2021, but does not
explain why it should be considered suspicious for departing
executives to divest their shares.

In sum, a holistic assessment of the SAC's allegations
demonstrates that it fails to plead scienter for any of the
defendants.  The pleadings support neither an inference of
conscious misbehavior or recklessness, nor an inference of
motive and opportunity to commit fraud.[7]

III. Request for Leave to Amend

The lead plaintiff requests that, if the renewed motion to
dismiss is granted, it be given leave to amend the SAC.
Although a request for leave to amend should be "freely give[n]
when justice so requires," Fed. R. Civ. P. 15(a)(2), "a district
court may decline to grant such leave for good reason, including
futility, bad faith, undue delay, or undue prejudice to the
opposing party."  Miller v. United States ex rel. Miller, 110
F.4th 533, 550 (2d Cir. 2024) (citation omitted).  Additionally,
a plaintiff "need not be given leave to amend if it fails to

---

[7] Because the SAC does not adequately allege a primary violation
under § 10(b) and Rule 10b-5, it also does not plead control
person liability.  See In re Philip Morris Int'l Inc. Sec.
Litig., 89 F.4th at 429.

specify how amendment would cure the pleading deficiencies in its complaint." Id. at 550-51 (citation omitted).

The lead plaintiff's request to amend is denied. The lead plaintiff has not identified how amendment would address the deficiencies in the SAC, nor has it attached a proposed amended complaint. The lead plaintiff was warned before filing the SAC that it would likely not have a further opportunity to amend the complaint, and it has not shown that this warning should be ignored. For instance, it has not identified any argument that could not have been anticipated from the arguments the defendants made in their original motion.

## Conclusion

The defendants' November 22, 2024 motion to dismiss is granted. The Clerk of Court shall enter judgment for the defendants and close the case.

Dated:      New York, New York
            March 21, 2025

                                   _____
                                          DENISE COTE
                              United States District Judge